**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEANNETE BRAUN, BRAUN IP LAW, LLC, & LAUREN PROPSON, | ) ) | |
| Plaintiffs, | ) ) | Case No. 23 C 16856 |
| v. | ) ) | |
| | ) | |
| REBEKAH M. DAY NEE BOX, KC THE OWNER & OPERATOR OF THE ONLINE SOCIAL MEDIA ACCOUNT @CAFFINATEDKITTI, LILY MARSTON, & JESSICA VAZQUEZ | ) ) ) ) ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT KC THE OWNER AND OPERATOR OF THE SOCIAL MEDIA ACCOUNT @CAFFINATEDKITTI'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF HER SPECIAL MOTION TO STRIKE PURSUANT TO O.C.G.A. § 9-11-11.1, OR, IN THE ALTERNATIVE, MOTION TO DISMISS PURSUANT TO FED. R. CIV. PROC. 12(B)(6) & 12(B)(3)**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.      INTRODUCTION .............................................................................………1

II.     BACKGROUND .........................................................................................2

        A.      Case Background ...........................................................................2

        B.      Defendant KC's Alleged Defamatory Statements Regarding Propson ....................3

        C.      Defendant KCs Alleged Defamatory Statements Regarding Braun ........................5

III.    ARGUMENT ..............................................................................................6

        A.      Plaintiffs' Claims Should Be Stricken Under the Georgia Anti-SLAPP Statute ......6

                1.      The Georgia Anti-SLAPP Statute Applies in this Case ................................6

                2.      KC's Statement Constitute a "Protected Activity" Under the Georgia Anti-SLAPP Statute………………………………………………………………...8

                3.      There is No Probability That Plaintiff's Can Prevail on Their Claims Because They Are Legally Insufficient ..........................................................................12

                a.      Braun Cannot Prevail on her Defamation Claim .........................................13

                b.      Propson Cannot Prevail on her Defamation Claim .....................................17

                c.      Plaintiffs Cannot Prevail on Their False Light and Trade Libel Claims .....21

                d.      Plaintiffs Cannot Prevail on Their Tortious Interference Claims...............21

                e.      Propson Cannot Prevail on Her Intentional Infliction of Emotional Distress Claim          ………………………………………………………….................24

        B.      Alternatively, Plaintiffs' Claims Should Dismissed Under Fed. R. Civ. P. 12(b)(6) ...................................................................................................25

        C.      Alternatively, Propson's Claims Should Dismissed Under Fed. R. Civ. P. 12(b)(3) as Her Claims Have Zero Nexus to Illinois ................................................26

IV.     CONCLUSION ........................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Am. Civil Liberties Union, Inc. v. Zeh,*
    312 Ga. 647 (2021) ...................................................................................8, 12

*Amin v. NBCUniveral Media, LLC,*
    2022 WL 16964770 (S.D. Ga. Nov. 16, 2022) ....................................8, 9

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) .................................................................................13

*Barnwell v. Trivedi,*
    366 Ga.App. 168 (2022) ...............................................................................9

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................13, 23, 24

*Brennan v. Kadner,*
    351 Ill.App.3d 963 (2004) ....................................................................13, 17

*Buckley v. DIRECTTV, Inc.*
    276 F.Supp.2d 1271 (N.D. Ga. 2003) .......................................................10

*Chi v. Loyola Univ. Med. Ctr.,*
    787 F.Supp.2d 797 (N.D. Ill. 2011) ...........................................................7

*Clark v. McDonald's Corporation,*
    2023 WL 2648467 (S.D. Ill., Mar. 27, 2023) .........................................25

*Colborn v. Netflix Inc.,*
    661 F.Supp.3d 838 (E.D. Wis. 2023).........................................................18

*Cross v. Cooper,*
    197 Cal.App.4th 357 (2011) .......................................................................10

*Doctor's Data, Inc. v. Barrett,*
    170 F.Supp.3d 1087 (N.D. Ill. 2016) ........................................................15

*Duct-O-Wire Co. v. U.S. Crane, Inc.,*
    31 F.3d 506 (7th Cir. 1994) .......................................................................23

*Equity Prime Mortgage v. Greene for Congress, Inc.,*
    366 Ga.App. 207 (Ga. Ct. App. 2022) .......................................................9

*Foseid v. State Bank of Cross Plains,*
    541 N.W.2d 203 (Wis. Ct. App. 1995) ......................................................22

*Green v. Rogers,*
    234 Ill.2d 478 (2009) .................................................................................14, 20

*Hackman v. Dickerson Realtors, Inc.,*
    557 F.Supp.2d 938 (N.D. Ill. 2008) .....................................................23, 24

*Harrison v. Chicago Sun-Times, Inc.,*
    341 Ill.App.3d 555 (2003) .............................................................................19

*Haynes v. Alfred A. Knopf, Inc.,*
    8 F.3d 1222 (7th Cir. 1993) ..........................................................................17

*Hopewell v. Vitullo,*
    299 Ill.App.3d 513 (1998) .............................................................................16

*Huon v. Breaking Media, LLC,*
    75 F.Supp.3d 747 (N.D. Ill. 2014) ...............................................................24

*Huon v. Denton,*
    841 F.3d 733 (7th Cir. 2016) ...........................................................19, 20, 24

*Intercon Solutions, Inc. v. Basel Action Network,*
    969 F.Supp.2d 1026 (N.D. Ill. 2013) .............................................................7

*Johnson v. Cordtz,*
    366 Ga.App. 87 (2022) ..................................................................................11

*Kamelgard v. Macura,*
    585 F.3d 334 (7th Cir. 2009) ..................................................................13, 17

*Kaminske v. Wisconsin Cent. Ltd.,*
    102 F.Supp.2d 1066 (E.D. Wis. 2000) ..........................................................18

*Kennedy v. Children's Service Soc. Of Wisconsin,*
    17 F.3d 980 (7th Cir. 1994) ..........................................................................20

*Kibler v. Northern Inyo County Local Hospital Dist.,*
    39 Cal.4th 192 (2006) ...................................................................................11

*La Liberte v. Reid,*
    966 F.3d 79 (2d Cir. 2020)............................................................................20

*Laker v. Board of Trustees of California State University,*
    32 Cal.App.5th 745 (2019) ...........................................................................11

*Lane Dermatology v. Smith,*
    861 S.E.2d 196 (Ga. Ct. App. 2021)...............................................................9

*Laughland v. Beckett,*
    365 Wis.2d 148 (2015) ........................................................................................19

*Law Offices of David Freydin, P.C. v. Chamara,*
    24 F.4th 1122 (7th Cir. 2022) ..........................................................................20

*Liebe v. City Finance Co.,*
    98 Wis.2d 10 (Ct. App. 1980) ..........................................................................22

*Madison v. Frazier,*
    539 F.3d 646 (7th Cir. 2008) ...........................................................................21

*Milkovich v. Lorain Journal,*
    497 U.S. 1 (1990) ..............................................................................................19

*Moriarty v. Greene,*
    315 Ill.App.3d 225 (2000) ...............................................................................17

*Osundairo v. Geragos,*
    447 F.Supp.3d 727 (N.D. Ill. 2020) .........................................7, 12, 14, 15, 19, 20

*Parish v. City of Elkhart,*
    614 F.3d 677 (7th Cir. 2010) ...........................................................................13

*Patterson v. World Wrestling Ent., Inc.,*
    2005 WL 8162784 (E.D. Wis. Feb. 8, 2005) ...................................................18

*Planned Parenthood Fed'n of Am., Inc. v. Center for Medical Progress,*
    890 F.3d 828 (9th Cir. 2018) ...........................................................................12

*Quinn v. Jewel Food Stores, Inc.,*
    276 Ill.App.3d 861 (1995) ...............................................................................21

*Rivera v. Allstate Insurance Company,*
    189 N.E.3d 982 (Ill. App. Ct. 2021) ...............................................................21

*Rosser v. Clyatt,*
    348 Ga.App. 40 (2018) ....................................................................................10

*Roumann Consulting Inc. v. Symbiont Construction, Inc.,*
    2019 WL 3501527 (E.D. Wis., Aug. 1, 2019) .................................................23

*Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,*
    681 F.Supp. 1297 (N.D. Ill. 1988) ..................................................................25

*Solaia Tech., LLC v. Specialty Pub. Co.,*
    221 Ill.2d 558 (2006) .......................................................................................16

*Tamburo v. Dworkin,*
    974 F.Supp.2d 1199 (N.D. Ill. 2013) ................................................................16

*Terry v. Journal Broadcast Corp.,*
    351 Wis.2d 479 (Wis. Ct. App. 2013) .....................................................20, 21, 24

*Townsend v. Sears, Roebuck & Co.,*
    227 Ill.2d 147 (2007) .......................................................................................13, 17

*Underground Sols., Inc. v. Palermo,*
    41 F.Supp.3d 720 (N.D. Ill. 2014) ....................................................................7

*Wagner v. Allen Media Broad.,*
    2024 WL 63689 (Wis. Ct. App. Jan. 5, 2024) ...................................................18

*Westbrook v. Ulrich,*
    90 F.Supp.3d 803 (W.D. Wis. 2015) ............................................................18, 19

*Wilkes & McHugh, P.A. v. LTC Consulting, L.P.,*
    306 Ga. 252 (2019) ..........................................................................................8, 10

## **STATUTES**

17 U.S.C. § 512(c)(3) ...........................................................................................11

28 U.S.C. § 1391(b) .............................................................................................25

28 U.S.C. § 1406(a) .............................................................................................26

Fed. R. Civ. P. 8 ............................................................................................18, 23

Fed. R. Civ. P. 12(b)(3) ....................................................................................2, 26

Fed. R. Civ. P. 12(b)(6) ..........................................................................1, 12, 25, 26

O.C.G.A. § 9-11-11.1 ..................................................................................8, 9, 10, 11

O.C.G.A. § 9-11-11.1(b)(1) .......................................................................8, 12, 13, 25, 26

O.C.G.A. § 9-11-11.1(c)(2) ..............................................................................11, 12

O.C.G.A. § 9-11-11.1(c)(3)(4) ............................................................................9, 12

## **OTHER**

14D Fed. Prac. & Proc. Juris. 3d § 3827 ..........................................................26

## I.     INTRODUCTION

At its core, this action is an attempt by an alleged well-known social media influencer with "millions" of followers - and her lawyer - to silence an individual who has voiced opinions about them on social media with which they disagree. While Plaintiff Lauren Propson ("Propson") and her lawyer Jeanette Braun/Braun IP Law (collectively, "Braun") may not like what Defendant KC the owner and operator of the social media account @CaffinatedKitti (hereafter, "KC") has to say about them on Tik Tok, the allegations of the Complaint reveal that KC's alleged statements are nothing more than her opinion, her subjective beliefs, and, at worst, hyperbolic name-calling – ***they are not actionable as defamation as a matter of law***.   Not one of the alleged "defamatory statements" is a verifiable statement of fact. Not only do these statements *not* constitute defamation under the applicable substantive state law, but – importantly – they fall within the scope of "protected activity" under the Georgia anti-SLAPP statute, which governs Georgia speakers such as KC (who the Complaint alleges is a resident of Georgia).   Put simply, this case is nothing more than a joint and inappropriate attempt by a lawyer and her client to bully and intimidate an individual for speaking her mind and exercising her First Amendment rights.   Indeed, the Complaint itself reveals the lengths to which Plaintiffs will go to harass KC for voicing her opinions, namely, calling the local police in Georgia and sending them to conduct a wholly fabricated "wellness check" on KC.

Because Plaintiffs' allegations of defamation are based on statements that are a "protected activity" under Georgia anti-SLAPP law ***and*** are legally deficient and nonactionable, the Georgia anti-SLAPP statute mandates that all nine causes of action asserted by Plaintiffs against KC (all of which arise out of the alleged defamatory statements) be stricken and attorneys' fees awarded to KC.   Alternatively, KC respectfully requests that this Court dismiss all nine causes of action

1

asserted against her for failure to state a claim under Fed. R. Civ. P. 12(b)(6) given that, as explained below, all of the claims rely on alleged defamatory statements that simply are not actionable under applicable law. Alternatively, and at a minimum, Propson's claims against KC – which are curiously joined with Braun's claims – should be dismissed under Fed. R. Civ. P. 12(b)(3) for improper venue because Propson is a Wisconsin resident, KC is a Georgia resident, and this venue has no nexus to, involvement with, or interest in the adjudication of Propson's claims.

## II. BACKGROUND

### A. Case Background.

Plaintiff Lauren Propson ("Propson") is social media personality and Plaintiff Jeanette Braun – through Plaintiff Braun IP Law, LLC (collectively, "Braun") – is her lawyer. (Complaint Dkt. 1 ("Compl.")). Propson is a licensed mortician residing in Wisconsin (*id.,* ¶ 4), who operates a social media account on Tik Tok under the name "Lauren the Mortician." (*Id.*, ¶¶ 13, 15). Propson alleges that she has "amassed millions of followers" on Tik Tok, as well as sponsorships and monetization of the videos she posts of Tik Tok, including a "brand partnership with a famous documentary channel." (*Id.,* ¶¶ 15-16). Propson alleges that her "lighthearted and educational videos" posted on Tik Tok "discuss death, the loss of loved ones, and demystify occupations and professions that work with deceased persons." (*Id.*, ¶ 14).

Propson hired Braun, a lawyer, to "assist with her copyright infringement claims by filing a Digital Millennium Copyright Act ("DMCA") complaint to social media platforms hosting a video" created by one of the defendants, who the Complaint names as "KC the owner and operator of the social media account @CaffinatedKitti" (hereafter referred to as "KC"). (*Id.,* ¶ 32). The Complaint alleges that KC is a "social media personality," and is a citizen and resident of Georgia.

(*Id.,* ¶¶ 6, 17). The Complaint alleges that Braun, who resides and is licensed to practice law in Illinois (*id.,* ¶¶ 2-3), filed a DMCA complaint with the social media company Meta on behalf of Propson to remove from Facebook a post created by KC on the ground that KC's post used Propson's copyrighted material. (*Id.,* ¶ 33). The Complaint alleges that Meta approved the DMCA removal request filed by Braun on behalf of Propson, and it removed KC's post from Facebook on November 4, 2023. (*Id.,* ¶¶ 33-36). Propson has not asserted any allegations of copyright infringement against KC in connection with her alleged use of copyrighted material in her Facebook post. Rather, this action is based on allegations that KC posted videos on another social media platform, Tik Tok, in which she made alleged defamatory statements about Propson and Braun. Based on these alleged defamatory statements, Propson and Braun both assert claims for defamation, false light, and trade libel against KC. In addition, Propson asserts claims for tortious interference with contract and intentional infliction of emotional distress against KC, and Braun asserts a claim for tortious interference with business relationships against KC.

**B.      Defendant KC's Alleged Defamatory Statements Regarding Propson.**

Propson alleges that on or around October 24, 2023, KC published a video on Tik Tok and identified her by "her public persona 'Lauren the Mortician'" ("10/24/23 Tik Tok Post") (*Id.,* ¶ 19; Link: https://www.tiktok.com/@caffinatedkitti/video/7293290351555513642). The Complaint contends that in the 10/24/23 Tik Tok Post, KC "accused [] Propson of being 'transphobic' and a 'TERF' because she liked posts by a social media personality, who is in a gay relationship." (*Id.,* ¶ 20). The Complaint alleges that "TERF" is a "derogatory slur," "highly offensive term," and "acronym standing for 'Trans-Exclusionary Radical Feminist' which is a term used to refer to or describe 'an advocate of radical feminism who does not believe that transgender people's identities are legitimate, and who is hostile to the inclusion of trans women in the feminist movement." (*Id.,*

¶¶ 21-22).  The Complaint then sets forth "screenshots" from the 10/24/23 Tik Tok Post in which Plaintiffs allege that "Defendant KC accuses Ms. Propson of being a 'TERF' and 'transphobic.'" (*Id.,* ¶ 23).  One of the screenshots depicts a picture of KC with the text "Lauren the Mortician is a Terf."  (*Id.*)  The other screenshot is a depicts a picture of KC with the text "Unfriendly reminder: we see Transphobic so we're saying transphobic. That ain't bullying – it's an astute observation. – boondocks2014" and "bi people can be transphobic." (*Id.*) Neither of the screenshots depict any text stating that Propson is "transphobic."  (*Id.*)

Propson allege that "[i]n explaining her reasons for her accusations, Defendant KC stated that she was not accusing Ms. Propson of being transphobic because Ms. Propson has a larger fan base and following, but because people were confusing Ms. Propson's 'Lauren the Mortician' persona with Defendant KC's "@CaffinatedKitti' persona." (*Id.,* ¶ 24).  The Complaint further alleges that in the 10/24/23 Tik Tok Post, KC also "announced that she compiled a list of links to posts that Ms. Propson 'liked' [that] contained 'transphobic and hateful rhetoric.'"  (*Id.,* ¶ 25). The Complaint depicts another screenshot of the 10/24/23 Tik Tok Post that depicts a picture of KC over the background of a social media account profile for an individual named "Anthony Ramondi" under the profile name "conservativeant", which indicates that "Lauren the Mortician" follows the "conservativeant" account. (*Id.*)   The screenshot further depicts a comment from KC stating that "I'm not one for Drama but when I'm getting confused for someone it becomes my business. And I value being thorough when it comes to addressing any accusation against someone else. Is it too much to ask that people hate me for who 'I' am? Anyway, take my information and do your own research if you'd like – but refusing to address 'why' hateful content is so likeable smells like cowardice to me. I'll post my link in the comments for y'all, but do NOT comment on this guy's (derogatory) stuff, it is rage bait for a reason . . . ." (*Id.*)  The Complaint alleges that

"[u]pon information and belief, none of the videos Defendant KC linked contain transphobic and hateful rhetoric" and "upon information and belief, Defendant KC's motive and intent behind these posts were to tarnish and damage Ms. Propson's reputation." (*Id.,* ¶ 26).

When viewed in its entirety, it is apparent that the statements made by KC in the 10/24/23 Tik Tok Post are limited to statements by KC that Propson actively follows and "likes" social media posts that contain "transphobic" and "hateful" rhetoric (*see* Request for Judicial Notice ("RJN"), Exh. 1 (transcription of 10/24/23 Tik Tok Post)), and because KC finds such rhetoric offensive, she does not want people on social media to confuse her for Propson or her "Lauren the Mortician" persona. Nowhere in the 10/24/23 Tik Tok Post does KC state that Propson or "Lauren the Mortician" *is* transphobic or has made specific transphobic statements herself, rather, only that she has "liked" posts by other individuals who have made transphobic statements. (*Id.*) Nowhere in the Complaint do Plaintiffs allege that Propson has ***not*** "liked" these posts or followed these individuals on social media. (*See* Complaint, Dkt. 1). Moreover, nowhere in the Complaint do Plaintiffs allege any facts demonstrating that any statements made by KC in the 10/24/23 Tik Tok Post are false. (*See* Complaint, Dkt. 1).

### C.    Defendant KC's Alleged Defamatory Statements Regarding Braun.

As stated above, Propson hired Braun to file a DMCA copyright complaint with Meta regarding KC's alleged use of Propson's copyrighted material in a post on Facebook (*not* Tik Tok), which Meta approved. (Compl., ¶¶ 32-36). The Complaint alleges that KC then "used her social media accounts to express her anger and resentment" of Braun. (*Id.,* ¶ 40). Specifically, Plaintiffs allege that on November 21, 2023, KC "posted a video accusing Ms. Propson of using Attorney Braun to file bad faith copyright claims with social media platforms" and in the same video, KC accused Braun of "filing bad faith copyright strikes against Defendant KC." (*Id.,* ¶¶ 42-43).

Plaintiffs allege that KC posted the *same video again* on Tik Tok on November 25, 2023. (Both Tik Tok posts are collectively referred to as the "11/23 Tik Tok Posts")[1] (*Id.,* ¶ 45).  Contrary to the allegations in the Complaint, nowhere in the 11/23 Tik Tok Posts does KC state that Braun filed "bad faith" or "false" copyright claims or strikes against KC.  (RJN, Exh. 2 (transcription of 11/23 Tik Tok Posts)). To the contrary, KC does not even discuss the copyright strike for most of the video; rather, KC describes how Braun called the police and sent them to KC's home in Georgia to conduct a "wellness check," as well as how Braun sent KC a cease and desist letter on which Braun copied KC's mother and a theater company with which KC is not even affiliated. (*Id.*)

Plaintiffs further allege that on November 21, 2023, KC "created a page on the donation platform called GoFundMe," and posted on this page a portion of a cease and desist letter that KC received from Braun. (*Id.,* ¶¶ 47-48).  The Complaint alleges that on December 8, 2023, KC published on the GoFundMe page her email response to Braun, and "falsely claiming [sic] that Attorney Braun filed a 'false copyright claim' and that she was a fan of Lauren the Mortician and was not actually retained to be Ms. Propson's attorney." (*Id.,* ¶ 49). The Complaint sets forth a screenshot of the GoFundMe page update from December 8, 2023, that reflects KC's email response to Braun regarding allegations of copyright infringement.  It states, in relevant part, that KC would "love further details on [Braun's] client and how the video had grounds for a copyright strike, as it clearly falls under fair use . . . I do understand how you have reached out with cease and desist to smaller content creators speaking negatively about Lauren the Mortician's scandals, and while I understand your desire to protect a creator you enjoy – if you were not legally obtained as counsel for her and I speak on this via my platform, your actions are going to cause her significantly more strife . . . ."  (Compl., ¶ 51).

---

[1] Link to 11/23 Tik Tok Posts: https://www.tiktok.com/@caffinatedkitti/video/7304065297856613675?lang=en

III.    ARGUMENT

    A.    **Plaintiffs' Claims Should Be Stricken Under the Georgia Anti-SLAPP Statute.**

        1.    **The Georgia Anti-SLAPP Statute Applies in this Case.**

"In the case of an anti-SLAPP statute raised as a defense to a defamation claim, the choice-of-law question regarding the anti-SLAPP law is treated separately from whether a statement is defamatory because the anti-SLAPP question involves whether a statement is privileged, not whether its content is defamatory." *Osundairo v. Geragos,* 447 F.Supp.3d 727, 743 (N.D. Ill. 2020) (internal quotations omitted) (citing *Underground Sols., Inc. v. Palermo*, 41 F. Supp. 3d 720, 722 (N.D. Ill. 2014) (citing *Chi v. Loyola Univ. Med. Ctr.*, 787 F.Supp.2d 797, 803 (N.D. Ill. 2011)). Pursuant to dépeçage, the Court can apply different states' laws to different elements of the lawsuit. *See Underground Sols.,* 41 F. Supp. 3d at 722.  Although the place of alleged injury might be critical in determining the law applicable to the defamation claim, the choice of law for anti-SLAPP protection involves different interests – namely, protecting the speaker's exercise of First Amendment rights – and could lead to the application of different state law. *See Underground Sols.*, 41 F. Supp. 3d at 722; *Chi*, 787 F. Supp. 2d at 803.  "In determining which law to apply to defenses raised pursuant to anti-SLAPP statutes, courts have found the place where the allegedly tortious speech took place and the domicile of the speaker central to the choice-of-law analysis." *Intercon Solutions, Inc. v. Basel Action Network,* 969 F.Supp.2d 1026, 1035 (N.D. Ill. 2013), *aff'd* 791 F.3d 729 (7th Cir. 2015) (applying Washington's anti-SLAPP statute when defendants were citizens of the State of Washington and their allegedly defamatory speech, though eventually published in Illinois and on the Internet, originated in that state).  Here, the Complaint alleges that KC is a "citizen and resident of the State of Georgia" (Compl., ¶ 6), and there is no allegation that the alleged defamatory speech (while eventually published on social media and the Internet)

originated anywhere other than Georgia.  Thus, Georgia has a strong interest in protecting KC's speech and the Georgia anti-SLAPP law applies to Plaintiffs' claims against her. *See Osundairo,* 447 F.Supp.3d at 743; *Underground Sols.*, 41 F. Supp. 3d at 725; *Chi*, 787 F. Supp. 2d at 803; *see also Amin v. NBCUniversal Media, LLC,* 2022 WL 16964770, at *7 (S.D. Ga. Nov. 16, 2022) (holding that the Georgia anti-SLAPP statute "does not directly conflict with a Federal Rule of Civil Procedure and, thus, is substantive and can apply in federal court").

### 2. KC's Statements Constitute a "Protected Activity" Under the Georgia Anti-SLAPP Statute.

Under Georgia law, the analysis of an anti-SLAPP motion to strike involves two steps. *See Am. Civil Liberties Union, Inc. v. Zeh,* 312 Ga. 647, 650 (2021) (citing *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 261 (2019)). First, the court must decide whether the party filing the anti-SLAPP motion "has made a threshold showing that the challenged claim is one 'arising from' protected activity." *Wilkes,* 306 Ga. at 262 (quoting OCGA § 9-11-11.1 (b) (1)). If so, the court must then "decide whether the plaintiff 'has established that there is a probability that the [plaintiff] will prevail on the claim." *Wilkes*, 306 Ga. at 262 (quoting OCGA § 9-11-11.1 (b) (1)).  A "protected activity" under O.C.G.A. § 9-11-11.1 (b) (1) is one "which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern."  *See* Ga. Code Ann. § 9-11-11.1(b)(1).  The code section defines an "act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" to include: "[a]ny written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law", "[a]ny written or oral statement

or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern", or "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern." *See Barnwell v. Trivedi*, 366 Ga.App. 168, 170–171 (2022) (citing OCGA § 9-11-11.1). The statute "is intended to protect persons exercising their constitutional rights of petition and freedom of speech. To accomplish this goal, the statute is to be construed broadly." *Id.*

With respect to both Plaintiffs claims against KC, there can be no question that they are based on statements made by KC "in a public forum" "in connection with a public issue or an issue of public concern." *See* OCGA § 9-11-11.1(c)(3)(4). The Complaint alleges that the statements were made in videos posted on social media platforms, including Tik Tok, as well as on an online donation platform called GoFundMe. (Compl., ¶¶ 19, 42-51). The Complaint also alleges that the videos containing the alleged defamatory statements were viewed "approximately 928,000 times" and "over 263,000" times. (*Id.,* ¶¶ 44-45). Social media and online platforms are considered "public forums" for purposes of anti-SLAPP statutes. *See e.g., Equity Prime Mortgage v. Greene for Congress, Inc.,* 366 Ga.App. 207, 216 (Ga. Ct. App. 2022) (holding that statements made on social media fell within scope of OCGA § 9-11-11.1).

"To determine whether an issue is an 'issue of public concern' under the statute, courts consider 'whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occurred in the context of an ongoing controversy, dispute or discussion, or affected a community in a manner similar to that of a governmental entity.'" *Amin v. NBCUniversal Media, LLC,* 2022 WL 16964770, at *6 (S.D. Ga., Nov. 16, 2022) (citing *Lane Dermatology v. Smith*, 861 S.E.2d 196, 204 (Ga. Ct. App. 2021). "[A]n issue of public interest' ... is any issue in which the public is

interested. In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." *See Cross v. Cooper,* 197 Cal.App.4th 357, 373 (2011), *as modified on denial of reh'g* (Aug. 4, 2011) (citation omitted).[2]

*As to Propson's claims*, the Complaint alleges that Propson maintains a famous social media persona with "millions of followers" on Tik Tok, as well as sponsorships and a brand partnership with a famous documentary channel (Compl., ¶¶13-16); thus, she certainly is in the "public eye". The Complaint also alleges that KC explained that her statements were made as the result of confusion between KC and Propson by social media followers, and KC did not want to be confused with a social media persona (with millions of followers) who "liked" "transphobic and hateful rhetoric." (*Id.,* ¶¶ 24-25). Thus, the public issue implicated by KC's alleged statements is the confusion between two social media personas who are undoubtedly in the public eye, one of which has "liked" and "followed" other social media personas whose content contains "transphobic" and "hateful rhetoric." Whether Propson, who has "millions" of social media followers for her "educational videos" about "death" and the "loss of loved ones", likes and follows other social media personalities who post "transphobic and hateful rhetoric" is certainly a matter of public interest, particularly when the public is confusing KC and Propson. *Rosser v. Clyatt,* 348 Ga.App. 40, 44 (2018) (holding that statements made regarding former president of a corporation in connection with a controversy that would affect the more than 13,000 members of the corporation "is of legitimate public concern") (citing *Buckley v. DIRECTV, Inc*., 276 F.Supp.2d 1271, 1275 (N.D. Ga. 2003) ("Any action involving such a large number of people is, by definition, a matter of public interest and concern")).

---

[2] Georgia courts have expressly looked to California case law interpreting the California anti-SLAPP statute for guidance in interpreting OCGA § 9-11-11.1, given that the California anti-SLAPP statute is "very similar to the text of Georgia's revised anti-SLAPP statute." *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 258 (2019).

*As for Braun's claims against KC*, they are also based on "protected activity" by KC. Namely, Braun's allegations are based on purported statements that KC accused Braun of filing a "bad faith" copyright strike or complaint under the DMCA against KC, *i.e.*, the filing of the DMCA copyright strike/complaint was unfounded or "in bad faith" because KC's use of Propson's alleged copyrighted material constituted "fair use." (Compl., ¶¶ 43, 49, 51). As explained above, OCGA § 9-11-11.1 provides that "[a]ny written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, *or any other official proceeding authorized by law*" is deemed a "protected activity" under the Georgia anti-SLAPP statute. *See* OCGA § 9-11-11.1(c)(2) (emphasis added). This statute creates "an expansive definition of protected speech" that includes "*any statement made in connection with an issue under consideration by any official proceeding*." *Johnson v. Cordtz*, 366 Ga.App. 87, 91 (2022) (emphasis added). The filing of a complaint or copyright strike under the DMCA constitutes an "official proceeding" as it is expressly "authorized by law." *Kibler v. Northern Inyo County Local Hospital Dist.*, 39 Cal.4th 192, 200 (2006), as modified (July 20, 2006) (holding that hospital peer review constitutes an "official proceeding" under anti-SLAPP law because it is authorized by California Business & Professions Code section 805 *et seq.*); *see also Laker v. Board of Trustees of California State University*, 32 Cal.App.5th 745, 764 (2019) (holding that investigations by state university into employee allegations of workplace misconduct were "official proceedings authorized by law" that receive the protections of the anti-SLAPP statute because the university had statutory authority under the California Education Code to make rules governing employees and to respond to complaints of workplace misconduct). Here, the DMCA specifically authorizes and outlines the procedure for the filing of a complaint or copyright strike with an online service provider. *See* 17 U.S.C. § 512(c)(3)). Thus, it constitutes an "official

proceeding authorized by law," and KC's alleged statements made in connection with that "official proceeding" (*i.e.*, it was filed "in bad faith") is protected under the Georgia anti-SLAPP statute.

Furthermore, the statements are also protected as public statements of a public issue or public concern under OCGA § 9-11-11.1(c)(3) & (4). Again, the Complaint alleges that Propson has millions of social media followers; thus, whether she has hired an attorney to file copyright claims and/or strikes against content creators simply because they post content that Braun's clients, including Propson, do not like, is a matter of public interest and concern. *ACLU,* 312 Ga. at 650 (holding that a blog post asserting that a public defender had charged an indigent criminal defendant a fee for public defense services was a protected activity under anti-SLAPP statute). Because KC's statements are "protected activity" under OCGA § 9-11-11.1(c)(2), (3) and/or (4), KC has satisfied the first step of the anti-SLAPP inquiry as to both Plaintiffs.

### 3. There is No Probability That Plaintiffs Can Prevail on Their Claims Because They Are Legally Deficient.

Once a defendant has established that the claims asserted against it arise out of protected activity, as KC has done here, the burden then shifts to the plaintiff to demonstrate that there is a probability that the plaintiff will prevail on his or her claims. *See* Ga. Code Ann. § 9-11-11.1(b)(1). In federal district court, an anti-SLAPP motion "may be premised on legal deficiencies inherent in the plaintiff's claim, analogous to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)," and if "a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of [the anti-SLAPP statute] applies." *Planned Parenthood Fed'n of Am., Inc. v. Center for Medical Progress*, 890 F.3d 828, 834 (9th Cir. 2018), amended 897 F.3d 1224 (9th Cir. 2018); *see also Osundairo,* 447 F.Supp.3d at 744 (same). In determining whether a complaint satisfies Rule 12(b)(6), the Court accepts the facts stated in the

12

complaint as true and draws reasonable inferences in plaintiff's favor. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010). Though a complaint need not contain "detailed factual allegations, ... a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A complaint fails to state a claim "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009). Here, as explained below, Plaintiffs have failed to state facts sufficient to constitute any cause of action against KC; thus, each of the claims should be stricken under OCGA § 9-11-11.1(b)(1) and attorneys' fees under that statute should be awarded to KC. *See* OCGA § 9-11-11.1(b.1).

### a. Braun Cannot Prevail on Her Defamation Claim.

To state a claim for defamation under Illinois law,[3] a plaintiff must plead facts showing: "(1) the defendant made a false statement concerning the plaintiff; (2) there was an unprivileged publication of the defamatory statement to a third party by defendant; and (3) publication of the defamatory statement damaged the plaintiff." *Brennan v. Kadner,* 351 Ill.App.3d 963, 968 (2004). Here, the Complaint alleges that KC defamed Braun by "publicly stating that Ms. Braun filed 'false copyright lawsuits' and by 'implying that she was acting as an attorney without being hired by Lauren the Mortician'" and she "used her platform to attack [Braun's] character and reputation." (Compl., ¶ 113). The Complaint also alleges that KC stated that Braun filed "bad faith" copyright strikes against her, and that Braun was "accused of being an unethical lawyer that files frivolous copyright claims . . . ." (*Id.,* ¶¶ 42-43, 117-118). As a preliminary matter, the allegation that KC

---

[3] Under Illinois law, the law of the state where the injury occurred governs the substantive issues of the case (*Townsend v. Sears, Roebuck & Co.,* 227 Ill. 2d 147, 165 (2007)), and in the case of defamation that is the state in which the plaintiff is domiciled. *See Kamelgard v. Macura*, 585 F. 3d 334, 341-42 (7th Cir. 2009) (collecting cases).

defamed Braun by "using her platform to attack [Braun's] character and reputation," does not state a claim for defamation under Illinois law. Defamation *per se* must be pled with a "heightened level of precision and particularity. This higher standard is premised upon an important policy consideration, namely, that a properly pled defamation per se claim relieves the plaintiff of proving actual damages." *Green v. Rogers*, 234 Ill.2d 478, 495–496 (2009); *see also Osundairo,* 447 F.Supp.3d at 738–739 (holding that "plaintiffs do not identify any particular statement that forms the basis for this allegation . . . This imprecision leaves Defendants and this Court guessing as to which statements are at issue" and dismissing claims of defamation per se and false light based on allegation "for lack of specificity"). Thus, the vague allegation that KC attacked Braun's "character and reputation" without precise identification of the actual words used cannot state a claim for defamation. *Id.*

As for the allegations that KC defamed Braun by stating that Braun "files 'false copyright lawsuits'" or "bad faith" copyright strikes or claims, they are also patently defective. As a preliminary matter, both the 11/23 Tik Tok Posts and the GoFundMe website referenced in the Complaint make clear that KC is *of the opinion* that Braun had no grounds to file a copyright strike against her. A transcript of the 11/23 Tik Tok Posts reveals that **nowhere** in the 11/23 Tik Tok Posts does KC actually state that Braun filed "bad faith" or "false" copyright claims or copyright strikes against her. (*See* RJN, Exh. 2). Rather, the only reference to the "copyright strikes" filed against KC by Braun in the 11/23 Tik Tok Posts is KC's statement that she found the copyright strike to be "bizarre." (*Id.,* Exh. 2 at p. 2).[4] Likewise, the screenshot of the GoFundMe page posted by KC

---

[4] While the Complaint reflects an alleged screenshot from a November 21, 2023 Tik Tok post with the text "in bad faith copyright infringement strikes" imposed over an image of KC (Complaint, ¶ 42), that text is not reflected in the video itself, a link to which Plaintiffs failed to include or cite to in the Complaint. (*See* https://www.tiktok.com/@caffinatedkitti/video/7304065297856613675?lang=en). Moreover, nowhere in the 11/23 Tik Tok Posts or the GoFundMe page does KC state that the copyright strike filed against her was "in bad faith" or accuse Braun of "being an unethical lawyer who files frivolous copyright claims." (Compl., ¶¶ 42-43,117-119; RJN

reveals a letter from KC to Braun with the subject line "False Copyright Claim" and states only that KC and her team "would love further details on your client and how the video had grounds for a copyright strike, as it clearly falls under fair use." (Compl., ¶ 51). A party who has been sued or otherwise had a legal proceeding instituted against him or her is certainly permitted to express their disagreement with the merits of the proceeding without being liable for defaming the opposing counsel, as such a statement is a non-actionable opinion.

"A statement is constitutionally-protected opinion if it cannot reasonably be interpreted as stating actual facts about the plaintiff, when viewed 'from the perspective of an ordinary reader.'" *Doctor's Data, Inc. v. Barrett*, 170 F.Supp.3d 1087, 1113–1114 (N.D. Ill. 2016) (citations omitted). "To determine whether a statement is factual in nature, Illinois courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content. If it is clear that the speaker is expressing a subjective view or interpretation, such as when the speaker discloses the facts forming the basis for the statement, the statement is not actionable as defamation." *Id.* (citations omitted). Here, it is clear that KC is expressing her subjective opinion that the copyright claim had no grounds, based on her opinion that the defense of fair use is applicable. Furthermore, use of a term "false" or even "bad faith" (assuming KC even used that phrase), has no "precise and readily understood meaning." *See Solaia Tech., LLC v. Specialty Pub. Co.,* 221 Ill.2d 558, 582–583 (2006) ("The phrase "deeply greedy people" has no precise meaning, and it is not verifiable. Further, the context in which that phrase appeared indicates that it may have been judgmental, but it was not factual. This statement is not actionable"). The terms "false" or "bad faith" are so broad in scope that they "lack the necessary detail" to have a "precise and readily understood meaning"

Exh. 2). Thus, Braun has failed to allege with adequate particularity the statements that form the basis for the defamation and false light claims against KC based on these specific allegations. *Osundairo,* 447 F.Supp.3d at 742.

required to be actionable. *See Hopewell v. Vitullo,* 299 Ill.App.3d 513, 519-20 (1998) (holding that the term "incompetent" is a nonactionable opinion because there are "numerous reasons why one might conclude that another is incompetent; one person's idea of when one reaches the threshold of incompetence will vary from the next person's"); *see also Tamburo v. Dworkin,* 974 F.Supp.2d 1199, 1213 (N.D. Ill. 2013) (holding that statements that plaintiff's actions were "unethical" and "deceitful" are "plainly subjective", not "objectively verifiable" and "not actionable"). What does it mean for a claim to be "false" or in "bad faith," and how would one verify that? Courts can and do routinely disagree over whether particular claims have merit. To hold KC liable for expressing her opinion regarding the merits of the copyright strike filed against her by Braun would open any litigant up to liability for defamation if they spoke publicly regarding the merits of the proceedings filed against them. That is not and cannot be the law.

Finally, Braun's allegation that KC defamed her by "implying that she was acting as an attorney without being hired by Lauren the Mortician" is also a nonactionable opinion. Both the transcript of the 11/23 Tik Tok Posts and the GoFundMe page make clear that KC *thought* that Propson may not have hired Braun as her attorney. (*See* RJN, Exh. 2 at p. 2 ("So when this first started to the attorney, I didn't think that it was actually someone Lauren hired"; "So like I said, I thought Jeanette had just gone rogue and not been actually hired . . . ."; *see also* Compl., ¶ 51 (". . . while I understand your desire to protect a creator you enjoy – if you were not legally obtained as counsel for her and I speak on this via my platform, your actions are going to cause her significantly more strife.") "If it is clear that the writer is exploring a 'subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.'" *Moriarty v. Greene,* 315 Ill.App.3d 225, 234–235 (2000) (citing *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993));

*see also Brennan v. Kadner,* 351 Ill.App.3d 963, 969 (2004) (finding nonactionable opinion when "statement was not couched in terms of a factual assertion" but rather "as conjecture"). Moreover, "social contexts are a major determinant of whether an ordinary reader would view an alleged defamatory statement as constituting fact or opinion." *Brennan v. Kadner,* 351 Ill.App.3d 963, 970 (Ill. App. Ct. 2004). The fact that these statements were made on the Internet and social media posts further underscore that they constitute an opinion.[5]

Not only are KC's statements about Braun nonactionable opinions, but they are also subject to a qualified privilege under Illinois law. "Such a privilege may exist 'where the situation involves an interest of the person who publishes the defamatory statement or an interest of the person to whom the matter is published.'" *Tamburo,* 974 F.Supp.2d at 1214 (citation omitted). "Courts also recognize as privileged communications involving a recognized public interest." *Id.* Whether a qualified privilege exists is a question of law for the court. *Id.* KC's statements are privileged because they relate to her interest in protecting her freedom of speech in her social media posts and in *not* being subject to DMCA copyright strikes filed by Braun in response to statements made on social media with which Braun's clients disagree. Moreover, the statements made by KC were published *to those* who share that interest, *i.e.,* other individuals who have social media accounts who have been or could be subject to DMCA copyright strikes filed by Braun. *Id.; Haywood v. Lucent Tech., Inc*., 169 F.Supp.2d 890, 917 (N.D. Ill. 2001), *aff'd* 323 F.3d 524 (7th Cir. 2003); *Ludlow v. Northwestern Univ.,* 79 F.Supp.3d 824, 845 (N.D. Ill. 2015). "[O]nce qualified immunity has been identified, a plaintiff may overcome this challenge at the pleading stage by

---

[5] Courts have "emphasized the generally informal and unedited nature" of statements made on the Internet. *See Ganske v. Mensch*, 480 F.Supp.3d 542, 553 (S.D.N.Y. 2020) (citing *Sandals Resorts Int'l Ltd. v. Google, Inc*., 86 A.D. 3d 32, 44 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'"). Social media platforms are "equally — if not more — informal and 'freewheeling' and as such convey "a strong signal to a reasonable reader" that a statement is opinion. *Id.* (referring to statements on Twitter).

alleging the statement was made with actual malice — either knowledge of its falsity or in reckless disregard of the truth." *Id.* at 845. "Courts in this district, however, have looked for something ***more than conclusory statements*** in order to infer the defendant knew the statements were untrue or recklessly disregarded the truth or falsity of those statements." *Id.* (emphasis added). Here, the Complaint contains nothing more than conclusory statement that KC's "defamatory statements were made with knowledge of their falsity and with a reckless disregard for the truth . . . ." (Compl., ¶ 123). There are no facts alleged to support this boilerplate allegation, and without such facts, Braun cannot overcome application of the qualified privilege. Because Braun's claims for defamation against KC are legally deficient, Braun cannot satisfy her burden under the Georgia anti-SLAPP statute of demonstrating a probability of prevailing on the claim.

### b. Propson Cannot Prevail on her Defamation Claim.

The Complaint alleges that KC "defamed" Propson by "publicly stating" in the 10/24/23 Tik Tok Post that Propson was a "TERF" and "transphobic" and "used her platform to attack [Propson's] character and reputation." (Compl., ¶¶ 19-20, 23-25, 101). The Complaint alleges that the "false statements" were defamation *per se* because the "harm to Plaintiff's reputation is obvious and apparent on its face. Being called a transphobic is akin to being called a bigot or a racist . . . ." (*Id.,* ¶ 105). Because the Complaint alleges that Propson is a "citizen and resident of Wisconsin" (*id.,* ¶ 4), Wisconsin law governs the substantive issues of Propson's claims. *See Townsend,* 227 Ill. 2d at 165; *Kamelgard,* 585 F.3d at 341-42.[6]

As explained above in connection with Braun's defamation claim, allegations that KC defamed Propson by "using her platform to attack [Propson's] character and reputation" fail, because Propson has failed to identify any particular statement that forms the basis for this

---

[6] In the event that the Court finds that Illinois law governs a determination of the legal sufficiency of Propson's claims, KC has cited applicable Illinois law in connection with the analysis of Braun's claims. *See* Section I.C.1, *supra.*

allegation. This "imprecision" leaves KC and the Court guessing as to which statements are at issue and, accordingly, fail to plead facts to support the claim with adequate specificity. *Wesbrook v. Ulrich,* 90 F.Supp.3d 803, 808 (W.D. Wis. 2015) (dismissing defamation claim because "the allegations are too vague and conclusory as to the actual *content* of the alleged defamatory statements" to satisfy Fed. R. Civ. P. 8); *Patterson v. World Wrestling Ent., Inc.*, 2005 WL 8162784, at *8 (E.D. Wis. Feb. 8, 2005) ("complaint alleging defamation must set forth 'the particular words complained of'").

As for the allegation that KC stated Propson was a "TERF" (which the Complaint alleges stands for "Trans-Exclusionary Radical Feminist" defined as "someone who is hostile to the inclusion of trans women in the feminist movement"), that statement is pure opinion and nonactionable under both Wisconsin and Illinois law. *See Wagner v. Allen Media Broad.*, 2024 WL 63689, at *11 (Wis. Ct. App. Jan. 5, 2024) ("Generally speaking, defamation claims must be based on statements of fact rather than expressions of opinion"); *Wesbrook,* 90 F.Supp.3d at 810–811 ("statements of opinion are not defamatory"). "A defamatory statement must: (1) assert or imply a fact that is capable of being proven false; or (2) it must assert an opinion that directly implies the assertion of an undisclosed defamatory fact." *Id.* It is not possible to prove that Propson is *not* someone who is hostile to the inclusion of trans women in the feminist movement. Whether Propson is or is not "hostile" to trans women is entirely subjective and could vary from person to person. *Id.* ("statements of opinion are not actionable if they merely express 'a subjective view . . . .'"); *see also Kaminske v. Wisconsin Cent. Ltd.*, 102 F.Supp.2d 1066, 1080–1081 (E.D. Wis. 2000) (holding that "subjective impression" is not "sufficiently factual to be susceptible of being proved true or false"); *Colborn v. Netflix Inc.,* 661 F.Supp.3d 838, 849 (E.D. Wis. 2023) (same). Further, as the Seventh Circuit has held "[w]ords that are mere name calling or found to

19

be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable." *Huon v. Denton*, 841 F.3d 733, 744 (7th Cir. 2016) (applying Illinois law) (citing *Milkovich*, 497 U.S. at 20 (statements that are not reasonably understood as stating actual facts should not be actionable, in order to ensure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation").

As for the Complaint's allegation that KC defamed Propson by stating she was "transphobic," a transcript of the 10/24/23 Tik Tok Post reveals that KC *never* called Propson "transphobic." (RJN, Exh. 1). Not once in the 10/24/23 Tik Tok Post does KC use the word "transphobic," nor does she ever accuse Propson of disliking or being prejudiced against transgender individuals. (*Id.*) Rather, the transcript from the 10/24/23 Tik Tok Post demonstrates that KC stated only that Propson was "following" and "actively liking" social media posts by individuals who posted "incredibly transphobic and hateful rhetoric." (*Id.*, p. 1). Nowhere in the Complaint does Propson allege that this statement is false (i.e., that she did *not* "follow" and "actively like" social media posts by these particular individuals), and the 10/24/23 Tik Tok Post reveals that Propson *did* actually like and follow these individuals.[7] Given that the statement that Propson follows and "likes" these social media posts is not false, it cannot form the basis for a defamation claim. *Laughland v. Beckett,* 365 Wis.2d 148, 870 N.W.2d 466, 473 (2015) ("'Substantial truth' is a defense to a defamation action."); *see also Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 563 (2003).

As explained above, because Propson does not identify any particular statement that forms the basis for her "transphobic" allegation, the defamation claim based on this allegation must be

---

[7] *Osundairo*, 447 F.Supp.3d at 738 (court may consider transcript of 10/24/23 Tik Tok Post in determining legal sufficiency of defamation claim).

dismissed for "lack of specificity." *Wesbrook,* 90 F.Supp.3d at 808 (dismissing defamation claim because "the allegations are too vague and conclusory as to the actual *content* of the alleged defamatory statements"); *see also Osundairo*, 447 F.Supp.3d at 738–739 (applying Illinois law). Even if Propson *had* pled any facts supporting the allegation that KC had accused Propson of being "transphobic," which she did not, such a statement is not capable of being proven false and, therefore, is not actionable. *See e.g., Law Offices of David Freydin, P.C. v. Chamara,* 24 F.4th 1122, 1131 (7th Cir. 2022) (generally calling someone a "chauvinist" or "racist" is a nonactionable statement of opinion); *La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020) ("[A]ccusation[s] of concrete, wrongful conduct are actionable while general statements charging a person with being racist, unfair, or unjust are not"); *Terry v. Journal Broadcast Corp.,* 351 Wis.2d 479, 511–512 (Wis. Ct. App. 2013) (use of terms "rob" and "cheat" were nonactionable opinions under Wisconsin law); *Huon*, 841 F.3d at 744 (mere name calling is not actionable as defamation under Illinois law).

Moreover, Propson's defamation *per se* claim against KC should be dismissed because accusing someone of being a "TERF" or "transphobic" is ***not*** one of the specific categories of statements that fall within the definition of defamation *per se* under either Wisconsin or Illinois law. *See Kennedy v. Children's Service Soc. of Wisconsin,* 17 F.3d 980, 984 (7th Cir. 1994) (holding that statements must fall with four specific categories to be considered slander *per se* under Wisconsin law: imputation of certain crimes; allegations affecting one's business, trade, profession or office; imputation of a loathsome disease; or imputation of unchastity to a woman); *see also Green,* 234 Ill.2d at 491-492 (setting forth categories of defamation per se under Illinois law). Thus, Propson must plead specific allegations of "special damages resulting from the defamation," which the Complaint fails to do. *See Kennedy v. Children's Service Soc. of Wisconsin* 17 F.3d 980, 985 (7th Cir. 1994) (dismissing claim for defamation for failure to state a claim when special

21

damages were not plead). General allegations of harm to Propson's career, profession and reputation, or allegations of emotional distress, are insufficient to adequately plead special damages. *See Rivera v. Allstate Insurance Company,* 189 N.E.3d 982, 999 (Ill. App. Ct. 2021) (applying Illinois law). Likewise, a conclusory allegation that Propson lost a "contract with a famous documentary channel," without any supporting facts explaining that she lost the contract because of the alleged defamation, is insufficient to plead special damages. *Quinn v. Jewel Food Stores, Inc*., 276 Ill.App.3d 861, 869–870 (1995) (applying Illinois law and holding that plaintiff failed to plead special damages to state a claim for defamation because Plaintiff provided no explanation that denial of a franchise was *because of* defendant's statements).

> **c.** **Plaintiffs Cannot Prevail on Their False Light and Trade Libel Claims.**

Because Plaintiffs have failed to state a claim for defamation against KC, their respective false light claims against KC (Counts V and VI) arising out of the same allegations fail as well. *See Madison v. Frazier,* 539 F.3d 646, 659 (7th Cir. 2008) (When an "unsuccessful defamation per se claim is the basis of [a plaintiff's] false-light claim, his false-light invasion of privacy claim fails as well."); *Terry v. Journal Broadcast Corp.,* 351 Wis.2d 479, 509 (Wis. Ct. App. 2013) (Wisconsin does not recognize a claim for "false light"). Likewise, because Plaintiffs' trade libel claims against KC (Counts IX and X) are nothing more than a restatement of the defamation claims and based on the same alleged false statements by KC (Compl., ¶¶ 169, 173), the trade libel claims suffer from the same deficiencies as the defamation claims discussed in Sections A.3(a) and (b) above.

> **d.** **Plaintiffs Cannot Prevail on Their Tortious Interference Claims.**

Propson's claim for tortious interference against KC (Count XIII) asserts that KC's alleged defamatory statements intentionally interfered with a contract Propson had with a "famous and

well-known documentary channel." (Compl., ¶¶ 188-194). Braun has likewise asserted a claim for tortious interference with existing and potential business relationships against KC (Count XIV) based on allegations that KC's purported defamatory statements "have caused and are likely to cause the public and content creators not to employ [Braun] for legal representation." (*Id.,* ¶ 196). Both claims are legally deficient. As a preliminary matter, both claims for "tortious interference" are based on Plaintiffs' **nonactionable** allegations of defamation. *See* Sections A.3.(a) & (b), *supra; see also Liebe v. City Finance Co*., 98 Wis. 2d 10, 13 (Ct. App. 1980) (failed claim for defamation "cannot subject one to liability for tortious interference with a contract").

Furthermore, under Wisconsin law (which applies to Propson's claim), a claim for tortious interference with a contractual relationship requires the plaintiff to allege that the defendant "act[ed] with a purpose to interfere with the ... contract." *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 209 (Wis. Ct. App. 1995). "If an actor lacks 'the purpose to interfere' then his or her 'conduct does not subject [him or her] to liability even if it has the unintended effect of deterring [a third party] from dealing with the [plaintiff]." *Id*. Necessarily, "[t]o be subject to liability [for tortious interference with a contract], the actor must have knowledge of the contract with which he is interfering and the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts, § 766, cmt. i. The Complaint alleges no *facts* establishing that KC knew about Propson's alleged contract with the "documentary channel" and that she "acted with the purpose of interfering with that contract." Rather, the Complaint relies on nothing more than conclusory and insufficient allegations devoid of any facts. *Roumann Consulting Inc. v. Symbiont Construction, Inc.,* 2019 WL 3501527, at *9 (E.D. Wis., Aug. 1, 2019) ("vague and conclusory allegation is insufficient to state a plausible claim for tortious interference"*). Indeed, the Complaint makes clear that KC's motivation in making the statements about Propson on Tik Tok was to clear

23

up confusion between Propson and KC (*see* Compl., ¶ 24) – *not* to interfere with a contract between Propson and the documentary channel. Moreover, the Complaint is devoid of *any factual allegations* establishing that KC's statements were the *cause* of the documentary channel's termination of its contract with Propson. *Duct-O-Wire Co. v. U.S. Crane, Inc*., 31 F.3d 506, 509 (7th Cir. 1994) (essential element of tortious interference claim is that "a causal connection exists between the interference and the damages"); *Twombly,* 550 U.S. at 570 (complaint must allege "enough facts to state a claim to relief that is plausible on its face . . .").

Braun's tortious interference claim is equally deficient. Under Illinois law (which applies to Braun's claim), a claim for tortious interference with prospective economic advantage requires that plaintiffs show (1) their reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of that expectancy; (3) purposeful interference by the defendants preventing that expectancy from being fulfilled; and (4) damages resulting from such interference. *See Hackman v. Dickerson Realtors, Inc.*, 557 F.Supp.2d 938, 948 (N.D. Ill. 2008). Braun fails to allege any specific facts regarding the existing or prospective relationships with which KC allegedly interfered; rather, the Complaint alleges only conclusory allegations that KC has caused "the public and content creators not to employ" Braun. (Compl., ¶ 196). Per the Complaint, the interference claim could be based on *any member of "the public"* — there are no specific relationships identified and no facts alleging that KC knew of these potential or existing relationships. Such conclusory allegations are "too vague to state a viable claim" for tortious interference under Illinois law. *Hackman,* 557 F.Supp.2d at 949 (dismissing tortious interference claim that alleged defendant's conduct "caused unidentified agents to quit Hackman's employ"). Moreover, Braun has alleged no facts to support any allegation that members of the public have failed to employ Braun for legal representation *as a result of* KC's statements. Instead, the

Complaint relies on a conclusory assertion that KC's statements "have caused" or are "likely to continue to cause" people not to hire Braun. That simply is not enough to state a claim for tortious interference. *Id.* (dismissing claim for tortious interference based on "generic" allegations that "fall short of establishing the causation required for a claim for tortious interference with an existing business relationship" and are "too attenuated" and "too speculative and vague to state a 'plausible entitlement to relief'") (citing *Twombly,* 550 U.S. at 559).

**e.    Propson Cannot Prevail on Her Intentional Infliction of Emotional Distress Claim.**

Propson's claim for intentional infliction of emotional distress against KC is based entirely on KC's alleged defamatory statements (Count XV). (Compl., ¶¶ 200-202). Because Propson has failed to state a claim for defamation, she has also failed to state a claim for emotional distress. *Terry v. Journal Broadcast Corp.*, 351 Wis.2d 479, 515 (Wis. Ct. App. 2013) (affirming dismissal of emotional distress claim that was "derivative" of failed defamation claims); *see also Huon v. Breaking Media, LLC,* 75 F.Supp.3d 747, 773 (N.D.Ill. 2014), *aff'd in part, rev'd in part sub nom Huon v. Denton,* 841 F.3d 733 (7th Cir. 2016) (dismissing emotional distress claims based on failed defamation claim "since statements that do not rise to the level of defamation logically cannot rise to the even higher level of 'extreme and outrageous conduct'").

*            *            *            *

Because there is "no probability that [Braun and Propson] will prevail on the claim[s]" they have asserted against KC, the second prong of the Georgia anti-SLAPP statute has been satisfied, the claims asserted against KC should be stricken, and KC entitled to an award of her attorneys' fees. *See* OCGA § 9-11-11.1 (b.1).

**B.    Alternatively, Plaintiffs' Claims Should Dismissed Under Fed. R. Civ. P. 12(b)(6).**

25

As explained above in Sections A.3(a) through (e) *supra*, Plaintiffs are not likely to prevail on any of their nine causes of action asserted against KC because they are legally deficient, *i.e.*, they fail to state a claim under Fed. R. Civ. P. 12(b)(6). In the event that the Court determines that KC's conduct is not a protected activity and does not satisfy the first prong of the Georgia anti-SLAPP statute (OCGA § 9-11-11.1(b)(1)), KC respectfully requests that the Court alternatively dismiss the claims under Fed. R. Civ. P. 12(b)(6).

**C.    Alternatively, Propson's Claims Should Dismissed Under Fed. R. Civ. P. 12(b)(3) as Her Claims Have Zero Nexus to Illinois.**

A civil action is properly venued in (1) a judicial district in which any defendant resides, if all defendants reside in the State housing the district; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; or (3) if there is no such district in which the action may otherwise be brought, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to the action. *See* 28 U.S.C. § 1391(b); *see also Clark v. McDonald's Corporation,* 2023 WL 2648467, at *2 (S.D. Ill., Mar. 27, 2023). As explained above, two different plaintiffs have brought nine causes of action against KC (five by Propson and four by Braun), and "venue must be proper as to each cause of action". *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 681 F.Supp. 1297, 1301 (N.D. Ill. 1988).

Federal Rule of Civil Procedure 12(b)(3) allows a defendant to make a pre-answer motion to dismiss on the grounds of improper venue. Similarly, 28 U.S.C. § 1406(a) allows a court to dismiss a case when venue is improper. *See* 28 U.S.C. § 1406(a) (providing that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss . . . ."). In fact, "district courts often dismiss a case, rather than transfer it under Section 1406(a), if the plaintiff's attorney reasonably could have foreseen that the forum in which the suit was filed was improper and that similar conduct should be discouraged." *See* 14D Fed. Prac. & Proc. Juris.

3d § 3827. Here, venue is improper with respect to Propson's claims against KC because Propson is a resident of Wisconsin, KC is a resident of Georgia, and none of the claims asserted by Propson against KC have any connection to the State of Illinois (*i.e.,* no statements made in Illinois or directed at Illinois, no injury in Illinois). Indeed, as explained above, Illinois law does not apply to any of the claims asserted by Propson against KC. (*See* Sections A.3(b) and (e), *supra*).  Propson should have filed this action in Wisconsin or Georgia, but she instead chose to tie her claims to those asserted by Braun for her own convenience. That is not a reason for this Court to decide this issue, and dismissal of Propson's claims is warranted under Rule 12(b)(3).

## III.    CONCLUSION.

For the foregoing reasons, KC respectfully requests that this Court: (1) strike Counts I, II, V, VI, IX, X, XIII, XIV, and XV asserted by Propson and/or Braun against KC under O.C.G.A. § 9-11-11.1 (b) (1) and award KC the attorneys' fees she has incurred in connection with this motion under O.C.G.A. § 9-11-11.1 (b.1); or, alternatively, (2) dismiss Counts I, II, III, IV, V, VI, IX, X, XIII, XIV, XV asserted by Propson and/or Braun against KC for failure to state a claim under Rule 12(b)(6); or, alternatively, (3) dismiss Counts I, V, IX, XIII and XV asserted by Propson against KC for improper venue under Rule 12(b)(3).

Dated: February 29, 2024                              Respectfully Submitted,

                                                              *s/    Brandon J. Witkow*
                                                               Attorney for Defendants

                                                        Brandon J. Witkow [pro hac vice]
                                                        WITKOW | BASKIN
                                                        21031 Ventura Boulevard, Suite 700
                                                        Woodland Hills, California 91364
                                                        (818) 296-9508
                                                        bw@witkowlaw.com

s/      Amy Doig_____
Attorney for Defendants

Amy M. Doig
COZEN O'CONNOR
123 N. Wacker Dr., Suite 1800
Chicago, Illinois 60606
(312) 474-7900
adoig@cozen.com

*Attorneys for Defendants*

28

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was filed and served on all counsel of record noted below via the CM/ECF system of the United States District Court of the Northern District of Illinois.

> Benjamin C.R. Lockyer
> Lockyer Law LLC
> 100 N. Riverside Plaza, Suite 2400
> Chicago, Illinois 60606
> ben@lockyerlaw.com
>
> ***Attorney for Plaintiffs***

Dated: February 29, 2024

/s/  *Brandon J. Witkow*
Brandon J. Witkow

29