**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEANNETE BRAUN, BRAUN IP LAW, LLC, & LAUREN PROPSON, | ) ) | |
| Plaintiffs, | ) ) | Case No. 23 C 16856 |
| v. | ) ) | |
| | ) | |
| REBEKAH M. DAY NEE BOX, KC THE OWNER & OPERATOR OF THE ONLINE SOCIAL MEDIA ACCOUNT @CAFFINATEDKITTI, LILY MARSTON, & JESSICA VAZQUEZ | ) ) ) ) ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT KC THE OWNER AND OPERATOR OF THE SOCIAL MEDIA
ACCOUNT @CAFFINATEDKITTI'S MEMORANDUM OF POINTS & AUTHORITIES
IN SUPPORT OF HER SPECIAL MOTION TO STRIKE AMENDED COMPLAINT
PURSUANT TO O.C.G.A. § 9-11-11.1, OR, IN THE ALTERNATIVE, MOTION TO
DISMISS PURSUANT TO FED. R. CIV. PROC. 12(B)(6) & 12(B)(3)**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................1

II. BACKGROUND .....................................................................................2

   A.  Case Background ..........................................................................2

   B.  Defendant KC's Alleged Defamatory Statements Regarding Propson ......3

   C.  Defendant KCs Alleged Defamatory Statements Regarding Braun ...........5

   D.  Plaintiffs' Filing of the Original Complaint and Amended Complaint .......7

III. ARGUMENT ........................................................................................7

   A.  Plaintiffs' Claims Should Be Stricken Under the Georgia Anti-SLAPP
       Statute ......................................................................................7

       1.  The Georgia Anti-SLAPP Statute Applies in this Case ..................7

       2.  KC's Statement Constitute a "Protected Activity" Under the
           Georgia Anti-SLAPP Statute .............................................9

       3.  There is No Probability That Plaintiff's Can Prevail on Their
           Claims Because They Are Legally Deficient................................13

           a.  Braun Cannot Prevail on her Defamation Claim ..............14

           b.  Propson Cannot Prevail on her Defamation Claim............19

           c.  Plaintiffs Cannot Prevail on Their False Light and Trade
               Libel Claims....................................................24

           d.  Plaintiffs Cannot Prevail on Their Tortious Interference
               Claims .........................................................24

           e.  Plaintiff Cannot Prevail on Their Emotional Distress Claim
               27

   B.  Alternatively, Plaintiffs' Claims Should Dismissed Under Fed. R. Civ. P.
       12(b)(6) ..................................................................................27

C.     Alternatively, Propson's Claims Should Dismissed Under Fed. R. Civ. P.

12(b)(3) as Her Claims Have Zero Nexus to Illinois ................................ 27

IV.     CONCLUSION ...................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Am. Civil Liberties Union, Inc. v. Zeh,*
    312 Ga. 647 (2021) ...........................................................................................9, 13

*Amin v. NBCUniveral Media, LLC,*
    2022 WL 16964770 (S.D. Ga. Nov. 16, 2022) ..................................................8, 10

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009)..............................................................................................14

*Barnwell v. Trivedi,*
    366 Ga.App. 168 (2022) ............................................................................................9

*Bell Atlantic Corp.* v. Twombly,
    550 U.S. 544 (2007)..........................................................................................14, 26

*Brennan v.* Kadner,
    351 Ill.App.3d 963 (2004) .............................................................................15, 17, 18

*Buckley v.* DIRECTV, Inc.,
    276 F.Supp.2d 1271 (N.D. Ga. 2003) ....................................................................12

*Calborn v. Netflix Inc.,*
    661 F.Supp.3d 838 (E.D. Wis. 2023).....................................................................20

*Chi v. Loyola Univ. Med. Ctr.,*
    787 F.Supp.2d 797 (N.D. Ill. 2011) ..........................................................................8

*Clark v. McDonald's Corp.,*
    2023 WL 2648467 (S.D. Ill. Mar. 27, 2023) .........................................................28

*Cross v. Cooper,*
    197 Cal.App.4th 357 (2011) ....................................................................................11

*Doctor's Data, Inc. v. Barrett,*
    170 F.Supp.3d 1087 (N.D. Ill. 2016) ......................................................................16

*Duct-O-Wire Co. v. U.S. Crane, Inc.,*
    31 F.3d 506 (7th Cir. 1994) .....................................................................................26

*Equity Prime Mortg. V. Greene for Congress, Inc.*
    366 Ga.App. 207 (Ga. Ct. App. 2022) ...................................................................10

*Foseid v. State Bank of Cross Plains*,
   541 N.W.2d 203 (Wis. Ct. App. 1995) ...................................................25

*Ganske v. Mensch*,
   480 F.Supp.3d 542 (S.D.N.Y. 2020) ....................................................18

*Green v. Rogers*,
   234 Ill.2d 478 (2009) ...........................................................................23

*Hackman v. Dickerson Realtors, Inc.*,
   557 F.Supp.2d 938 (N.D. Ill. 2008) ................................................26, 27

*Harrison v. Chicago Sun-Times, Inc.*,
   341 Ill.App.3d 555 (2003) ....................................................................21

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993) ..................................................................17

*Haywood v. Lucent Tech., Inc.*,
   169 F.Supp.2d 890 (N.D. Ill. 2001) .....................................................18

*Hopewell v. Vitullo*,
   299 Ill.App.3d 513 (1998) ....................................................................16

*Huon v. Breaking Media LLC*,
   75 F.Supp.3d 747 (N.D. Ill. 2014) .......................................................27

*Huon v. Denton*,
   841 F.3d 733 (7th Cir. 2016) ...................................................20, 23, 27

*Intercon Solutions, Inc. v. Basel Action Network*,
   969 F.Supp.2d 1026 (N.D. Ill. 2013) ......................................................8

*Johnson v. Cordtz*,
   366 Ga.App. 87 (2022) .........................................................................12

*Kamelgard v. Macura*,
   585 F.3d 334 (7th Cir. 2009) ..........................................................14, 19

*Kaminske v. Wisconsin Cent. Ltd.*,
   102 F.Supp.2d 1066 (E.D. Wis. 2000) .................................................20

*Kennedy v. Children's Service Soc. of Wisconsin*,
   17 F.3d 980 (7th Cir. 1994) ..................................................................23

*Kibler v. Northern Inyo County Local Hospital Dist.*,
   39 Cal.4th 192 (2006) ...........................................................................12

*La Liberte v. Reid,*
    966 F.3d 79 (2d Cir. 2020).................................................................22

*Laker v. Bd of Trustees of Cal. State Univ.,*
    32 Cal.App.5th 745 (2019) .............................................................12

*Lane Dermatology v. Smith,*
    861 S.E.2d 196 (Ga. Ct. App. 2021) ...............................................10

*Laughland v. Beckett,*
    365 Wis.2d 148 (2015) ...................................................................21

*Law Office of David Freydin, P.C. v. Chamara,*
    24 F.4th 1122 (7th Cir. 2022) .........................................................22

*Liebe v. City Finance Co.,*
    98 Wis.2d 10 (Ct.App. 1980)..........................................................25

*Ludlow v. Northwestern Univ.,*
    79 F.Supp.3d 824 (N.D. Ill. 2015) ..................................................18

*Madison v. Frazier,*
    539 F.3d 646 (7th Cir. 2008) ..........................................................24

*Milkovich v. Lorain Journal,*
    497 U.S. 1 (1990)............................................................................20

*Moriarty v. Greene,*
    315 Ill.App.3d 225 (2000) .........................................................17, 22

*Osundairo v. Geragos,*
    447 F.Supp.3d 727 (N.D. Ill. 2020) ...................6, 8, 14, 15, 21, 22

*Parish v. City of Elkhard,*
    614 F.3d 677 (7th Cir. 2010) ..........................................................14

*Planned Parenthood Fed'n of Am., Inc. v. Center for Medical Progress,*
    890 F.3d 828 (9th Cir. 2018) ..........................................................14

*Quinn v. Jewel Food Stores, Inc.,*
    276 Ill.App.3d 861 (1995) ..............................................................23

*Rivera v. Allstate Ins. Co.,*
    189 N.E.3d 982 (Ill. App. Ct. 2021) ...............................................23

*Rosser v. Clyatt,*
    348 Ga.App. 40 (2018) ...................................................................11

*Roumann Consulting Inc. v. Symbiont Construction, Inc.,*
　　2019 WL 3501527 (E.D. Wis., Aug. 1, 2019) .......................................................25

*Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*
　　681 F.Supp. 1297 (N.D. Ill. 1988) .......................................................29

*Solaia Tech., LLC v. Specialty Pub. Co.,*
　　221 Ill.2d 558 (2006) .......................................................16

*Tamburo v. Dworkin,*
　　974 F.Supp.2d 1199 (N.D. Ill. 2013) .......................................................17, 18

*Terry v. Journal Broadcast Corp.,*
　　351 Wis.2d 479 (Wis. Ct. App. 2013) .......................................................22, 27

*Townsend v. Sears, roebuck & Co.,*
　　227 Ill. 2d 147 (2007) .......................................................14, 19

*Underground Sols., Inc. v. Palermo,*
　　41 F.Supp.3d 720 (N.D. Ill. 2014) .......................................................8

*Wagner v. Allen Media Broad.,*
　　2024 WL 63689 (Wis. Ct. App. Jan 5, 2024) .......................................................19

*Wesbrook v. Ulrich,*
　　90 F.Supp. 803 (W.D. Wis. 2015) .......................................................20, 22

*Wilkes & McHugh, P.A. v. LTC Consulting, L.P.,*
　　306 Ga. 252 (2019) .......................................................9, 11, 13

## **STATUTES**

17 U.S.C. § 512(c)(3) .......................................................13

28 U.S.C. § 1391(b) .......................................................28

28 U.S.C. § 1406(a) .......................................................28

Fed. R. Civ. P. 12(b)(3) .......................................................2, 28

Fed. R. Civ. P. 12(b)(6) .......................................................2, 14, 28

OCGA § 9-11-11.1 .......................................................9, 10, 11, 12, 13, 28

OCGA § 9-11-11.1(b)(1) .......................................................13, 14, 28

OCGA § 9-11-11.1(c)(2) .......................................................12, 13

OCGA § 9-11-11.1(c)(3) .......................................................10, 13

OCGA § 9-11-11.1(c)(4) ........................................................................................................10, 13

**OTHER**

14D Fed. Prac. Juris.3d § 382 ........................................................................................................28

## I.    INTRODUCTION

This action is an attempt by an alleged well-known social media influencer with "millions" of followers – and her lawyer – to silence an individual who has voiced opinions about them on social media with which they disagree. While Plaintiff Lauren Propson ("Propson") and her lawyer Jeanette Braun/Braun IP Law (collectively, "Braun") may not like what Defendant KC the owner and operator of the social media account @CaffinatedKitti (hereafter, "KC") has to say about them on Tik Tok, the allegations of the Amended Complaint reveal that KC's alleged statements are nothing more than her opinion, her subjective beliefs, and, at worst, hyperbolic name-calling – *they are not actionable as defamation as a matter of law*.  Not one of the alleged "defamatory statements" is a verifiable statement of fact, and – importantly – they each fall within the scope of "protected activity" under the Georgia anti-SLAPP statute, which governs Georgia speakers such as KC (who Plaintiffs allege is a resident of Georgia). Put simply, this case is nothing more than a coordinated, inappropriate attempt by a lawyer and her client to intimidate an individual for speaking her mind and exercising her First Amendment rights. Indeed, the Amended Complaint reveals the lengths to which Plaintiffs will go to harass KC for voicing her opinions, namely, sending police in Georgia to conduct a wholly fabricated "wellness check" on KC.

In response to Plaintiffs' original Complaint, KC filed a motion to strike under the Georgia anti-SLAPP statute and, alternatively, a motion to dismiss, demonstrating the protected nature of KC's conduct and baseless nature of Plaintiffs' claims. In response to that Motion, Plaintiffs amended their Complaint and had a second chance to allege facts demonstrating the inapplicability of the First Amendment and/or the viability of their claims. Once again, however, Plaintiffs have failed. As explained below, the Amended Complaint changes very little (contextual tweaks here and there) and is based on the *identical, protected* statements as the original Complaint. The

"amendment" is nothing more than Plaintiffs' attempt to protract this baseless litigation as a means of intimidating KC from expressing her opinions on social media. Accordingly, the Georgia anti-SLAPP statute mandates that all ten claims asserted by Plaintiffs against KC (all of which arise out of the alleged defamatory statements) be stricken and attorneys' fees awarded to KC. Alternatively, KC respectfully requests that this Court dismiss all claims under Fed. R. Civ. P. 12(b)(6), or at a minimum, Propson's claims against KC under Fed. R. Civ. P. 12(b)(3).

## II.    BACKGROUND

### A.    Case Background.

Plaintiff Lauren Propson ("Propson") is social media personality and Plaintiff Jeanette Braun – through Plaintiff Braun IP Law, LLC (collectively, "Braun") – is her lawyer. (Amended Complaint [Dkt. No. 29] ("Am. Compl."), ¶¶ 13, 53). Propson is a licensed mortician residing in Wisconsin (*id.*, ¶¶ 4, 13), who operates a social media account on Tik Tok under the name "Lauren the Mortician." (*Id.*, ¶ 13). Propson alleges that she has "amassed millions of followers" on Tik Tok, as well as sponsorships and monetization of the videos she posts of Tik Tok, including a "brand partnership with a famous documentary channel." (*Id.*, ¶¶ 41-42). Propson alleges that her "lighthearted and educational videos" posted on Tik Tok "discuss death, the loss of loved ones, and demystify occupations and professions that work with deceased persons." (*Id.*, ¶ 14).

Propson hired Braun, a lawyer, to "assist with her copyright infringement claims by filing a Digital Millennium Copyright Act ("DMCA") complaint to the social media platforms hosting [a] video" created by KC. (*Id.*, ¶ 52). The Amended Complaint alleges that KC is a "social media personality and influencer," and is a citizen and resident of Georgia. (*Id.*, ¶¶ 6, 15). Braun, who resides and is licensed to practice law in Illinois (*id.*, ¶¶ 2-3), allegedly filed a DMCA complaint with the social media company Meta on behalf of Propson to remove from Facebook a post created

by KC on the ground that KC's post used Propson's copyrighted material (*Id.,* ¶ 54). Meta allegedly removed KC's post from Facebook on November 4, 2023. (*Id.,* ¶ 59). Propson has not asserted any allegations of copyright infringement against KC in connection with her alleged use of copyrighted material in her Facebook post. Rather, this action is based on allegations that KC posted videos on another social media platform, Tik Tok, in which she allegedly defamed Propson and Braun.

### B. Defendant KC's Alleged Defamatory Statements Regarding Propson.

Propson alleges that on or around October 24, 2023, KC published a video on Tik Tok and identified her by "her public persona 'Lauren the Mortician'" ("10/24/23 Tik Tok Post") (*Id.,* ¶ 18)[1]. The Amended Complaint contends that in the 10/24/23 Tik Tok Post, KC "goes on to accuse [] Propson of being 'transphobic' and a 'TERF' because she liked posts by a social media personality, who is in a gay relationship." (*Id.,* ¶ 19). The Amended Complaint alleges that "TERF" is a "derogatory slur," "highly offensive term," and "acronym standing for 'Trans-Exclusionary Radical Feminist' which is a term used to refer to or describe 'an advocate of radical feminism who does not believe that transgender people's identities are legitimate, and who is hostile to the inclusion of trans women in the feminist movement." (*Id.,* ¶¶ 21-22). The 10/24/23 Tik Tok Post allegedly starts off with KC stating "Lauren the Mortician is a TERF. I have receipts, I have deets, and you should just go ahead and take a seat," and KC's reference to "deets" and "receipts" allegedly "was intended to tell audiences that [KC] had verifiable proof that [] Propson was transphobic." (*Id.,* ¶¶ 20, 23-25). KC then explains that Propson was "following" and "actively liking incredibly transphobic and hateful rhetoric and content" on social media, and KC stated that she "compiled a list of links to posts that [] Propson 'liked' [that] contained 'transphobic and hateful rhetoric.'" (*Id.,* ¶¶ 27-28). KC allegedly stated in the video that Propson "is trying to divert

---

[1] Link: https://www.tiktok.com/@caffinatedkitti/video/7293290351555513642

attention by saying she is just pro LGBTQ and bisexual as if that is some kind of hall pass that prevents her from being prejudiced to other sub-genres of the rainbow. Just like any other person can be biphobic, bi people can be transphobic. (Text Caption: 'Unfriendly Reminder: we see transphobic so we're saying transphobic. That ain't bullying its an observation')". (*Id.,* ¶ 29). Nowhere in the Amended Complaint does Propson identify any statements from the 10/24/23 Tik Tok Post that Propson *is* transphobic or that KC has "proof" that Propson *is* transphobic.

In the 10/24/23 Tik Tok Post, KC can be seen over the background of a social media account profile for an individual named "Anthony Ramondi" under the profile name "conservativeant", which indicates that "Lauren the Mortician" "follows" the "conservativeant" account, as well as a list of links of "all of the videos [KC] caught [Propson] liking." (*See* Link https://www.tiktok.com/@caffinatedkitti/video/7293290351555513642, at 0:26-0:41)[2]. In the 10/24/23 Tik Tok post, KC explains why she is identifying posts containing what KC believes to be "transphobic and hateful rhetoric" that Propson has liked and followed: "the only reason I'm saying anything is because I am getting confused for her in multiple threads over the weekend that people are taking about creators that are coming out with controversy or bad vibes . . . all I ask from this is that when you see people trying to cancel [Propson] or talk about the Beetlejuice lady, you just make sure that they know it's not me." (Request for Judicial Notice ("RJN"), Exh. 1 (Transcript of 10/24/23 Tik Tok Post) at pp. 1-2; *see also* Am. Compl., ¶ 33).

Nowhere in the Amended Complaint do Plaintiffs allege that Propson has ***not*** "liked" these posts or followed these individuals on social media. (*See* Am. Compl. [Dkt. No. 29]). Nowhere in

---

[2] While the original Complaint included screenshots of this portion of the 10/24/23 Tik Tok Post (Compl. [Dkt. No. 1], ¶ 25), those screenshots were deleted from the Amended Complaint. The Court may consider the **10/24/23 Tik Tok post in its entirety**, as well as a transcript of that post when ruling on this motion, because it is "is referenced in the complaint and central to plaintiff's claims." *Osundairo v. Geragos*, 447 F.Supp.3d 727, 738 (N.D. Ill. 2020) (holding that court could consider transcript of television show during which alleged defamatory statements were made when ruling on motion to dismiss).

the Amended Complaint do Plaintiffs allege that KC has misstated what these posts say, rather, the Amended Complaint alleges only that "[u]pon information and belief, none of the videos Defendant KC linked contain transphobic and hateful rhetoric." (*Id.,* ¶ 31). Moreover, nowhere in the Amended Complaint do Plaintiffs allege any facts demonstrating that any statements made by KC in the 10/24/23 Tik Tok Post are false. (*Id.*) Rather, the Amended Complaint alleges only that KC was aware that Propson "followed and liked pro-LGBTQ and pro-trans rights content on social media" and that "KC chose to highlight only [] Propson's interactions with the conservative social media personality" (*Id.,* ¶¶ 34, 36) – *an admission* by Plaintiffs that Propson *did* "interact" with (*i.e.*, "follow" and/or "like") an individual KC believed was posting "transphobic and hateful rhetoric." KC's statements allegedly caused Propson to lose "numerous followers, her contract with a famous and popular travel channel, and a podcast that was in negotiations." (*Id.,* ¶ 40).

## C. Defendant KC's Alleged Defamatory Statements Regarding Braun.

As stated above, Propson hired Braun to file a DMCA copyright complaint with Meta regarding KC's alleged use of Propson's copyrighted material in a post on Facebook (*not* Tik Tok), which Meta approved. (*Id.*, ¶¶ 53-59). KC then allegedly "used her social media accounts to express her anger and resentment" of Braun. (*Id.,* ¶ 63). Specifically, Plaintiffs allege that on November 21, 2023, KC "posted a video accusing [] Propson of using [] Braun to file 'false copyright claims' with social media platforms" and in the same video, KC accused Braun of "filing bad faith copyright infringement strikes against Defendant KC." (*Id.,* ¶¶ 65-66). The Amended Complaint alleges that this video was viewed over 928,000 times. (*Id.,* ¶ 68). Plaintiffs allege that KC posted the *same video again* on Tik Tok on November 25, 2023, which was viewed over 263,000 times. (Both Tik Tok posts are collectively referred to as the "11/23 Tik Tok Posts") (*Id.,* ¶ 69). Contrary to the allegations in the Amended Complaint, nowhere in the 11/23 Tik Tok Posts

does KC state that Braun filed "bad faith" or "false" copyright claims. (RJN, Exh. 2 (transcript of 11/23 Tik Tok Posts)).[3] In fact, KC does not even discuss the copyright strike for most of the video; rather, KC describes how Braun called the police and sent them to KC's home in Georgia to conduct a "wellness check," as well as how Braun sent KC a cease and desist letter on which Braun copied KC's mother and a theater company with which KC is not even affiliated. (*Id.*)

Plaintiffs further allege that on November 21, 2023, KC "created a page on the donation platform called GoFundMe" and on December 8, 2023, KC published on the GoFundMe page her email response to a cease and desist letter Braun sent to KC, and the subject line of KC's response was "False Copyright Claim." (*Id.,* ¶¶ 71-72, 75). The Amended Complaint sets forth text from and a screenshot of the GoFundMe page update from December 8, 2023 that reflects KC's email response to Braun regarding allegations of copyright infringement, stating, in relevant part, that KC would "love further details on [Braun's] client and how the video had grounds for a copyright strike, *as it clearly falls under fair use* . . . I do understand how you have reached out with cease and desist to smaller content creators speaking negatively about Lauren the Mortician's scandals, and while I understand your desire to protect a creator you enjoy – *if you were not legally obtained as counsel for her* and I speak on this via my platform, your actions are going to cause her significantly more strife . . . ." (*Id.*, ¶¶ 76, 81) (emphasis added).

### D.    Plaintiffs' Filing of the Original Complaint and Amended Complaint.

Plaintiffs filed their original complaint on December 15, 2023, asserting ten causes of action against KC and three other individuals who post content on social media platforms and/or the Internet based on statements that these individuals allegedly made regarding Braun. Plaintiffs

---

[3] Link to 11/23 Tik Tok Posts: https://www.tiktok.com/@caffinatedkitti/video/7304065297856613675?lang=en. A transcript of the 11/23 Tik Tok Posts is attached as Exhibit 2 to the RJN and is appropriate for the Court to consider in ruling on this Motion. *Osundairo*, 447 F.Supp.3d at 738.

do not allege that there is any relationship between the four defendants. On February 29, 2024, the defendants each filed motions to strike under applicable anti-SLAPP statutes and/or motions to dismiss. [Dkt. Nos. 21-26]. In response, on March 21, 2024, Plaintiffs filed an Amended Complaint asserting the same claims against all four defendants[4] based on the identical statements asserted in the original Complaint with little to no substantive changes. [Dkt. No. 29].

## III. ARGUMENT

### A. Plaintiffs' Claims Should Be Stricken Under the Georgia Anti-SLAPP Statute.

#### 1. The Georgia Anti-SLAPP Statute Applies in this Case.

"In the case of an anti-SLAPP statute raised as a defense to a defamation claim, the choice-of-law question regarding the anti-SLAPP law is treated separately from whether a statement is defamatory because the anti-SLAPP question involves whether a statement is privileged, not whether its content is defamatory." *Osundairo,* 447 F.Supp.3d at 743 (internal quotations omitted) (citing *Underground Sols., Inc. v. Palermo*, 41 F. Supp. 3d 720, 722 (N.D. Ill. 2014) (citing *Chi v. Loyola Univ. Med. Ctr.*, 787 F.Supp.2d 797, 803 (N.D. Ill. 2011)). Pursuant to dépeçage, the Court can apply different states' laws to different elements of the lawsuit. *See Underground Sols.,* 41 F. Supp. 3d at 722. Although the place of alleged injury might be critical in determining the law applicable to the defamation claim, the choice of law for anti-SLAPP protection involves different interests – namely, protecting the speaker's exercise of First Amendment rights – and could lead to the application of different state law. *See Underground Sols.*, 41 F. Supp. 3d at 722; *Chi*, 787 F.

---

[4] Once exception is the removal of a false light claim asserted by *Propson* against KC in the Amended Complaint, as KC pointed out in her motion to strike that no such claim exists under applicable Wisconsin law; instead, Braun has asserted two separate false light claims against KC in the Amended Complaint. The only other substantive change was the removal of an intentional infliction of emotional distress claim by *Propson* against Defendant Rebekah Day in the original complaint, which has been replaced by an intentional infliction of emotional distress claim by *Braun* against all defendants.

Supp. 2d at 803. "In determining which law to apply to defenses raised pursuant to anti-SLAPP statutes, courts have found the place where the allegedly tortious speech took place and the domicile of the speaker central to the choice-of-law analysis." *Intercon Solutions, Inc. v. Basel Action Network,* 969 F.Supp.2d 1026, 1035 (N.D. Ill. 2013), *aff'd* 791 F.3d 729 (7th Cir. 2015) (applying Washington's anti-SLAPP statute when defendants were citizens of the State of Washington and their allegedly defamatory speech, though eventually published in Illinois and on the Internet, originated in that state). Here, the Amended Complaint alleges that KC is a "citizen and resident of the State of Georgia" (Am. Compl., ¶ 6), and there is no allegation that the alleged defamatory speech (while published on social media and the Internet) originated anywhere other than Georgia. Thus, Georgia has a strong interest in protecting KC's speech and the Georgia anti-SLAPP law applies to Plaintiffs' claims against her. *See Osundairo,* 447 F.Supp.3d at 743; *Underground Sols.*, 41 F. Supp. 3d at 725; *Chi*, 787 F. Supp. 2d at 803; *see also Amin v. NBCUniversal Media, LLC,* 2022 WL 16964770, at *7 (S.D. Ga. Nov. 16, 2022) (holding that the Georgia anti-SLAPP statute "does not directly conflict with a Federal Rule of Civil Procedure and, thus, is substantive and can apply in federal court").

**2.      KC's Statements Constitute a "Protected Activity" Under the Georgia Anti-SLAPP Statute.**

Under Georgia law, the analysis of an anti-SLAPP motion to strike involves two steps. *See Am. Civil Liberties Union, Inc. v. Zeh,* 312 Ga. 647, 650 (2021) (citing *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 261 (2019)). First, the court must decide whether the party filing the anti-SLAPP motion "has made a threshold showing that the challenged claim is one 'arising from' protected activity." *Wilkes,* 306 Ga. at 262 (quoting OCGA § 9-11-11.1 (b) (1)). If so, the court must then "decide whether the plaintiff 'has established that there is a probability that the [plaintiff] will prevail on the claim." *Id.* A "protected activity" under OCGA § 9-11-11.1 (b)

(1) is one "which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern." *See* OCGA § 9-11-11.1(b)(1). The code section defines an "act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" to include: "[a]ny written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law", "[a]ny written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern", or "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern." *See Barnwell v. Trivedi*, 366 Ga.App. 168, 170–171 (2022) (citing OCGA § 9-11-11.1). The statute "is intended to protect persons exercising their constitutional rights of petition and freedom of speech" and "is to be construed broadly." *Id.*

With respect to both Plaintiffs claims against KC, there can be no question that they are based on statements made by KC "in a public forum" "in connection with a public issue or an issue of public concern." *See* OCGA § 9-11-11.1(c)(3)(4). The statements allegedly were made in videos posted on the social media platform Tik Tok, as well as on the online donation platform GoFundMe. (Am. Compl., ¶¶ 18-19, 65-76, 81-83). The Tik Tok videos containing the alleged defamatory statements allegedly were viewed "over 928,000" and "over 263,000" times. (*Id.,* ¶¶ 68-69). Social media and online platforms are "public forums" for purposes of anti-SLAPP statutes. *Equity Prime Mortg. v. Greene for Congress, Inc.,* 366 Ga.App. 207, 216 (Ga. Ct. App. 2022) (holding that statements made on social media fell within scope of OCGA § 9-11-11.1).

9

"To determine whether an issue is an 'issue of public concern' under the statute, courts consider 'whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occurred in the context of an ongoing controversy, dispute or discussion, or affected a community in a manner similar to that of a governmental entity.'" *Amin,* 2022 WL 16964770, at *6 (citing *Lane Dermatology v. Smith*, 861 S.E.2d 196, 204 (Ga. Ct. App. 2021)). "[A]n issue of public interest' ... is any issue in which the public is interested. In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." *See Cross v. Cooper,* 197 Cal.App.4th 357, 373 (2011), *as modified on denial of reh'g* (Aug. 4, 2011) (citation omitted).[5]

*As to Propson's claims*, Propson allegedly maintains a famous social media persona with "millions of followers" on Tik Tok, as well as sponsorships and a brand partnership with a famous documentary channel (Am. Compl., ¶¶ 40-42); thus, she certainly is in the "public eye". Further, KC allegedly is a "social media personality and influencer" who "uses her platform to create content that she monetizes from views and user engagement." (*Id.,* ¶¶ 15-16). KC's statements allegedly were made as the result of confusion between these two "social media personas" (*i.e.* KC and Propson) by social media followers. (*Id.,* ¶¶ 27-28, 33; *see also* RJN 1, pp. 1-2). Thus, the public issue implicated by KC's alleged statements is the confusion by potentially hundreds of thousands to millions of individuals between two social media personas who are undoubtedly in the public eye, one of which has "liked" and "followed" posts containing "transphobic" and "hateful rhetoric." Further, whether Propson, who allegedly has "millions" of social media

---

[5] Georgia courts have expressly looked to California case law interpreting the California anti-SLAPP statute for guidance in interpreting OCGA § 9-11-11.1, given that the California anti-SLAPP statute is "very similar to the text of Georgia's revised anti-SLAPP statute." *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 258 (2019).

followers for her "educational videos" about "death" and the "loss of loved ones" and who has held herself out as "pro LGBTQ and bisexual", likes and follows other social media personalities who post "transphobic and hateful rhetoric" is certainly a matter of public interest, particularly when the public is confusing KC and Propson. *Rosser v. Clyatt,* 348 Ga.App. 40, 44 (2018) (holding that statements made regarding former president of a corporation in connection with a controversy that would affect the more than 13,000 members of the corporation "is of legitimate public concern") (citing *Buckley v. DIRECTV, Inc*., 276 F.Supp.2d 1271, 1275 (N.D. Ga. 2003) ("Any action involving such a large number of people is, by definition, a matter of public interest and concern")).

*As for Braun's claims against KC*, they are also based on "protected activity" by KC. Namely, Braun's allegations are based on purported statements that KC accused Braun of filing a "false copyright claim" or "bad faith" copyright strike under the DMCA against KC (Am. Compl., ¶¶ 65-66, 75). The Amended Complaint demonstrates that KC claimed that Braun's DMCA copyright strike/complaint was "false" because KC believed her use of Propson's alleged copyrighted material constituted "fair use." (*Id*., ¶ 81). As explained above, OCGA § 9-11-11.1 provides that "[a]ny written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, ***or any other official proceeding authorized by law***" is deemed a "protected activity" under the Georgia anti-SLAPP statute. *See* OCGA § 9-11-11.1(c)(2) (emphasis added). This statute creates "an expansive definition of protected speech" that includes "***any statement made in connection with an issue under consideration by any official proceeding***." *Johnson v. Cordtz*, 366 Ga.App. 87, 91 (2022) (emphasis added). The filing of a copyright strike under the DMCA constitutes an "official proceeding" as it is expressly "authorized by law." *Kibler v. Northern Inyo County Local Hospital*

*Dist.*, 39 Cal.4th 192, 200 (2006), as modified (July 20, 2006) (holding that hospital peer review constitutes an "official proceeding" under anti-SLAPP law because it is authorized by California Business & Professions Code section 805 *et seq.*); *see also Laker v. Bd. of Trustees of Cal. State Univ.*, 32 Cal.App.5th 745, 764 (2019) (holding that investigations by university into employee allegations of workplace misconduct were "official proceedings authorized by law" under anti-SLAPP statute because university had statutory authority to make rules governing employees and to respond to complaints of workplace misconduct).[6]  Here, the DMCA specifically authorizes and outlines the procedure for the filing of a copyright strike with an online service provider. *See* 17 U.S.C. § 512(c)(3)). Thus, it constitutes an "official proceeding authorized by law," and KC's alleged statements made in connection with that "official proceeding" (*i.e.*, it was "false") are protected under the Georgia anti-SLAPP statute.

Furthermore, the statements are protected as public statements of a public issue or public concern under OCGA § 9-11-11.1(c)(3) & (4). Again, Propson allegedly has millions of social media followers; thus, whether she has hired an attorney to file meritless copyright strikes against content creators simply is a matter of public interest and concern. Likewise, if Braun were taking it upon herself to file baseless DMCA strikes against content creators without even being hired to do so, it would also constitute a matter of public concern. *ACLU,* 312 Ga. at 650 (holding that a blog post asserting that a public defender had charged an indigent criminal defendant a fee for public defense services was a protected activity under anti-SLAPP statute). Because KC's statements are "protected activity" under OCGA § 9-11-11.1(c)(2), (3) and/or (4), KC has satisfied the first step of the anti-SLAPP inquiry as to both Plaintiffs.

### 3. There is No Probability That Plaintiffs Can Prevail on Their Claims Because They Are Legally Deficient.

---

[6] As explained above, Georgia courts look to California case law interpreting the California anti-SLAPP statute for guidance in interpreting OCGA § 9-11-11.1. *Wilkes*, 306 Ga. at 258.

Once a defendant has established that the claims asserted against it arise out of protected activity, as KC has done here, the burden then shifts to the plaintiff to demonstrate that there is a probability that the plaintiff will prevail on his or her claims. *See* Ga. Code Ann. § 9-11-11.1(b)(1). In federal district court, an anti-SLAPP motion "may be premised on legal deficiencies inherent in the plaintiff's claim, analogous to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)," and if "a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of [the anti-SLAPP statute] applies." *Planned Parenthood Fed'n of Am., Inc. v. Center for Medical Progress*, 890 F.3d 828, 834 (9th Cir. 2018), amended 897 F.3d 1224 (9th Cir. 2018); *see also Osundairo,* 447 F.Supp.3d at 744 (same). In determining whether a complaint satisfies Rule 12(b)(6), the Court accepts the facts stated in the complaint as true and draws reasonable inferences in plaintiff's favor. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010). Though a complaint need not contain "detailed factual allegations, ... a formulaic recitation of the elements of a cause of action will not do"; the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  A complaint fails to state a claim "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009). Here, Plaintiffs have failed to state facts sufficient to constitute any cause of action against KC; thus, each of the claims should be stricken under OCGA § 9-11-11.1(b)(1) and attorneys' fees under that statute should be awarded.

### a.      Braun Cannot Prevail on Her Defamation Claim.

To state a claim for defamation under Illinois law,[7] a plaintiff must plead facts showing: "(1) the defendant made a false statement concerning the plaintiff; (2) there was an unprivileged publication of the defamatory statement to a third party by defendant; and (3) publication of the defamatory statement damaged the plaintiff." *Brennan v. Kadner,* 351 Ill.App.3d 963, 968 (2004). Here, KC allegedly defamed Braun by "publishing her claim stating that [] Braun files 'false copyright lawsuits' to imply that [Braun] file baseless and frivolous DMCA actions", and by "publishing her letter accusing [Braun] of not in fact being [] Propson's attorney." (Am. Compl., ¶¶ 177-178). These statements allegedly were made "publicly across multiple social media platforms" and were "defamation per se because the harm to [Braun's] reputation is obvious and apparent on its face." (*Id.,* ¶¶ 180, 184).

These allegations of defamation are patently defective. As a preliminary matter, both the 11/23 Tik Tok Posts and the GoFundMe website referenced in the Amended Complaint make clear that KC is *of the opinion* that Braun had no grounds to file a copyright strike against her. A transcript of the 11/23 Tik Tok Posts reveals that **nowhere** in the 11/23 Tik Tok Posts does KC actually state that Braun filed "bad faith" or "false" copyright claims or copyright strikes against her. (*See* RJN, Exh. 2). Rather, the only reference to the "copyright strikes" filed against KC by Braun in the 11/23 Tik Tok Posts is KC's statement that she found the copyright strike to be "bizarre." (*Id.,* Exh. 2 at p. 2).[8] Likewise, the screenshot of the GoFundMe page posted by KC reveals a letter from KC to Braun with the subject line "False Copyright Claim" and states only that KC and her team "would love further details on your client and how the video had grounds

---

[7] Under Illinois law, the law of the state where the injury occurred governs the substantive issues of the case (*Townsend v. Sears, Roebuck & Co.,* 227 Ill. 2d 147, 165 (2007)), and in the case of defamation that is the state in which the plaintiff is domiciled. *See Kamelgard v. Macura,* 585 F. 3d 334, 341-42 (7th Cir. 2009) (collecting cases).

[8] Nowhere in the 11/23 Tik Tok Posts or the GoFundMe page does KC state that the copyright strike filed against her was "in bad faith." (*Compare* Am. Compl., ¶ 66 *with* Am. Compl., ¶ 81; RJN Exh. 2). Thus, Braun has failed to allege with adequate particularity the statements that form the basis for the defamation and false light claims against KC based on these specific allegations. *Osundairo,* 447 F.Supp.3d at 742.

for a copyright strike, ***as it clearly falls under fair use***." (Am. Compl., ¶ 81) (emphasis added). A party who has been sued or otherwise had a legal proceeding instituted against him or her is certainly permitted to express their disagreement with the merits of the proceeding without being liable for defaming the opposing counsel, as such a statement is a non-actionable opinion.

"A statement is constitutionally-protected opinion if it cannot reasonably be interpreted as stating actual facts about the plaintiff, when viewed 'from the perspective of an ordinary reader.'" *Doctor's Data, Inc. v. Barrett*, 170 F.Supp.3d 1087, 1113–1114 (N.D. Ill. 2016) (citations omitted). "To determine whether a statement is factual in nature, Illinois courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content. If it is clear that the speaker is expressing a subjective view or interpretation, such as when the speaker discloses the facts forming the basis for the statement, the statement is not actionable as defamation." *Id*. Here, it is clear that KC is expressing her subjective opinion that the copyright claim was baseless because the defense of fair use is applicable. (Am. Compl., ¶ 81). Furthermore, the terms "false" or even "bad faith" (assuming KC even used that phrase) are so broad in scope that they "lack the necessary detail" and have no "precise and readily understood meaning." *See Solaia Tech., LLC v. Specialty Pub. Co.,* 221 Ill.2d 558, 582–583 (2006) ("The phrase "deeply greedy people" has no precise meaning, and it is not verifiable. Further, the context in which that phrase appeared indicates that it may have been judgmental, but it was not factual. This statement is not actionable"); *Hopewell v. Vitullo,* 299 Ill.App.3d 513, 519-20 (1998) (holding that the term "incompetent" is a nonactionable opinion because there are "numerous reasons why one might conclude that another is incompetent; one person's idea of when one reaches the threshold of incompetence will vary from the next person's"); *Tamburo v. Dworkin,* 974 F.Supp.2d 1199, 1213

(N.D. Ill. 2013) (holding that statements that plaintiff's actions were "unethical" and "deceitful" are "plainly subjective", not "objectively verifiable" and "not actionable"). What does it mean for a claim to be "false" or in "bad faith," and how would one verify that? Courts can and do routinely disagree over whether particular claims have merit. To hold KC liable for expressing her opinion regarding the merits of the copyright strike filed against her by Braun would open any litigant up to liability for defamation if they spoke publicly regarding the merits of the proceedings filed against them. That is not and cannot be the law.

Finally, Braun's allegation that KC defamed her by "accusing [Braun] of not in fact being [] Propson's attorney" is also a nonactionable opinion. Both the transcript of the 11/23 Tik Tok Posts and the GoFundMe page make clear that KC *thought* that Propson may not have hired Braun as her attorney. (*See* RJN, Exh. 2 at p. 2 ("So when this first started to the attorney, I didn't think that it was actually someone Lauren hired"; "So like I said, I thought Jeanette had just gone rogue and not been actually hired . . . ."; *see also* Am. Compl., ¶ 81 (". . . while I understand your desire to protect a creator you enjoy – if you were not legally obtained as counsel for her and I speak on this via my platform, your actions are going to cause her significantly more strife.") "If it is clear that the writer is exploring a 'subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.'" *Moriarty v. Greene,* 315 Ill.App.3d 225, 234–235 (2000) (citing *Haynes v. Alfred A. Knopf, Inc*., 8 F.3d 1222, 1227 (7th Cir.1993)); *see also Brennan,* 351 Ill.App.3d at 969 (finding nonactionable opinion when "statement was not couched in terms of a factual assertion" but rather "as conjecture"). Also, "social contexts are a major determinant of whether an ordinary reader

would view an alleged defamatory statement as constituting fact or opinion" (*id.* at 970); that these statements were made on the Internet/social media underscores that they constitute opinion.[9]

Not only are KC's statements about Braun nonactionable opinions, but they are also subject to a qualified privilege under Illinois law. "Such a privilege may exist 'where the situation involves an interest of the person who publishes the defamatory statement or an interest of the person to whom the matter is published.'" *Tamburo,* 974 F.Supp.2d at 1214 (citation omitted). "Courts also recognize as privileged communications involving a recognized public interest." *Id.* Whether a qualified privilege exists is a question of law for the court. *Id.* KC's statements are privileged because they relate to her interest in protecting her freedom of speech in her social media posts and in *not* being subject to DMCA copyright strikes filed by Braun in response to statements made on social media with which Braun's clients disagree. Moreover, the statements made by KC were published *to those* who share that interest, *i.e.,* other individuals who follow KC, have social media accounts and who have been or could be subject to DMCA copyright strikes filed by Braun. *Id.; Haywood v. Lucent Tech., Inc.*, 169 F.Supp.2d 890, 917 (N.D. Ill. 2001), *aff'd* 323 F.3d 524 (7th Cir. 2003); *Ludlow v. Northwestern Univ.,* 79 F.Supp.3d 824, 845 (N.D. Ill. 2015). "[O]nce qualified immunity has been identified, a plaintiff may overcome this challenge at the pleading stage by alleging the statement was made with actual malice — either knowledge of its falsity or in reckless disregard of the truth." *Id.* at 845. "Courts in this district, however, have looked for something **more than conclusory statements** in order to infer the defendant knew the statements were untrue or recklessly disregarded the truth or falsity of those statements." *Id.* (emphasis

---

[9] Courts have "emphasized the generally informal and unedited nature" of statements made on the Internet. *See Ganske v. Mensch*, 480 F.Supp.3d 542, 553 (S.D.N.Y. 2020) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'"). Social media platforms are "equally — if not more — informal and 'freewheeling' and as such convey "a strong signal to a reasonable reader" that a statement is opinion. *Id.* (referring to statements on Twitter).

added). Here, the Amended Complaint contains nothing more than the conclusory statement that KC's "defamatory statements were made with knowledge of their falsity and with a reckless disregard for the truth . . . ." (Am. Compl., ¶ 190). There are no facts alleged to support this boilerplate allegation, and without such facts, Braun cannot overcome application of the qualified privilege. Because Braun's claims for defamation against KC are legally deficient, Braun cannot satisfy her burden under the Georgia anti-SLAPP statute of demonstrating a probability of prevailing on her defamation claim.

### b. Propson Cannot Prevail on her Defamation Claim.

KC allegedly "defamed" Propson by "publicly stating" in the 10/24/23 Tik Tok Post that Propson was a "TERF" and "transphobic" and "used her platform to attack [Propson's] character and reputation." (*Id.,* ¶ 164). These "false statements" allegedly are defamatory because the "harm to Plaintiff's reputation is obvious and apparent on its face. Being called a transphobic is akin to being called a bigot or a racist . . . ." (*Id.,* ¶ 168). Because Propson allegedly is a "citizen and resident of Wisconsin" (*id.,* ¶ 4), Wisconsin law governs the substantive merit of Propson's claims. *See Townsend,* 227 Ill. 2d at 165; *Kamelgard,* 585 F.3d at 341-42.[10]

With respect to the allegation that KC stated Propson was a "TERF" (which allegedly stands for "Trans-Exclusionary Radical Feminist" defined as "someone who is hostile to the inclusion of trans women in the feminist movement"), that statement is pure opinion and nonactionable under both Wisconsin and Illinois law. *See Wagner v. Allen Media Broad.*, 2024 WL 63689, at *11 (Wis. Ct. App. Jan. 5, 2024) ("Generally speaking, defamation claims must be based on statements of fact rather than expressions of opinion"); *Wesbrook,* 90 F.Supp.3d at 810–811 ("statements of opinion are not defamatory"). "A defamatory statement must: (1) assert or

---

[10] In the event that the Court finds that Illinois law governs a determination of the legal sufficiency of Propson's claims, KC has cited applicable Illinois law in connection with the analysis of Braun's claims. *See* Section I.C.1, *supra.*

imply a fact that is capable of being proven false; or (2) it must assert an opinion that directly implies the assertion of an undisclosed defamatory fact." *Id.* It is not possible to prove that Propson is *not* someone who is hostile to the inclusion of trans women in the feminist movement. Whether Propson is or is not "hostile" to trans women is entirely subjective and could vary from person to person. *Id.* ("statements of opinion are not actionable if they merely express 'a subjective view . . . ."); *Kaminske v. Wisconsin Cent. Ltd.*, 102 F.Supp.2d 1066, 1080–1081 (E.D. Wis. 2000) (holding that "subjective impression" is not "sufficiently factual to be susceptible of being proved true or false"); *Colborn v. Netflix Inc.,* 661 F.Supp.3d 838, 849 (E.D. Wis. 2023) (same). Further, as the Seventh Circuit has held "[w]ords that are mere name calling or found to be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable." *Huon v. Denton*, 841 F.3d 733, 744 (7th Cir. 2016) (applying Illinois law) (citing *Milkovich*, 497 U.S. at 20 (statements that are not reasonably understood as stating actual facts should not be actionable, in order to ensure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation").

As for the allegation that KC defamed Propson by stating she was "transphobic," a transcript of the 10/24/23 Tik Tok Post reveals that KC *never* called Propson "transphobic." (RJN, Exh. 1). Rather, the transcript from the 10/24/23 Tik Tok Post demonstrates that KC stated only that Propson was "following" and "actively liking" social media posts by individuals who posted "incredibly transphobic and hateful rhetoric." (*Id.*, p. 1). Nowhere in the Amended Complaint does Propson allege that this statement is false (*i.e.*, that she did *not* "follow" and "actively like" social media posts by these particular individuals), and the 10/24/23 Tik Tok Post reveals – on its face – that Propson *did* actually like and follow these individuals.[11] Indeed, the Amended Complaint

---

[11] *Osundairo*, 447 F.Supp.3d at 738 (court may consider transcript in determining legal sufficiency of defamation claim).

added an allegation confirming that Propson "interact[ed] with the social media personality" that KC felt posted "hateful and transphobic rhetoric." (Am. Compl., ¶ 36). Given that KC's alleged statement that Propson follows and "likes" these social media posts is *not* false, it cannot form the basis for a defamation claim. *Laughland v. Beckett,* 365 Wis.2d 148, 870 N.W.2d 466, 473 (2015) ("'Substantial truth' is a defense to a defamation action."); *see also Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 563 (2003).[12]

The Amended Complaint also alleges that KC stated in the 10/24/23 Tik Tok Post that Propson is "trying to divert attention by saying she is just pro LGBTQ and bisexual as if that is some kind of hall pass that prevents her from being prejudiced to other sub-genres of the rainbow. Just like any other person can be biphobic, bi people can be transphobic. (Text Caption: 'Unfriendly Reminder: we see transphobic so we're saying transphobic. That aint bullying it's an observation')". (Am. Compl., ¶ 29). Again, KC does not state that Propson *is* transphobic, only that bipeople "can be transphobic," and that Propson has liked and followed individuals on social media who post "incredibly transphobic and hateful rhetoric content" even though she claims to be pro-LGBTQ and bisexual. (*Id.*, ¶¶ 27-29). If anything, KC is expressing her opinion and theory that Propson might be transphobic given the fact that she follows and likes certain individuals on social media. But, as stated above, the expression of a "subjective view, an interpretation, a theory, conjecture or surmise" is "not actionable." *See Moriarty,* 315 Ill.App.3d at 235. As explained above, because Propson does not also identify any particular statement that forms the basis for her

---

[12] The Amended Complaint includes an allegation that KC was "aware" that Propson "followed and liked pro-LGBTQ and pro-trans rights content on social media" (Am. Compl., ¶ 34) and that "KC chose to highlight only [] Propson's interactions with the social media personality, while ignoring and recklessly disregarding evidence contradicting her transphobia claims." (*Id.,* 36). Again, the Amended Complaint identifies no statement by KC that Propson is "transphobic," and allegations that Propson "followed and liked pro-LGBTW and pro-trans content" does not demonstrate the "falsity" of KC's alleged statement that Propson *simultaneously* followed and liked social media content that contained "transphobic and hateful rhetoric." Indeed, the Amended Complaint alleges that KC explained in the 10/24/23 Tik Tok posts that Propson was *saying* she was pro-LGBTQ and bisexual *while at the same time* following and "liking" "transphobic and hateful rhetoric" on social media. (*Id.,* ¶ 29).

"transphobic" allegation[13], the defamation claim based on this allegation must be dismissed for "lack of specificity." *Wesbrook,* 90 F.Supp.3d at 808 (dismissing defamation claim because "the allegations are too vague and conclusory as to the actual *content* of the alleged defamatory statements"); *see also Osundairo*, 447 F.Supp.3d at 738–739 (applying Illinois law).

Even if Propson *had* pled any facts supporting the allegation that KC had accused Propson of being "transphobic," which she did not, ***such a statement is not capable of being proven false and, therefore, is not actionable***. *See e.g., Law Offices of David Freydin, P.C. v. Chamara,* 24 F.4th 1122, 1131 (7th Cir. 2022) (generally calling someone a "chauvinist" or "racist" is a nonactionable statement of opinion); *La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020) ("[A]ccusation[s] of concrete, wrongful conduct are actionable while general statements charging a person with being racist, unfair, or unjust are not"); *Terry v. Journal Broadcast Corp.,* 351 Wis.2d 479, 511–512 (Wis. Ct. App. 2013) (use of terms "rob" and "cheat" were nonactionable opinions under Wisconsin law); *Huon,* 841 F.3d at 744 (mere name calling is not actionable as defamation). Moreover, Propson's defamation claim against KC should be dismissed because accusing someone of being a "TERF" or "transphobic" is ***not*** one of the specific categories of statements that fall within the definition of defamation *per se* under either Wisconsin or Illinois law. *See Kennedy v. Children's Service Soc. of Wisconsin,* 17 F.3d 980, 984 (7th Cir. 1994) (holding that statements must fall with four specific categories to be considered slander *per se* under Wisconsin law:

---

[13] The Amended Complaint alleges that KC's reference to having "receipts" and "deets" was "intended to tell audiences that [KC] had verifiable proof that [Propson] was transphobic." (Am. Compl., ¶ 24). However, nothing in the links/transcripts to KC's 10/24/23 Tik Tok Post can be construed to support a statement by KC that she has "verifiable proof that Propson was transphobic", and this statement cannot form the basis of a defamation claim against KC. *Osundairo*, 447 F.Supp.3d at 742 (holding that defendant did "not make any statements during the podcast that could reasonably be interpreted as being implicated by the allegations in Plaintiffs' complaint"; thus, "Plaintiffs fail to allege with adequate particularity the statements that form the basis for their defamation and false light claims against [defendant].)" Moreover, the Amended Complaint's allegation that "upon information and belief, none of the videos KC linked contain transphobic content" (*id.,* ¶ 31) only underscores that what *is or is not* considered "transphobic" is a matter of opinion that can vary from one individual to another and is *not* a verifiable statement of fact that can support a defamation claim.

imputation of certain crimes; allegations affecting one's business, trade, profession or office; imputation of a loathsome disease; or imputation of unchastity to a woman); *see also Green,* 234 Ill.2d at 491-492. Thus, Propson must plead specific allegations of "special damages resulting from the defamation," which the Amended Complaint fails to do. *See Kennedy v. Children's Service Soc. of Wisconsin* 17 F.3d 980, 985 (7th Cir. 1994) (dismissing claim for defamation for failure to state a claim when special damages were not plead). General allegations of harm to Propson's career, profession and reputation (Am. Compl., ¶¶ 169, 171, 173), or allegations of emotional distress (*id., ¶* 174), are insufficient to adequately plead special damages. *See Rivera v. Allstate Ins. Co.,* 189 N.E.3d 982, 999 (Ill. App. Ct. 2021) (applying Illinois law). Likewise, a conclusory allegation that Propson lost a "contract with a famous documentary channel," without any supporting facts explaining that she lost the contract *because of KC's alleged defamatory statements*, is insufficient to plead special damages. *Quinn v. Jewel Food Stores, Inc*., 276 Ill.App.3d 861, 869–870 (1995) (holding that plaintiff failed to plead special damages for defamation because Plaintiff provided no explanation that denial of a franchise was *because of* defendant's statements).[14]

### c. Plaintiffs Cannot Prevail on Their False Light and Trade Libel Claims.

Because Braun has failed to state a claim for defamation against KC, Braun's false light claims against KC (Counts V and VI) arising out of the same allegations fail as well. *See Madison v. Frazier,* 539 F.3d 646, 659 (7th Cir. 2008) (When an "unsuccessful defamation per se claim is the basis of [a plaintiff's] false-light claim, his false-light invasion of privacy claim fails as well.")[15]

---

[14] The Amended Complaint adds only the allegation that *fans of KC's* allegedly "commented on the famous documentary channel's posts accusing [] Propson of being transphobic" and the "famous travel documentary channel" would no longer post Propson's videos because of an "online controversy surrounding her" and the need "to protect themselves from the negativity." (Am. Compl., ¶ 47). There is no allegation that the channel stopped posting Propson's videos *because of the alleged defamatory statements made by KC*.

[15] The Amended Complaint no longer contains a false light claim asserted by Propson against KC; rather, it asserts two separate false light claims by Braun against KC, both of which are based on the same facts as Braun's defamation claim, *i.e.*, that KC stated Braun filed a "false copyright strike" and Propson never actually hired Braun as an attorney. (*Id.*, ¶¶ 214, 221).

Likewise, because Plaintiffs' trade libel claims against KC (Counts IX and X) are nothing more than a restatement of the defamation claims and based on the same alleged false statements by KC (Am. Compl., ¶¶ 241, 245), the trade libel claims suffer from the same deficiencies as the defamation claims discussed in Sections A.3(a) and (b) above.

### d. Plaintiffs Cannot Prevail on Their Tortious Interference Claims.

Propson's claim for tortious interference against KC (Count XIII) asserts that KC's alleged defamatory statements intentionally interfered with a contract Propson had with a "famous and well-known documentary channel." (*Id.*, ¶¶ 260-266). Braun has likewise asserted a claim against KC for tortious interference with existing and potential business relationships (Count XIV).[16] As a preliminary matter, both claims for "tortious interference" are based on Plaintiffs' ***nonactionable*** allegations of defamation. *See* Sections A.3.(a) & (b), *supra; see also Liebe v. City Finance Co.*, 98 Wis. 2d 10, 13 (Ct. App. 1980) (failed claim for defamation "cannot subject one to liability for tortious interference with a contract").

Furthermore, under Wisconsin law (which applies to Propson's claim), a claim for tortious interference with a contractual relationship requires the plaintiff to allege that the defendant "act[ed] with a purpose to interfere with the ... contract." *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 209 (Wis. Ct. App. 1995). "If an actor lacks 'the purpose to interfere' then his or her 'conduct does not subject [him or her] to liability even if it has the unintended effect of deterring [a third party] from dealing with the [plaintiff].'" *Id.* Necessarily, "[t]o be subject to liability [for tortious interference with a contract], the actor must have *knowledge of* the contract with which he is interfering and the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts, § 766, cmt. I (emphasis added). The Amended Complaint alleges

---

[16] The Amended Complaint refers to alleged false statements made by "Defendants Marston and Vasquez." (Am. Compl., ¶ 268). Thus, it is unclear against whom this claim is now being asserted.

no *facts* establishing that KC knew of and acted with the purpose of interfering with Propson's contract with a "famous travel documentary channel." Rather, the Amended Complaint relies on nothing more than conclusory and insufficient allegations devoid of any facts. (Am. Compl., ¶¶ 44, 261-265); *Roumann Consulting Inc. v. Symbiont Construction, Inc.,* 2019 WL 3501527, at *9 (E.D. Wis., Aug. 1, 2019) ("vague and conclusory allegation is insufficient to state a plausible claim for tortious interference")*.* Indeed, the Amended Complaint makes clear that KC's motivation in making the statements about Propson on Tik Tok was to clear up confusion between her and Propson (*see* Am. Compl., ¶ 33; RJN Exh. 1) – *not* to interfere with a contract between Propson and the unknown documentary channel. Moreover, the Amended Complaint is devoid of *any factual allegations* establishing that KC's statements were the *cause* of the documentary channel's termination of its contract with Propson. *Duct-O-Wire Co. v. U.S. Crane, Inc*., 31 F.3d 506, 509 (7th Cir. 1994) ( "a causal connection [] between the interference and the damages" is an essential element); *Twombly,* 550 U.S. at 570 (complaint must allege "enough facts to state a claim to relief that is plausible on its face . . ."). Rather, it alleges only that the *other individuals – not KC -* commented on the channel's posts accusing Propson of being transphobic, and there is no factual allegation that these individuals were acting at the direction of KC. (Am. Compl., ¶ 45). Moreover, there is no indication that the channel terminated its alleged contract with Propson *because of KC's actions*; the Amended Complaint alleges only that the channel told Propson that "due to the online controversy surrounding her, they needed to protect themselves from the negativity . . . ." (*Id.*., ¶ 47).

Braun's tortious interference claim is equally deficient. Under Illinois law, a claim for tortious interference with prospective economic advantage requires that plaintiffs show (1) their reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of

that expectancy; (3) purposeful interference by the defendants preventing that expectancy from being fulfilled; and (4) damages resulting from such interference. *See Hackman v. Dickerson Realtors, Inc.*, 557 F.Supp.2d 938, 948 (N.D. Ill. 2008). Braun fails to allege any *specific facts* regarding the existing or prospective relationships with which KC allegedly interfered; rather, the Amended Complaint alleges only conclusory allegations that Defendants' alleged defamation "constitutes unlawful interference with [Braun's] existing and potential contracts with its current and prospective clients . . . ." (Am. Compl., ¶ 273). Thus, the interference claim could be based on *any member of "the public"* — there are no specific relationships identified and no facts alleging that KC knew of these potential or existing client relationships. Such conclusory allegations are "too vague to state a viable claim" for tortious interference under Illinois law. *Hackman,* 557 F.Supp.2d at 949 (dismissing tortious interference claim that alleged defendant's conduct "caused unidentified agents to quit Hackman's employ"). Moreover, Braun has alleged no facts to support any allegation that members of the public have failed to employ Braun for legal representation *as a result of* KC's statements. Rather, the claim relies only on an allegation that statements made *by Defendants Jessica Vasquez and Lily Marston (not Defendant KC)* caused Braun to receive "1 star google reviews . . . and had clients end their use of Braun Law for legal services out of fear of harassment." (Am. Comp., ¶ 270). The fact that unidentified individuals left 1-star Google reviews following statements made by *other defendants* certainly does not state a claim for interference against KC. The conclusory allegation that Defendants collectively "interfered with existing and prospective client relationships" also is insufficient. *Hackman,* 557 F.Supp.2d at 949 (dismissing claim based on "generic" allegations that "fall short of establishing the causation required for a claim for tortious interference with an existing business relationship" and are "too attenuated" and "too speculative and vague to state a 'plausible entitlement to relief'").

### e. Plaintiffs Cannot Prevail on Their Emotional Distress Claim.

Plaintiffs' claims for intentional infliction of emotional distress against KC are based on KC's alleged defamatory statements (Counts XV and XVI). (Am. Compl., ¶¶ 275-279, 281-284). Because Plaintiffs have failed to state a claim for defamation, they have also failed to state a claim for emotional distress. *Terry v. Journal Broadcast Corp.*, 351 Wis.2d 479, 515 (Wis. Ct. App. 2013) (affirming dismissal of emotional distress claim that was "derivative" of failed defamation claims); *see also Huon v. Breaking Media, LLC,* 75 F.Supp.3d 747, 773 (N.D.Ill. 2014), *aff'd in part, rev'd in part sub nom Huon v. Denton,* 841 F.3d 733 (7th Cir. 2016) (dismissing emotional distress claims based on failed defamation claim "since statements that do not rise to the level of defamation logically cannot rise to the even higher level of 'extreme and outrageous conduct'").[17]

*       *       *       *

As there is "no probability that [Braun and Propson] will prevail on the claim[s]" they have asserted against KC, the second prong of the Georgia anti-SLAPP statute has been satisfied, the claims asserted against KC should be stricken, and KC entitled to an award of her attorneys' fees.

### B. Alternatively, Plaintiffs' Claims Should Dismissed Under Fed. R. Civ. P. 12(b)(6).

As explained above in Sections A.3(a) through (e) *supra*, Plaintiffs are not likely to prevail on any claim asserted against KC because they are legally deficient, *i.e.*, they fail to state a claim under Fed. R. Civ. P. 12(b)(6). If the Court determines that KC's conduct is not a protected activity

---

[17] The Amended Complaint adds an allegation that KC intentionally inflicted emotional distress on Propson by "threatening [her] with continuing to defame her if she did not admit to being anti-trans" (Am. Compl., ¶ 275); however, there are no *facts* pled in the Amended Complaint to support this allegation. The Amended Complaint also includes allegations of an "online mob" being incited to act against or harass Plaintiffs as a result of some conduct by KC. (*Id.,* ¶¶ 278, 281). Again, aside from these conclusory allegations, there are no *facts* regarding KC's purported incitement of an online mob. Rather, the Amended Complaint contains factual allegations *only* relating to statements allegedly made by KC in her Tik Tok post and Go Fund Me webpage, none of which reflect efforts by KC to encourage viewers of her post to take any action with respect to and/or against Plaintiffs.

under the first prong of the Georgia anti-SLAPP statute (OCGA § 9-11-11.1(b)(1)), KC respectfully requests that the Court alternatively dismiss the claims under Fed. R. Civ. P. 12(b)(6).

### C. Alternatively, Propson's Claims Should Be Dismissed Under Fed. R. Civ. P. 12(b)(3) as Her Claims Have Zero Nexus to Illinois.

A civil action is properly venued in (1) a judicial district in which any defendant resides, if all defendants reside in the State housing the district; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; or (3) if there is no such district in which the action may otherwise be brought, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to the action. *See* 28 U.S.C. § 1391(b); *see also Clark v. McDonald's Corp.,* 2023 WL 2648467, at *2 (S.D. Ill. Mar. 27, 2023). As explained above, two different plaintiffs have brought ten causes of action against KC (four by Propson and six by Braun), and "venue must be proper as to each cause of action". *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 681 F. Supp. 1297, 1301 (N.D. Ill. 1988).

Federal Rule of Civil Procedure 12(b)(3) permits a pre-answer motion to dismiss on the grounds of improper venue, and 28 U.S.C. § 1406(a) allows a court to dismiss a case when venue is improper. *See* 28 U.S.C. § 1406(a) (providing that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss . . . ."). "[D]istrict courts often dismiss a case, rather than transfer it under Section 1406(a), if the plaintiff's attorney reasonably could have foreseen that the forum in which the suit was filed was improper and that similar conduct should be discouraged." *See* 14D Fed. Prac. & Proc. Juris. 3d § 3827. Here, venue is improper with respect to Propson's claims against KC because Propson is a resident of Wisconsin, KC is a resident of Georgia, and none of the claims asserted by Propson against KC have any connection to Illinois (*i.e.,* no statements made or directed at Illinois, no injury in Illinois). As explained above, Illinois law does not apply to any of the claims asserted by Propson against

KC. (*See* Sections A.3(b) and (e), *supra*). Propson should have filed this action in Wisconsin or Georgia, but she chose to tie her claims to those asserted by Braun for *her own* convenience. That is not a reason for this Court to decide this issue, and dismissal is warranted under Rule 12(b)(3).

## III.   CONCLUSION.

Based on the foregoing, KC respectfully requests that this Court: (1) strike Counts I, II, V, VI, IX, X, XIII, XIV, XV, and XVI under OCGA § 9-11-11.1 and award KC the attorneys' fees under OCGA § 9-11-11.1 (b.1); or, alternatively, (2) dismiss Counts I, II, III, IV, V, VI, IX, X, XIII, XIV, XV, and XVI for failure to state a claim under Rule 12(b)(6); or, alternatively, (3) dismiss Counts I, IX, XIII and XV for improper venue under Rule 12(b)(3).

Dated: April 22, 2024                                   Respectfully Submitted,

*s/ Brandon J. Witkow*
Attorney for Defendants

Brandon J. Witkow [pro hac vice]
WITKOW | BASKIN
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
(818) 296-9508
bw@witkowlaw.com


 *s/ Amy M. Doig*
Attorney for Defendants

Amy M. Doig
COZEN O'CONNOR
123 N. Wacker Dr., Suite 1800
Chicago, Illinois 60606
(312) 474-7900
adoig@cozen.com

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that the foregoing document was filed and served on all counsel of record noted below via the CM/ECF system of the United States District Court of the Northern District of Illinois.

> Benjamin C.R. Lockyer
> Lockyer Law LLC
> 100 N. Riverside Plaza, Suite 2400
> Chicago, Illinois 60606
> ben@lockyerlaw.com
>
> ***Attorney for Plaintiffs***

Dated:  April 22, 2024                          *s/ Brandon J. Witkow*
                                                          Brandon J. Witkow