**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEANNETE BRAUN, BRAUN IP LAW, LLC, & LAUREN PROPSON, | ) ) | |
| Plaintiffs, | ) ) | Case No. 23 C 16856 |
| v. | ) ) | |
| | ) | |
| REBEKAH M. DAY NEE BOX, KC THE OWNER & OPERATOR OF THE ONLINE SOCIAL MEDIA ACCOUNT @CAFFINATEDKITTI, LILY MARSTON, & JESSICA VAZQUEZ | ) ) ) ) ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT KC THE OWNER AND OPERATOR OF THE SOCIAL MEDIA
ACCOUNT @CAFFINATEDKITTI'S REPLY BRIEF IN SUPPORT OF SPECIAL
MOTION TO STRIKE AMENDED COMPLAINT PURSUANT TO O.C.G.A.
§ 9-11-11.1, OR, IN THE ALTERNATIVE, MOTION TO DISMISS
PURSUANT TO FED. R. CIV. PROC. 12(B)(6) & 12(B)(3)**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II. THE OPPOSITION FAILS TO DEMONSTRATE THAT PLAINTIFFS'
    CLAIMS SURVIVE THE GEORGIA ANTI-SLAPP STATUTE OR FED. R.
    CIV. P. 12(b)(6) ..............................................................................................2

    A.  Plaintiffs Fail to Demonstrate that KC's Statements Were Not a "Protected
        Activity" Under the Georgia Anti-SLAPP Statute .....................................2

        1.  There is No Factual Dispute as to Whether KC's Statements
            Regarding Propson are a "Protected Activity" Under the anti-
            SLAPP Statute ..............................................................................2

        2.  There is No Factual Dispute as to Whether KC's Statements
            Regarding Braun are a "Protected Activity" Under the anti-SLAPP
            Statute  ..........................................................................................6

    B.  The Opposition Fails to Demonstrate That Plaintiffs' Claims Are Legally
        Sufficient...................................................................................................8

        1.  Plaintiffs Cannot State a Claim for Defamation ...........................8

            a.  Braun's Defamation Claim Against KC is Legally
                Insufficient ........................................................................8

            b.  Propson's Defamation Claim Against KC is Legally
                Insufficient ......................................................................14

        2.  Plaintiffs Cannot State Claims for False Light and Trade Libel....16

        3.  Plaintiffs Cannot State Claims for Tortious Interference .............16

        4.  Plaintiffs Cannot State Claims for Emotional Distress.................17

III. THE OPPOSITION FAILS TO DEMONSTRATE THAT VENUE IS PROPER
     IN THIS DISTRICT ......................................................................................18

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*ACLU, Inc. v. Zeh,*
   312 Ga. 647, 864 S.E.2d 422 (2021)..................................................................3, 7

*Alzheimer's Found. Of Amer., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.,*
   796 F.Supp.2d 458 (S.D.N.Y. 2011).................................................................11

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.,*
   2013 WL 3460707 (N.D. Cal. July 9, 2013)..................................................11

*Amin v. NBCUniversal, LLC,*
   2022 WL 16964770 (S.D. Ga. Nov. 16, 2022)..................................................3, 4

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..........................................................................17

*Bauer v. Hill,*
   2022 WL 18397513 (C.D. Cal. Nov. 23, 2022)..................................................11

*Bielanski v. County of Kane,*
   550 F.3d 632 (7th Cir. 2008) ...................................................................2

*Brennan v. Kadner,*
   351 Ill.App.3d 963 (2004) ...................................................................13

*Brian v. Richardson,*
   87 N.Y.2d 46 (1995) .........................................................................11

*Buckley v. DIRECTV, Inc.,*
   276 F.Supp.2d 1271 (N.D. Ga. 2003).........................................................6, 13

*Cincinnati Ins. Co. v. E. Atl. Ins. Co.,*
   260 F.3d 742 (7th Cir. 2001) ..................................................................5

*Complex Media, Inc. v. X17, Inc.,*
   2019 WL 2896117 (C.D. Cal. Mar. 4, 2019)...................................................7

*Ganske v. Mensch,*
   480 F.Supp.3d 542 (S.D.N.Y. 2020)........................................................10, 12

*GetFugu, Inc. v. Patton Boggs LLP,*
   220 Cal.App.4th 141 (2013) ..................................................................11

*Glocoms Group, Inc. v. Center for Public Integrity,*
  2018 WL 2689434 (N.d. Ill., June 5, 2018) ................................................3

*Hackman v. Dickerson Realtors, Inc.,*
  557 F.Supp.2d 938 (N.D. Ill. 2008) ......................................................17

*Hilton v. Hallmark Cards,*
  599 F.3d 894 (9th Cir. 2010) .........................................................3, 4

*Jacobson v. CBS Broad., Inc.,*
  19 N.E.d3 1165 (Ill. App. Ct. 2014) ....................................................16

*Kapotas v. Better Government Ass'n,*
  30 N.E.3d 572 (Ill. App. Ct. 2015) ......................................................17

*Lane Derm. V. Smith,*
  861 S.E.2d 196 (Ga. Ct. App. 2021) ......................................................5

*Laughland v. Beckett,*
  365 Wis.2d 148 (2015) ...................................................................15

*Law Offices of David Freydin, P.C. v. Chamara,*
  24 F.4[th] 1122 (7th Cir. 2022) ..........................................10, 11, 12, 15

*LoggerHead tools, LLC v. Sears Holding Corp.,*
  2013 WL 1858590 (N.D. Ill., May 1, 2013) ...............................................17

*Ludlow v. Northwestern Univ.,*
  79 F.Supp.3d 824 (N.D. Ill. 2015) .......................................................14

*Madison v. Frazier,*
  539 F.3d 646 (7th Cir. 2008) ..........................................................16

*Makhsous v. Mastroianni,*
  2020 WL 1530740 (N.D. Ill. Mar. 31, 2020) ..............................................16

*Masson v. New Yorker Magazine,*
  501 U.S. 496 (1991) ......................................................................3

*Masters v. Hesston Corp.,*
  291 F.3d 985 (7th Cir. 2002) ...........................................................8

*Moonbug Ent. Ltd., et al. v. Babybus (Fujian) Network Tech. Co., Ltd.,*
  2022 WL 580788 (N.D. Cal. Feb. 25, 2022) ................................................8

*Morgan v. Mainstreet Newspapers, Inc.,*
  368 Ga.App. 111 (Ga. Ct. App. 2023) .....................................................5

*Moriarty v. Greene,*
    315 Ill.App.3d 225 (2000) .................................................................................. 12

*Morton Grove Pharm. V. Nat'l Pediculosis Ass'n,*
    525 F.Supp.2d 1039 (N.D. Ill. 2007) ................................................................. 18

*Osundairo v. Geragos,*
    447 F.Supp.3d 727 (N.D. Ill. 2020) ............................................................ 7, 9, 14

*Overhill Farms, Inc. v. Lopez,*
    190 Cal.App.4th 1248 (2010) ............................................................................ 15

*Rosser v. Clyatt,*
    348 Ga. App. 40 (2018) ....................................................................................... 4

*Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996,*
    302 F.3d 998 (9th Cir. 2002) ............................................................................. 11

*Tamburo v. Dworkin,*
    974 F.Supp.2d 1199 (N.D. Ill. 2013) .................................................................. 9

*Wilkes & Mchugh, P.A. v. LTC Consulting, L.P.,*
    306 Ga.252, 830 S.E.2d 119 (2019) ................................................................... 5

*Young v. NeoCortext, Inc.,*
    2023 WL 6166975 (C.D. Cal. Sept. 5, 2023) ...................................................... 4

## **STATUTES**

17 U.S.C. § 512(c)(3)............................................................................................... 8

Fed. R. Civ. P. 12(b)(3)........................................................................................... 18

Fed. R. Civ. P. 12(b)(6)......................................................................................... 2, 7

OCGA § 9-11-11.1(b)(1) ......................................................................................... 3

OCGA § 9-11-11.1(c)(2) ....................................................................................... 7, 8

## I.     INTRODUCTION

Defendant KC's Motion to Strike under the Georgia anti-SLAPP statute demonstrates that Plaintiffs Lauren Propson's ("Propson") and Jeanette Braun's ("Braun") (collectively, "Plaintiffs") claims for defamation and related torts should be stricken, as they are based on statements made by KC in a public forum about issues that are in the public's interest or concern and about an individual who unquestionably is in the public eye. Not only that, but Plaintiffs' defamation claims fail as a matter of law because they are based on constitutionally protected opinions, *not* verifiable statements of fact. In making this demonstration, KC's anti-SLAPP Motion is based on *nothing* other than the allegations of the Amended Complaint and is supported by ample legal authority.

Plaintiffs' Opposition, on the other hand, is long on pages and short on substance. Plaintiffs fail to address, discuss, or distinguish any of the cases cited in KC's Motion, nor do they rely on any authorities to demonstrate the inapplicability of the Georgia anti-SLAPP statute or the viability of their claims. Plaintiffs make no attempt to argue that KC's statements were *not* made in connection with a public interest or concern, as required under the anti-SLAPP statute, instead they curiously argue that "factual disputes" preclude striking the Amended Complaint. There can be no factual disputes, however, as KC's Motion rests *entirely* on the allegations of the Amended Complaint. A conclusory cry of "factual dispute" simply is not enough to avoid an anti-SLAPP motion to strike. As to the legal sufficiency of Plaintiffs' claims, Plaintiffs have made no effort to address or counter the numerous cases cited in KC's Motion demonstrating that her statements are constitutionally protected opinions. Instead, Plaintiffs once again make general, unsupported claims that KC's statements are "mixed opinions" or are "verifiable" – assertions that belie the plain allegations of the Amended Complaint and the authorities set forth in KC's motion. Accordingly, KC respectfully requests that

this Court grant her Motion to Strike and award her attorneys' fees under the Georgia anti-SLAPP

statute or, alternatively, dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).

## II. THE OPPOSITION FAILS TO DEMONSTRATE THAT PLAINTIFFS' CLAIMS SURVIVE THE GEORGIA ANTI-SLAPP STATUTE OR FED. R. CIV. P. 12(b)(6).

### A. Plaintiffs Fail to Demonstrate that KC's Statements Were Not a "Protected Activity" Under the Georgia Anti-SLAPP Statute.

Plaintiffs' Opposition *concedes* that Georgia law would apply to an anti-SLAPP determination

given that KC is a citizen of Georgia and that this Court *can* make an anti-SLAPP determination

based solely on the allegations of the Amended Complaint, applying a Fed. R. Civ. P. 12(b)(6)

standard. (Opposition ("Opp."), pp. 3-7). Plaintiffs do not dispute the anti-SLAPP standard laid out

in KC's Motion to Strike, nor do they take issue with or distinguish *any* of the authorities KC has

cited in her Motion. Instead, Plaintiffs Opposition hinges on the singular argument that this Court

should deny the anti-SLAPP motion because it relies on "disputed facts that are outside the Amended

Complaint and not appropriate for a motion to dismiss." (Opp., p. 8). While it is certainly true that

this Court is not permitted to consider matters outside the allegations of the Amended Complaint or

judicially noticeable documents in ruling on an anti-SLAPP motion at this stage of the litigation,

Plaintiffs' assertion that KC has relied on external, disputed facts is nonsensical. As made clear in her

anti-SLAPP motion and explained below, KC's motion relies on *nothing* other than the factual

allegations of the Amended Complaint, and those allegations must be accepted as true when ruling

on KC's motion under a Rule 12(b)(6) standard. *See Bielanski v. County of Kane,* 550 F.3d 632, 633

(7th Cir. 2008) (court will "accept as true all well-pleaded facts" in ruling on a Rule 12(b)(6) motion).

### 1. There is No Factual Dispute as to Whether KC's Statements Regarding Propson are a "Protected Activity" Under the anti-SLAPP Statute.

As explained in KC's anti-SLAPP motion, the Court must grant a Motion to Strike under

Georgia anti-SLAPP law if: (1) the speech is considered a "protected activity" under the Georgia anti-

SLAPP statute, and (2) the plaintiff cannot establish that there is a probability it will prevail on its claim. *See ACLU, Inc. v. Zeh,* 312 Ga. 647, 650 (2021). Speech is a "protected activity" if it is "in furtherance of the person's or entity's right of petition or free speech under the Constitution . . . ***in connection with an issue of public interest or concern***." *See* OCGA § 9-11-11.1(b)(1) (emphasis added). Relying *only on* the allegations of the Amended Complaint, KC's Motion establishes that her statements were made in connection with an issue of "public interest or concern," because they were made in an open place or forum (*i.e.*, on social media) regarding someone in the public eye (*i.e.*, an admitted social media persona with "millions of followers") and concerning a matter of public interest (*i.e.*, confusion between KC and a social media persona with "millions of followers" who has "liked" and "followed" posts containing hateful and transphobic rhetoric).  (Motion, pp. 8-11).

In their Opposition, Plaintiffs do not dispute that the statements were made in an "open place or forum"; rather they argue that "the parties are in dispute over whether [] Propson is a limited purpose public figure, and whether all aspects of her life are in the public eye." (Opp., p. 8). This assertion is nonsensical, as KC has *never* argued that Propson was a "limited purpose public figure" or that "all aspects of her life are in the public eye." Rather, as explained above, in determining whether an issue is one of "public interest or concern" for purposes of the Georgia anti-SLAPP statute, one factor courts consider is whether the subject of the speech (*i.e.*, Propson) is "in the public eye." *Amin v. NBCUniversal, LLC,* 2022 WL 16964770, at *6 (S.D. Ga. Nov. 16, 2022).[1] KC's Motion

---

[1] Plaintiffs appear to confuse the term "in the public eye" for purposes of determining the application of an anti-SLAPP statute with the term "limited purpose public figure" for purposes of pleading a claim for defamation (*i.e.*, "limited purpose public figures" must plead and prove actual malice for defamation claim). *See e.g., Masson v. New Yorker Magazine,* 501 U.S. 496, 508 (1991). Nowhere in KC's Motion to Strike, does KC argue that Propson is a "limited purpose public figure" requiring Propson to plead and prove that KC acted with actual malice. Indeed, the two terms are quite distinct, as a "limited purpose public figures" are those who "thrust themselves to the forefront of *particular* public controversies." *See e.g., Glocoms Group, Inc. v. Center for Public Integrity,* 2018 WL 2689434, at *5 (N.D. Ill., June 5, 2018). An individual who is in the "public eye" for purposes of the anti-SLAPP, on the other hand, is one who is merely a "public figure and a subject of public interest" with "widespread public recognition." *See e.g., Hilton v. Hallmark Cards,* 599 F.3d 894, 907 (9th Cir. 2010). Given Propson's own allegation that she has "millions of followers" on social media (Am. Compl., ¶ 41), she most certainly falls within this definition.

explains that *the Amended Complaint alleges* that Propson is a social media persona who has "*amassed millions of followers* on the social media platform TikTok, *as well as sponsorships and monetization of her videos."* (Motion, p. 10 (citing Am. Compl., ¶¶ 40-42) (emphasis added)).  If *millions of people* follow Propson on social media, how can she *not* be in "the public eye"?  Further, the Amended Complaint alleges that "*[d]ue to Propson's following*, the [purported] allegation that she is transphobic *spread quickly throughout the internet,* and became the source of *multiple* posts, comments and blog articles." (*Id.,* ¶ 38) (emphasis added).  Thus, by the very allegations of her Amended Complaint, Propson concedes she is in the "public eye" – *there is no factual dispute.  See Hilton,* 599 F.3d at 907, n. 8 (finding that there was no factual dispute as to whether plaintiff - who was a "public figure and a subject of public interest" - was in the "public eye" for purposes of anti-SLAPP); *Young v. NeoCortext, Inc.*, 2023 WL 6166975, at *5 (C.D. Cal. Sept. 5, 2023) (holding that no factual dispute as to whether reality show cast member is "in the public eye" for purpose of anti-SLAPP statute); *compare Amin,* 2022 WL 16964770, at *7 (holding that plaintiff physician who was alleged to be a "private figure" and "private individual" was *not* person in the public eye for purposes of Georgia anti-SLAPP statute).  Moreover, while the Opposition generally asserts that KC relies on matters outside of the Amended Complaint to establish that Propson is in the public eye, it points to no such "external matters", and none exist.

Not only are KC's statements protected under the Georgia anti-SLAPP statute because they involve a person in the "public eye," but as explained in KC's Motion, her statements also involve an issue of "public concern." Namely, whether Propson – who alleges to have "amassed millions of followers" for her "educational videos" – likes and follows individuals who post "hateful and transphobic rhetoric" is a matter of public concern or interest, particularly when the public is confusing KC and Propson. *See Rosser v. Clyatt,* 348 Ga. App. 40, 44 (2018) (statements that would

affect more than 13,000 members of a corporation is of "legitimate public concern"); *Lane Derm. v. Smith,* 861 S.E.2d 196, 204 (Ga. Ct. App. 2021) (broadly finding that "any issue in which the public is interested" is protected under anti-SLAPP). KC's Motion relies on *nothing* other than the allegations of the Amended Complaint to demonstrate that KC made these statements in connection with this issue of public interest or concern. (*See* Am. Compl., ¶ 33 ("Defendant KC stated that she was making her claims because people were confusing Ms. Propson's "Lauren the Mortician" persona with Defendant KC's "@CaffinatedKitti" persona . . . ."); *Id.,* ¶¶ 27-28 ("Defendant KC goes on to explain the meaning of her opening statement in the video by stating: '[A]nd not only was [Propson] following him but she was actively liking incredibly transphobic and hateful rhetoric and content")).

Indeed, Plaintiffs' Opposition does not dispute that whether Propson likes and follows "hateful and transphobic rhetoric" *is* a matter of public interest or concern, nor does the Opposition argue that whether the public is confusing Propson and KC *is* a matter of public interest or concern under anti-SLAPP law, thereby conceding this issue.[2] Rather, the Opposition argues *only* that there is a "factual dispute" as to whether social media users were *actually* confused between Propson and KC, and whether the social media content Propson was actively following and liking *actually* contained "hateful and transphobic rhetoric." (Opp., p. 9). However, the question under Georgia anti-SLAPP law is whether the KC's statements are "***connected*** with a public issue and/or an issue of public concern." *Morgan v. Mainstreet Newspapers, Inc.*, 368 Ga.App. 111, 116–117 (Ga. Ct. App. 2023). Whether or not individuals were *actually* confused or whether the social media content *actually* contained hateful and transphobic rhetoric is irrelevant. For example, in *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 263 (2019), the plaintiffs, who owned a nursing home, sued the defendant (a law firm) for defamation based on defendant's running of ads informing the public of

---

[2] *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (where a party fails to address a non-frivolous or dispositive argument, it is appropriate to infer acquiescence, and "acquiescence operates as a waiver.")

deficiencies at the nursing home and stating that it was available to provide legal services to those who had been injured there. The court held that the ads were protected as "an act in furtherance of the defendants' constitutional right of free speech in connection with a public issue or an issue of public concern." *Id.* Certainly, the plaintiff disputed that its nursing home *actually* was deficient or *actually* caused injuries given its defamation claim, but that "dispute" would not preclude the court from finding the ads were made in connection with a matter of public concern. In any defamation action, a plaintiff disputes the veracity of the statement made. If that were sufficient to create a "factual dispute" to preclude an anti-SLAPP motion on the pleadings, no defendant would ever be able to move to strike at this stage of the proceedings, which certainly is not the case. *See e.g., Buckley v. DIRECTV, Inc.*, 276 F.Supp.2d 1271, 1273–1275 (N.D. Ga. 2003) (granting anti-SLAPP motion based on pleadings alone, finding that allegations of complaint demonstrated that claims involved an issue that "affects millions" and "[a]ny action involving such a large number of people is, by definition, a matter of public interest and concern"). Thus, KC's statements regarding Propson must be considered a "protected activity" under the Georgia anti-SLAPP statute.

2. **There is No Factual Dispute as to Whether KC's Statements Regarding Braun are a "Protected Activity" Under the anti-SLAPP Statute**.

Plaintiffs have employed the same tactic in claiming that "factual disputes" prevent the Court from striking Braun's claims against KC under the Georgia anti-SLAPP statute. As explained in KC's Motion, Braun's allegations against KC are based on KC's statements accusing Braun of filing a "false copyright claim" or "bad faith" copyright strikes under the DMCA against KC, and the Amended Complaint alleges that KC claimed the DMCA strikes were "false" because her use of Propson's alleged copyrighted material was "fair use." (Motion, p. 11) (*citing* Am. Compl., ¶¶ 65-66, 75, 81). The Opposition does not dispute that a statement in a public forum regarding the filing of a "false" or "bad faith" copyright strike by a lawyer constitutes a matter of "public concern" under

Georgia anti-SLAPP law. The Opposition also does not dispute that a statement in a public forum that a lawyer has taken it upon herself to file a "false" or "bad faith" copyright strike without being retained constitutes a matter of public concern under Georgia anti-SLAPP law. Thus, Braun concedes these arguments. Instead, the Opposition argues *only* that there is a factual dispute as to whether KC's use of Propson's content *actually* constituted fair use and whether Braun *actually* was retained by Propson. (Opp., p. 10). As explained above, whether KC's use of Propson's material *actually* constituted fair use or whether Braun *actually* was retained by Propson is irrelevant here. The question under Georgia anti-SLAPP law is whether KC made her statements ***in connection with*** an issue of "public concern" – *i.e.* whether a lawyer is filing false or bad faith DMCA copyright strikes against those who post unflattering statements about her clients constitutes a matter of public concern. *Zeh*, 312 Ga. at 650 (holding that blog post asserting that plaintiff, public defender, had charged an indigent client a fee for his public defense services was a "protected activity"); *Complex Media, Inc. v. X17, Inc.*, 2019 WL 2896117, at *4 (C.D. Cal. Mar. 4, 2019) (conduct affecting the availability of videos in this large online community is a concern for each subscribing member of the public and thus 'an issue of public interest'"). Simply because Braun disagrees with the statements KC made about her – *as all plaintiffs in a defamation lawsuit undoubtedly do* – does not mean that there is a "factual dispute" as to whether they were made *in connection with* a public issue precluding an anti-SLAPP motion at the pleading stage. If that were true, *no* defamation defendant could *ever* move to strike under the anti-SLAPP statute under Rule 12(b)(6), which certainly is not the case.

Finally, the Opposition asserts the untenable argument that there is a "factual dispute" as to whether KC's statements about the filing of a DMCA copyright strike constitute a "protected activity" made in connection with an "official proceeding" under the Georgia anti-SLAPP statute. *See* OCGA § 9-11-11.1(c)(2); (*see also* Motion, pp. 11-12). The filing of a DMCA copyright strike falls within

the definition of an "official proceeding" because the DMCA specifically authorizes and outlines the procedure for filing a copyright strike with an online service provider. *See* 17 U.S.C. § 512(c)(3). The Opposition argues that this is a "factual dispute" because "no court in federal or state court has ever found that a DMCA process constitutes an official proceeding for purposes of anti-SLAPP." (Opp., p. 10). However, whether a DMCA copyright strike falls within the scope of OCGA § 9-11-11.1(c)(2) is a *question of law* for this Court to decide, so there can be no "factual dispute." *Masters v. Hesston Corp.*, 291 F.3d 985, 989 (7th Cir. 2002) ("The interpretation of a statute is a question of law"). Also, Plaintiffs' claim that "no court" has ever considered this issue is patently incorrect. *See Moonbug Ent. Ltd., et al., v. Babybus (Fujian) Network Tech. Co., Ltd.*, 2022 WL 580788, at \*13 (N.D. Cal. Feb. 25, 2022) (holding that filing DMCA notices with YouTube was an act in furtherance of the plaintiff's rights of free speech because, in part, it was made in connection with an issue under review by "other official proceeding"). Thus, KC has satisfied the first prong of the Georgia anti-SLAPP statute.

**B.     The Opposition Fails to Demonstrate That Plaintiffs' Claims Are Legally Sufficient.**

**1.     Plaintiffs Cannot State a Claim for Defamation.**

In her Motion, KC cited cases demonstrating that Plaintiffs' defamation claims against KC fail because (1) KC's statements are nonactionable, constitutionally protected *opinions,* and (2) Braun's defamation claim against KC is subject to a qualified privilege under Illinois law. The Opposition does not distinguish, discuss or even mention *any* of the cases cited by KC. Instead, Plaintiffs make conclusory assertions regarding the viability of their defamation claims unsupported by any legal authority – a strategy that falls far short of overcoming a motion to strike or dismiss.

**a.     Braun's Defamation Claim Against KC is Legally Insufficient.**

First, as to Plaintiffs' "bad faith" or "false" copyright strike allegations, KC's Motion explains that KC's statements were the expression of *her opinion* regarding the copyright strike filed against

8

her, and it cites ample legal authorities demonstrating that the terms "bad faith" and "false" are so broad in scope that they have no "precise and readily understood meaning" and "lack the necessary detail" to be actionable.  (*See* Motion, pp. 14-16) (citing *e.g., Tamburo v. Dworkin,* 974 F.Supp.2d 1199, 1213 (N.D. Ill. 2013) (holding that statements that plaintiff's actions were "unethical" and "deceitful" are "plainly subjective", not "objectively verifiable" and "not actionable")).[3]  Plaintiffs ignore these cases and rely solely on the conclusory assertion that KC's purported statements regarding the "bad faith" or "false" copyright strike are in fact verifiable by looking to "the context of [KC's] own statement and the Illinois Rules of Professional Conduct." (Opp., p. 20).[4]  However, KC's "own statement" (*i.e.*, the 11/23 Tik Tok Posts and the GoFundMe page) do not provide any context as to how the copyright strike could be verified as *not* "false" or *not* in "bad faith."  In fact, as explained in the Motion, the 11/23 Tik Tok Posts do not even use the term "false copyright strike" or "bad faith copyright strike." (Dkt. No. 39-1 (RJN) at Exh. 2).[5]  Rather, in the 11/23 Tik Tok Posts

---

[3] A review of the full 11/23 Tik Tok Post or the certified transcript submitted with KC's Request for Judicial Notice ("RJN") demonstrates that KC does not even refer to the copyright strike filed by Braun as being in "bad faith" or "false."  (Motion, p. 14). The Opposition argues that it is improper for the Court to review KC's Tik Tok video post containing the alleged defamatory statements in its entirety or a certified transcript of the video post because they are "not in the four corners of the Amended Complaint." (Opp., p. 21). Plaintiffs also claim that KC's RJN only submitted a "link" to the Tik Tok "video with auto-generated captions", and *not* a certified transcript. (Opp., p. 22, n. 9). Plaintiffs are mistaken on both accounts. ***First***, "where a document is referenced in the complaint and central to plaintiff's claims, the Court may consider it in ruling on the motion to dismiss." *Osundairo v. Geragos,* 447 F.Supp.3d 727, 738 (N.D. Ill. 2020) (holding court could consider transcripts of television show in ruling on motion to dismiss defamation claims because "Plaintiffs explicitly refer to these media appearances in their Complaint and the very statements at issue were made by Defendants during these media appearances"). ***Second***, Exhibits 1 and 2 to the RJN *actually do* set forth *certified* transcripts of both Tik Tok videos on which this action is based. (Dkt. No. 39-1 (RJN) at Exhs. 1 and 2)).

[4] The Opposition cites *Osundairo* for this proposition, curiously relying on a holding from this Court's opinion from that case regarding the "innocent-construction rule." (Opp., p. 20). Plaintiffs also reference the innocent-construction rule later in their Opposition. (*Id.,* p. 22). KC has never argued that the innocent-construction rule applies to the alleged "bad faith" and "false" copyright claim statements; thus, the reliance on this authority is inapplicable.

[5] The Opposition sets forth purported "relevant text" from the 11/23 Tik Tok Posts which make reference to "bad faith copyright infringement strikes" (Opp., p. 22). However, when read *in context* and filling in the text that has been strategically omitted, it is apparent that the phrase "bad faith copyright strike" used by KC is *not* in reference to the copyright strike filed by Braun against her. Rather, KC is explaining that she found the copyright strike filed against her by Braun ironic given that Propson herself "uses other content creators content and their pictures of their comment section and the like, all the things [Propson] is saying in [her] case are trademark, copyright infringement, et cetera. And so I am just saying if you are gonna to go that route and say that's the case for you, you might want to put up a metaphorical pool fence to protect your own assets, before one of them almost drowns in, bad faith, copyright

KC expresses only her belief that the copyright strike Braun filed against her on behalf of Propson was "bizarre" and that she disagreed that she had committed copyright infringement. (*Id.,* at p. 2). As explained below, any statements by KC regarding her view of the merits of the copyright strike Braun filed against her are protectable opinions.[6] Moreover, the Court must consider the context in which KC made these statements, *i.e.*, a social media post from KC's personal account in which KC is sharing her perspective of her interactions with Plaintiffs. (Motion, p. 17 and n. 9) (citing *Ganske v. Mensch*, 480 F.Supp.3d 542, 533 (S.D.N.Y. 2020) (holding social media platforms are "informal and freewheeling" and convey a "strong signal to a reasonable reader" that a statement is opinion); *see also Law Offices of David Freydin, P.C. v. Chamara,* 24 F.4th 1122, 1130 (7th Cir. 2022) (holding that readers of online reviews would be "skeptical about what they read, both positive and negative")).

While the response email KC posted on her GoFundMe page does use the term "false copyright strike" in the email's subject line, the email response itself does not provide any factual context sufficient to verify whether or not the copyright strike was "false." In fact, in the email response, KC *specifically asks* Braun to provide "further details" as to "how the video had grounds for a copyright strike" and KC expresses her belief that her use of the video "falls under fair use." (Am. Compl., ¶ 81) ("My team and I would love further details on your client and how the video had grounds for a copyright strike, as it clearly falls under fair use"). That is the *only* context provided for the use of the amorphous term "False Copyright Claim" in the subject line of the email response.

---

infringement strikes." (Dkt. No. 39-1 (RJN), Exh. 2 at p. 4). Thus, the reference to "bad faith copyright infringement strikes" is to strikes that might be filed against Propson for her potential use of other content creator's protected content, not the strike filed by Braun.

[6] The Opposition argues that KC's alleged "bad faith copyright infringement strike" statement in the 11/23 Tik Tok Posts "implies the existence of undisclosed facts and thus makes it a mixed opinion relying on facts." (Opp., p. 23). Putting aside that the 11/23 Tik Tok Posts do not refer to the copyright strike filed by Braun as "bad faith," the Opposition does not identify what "undisclosed facts" the existence of which this alleged statement supposedly "implies." Instead, the Opposition simply states over and over again – without any authority or explanation - that KC's 11/23 Tik Tok Posts state that Braun filed a "bad faith copyright infringement strike" and such a statement is a "verifiable falsehood." (*Id.*)

Does KC's statement of her belief that her video fell within "fair use" constitute actionable defamation? Of course not. Thus, this context certainly does not transform KC's use of the term "False Copyright Claim" into a "verifiable fact." Indeed, "[d]eprecatory statements regarding the merits of ligation are nothing more than the predictable opinion of one side to the lawsuit and cannot be the basis for a defamation claim." *Bauer v. Hill*, 2022 WL 18397513, at *6 (C.D. Cal. Nov. 23, 2022) (citing *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal.App.4th 141, 156 (2013)); *see also Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2013 WL 3460707, at *4 (N.D. Cal. July 9, 2013) (holding that statements party to copyright action made in online blog post regarding the merits case "expressed Ozimals' opinions and purported to apply Ozimals' understanding of copyright law as applied to the facts"); *Alzheimer's Found. of Amer., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F.Supp.2d 458, 471 (S.D.N.Y. 2011) (holding that "statement condemning an opponent's legal claims as 'baseless' is mere opinion and is not defamatory" and dismissing claim).[7]

Equally unclear is how the Illinois Rules of Professional Conduct would transform KC's opinion that the copyright strike was "bad faith" or "false" into a verifiable fact. The Opposition cites Rule 3.1, which states that a lawyer shall not make "frivolous" assertions and generally argues that the Amended Complaint alleges Braun's copyright strike satisfies this standard. (*Id.*, p. 21, n. 7). Plaintiffs are certainly correct that the term "bad faith" and "false" could be understood to mean frivolous, but whether a statement *could* be interpreted in one way is *not* the question a court asks when determining whether a statement is a verifiable statement of fact that can be actionable as defamation. Indeed, in *Freydin*, the plaintiff brought a claim for libel against defendants who left

---

[7] KC was unable to locate any Illinois cases addressing the issue of whether statements as to the merits of a legal dispute or lawsuit constitute are actionable as defamation. However, given that California, New York and Illinois consider similar factors in determining whether a statement is a nonactionable opinion, KC respectfully requests that the Court consider these holdings in making its determination on this issue. *See e.g., Freydin*, 24 F.4th at 1129 (discussing factors court considers in determining whether statement is fact or opinion); *compare with Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995); *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996*, 302 F.3d 998, 1005–1006 (9th Cir. 2002).

online reviews of plaintiff and his law firm that included statements such as "terrible experience," "awful customer service," and "don't waste your money." *Freydin,* 24 F.4th at 1130. The Seventh Circuit found that "the statements do not have precise and readily understood specific meanings. Granted, they are easily understood phrases in the English language. But there are numerous reasons why someone may have had a 'terrible experience' or suggest that a product or service would be a 'waste of money.' Without additional details, the use of these phrases cannot be understood to be 'precise.'" *Id.* The Seventh Circuit went on to explain that "[w]hat objective indicator defines whether a given customer service experience was good or bad? Or whether a service or good was worth the money?" *Id.* The same can be said here. While KC does not dispute that the terms "false" or "bad faith" may be readily understood in the English language, they are simply too imprecise to be verifiable. "Bad faith" or "false" could mean "frivolous" as defined by the Rules of Professional Conduct, or it could mean that the action was brought for an improper purpose or motive, or filed without proper investigation, *or* it could mean that there is a viable defense, as the Amended Complaint reflects that KC believed there was here. Thus, Plaintiffs' conclusory assertions that these statements are "verifiable" are legally without merit and unsupported.

As to KC's alleged statement that Braun did not represent Propson, KC's Motion demonstrates that KC *only speculated* that Braun may not have been retained by Propson, and the law is clear that a "subjective view, an interpretation, a theory, conjecture or surmise" is not actionable. (Motion, p. 16) (*Moriarty v. Greene,* 315 Ill.App.3d 225, 234-235 (2000)). This is particularly true when the statement is made online or in a social media post where the speaker is expressing his or her subjective opinions and views. *See Ganske,* 480 F.Supp.3d at 533; *Freydin,* 24 F.4th at 1130. The Opposition does not address this argument, instead reiterating the same, general, unsupported assertion that KC's statement is a "mixed opinion that is not protected by the First Amendment." (Opp., p. 24). First,

KC's statements quoted in the Opposition actually demonstrate that KC was *questioning* whether Braun was retained by Propson – not making a statement of fact, namely, the Opposition quotes KC as stating: "***if*** you were not legally obtained as counsel for her . . . ." (Opp., p. 23) (emphasis added). Moreover, the 11/23 Tik Tok Posts relied on by Braun also demonstrate that KC stated she was not sure if Propson had actually hired Braun: "So when this first started to the attorney, ***I didn't think it was actually someone Lauren hired*** . . . So like I said, ***I thought*** Jeanne had just gone rogue and not been actually hired. So ***I reached out to her to clarify*** and to ask like I have it on good authority that you are representing Lauren with this specific video. Uh, ***so I gotta ask like, are you her actual counsel like hired***?" [Dkt. No. 39-1 (RJN), at p. 2 (emphasis added)]. These are *not* actionable "factual assertions" that Braun does not represent Propson, and KC's speculation regarding this issue does not imply any undisclosed facts that could be verified. *Brennan v. Kadner,* 351 Ill.App.3d 963, 969 (2004) (finding nonactionable opinion when "statement was not couched in terms of a factual assertion" but rather "as conjecture"). Thus, Plaintiff's claim that the statement is a "mixed opinion" (Opp., p. 23) is without merit.

Moreover, the Opposition does not dispute that KC's statements are subject to a "public interest" qualified privilege[8], but instead claims that KC cannot rely on the privilege because she has "abused it." (Opp., p. 25). While KC agrees that a plaintiff *may* overcome the qualified privilege at the pleading stage by alleging the statement was made with "actual malice," there is no question Plaintiffs have *not* satisfied this requirement. (*See* Motion, pp. 17-18). To overcome qualified immunity on the grounds of "actual malice" by the defendant, "courts in this district [] have looked for something more than conclusory statements in order to infer that the defendant knew the statements were untrue or recklessly disregarded the truth or falsity of the statements." *Id.* (citing

---

[8] Thus, Plaintiffs concede that the statements fall within the scope of this qualified privilege. *Cincinnati Ins.*, 260 F.3d at 747.

*Ludlow v. Northwestern Univ.,* 79 F.Supp.3d 824, 845 (N.D. Ill. 2015)). Here, the Amended Complaint relies on nothing more than conclusory assertions regarding KC's purported intent (Am. Compl., ¶ 190), and the Opposition simply echoes those inadequate allegations. (Opp., pp. 25-26) (arguing that Braun "alleges enough facts to show that Defendant KC intended to harm Plaintiff Braun with her false statements", without actually identifying what those "facts" are).

      **b.**    **Propson's Defamation Claim Against KC is Legally Insufficient.**

As explained in KC's Motion, Propson's defamation claim fails as a matter of law because a statement that someone is a "TERF" or "transphobic" simply is not actionable as defamation under applicable Wisconsin law. (Motion, pp. 18-22). In their Opposition, Plaintiffs do not address, discuss or distinguish any of the authorities cited by KC. Instead, Plaintiffs once again fall back on the unsupported, conclusory claim that KC's statement about Propson is a "mixed opinion that combines an expression of her opinion with a statement of fact." (Opp., p 17). Namely, Plaintiffs assert that "here, KC did not simply call Plaintiff Propson transphobic; she claimed that Propson is transphobic and she has proof." (*Id.,* p. 18). This statement is based on a complete mischaracterization of KC's actual statements. First, as explained in the Motion, KC *never* called Propson "transphobic", and KC *never* stated that she had "proof" that Propson was transphobic. (Motion, pp. 19-20). Rather, a transcript of KC's 10/24/23 Tik Tok Post (in which she made the allegedly defamatory statements) reveals that KC stated *only* that Propson was "following" and "actively liking" social media posts by individuals who posted "incredibly transphobic and hateful rhetoric." [Dkt. No. 39-1 (RJN), Exh. 1 and p. 2]. [9] When KC states in the Post that she has "deets" and "receipts", she is not expressly or impliedly stating that she has "proof" that Propson is transphobic, contrary to the arguments made in the Opposition. Rather, she states that she has proof (*i.e.*, "deets" and "receipts") that Propson was

---

[9] *Osundairo*, 447 F.Supp.3d at 738 (court may consider transcript of full television show episode in which alleged defamatory statements were made).

liking and following an individual who was posting "transphobic and hateful rhetoric and content." (*Id.*) Neither the Amended Complaint nor the Opposition contend that Propson was *not* liking and following this individual on social media. Rather, Plaintiffs dispute *only* that the content Propson liked and followed *was actually* "transphobic." (Opp., p. 15) ("the posts compiled by [] KC were not transphobic"). Thus, ultimately, Plaintiffs' claim circles back to and relies entirely on the use of the term "transphobic." Clearly, KC and Propson have *different* views on what content is or is not "transphobic" and that is *precisely* why such terms are not actionable as defamation – **because they cannot be verified.** *See e.g., Freydin,* 24 F.4th at 1131.

The Opposition relies on two cases for the proposition that name-calling can be verifiable if the conduct is given enough specificity. (Opp., p. 18). These cases provide no support here – one, because KC never actually called Propson "transphobic" and, two, because they are factually distinguishable. (*Id.*) (citing *Laughland v. Beckett,* 365 Wis.2d 148, 168 (2015)) (holding that defendant "did not merely opine that Laughland was a 'low life loser'", but rather "made specific allegations" "accusing [plaintiff] of defrauding banks, 'manipulating banks and credit card companies' and engaging in underhanded business practices"); *Overhill Farms, Inc. v. Lopez,* 190 Cal.App.4th 1248, 1262 (2010) (holding that "in almost every instance, defendants' characterization of Overhill as 'racist' is supported by a specific reference to its decision to terminate the employment of a large group of Latino immigrant workers."). Here, in contrast, what are the specific facts relied on by Plaintiffs to support KC's alleged characterization of Propson as "transphobic," or as a "TERF"? Only KC's statement that Propson has liked and followed a particular individual on social media – *a fact within which Propson does not dispute*. Again, whether or not the social media content posted by that individual is *actually* "hateful or transphobic," is not a specific fact that can be verified.

Thus, the Opposition has failed to refute that KC's statements about Propson are nonactionable opinions and Propson's defamation claim against KC remains legally deficient.

### 2. Plaintiffs Cannot State Claims for False Light and Trade Libel.

As explained in KC's Motion, because Plaintiffs' defamation claims are insufficient, their false light and trade libel claims based on the identical allegations must fail as well. (Motion, pp. 22-23) (citing *Madison v. Frazier,* 539 F.3d 646, 659 (7th Cir. 2008)). The Opposition does not explain how these claims can survive if the defamation claims fail (which they do); thus, dismissal of the defamation claims warrants dismissal of these claims based on identical inadequate allegations.[10]

### 3. Plaintiffs Cannot State Claims for Tortious Interference.

As a preliminary matter, a failed defamation claim cannot serve as a basis for a claim of intentional interference with contract, because as Plaintiffs concede, intentional interference requires that the interference was not "justified or privileged." (Opp., p. 40). Here, as explained above, KC's statements regarding Braun and Propson were constitutionally protected.[11] Moreover, as to Propson's interference claim, the Opposition does not point to any specific facts pled in the Amended Complaint to support the claim's elements, but instead simply reiterates the same inadequate conclusory allegations, e.g., "KC used her platform to post fake statements accusing [] Propson of being transphobic with the intent to ruin [] Propson's reputation and content partnerships", "as a result of [] KC's actions, the … channel terminated its contract with [] Propson…." (*Id.*) These allegations/arguments are nothing more than a restatement of the elements of intent and causation

---

[10] In support of her false light claim, Braun argues in her opposition that she has plead the essential element of "actual malice" because she has alleged that KC "insinuated" that Braun was a "rogue attorney who filed frivolous copyright strikes for another without their permission", but this is nothing more than the same allegation on which Braun bases her defamation claim. An allegation of defamation does not – in and of itself – establish malice.

[11] Also, a failed defamation claim cannot serve as a basis for a claim of intentional interference with prospective economic advantage. *Makhsous v. Mastroianni*, 2020 WL 1530740, at *4 (N.D. Ill. Mar. 31, 2020) (citing *Jacobson v. CBS Broad., Inc.*, 19 N.E.3d 1165, 1182 (Ill. App. Ct. 2014) (holding that a dismissed defamation claim cannot serve as a basis for a claim of intentional interference with prospective economic advantage))

and they directly contradict *actual facts* alleged in the Amended Complaint[12], *i.e.*, that KC made her statements to clear up confusion between her and Propson (Am. Compl., ¶ 33 and RJN Exh. 1) and that the channel terminated its contract with Propson because of comments *other people* made on the channel's social media posts. (*Id.,* ¶ 45).

As to Braun's interference claim, the Opposition does not point to any specific facts alleged to counter the authority cited in KC's Motion, namely, that Braun must allege specific relationships with which KC allegedly interfered – vague references to "existing and prospective clients" is patently insufficient. (Motion, p. 25) (citing *Hackman v. Dickerson Realtors, Inc.,* 557 F.Supp.2d 938, 948 (N.D. Ill. 2008)). Instead, Plaintiffs argue that Braun had "ongoing and prospective business relationships with several clients for legal services", and KC's statements "led members of the public who had never worked with [Braun] to leave negative reviews and the termination of several client engagements…" (Opp., p. 41). This is simply not enough to state a claim for tortious interference with a business expectancy. *Kapotas v. Better Government Ass'n,* 30 N.E.3d 572, 596 (Ill. App. Ct. 2015) (holding that "[t]he hope of receiving a job offer is not a sufficient expectancy . . . The plaintiff must specifically identify the person with whom the plaintiff expected to contract and allege specific acts of interference"). Furthermore, Plaintiffs fail to allege "an action by the defendant directed *towards* [a] third party" with whom the plaintiff expected to contract. *See LoggerHead Tools, LLC v. Sears Holding Corp.,* 2013 WL 1858590, at *6 (N.D. Ill., May 1, 2013). Finally, there is no factual allegation that the statements by KC *caused* the unidentified clients not to employ Braun or to terminate their existing engagement. *Hackman,* 557 F.Supp.2d at 949 (dismissing allegations that were "too attenuated" to plead causation element of an intentional inference claim).

### 4. Plaintiffs Cannot State Claims for Emotional Distress.

---

[12] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

As explained in KC's Motion, Plaintiffs' emotional distress claims are entirely derivative of their failed defamation claims. The law is clear that if Plaintiffs cannot state a claim for defamation, a claim for emotional distress based on the purported defamation also fails. (Motion, p. 26). The Opposition also fails to address or distinguish the authorities cited by KC. (Opp., at pp 42-44).

## III.   THIS DISTRICT IS AN IMPROPER VENUE FOR PROPSON'S CLAIMS.

The Opposition argues that venue in the Northern District of Illinois is appropriate for Propson's claims because they are "tied" to those of Braun (who *is* an Illinois resident), *i.e.*, "the defamatory statements made by the Defendants about both Plaintiffs in singular posts constitute a series of related events central to the claims of both Plaintiffs." (Opp., p. 45). However, the statements KC allegedly made about "both plaintiffs" were not made in a "singular post." Rather, the Amended Complaint alleges that the statements about Propson were made in the 10/24/23 Tik Tok Post, which does not even mention Braun. (Am. Compl., ¶¶ 18-33) ("[Propson] is the only person discussed and accused in the video…"). Braun's claims are based on *entirely separate posts* (i.e., the 11/23 Tik Tok Posts and the GoFundMe Page), which the Amended Complaint does *not* allege contain any statements about Propson. (*Id.,* ¶¶ 65-81). Thus, there is nothing "tying" Plaintiffs' claims together.[13] There is simply no connection between Propson's claims and this district; thus, Propson's claims – at a minimum – should be dismissed under Fed. R. Civ. P. 12(b)(3).

---

[13] Moreover, the Opposition's reliance on *Morton Grove Pharm. v. Nat'l Pediculosis Ass'n,* 525 F.Supp.2d 1039, 1043 (N.D.Ill. 2007) is misplaced. In that case, the defendant *intentionally* mailed newsletters containing the statements at issue *to Illinois residents at their Illinois addresses*. 525 F.Supp.2d at 1043 (holding that the defendant "directed the allegedly improper statements to Illinois residents in Illinois, thereby committing a tort and causing injury within Illinois"). Conversely, the Amended Complaint does not allege that KC intentionally directed any statements about Propson to Illinois residents. *Id.* at 1042 (holding that "A tortious act is not committed in Illinois merely because defendants allegedly caused [plaintiff] reputational and economic injury within the state").

Dated: June 12, 2024

Respectfully Submitted,

_s/ Brandon J. Witkow_

Brandon J. Witkow [pro hac vice]
WITKOW | BASKIN
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
(818) 296-9508
bw@witkowlaw.com


_s/ Amy M. Doig_

Amy M. Doig
COZEN O'CONNOR
123 N. Wacker Dr., Suite 1800
Chicago, Illinois 60606
(312) 474-7900
adoig@cozen.com

_Attorneys for Defendants_

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that the foregoing document was filed and served on all counsel of record noted below via the CM/ECF system of the United States District Court of the Northern District of Illinois.

> Benjamin C.R. Lockyer
> Lockyer Law LLC
> 100 N. Riverside Plaza, Suite 2400
> Chicago, Illinois 60606
> ben@lockyerlaw.com
>
> ***Attorney for Plaintiffs***

Dated:  June 12, 2024                                      *s/ Brandon J. Witkow*
                                                          Brandon J. Witkow