### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JEANNETE BRAUN, BRAUN IP LAW, LLC,   )
& LAUREN PROPSON,   )
               Plaintiffs,   )
      v.     )  Case No. 23 C 16856
  )
REBEKAH M. DAY NEE BOX, KRISTA   )
CARTER & LILY MARSTON,   )
  )
  )
        Defendants.   )

## DEFENDANTS REQUEST FOR JUDICIAL NOTICE PURSUANT TO FED. R. EVID. 201

NOW COMES, Defendants Rebekah M. Day & Lily Marston (together, "Defendants"), by and through her undersigned counsel, and hereby requests that, pursuant to Federal Rule of Evidence 201, the Court take judicial notice of the following documents in support of their Oppositions to Plaintiffs Motion to Compel. In support of their motions, Defendants state as follows:

Exhibit A: **PETITIONER'S RESPONSE TO RESPONDENT'S MOTION TO DISMISS SECOND AMENDED PETITION FOR STALKING NO CONTACT PURSUANT TO 735 ILCS 5/2-619.1**, filed by Jeanette Braun in the case of *Jeannette Braun v. Ian Runkle,* Circuit Court of Cook County, Illinois, Docket No. 25 OP 74761 the "State Court Action").

Exhibit B: **SECOND MOTION FOR SANCTIONS ILLINOIS SUPREME COURT RULE 137**, filed by Ian Runkle in the State Court Action.

Pursuant to Federal Rule of Evidence 201, Defendants respectfully request that this Court take judicial notice of the above pleadings filed in the State Court Action.

Courts routinely take judicial notice of decisions and filings from other tribunals. *See, e.g., Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) (judicial notice proper where proceedings in other tribunals bear directly on issues before the court); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citations omitted); *BP West Coast Products LLC v. Greene*, 318 F.Supp.2d 987, 994 (E.D.Cal. 2004) ("[j]udicial notice may be taken of court records . . . As such, the court will take judicial notice of the opinions, complaints, briefs, and evidence filed in other actions").

Dated:  April 28, 2026

Respectfully Submitted,


*s/      Brandon J. Witkow*
Attorney for Defendants

Brandon J. Witkow [pro hac vice]
Cory A. Baskin
WITKOW | BASKIN
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
(818) 296-9508
bw@witkowlaw.com

*Attorneys for Defendants*

2

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the foregoing document was filed and served on all counsel of record noted below via the CM/ECF system of the United States District Court of the Northern District of Illinois.

Jeanette Braun
1600 W. Lake Street
Suite 103B
Addison, IL 60101
jmbraun@brauniplaw.com

***Attorney for Plaintiffs***

Dated: April 28, 2026                                         /s/ *Brandon J. Witkow*
                                                                              Brandon J. Witkow

**Exhibit A**

For updated information about your case including hearings, subsequent filings, and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED
2/18/2026 3:21 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025OP74761
Calendar, 71
36718972

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION**

|  |  |  |
|---|---|---|
| JEANETTE BRAUN, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 25 OP 74761 |
| | ) | |
| v. | ) | Hon. J. Dawn Gonzalez |
| | ) | |
| IAN RUNKLE, | ) | Calendar 71 |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S RESPONSE TO RESPONDENT'S MOTION TO DISMISS SECOND AMENDED PETITION FOR STALKING NO CONTACT PURSUANT TO 735 ILCS 5/2-619.1**

**NOW COMES** the Petitioner, Jeanette Braun ("**Jeanette**" or "**Petitioner''**), pro se, and in response to the Respondent's Motion to Dismiss Second Amended Petition For Stalking No Contact Pursuant to 735 ILCS 5/2-619.1, she states as follows:

Jeanette moves this Court and/or requests a full evidentiary hearing if this Court is not inclined to deny said Motion in its entirety.

1. Jeanette admits the allegations set forth in paragraph 1.

2. Jeanette admits and denies the allegations set forth in paragraph 2.

3. Jeanette admits the Court entered an Order on October 3, 2025, and denies the rest of the allegations set forth in paragraph 3. For the subparagraphs under paragraph 3, (a-b and their subparagraphs, Jeanette affirmatively states that the Court's Order entered November 26, 2024, speaks for itself.

4. Jeanette admits the allegations set forth in paragraphs 4-8.

5. Jeanette admits the allegations set forth in paragraph 9, that on November 19, 2025, the Court gave Jeanette leave to file a Second Amended Petition, and denies the rest of the

1 of 36

ER

FILED DATE: 2/18/2026 3:21 PM 2025OP74761

allegations in paragraph 9 and 9(a). Jeanette affirmatively states that the Court's Order entered thereafter speaks for itself.

6. Jeanette admits that on December 2, 2025, Jeanette filed her Second Amended Petition, and denies the rest of the allegations in paragraph 10. Jeanette affirmatively states that record speaks for itself.

7. Jeanette admits that the Court entered an Order on December 9, 2025, and lacks information to be able to admit or deny the rest of the allegations in paragraphs 9-9(c), and therefore denies them. Jeanette affirmatively states that the Court's Order entered on December 9, 2025, speaks for itself.

8. Jeanette admits the allegations set forth in paragraphs 12-14.

9. Jeanette denies that section II of Respondent's Motion comprises only relevant standards, statutes, and cases.

10. Jeanette declines to admit or deny the allegations set forth in paragraph 15, as paragraph 15 exclusively contains statutory language which speaks for itself.

11. Jeanette declines to admit or deny the allegations set forth in paragraph 16, as paragraph 16 contains statutory language, and any allegations therein are based on the statute, which speaks for itself.

12. Jeanette declines to admit or deny the allegations set forth in paragraphs 16-18(c)(iv), as paragraphs 16-18(c)(iv) contains statutory language and case law citations, and any allegations therein are based on statute or case law, which speak for themselves.

13. Jeanette denies the allegations set for in paragraphs 19-19(g)(i), that are not based on statute or case law and declines to admit or deny the allegations that are exclusively statutes and case law because they speak for themselves.

14. Jeanette lacks sufficient information to admit or deny the allegations set forth in paragraph 14, and therefore denies the same.

15. On January 21, 2026, the Court denied Respondent's Motion for Sanctions and mooted the Respondent's Motion to Disqualify Ben Lockyer as Petitioner's Attorney.

## I. INTRODUCTION

16. Respondent moves to dismiss the Second Amended Petition under both 735 ILCS 5/2-615 and 2-619.1. The motion misstates the pleading standard, ignores the well-pleaded factual allegations contained in the Second Amended Petition, improperly attempts to convert a fact-intensive stalking claim into an adjudication on the pleadings, and attempts to misuse the Illinois Anti-SLAPP statute.

17. When the Petition's factual allegations are accepted as true, as required under § 2-615, Petitioner has plainly alleged:

- Multiple acts constituting a statutory "course of conduct,"

- Monitoring and surveillance (including electronic monitoring),

- Indirect contact through third parties,

- Foreseeable and actual third-party harassment triggered by Respondent's publications,

- Knowledge and intent,

- Emotional distress and reasonable fear.

## II. GOVERNING LEGAL STANDARDS

### A. Section 2-615

18. A motion under § 2-615 attacks only the legal sufficiency of the complaint. All well-pleaded facts must be taken as true and construed in the light most favorable to the plaintiff.

*Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). Dismissal is proper only where "no set of facts" could entitle the plaintiff to relief. Id.

19.     The court does not weigh evidence or resolve factual disputes. *Id.*

20.     On § 2-615 review, courts take well-pleaded factual allegations as **true**, draw **reasonable inferences** in Plaintiff's favor; are **not required to accept as true** "mere conclusions" or "unsupported conclusions." See *Ward v. Decatur Memorial Hospital*, 2019 IL 123937 (Ill. 2021) Citation; *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951 (Ill. 2018) Citation; *Stachler v. Board of Education of the City of Chicago*, 2023 IL App (1st) 221092 (Ill. App. Ct. 1st Dist. 2023) Citation; *Eberhardt v. Village of Tinley Park*, 2024 IL App (1st) 230139 (Ill. App. Ct. 1st Dist. 2024) Citation; *Colon v. Illinois Central R.R. Co.*, 2024 IL App (1st) 221841 (Ill. App. Ct. 1st Dist. 2024) Citation.

21.     A court doesn't strike conclusory phrases when a Motion to Dismiss is filed and a Complaint or Petition contains conclusory phrases. Courts simply disregard them and decide whether the remaining ultimate facts state a cause of action. See *Ward v. Decatur Memorial Hospital*, 2019 IL 123937 (Ill. 2021); *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951 (Ill. 2018).

22.     The inquiry focuses on whether the allegations, **when proven at plenary hearing/trial**, would entitle the plaintiff to relief. Thus, the standard is stringent, as it emphasizes the plaintiff's right to present their case rather than an early dismissal based on perceived deficiencies.

### B. Section 2-619

23.     A § 2-619(a)(9) motion requires "affirmative matter" that completely defeats the claim. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). Affirmative matter is not:

• Mere contradiction of plaintiff's allegations;

• Factual disputes;

• Competing inferences;

• A preview of summary judgment. *Id*.

24. Respondent's Motion repeatedly disputes causation, intent, and characterization. Those are factual issues, not affirmative matters.

25. In examining the allegations against Respondent, it is clear that significant details are provided, such as the Respondent's repeated online publications and the direct impact of these actions on Petitioner. For instance, the Respondent has created and disseminated videos, posts, and commentary regarding Petitioner, escalating from mere commentary to actions that include monitoring and surveillance. This pattern of behavior underscores the potential for an actionable claim, particularly regarding harassment or emotional distress.

26. Moreover, Respondent's actions, such as attending Jeanette's private domestic-relations hearings without any legitimate purpose, demonstrate a blatant disregard for the legal boundaries of acceptable conduct. This behavior, coupled with the voluminous published content depicting Jeanette as a monster, dehumanizing her and portraying her as something that needs to be destroyed, that has incited third parties to send threatening communications, further substantiates claims of emotional distress and harassment. These facts are crucial as they illustrate how Respondent's conduct goes beyond mere expression and into the realm of actionable harm.

27. Additionally, Respondent's admission of awareness regarding the negative effects of his videos on Jeanette suggests, at the least, a recklessness that could support claims of intentional infliction of emotional distress. The knowledge that his content adversely affects

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

Petitioner, along with the monetization of this distressing content, raises questions about the legitimacy of Respondent's actions and motivations.

28. The allegations set forth by Petitioner, when examined under the legal standards established by 735 ILCS 5/2-615 and 735 ILCS 5/2-619, reveal a set of facts that are not only sufficient to withstand a motion to dismiss for lack of legal sufficiency but also highlight affirmative actions by Respondent that may warrant dismissal based on external defenses. The court must assess these allegations with a view that favors Jeanette's right to pursue relief, considering the serious and impactful nature of the claims presented.

## III. THE SECOND AMENDED PETITION SATISFIES ILLINOIS FACT-PLEADING REQUIREMENTS

29. Respondent characterizes paragraphs 9-14, among others, as "notice pleading." That characterization is incorrect.

30. Paragraphs 9-14, and the rest, provide the structural framework of the course of conduct, and are followed by detailed, date-specific allegations.

31. For example (not exhaustive):

**Specific Online Publications (Dates + Content Identified)**

| Paragraph | Fact Identified | Why It Is Well-Pleaded |
|---|---|---|
| ¶ 9 | Repeated creation and publication of online videos beginning December 2023 | Identifies timeframe and type of conduct |
| ¶ 15 | Appeared via Zoom at April 21 and May 16, 2025 hearings | Specific dates + specific conduct |

| Paragraph | Fact Identified | Why It Is Well-Pleaded |
|---|---|---|
| ¶ 29 | October 6, 2025 video titled "How Jeanette 'Janet' Braun Used Lawfare to Try to Silence Me (It's Not Working)" | Date + exact title |
| ¶ 30 | Accused Petitioner of "lawfare" and abusing legal system | Identified statement |
| ¶ 31 | Promoted video on Reddit forum r/TheGirliesVsJanet | Platform identified |
| ¶ 34 | October 6, 2025 anonymous registration using vulgar name | Date + specific act |
| ¶ 38 | ARDC complaint filed same day | Date + event |
| ¶ 40 | ARDC complaint explicitly cited Respondent's video | Factual linkage |
| ¶ 50 | April 19, 2024 threatening email tracking location and referencing propane tank | Date + concrete threat |
| ¶ 51 | January 7, 2024 video calling her "Rogue Lawyer" | Date + quoted phrase |
| ¶ 52 | January 11, 2024 TikTok message stating she was not safe | Date + content |
| ¶ 53 | March 3, 2024 video followed by "kill yourself" message next day | Date + content |
| ¶ 54 | June 18, 2024 video followed by "needs a wellness check" message same day | Date + sequence |
| ¶ 56 | February 12, 2024 video followed by AI pornography/suicide email | Date + content |

FILED DATE: 2/18/2026 3:21 PM    2025OP74761

| Paragraph | Fact Identified | Why It Is Well-Pleaded |
|---|---|---|
| ¶ 60 | Monetized videos using AI-altered images and captions | Identifies monetization + captions |
| ¶ 61 | August 9, 2024 livestream quote ("lady with the horns… going to continue…") | Verbatim statement |
| ¶ 67 | June 16, 2024 post: "mess with her week" | Admission |
| ¶ 68 | June 18, 2024 post: "Janet smackdown" | Specific quote |
| ¶ 69 | Posting in specific Reddit forums using handle "VARSIL" | Identified account + platform |
| ¶¶ 70–72 | Anti-SLAPP misstatement allegation + specific video URLs | Identified videos |

These are classic fact-pleading examples under Illinois law because they identify:

- Actor

- Date

- Platform

- Statement

- Conduct

**Monitoring / Hearing Attendance**

| Paragraph | Fact Identified | Why Well-Pleaded |
|---|---|---|
| ¶ 15 | Attendance at specific Zoom hearings | Specific date + method |

| Paragraph | Fact Identified | Why Well-Pleaded |
|---|---|---|
| ¶ 16 | Transcript reference to request remote access | Identified transcript citation |
| ¶ 18 | Clerk docket did not publicly list April 21 hearing | Identified source |
| ¶ 19 | Allegation hearing not accessible via ordinary public access | Factual assertion |
| ¶ 20 | Required deliberate effort to locate hearing | Inference tied to specific hearing |
| ¶ 22 | Appeared for purpose of intimidation | Mixed (see below) |
| ¶ 23 | Proceeding concerned private domestic matters | Specific subject matter |
| ¶ 24 | No domestic relations practice in IL | Specific factual assertion |

**Concrete Emotional Harm Allegations**

| Paragraph | Fact Identified | Why Well-Pleaded |
|---|---|---|
| ¶ 58 | Reasonable fear each time videos are posted | Emotional response tied to conduct |
| ¶ 59 | Fear of monitoring and publication of private life | Specific fear tied to conduct |
| ¶ 81 | Altered routines, limited public presence, counseling, relocation | Concrete life changes |

Paragraph 81 is particularly strong because it describes specific actions taken and not just "I was distressed."

32.     Illinois is a fact-pleading jurisdiction. *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662.

33. Petitioner has pled dates, statements, acts, and causal linkage.

## IV. THE PETITION ALLEGES EACH ELEMENT OF STALKING UNDER 740 ILCS 21/10

34. The Act defines stalking as:

 a. A course of conduct

 b. Directed at a specific person

 c. That the respondent knows or should know would cause reasonable fear or emotional distress

 d. That is not lawful protected speech. 740 ILCS 21/10.

### A. Course of Conduct (Two or More Acts)

35. The Petition alleges far more than two acts in paragraph 31 above, which satisfies "two or more acts."

### B. Directed at a Specific Person

36. All videos, thumbnails, and posts listed in the Second Amended Petition specifically name and depict Petitioner (¶¶ 29-33, 60-63).

37. Respondent referenced her directly in livestream statements (¶ 61).

38. This is not generalized commentary; it is targeted.

### C. Knowledge / Foreseeability

39. Paragraphs 13, 57, 65, and 66 allege Respondent knew his videos inflamed the public and continued. Paragraph 67 quotes him: "I know my videos are probably going to mess with her week."

40. Knowledge and foreseeability are factual issues inappropriate for dismissal.

### D. Monitoring and Surveillance (Including Electronic)

41. Respondent argues stalking requires physical proximity.

42. The statute expressly includes electronic monitoring. 740 ILCS 21/10.

43. Paragraphs 15-21 allege repeated virtual attendance at private domestic-relations proceedings.

44. Paragraph 20 alleges deliberate efforts to locate hearings not listed on the Cook County Public Portal or available generally to the public.

45. The Act includes "acquiring or using electronic information to determine a person's location." 740 ILCS 21/10.

46. Whether virtual presence constitutes monitoring is a factual and statutory interpretation question and is not resolvable on pleadings.

**E. Direct and Indirect Contact Through Third Parties**

47. The Act explicitly includes indirect contact. 740 ILCS 21/10.

48. Paragraphs 34-44 allege:

• Same-day Innocence Project registration with vulgar name.

• Same-day ARDC complaint citing his video.

• Mirrored language between his video and complaint.

• Explicit citation of his video as the source.

49. Paragraph 50 alleges a threatening email referencing location tracking and propane tank explosions.

50. The timing and mirrored language are factual allegations that support causation inference at the pleading stage.

51. Respondent has directly contacted Petitioner, by appearing in her line of sight twice at court hearings and by tagging her in a TikTok video denigrating her and falsely accusing her of violating her ethical obligations, which appears to have been inadvertently removed from the

Second Amended Petition, but was alleged previously, and is still true. Petitioner can add that allegation back in if the Court so desires.

52. Under *Marshall*, reasonable inferences must favor Petitioner.

## V. RESPONDENT'S 2-619 ARGUMENT IS PROCEDURALLY DEFECTIVE

53. Respondent's "affirmative matter" consists of:

• Denials he encouraged harassment.

• Assertions other YouTubers posted videos.

• Assertions he told viewers not to contact Petitioner.

• Arguments about First Amendment protection.

54. None of these negate the cause of action "completely." *Illinois Graphics*, 159 Ill. 2d at 486.

55. They are factual disputes.

56. Section 2-619 does not permit weighing competing narratives.

## VI. FIRST AMENDMENT ANALYSIS IS PREMATURE

57. Under *Pokorny v. DeBolt*, 2022 IL App (2d) 210511-U, ¶ 36, lack of First Amendment protection is an element the petitioner must prove.

58. However, that proof occurs at evidentiary hearing, **not in pleadings**.

59. Whether speech constitutes a "true threat" requires contextual factual analysis. *Virginia v. Black*, 538 U.S. 343, 359 (2003).

60. Whether speech is integral to criminal conduct or part of stalking conduct is fact-intensive. *McNally v. Bredemann*, 2015 IL App (1st) 134048.

61. *Flood v. Wilk*, 2019 IL App (1st) 172792, held that overbroad injunctions are improper, but did not authorize dismissal at pleading stage.

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

62.     The Court must first determine:

• What was said

• How it was said

• Context

• Intent

• Effect

• Pattern

63.     Also, Respondent's status as a reporter must be determined.  In *Popcorned Planet, Inc. v. Lively*, 8:25-mc-00028 (M.D. Fla. 2025), a persuasive authority rather than binding authority in Illinois, a Florida federal magistrate ruled that Popcorned Planet (run by Andy Signore) does not qualify for journalistic privilege under Florida law because it is not a traditional newspaper, network, or TV station. The court found that self-employed digital creators lack the required editorial standards, and Respondent has admitted he is a self-employed digital creator in his previous filings with this Court, particularly in Jeanette's divorce matter.

64.     These are evidentiary questions and an evidentiary hearing, along with discovery prior to the hearing, is required to determine the answer to those questions.

## VII. THE SECOND AMENDED PETITION CONTAINS WELL-PLEADED FACTUAL ALLEGATIONS THAT MUST BE ACCEPTED AS TRUE

65.     Under Illinois law, a motion brought pursuant to 735 ILCS 5/2-615 tests only the legal sufficiency of the pleading.

66.     In evaluating such a motion, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences **in favor of the pleader**. 735 ILCS 5/2-615; *Cochran v. Securitas Sec. Servs. USA, Inc.*, 2017 IL 121200, ¶ 11; *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1098–99 (Ill. 2012); *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 2018 IL

FILED DATE: 2/18/2026 3:21 PM 2025OP74761

120951, ¶ 23. While courts disregard bare legal conclusions, they do not strike them. Rather, the Court must credit specific, nonconclusory factual averments. *Id.*

67. The Second Amended Petition contains numerous concrete factual allegations that satisfy Illinois's fact-pleading standard. See paragraph 31 above. These include specific dates, identified publications, quoted statements, identified communications, and detailed descriptions of conduct and resulting harm.

68. The Petition alleges that beginning in December 2023, Respondent repeatedly created and published online videos and commentary targeting Petitioner (¶ 9). It identifies specific videos by date and title, including the October 6, 2025 video titled "How Jeanette 'Janet' Braun Used Lawfare to Try to Silence Me (It's Not Working)" (¶ 29), and alleges that Respondent accused Petitioner of engaging in "lawfare" and abusing the legal system (¶ 30). The Petition further alleges that Respondent posted specific statements on social media, including "I know my videos are probably going to mess with her week" (¶ 67) and "What's the appropriate amount of Janet smackdown in a day?" (¶ 68).

69. These are not statutory labels or generalized accusations; they are identified statements made on identifiable dates and platforms. Under Illinois pleading standards, such allegations constitute well-pleaded facts that must be accepted as true at this stage.

70. The Petition alleges that Respondent appeared via Zoom at Petitioner's domestic-relations hearings on April 21, 2025 and May 16, 2025 (¶ 15). It further alleges that the April 21 hearing was not publicly listed on the Clerk's online docket (¶¶ 18–19) and that Respondent's appearance required deliberate efforts to locate proceedings involving Petitioner (¶ 20). The Petition describes these acts as monitoring and observation within the meaning of 740 ILCS 21/10 (¶ 17).

71.     The allegations identify the dates, the manner of attendance (Zoom), and the factual circumstances surrounding accessibility. These are specific factual assertions, not mere recitations of statutory elements.

72.     The Petition alleges multiple date-specific third-party communications following Respondent's publications, many of which are reproduced in paragraph 31.

73.     Each of the allegations listed in paragraph 31 includes a date, platform, and description of the communication. Illinois courts routinely treat such time-anchored, content-specific allegations as well-pleaded facts at the motion-to-dismiss stage. 735 ILCS 5/2-615; *Simpkins*, 965 N.E.2d at 1098.

74.     Whether causation is ultimately proven is not the question at this stage. The temporal proximity and mirrored language are factual allegations from which reasonable inferences may be drawn, and under Illinois law those inferences must be drawn in Petitioner's favor at the pleading stage. *Bogenberger*, 2018 IL 120951, ¶ 23.

75.     Illinois courts distinguish between conclusory statements ("I suffered emotional distress") and specific factual allegations describing observable effects. See 735 ILCS 5/2-615; *Cochran*, 2017 IL 121200, ¶ 11. Paragraph 81 contains the latter.

76.     To the extent certain paragraphs also contain statutory language, such as stating that Respondent's conduct "constitutes stalking" (¶ 82) or "meets every element" of the Act (¶ 80), those statements are legal conclusions. Illinois courts may disregard those labels. However, the presence of legal conclusions does not negate the numerous underlying factual allegations detailed above.

77. Table: Some of the Well-Pleaded Facts Supporting Elements of Stalking Under 740 ILCS 21/10 (Not Exhaustive)

15 of 36

FILED DATE: 2/18/2026 3:21 PM    2025OP74761

| Statutory Element (740 ILCS 21/10) | Well-Pleaded Factual Allegations (Not Exhaustive) | Paragraph(s) |
|---|---|---|
| **1. Course of Conduct (2 or more acts)** | Repeated creation and publication of online videos targeting Petitioner beginning December 2023 | ¶ 9 |
| | Repeated virtual attendance at Petitioner's April 21 and May 16, 2025 domestic-relations hearings | ¶ 15 |
| | October 6, 2025 video titled "How Jeanette 'Janet' Braun Used Lawfare to Try to Silence Me (It's Not Working)" | ¶ 29 |
| | Promotion of October 6 video on Reddit forum targeting Petitioner | ¶¶ 31–33 |
| | Same-day vulgar Innocence Project registration following October 6 video | ¶ 34 |
| | Same-day ARDC complaint citing Respondent's video | ¶¶ 38–41 |
| | April 19, 2024 threatening email referencing Petitioner's location and propane tank | ¶ 50 |
| | January 7, 2024 video calling Petitioner a "Rogue Lawyer" followed by "you are not safe" message | ¶¶ 51–52 |

16 of 36

FILED DATE: 2/18/2026 3:21 PM  2025OP74761

| Statutory Element (740 ILCS 21/10) | Well-Pleaded Factual Allegations (Not Exhaustive) | Paragraph(s) |
|---|---|---|
| | March 3, 2024 video followed by "kill yourself" message | ¶ 53 |
| | June 18, 2024 video followed by "needs a wellness check" message | ¶¶ 54–55 |
| | February 12, 2024 video followed by AI-pornography/suicide threat email | ¶ 56 |
| | Numerous monetized videos with inflammatory captions and AI-altered thumbnails | ¶ 60 |
| | Repeated social media posts acknowledging impact ("mess with her week"; "Janet smackdown") | ¶¶ 67–68 |
| | Regular participation in online forums targeting Petitioner | ¶ 69 |
| **2. Directed at a Specific Person** | Videos, posts, thumbnails specifically name and depict Petitioner | ¶¶ 9, 29–33, 60–63 |
| | Statements referencing Petitioner's divorce proceedings and late husband | ¶¶ 74–76 |
| | Repeated references to Petitioner's federal case | ¶¶ 25, 70–72 |

17 of 36

| Statutory Element (740 ILCS 21/10) | Well-Pleaded Factual Allegations (Not Exhaustive) | Paragraph(s) |
|---|---|---|
| 3. Monitoring / Observing / Surveillance (including electronic) | Virtual attendance at non-public domestic-relations hearings | ¶¶ 15–21 |
| | Allegation hearing was not publicly posted; deliberate efforts required to locate | ¶¶ 18–20 |
| | Appearing "within sight" during virtual hearings | ¶ 17 |
| | Electronic monitoring and online tracking leading to threats | ¶¶ 50, 57 |
| 4. Direct or Indirect Contact (including through third parties) | Indirect harassment via Innocence Project impersonation | ¶¶ 34–37 |
| | Indirect ARDC complaint explicitly citing Respondent's video | ¶¶ 38–41 |
| | Emails threatening harm to Petitioner's home | ¶ 50 |
| | TikTok messages stating she was not safe | ¶ 52 |
| | TikTok message instructing her to kill herself | ¶ 53 |
| | Email predicting suicide within one year | ¶ 56 |
| 5. Knowledge / Foreseeability | Allegation Respondent aware his videos inflame public and cause harassment | ¶¶ 13, 28 |

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

| Statutory Element (740 ILCS 21/10) | Well-Pleaded Factual Allegations (Not Exhaustive) | Paragraph(s) |
|---|---|---|
| | Allegation Respondent knew videos had potential to cause harassment and continued | ¶ 65 |
| | Admission that videos would "mess with her week" | ¶ 67 |
| | Mirrored language between video and ARDC complaint | ¶ 41 |
| | Same-day temporal proximity between video and third-party acts | ¶¶ 37, 42 |
| 6. Emotional Distress / Reasonable Fear | Conduct would cause reasonable person to fear for safety or suffer distress | ¶ 14 |
| | Petitioner in reasonable fear each time videos are posted | ¶ 58 |
| | Fear of monitoring and publication of private life | ¶ 59 |
| | Fear, anxiety, altered routines, counseling, relocation | ¶ 81 |
| 7. Conduct Not Necessary for Reasonable Purpose (Post-Amendment Language) | Videos extend into private divorce proceedings and personal matters unrelated to public controversy | ¶¶ 74–76 |

| Statutory Element (740 ILCS 21/10) | Well-Pleaded Factual Allegations (Not Exhaustive) | Paragraph(s) |
|---|---|---|
| **8. Escalation Pattern** | Monetization and continued publication despite harm | ¶¶ 77, 79 |
| | Progression from commentary to monitoring to third-party harassment | ¶¶ 9–12, 44–45 |
| | Continuing publication after emergency order | ¶ 79 |

78. This table demonstrates:

• More than two qualifying acts

• Specific dates tied to subsequent threats

• Direct and indirect contact

• Monitoring through electronic means

• Foreseeable third-party harassment

• Emotional distress

• Escalation over time

79. Under Illinois pleading standards (*Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006)), these allegations must be accepted as true at the motion to dismiss stage.

80. The Second Amended Petition contains specific "who/what/when/where/how" allegations sufficient to state a claim under 740 ILCS 21/10. At this procedural posture, the Court must credit those well-pleaded facts and may not weigh Respondent's competing characterizations.

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

## VIII. RESPONDENT'S "NO EXHIBITS ATTACHED" ARGUMENT MISSTATES THE RECORD AND DOES NOT SUPPORT DISMISSAL

81.     Respondent repeatedly argues in his Motion to Dismiss that various paragraphs of the Second Amended Petition should be stricken because certain referenced exhibits were not attached to the Petition itself. This argument misstates both the procedural record and Illinois pleading law.

82.     First, the exhibits referenced in the Second Amended Petition were previously filed and attached to Petitioner's Motion to Supplement filed on November 3, 2025. Those materials were part of the court record, served on Respondent through his counsel, and were discussed at length during the January 21, 2026, hearing on Respondent's Motion for Rule 137 Sanctions. The existence, substance, and content of those exhibits were therefore not hidden, new, or unknown to Respondent. The Court and parties addressed them in open court.

83.     Second, Illinois law does not require that every document referenced in a complaint or verified petition be physically attached for the pleading to survive a § 2-615 challenge. A motion under 735 ILCS 5/2-615 tests the legal sufficiency of the allegations, not the formatting or attachment structure of supporting materials. See *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). Well-pleaded factual allegations must be accepted as true at this stage, regardless of whether documentary evidence has been appended.

84.     While 735 ILCS 5/2-606 addresses written instruments attached as exhibits, the absence of an attachment does not render factual allegations legally insufficient where the pleading otherwise states specific, nonconclusory facts. Illinois courts focus on whether the complaint alleges concrete facts, not whether every referenced exhibit is reattached in each iteration of a pleading.

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

85.     The Second Amended Petition contains specific factual allegations including dates, quotations, communications, identified videos, and detailed descriptions of third-party conduct. The referenced exhibits merely corroborate those facts; they are not required to plead the cause of action itself.

86.     Respondent's "NO EXHIBITS ATTACHED" argument is disingenuous and also not a basis for dismissal under §§ 2-615 or 2-619 or for striking those paragraphs in Jeanette's Second Amended Petition. The factual allegations are sufficiently pleaded, the referenced materials were previously filed with the Court and served on Respondent, and any issues concerning evidentiary proof are properly addressed at a plenary hearing, not at the pleading stage.

## XIV. RESPONDENT'S RELIANCE ON THE ILLINOIS CITIZEN PARTICIPATION ACT IS MISPLACED

87.     Respondent's invocation of the Illinois Citizen Participation Act ("CPA") fails at the threshold. This proceeding is not the kind of retaliatory, meritless "SLAPP" action the statute was enacted to prevent, and, most importantly, the Petition is not based solely on Respondent's protected participation or petitioning activity.

88.     Illinois courts have consistently emphasized that the CPA is a narrow dismissal mechanism aimed at lawsuits brought solely to chill protected participation in government. It does not provide broad immunity for any dispute that involves speech. *Sandholm v. Kuecker*, 2012 IL 111443, ¶¶ 34–45; *Chicago Reg'l Council of Carpenters v. Jursich*, 2013 IL App (1st) 113279.

**A. The CPA does not authorize dismissal of claims alleging concrete injury merely because speech is involved.**

89.     The Illinois Supreme Court made clear in *Sandholm* that the CPA applies only where the action is based solely on acts in furtherance of petitioning or participation in government. 2012 IL 111443, ¶ 45. Where a plaintiff seeks redress for alleged wrongful conduct causing real injury, even if speech is part of the factual context, the CPA does not mandate dismissal. See

FILED DATE: 2/18/2026 3:21 PM    2025OP74761

*Jursich*, 2013 IL App (1st) 113279; *Hammons v. Soc'y of Permanent Cosmetic Pros.*, 2012 IL App (1st) 102644.

90.    This Petition is not a defamation action or damages suit aimed at punishing participation in government. It is a statutory petition for a Stalking No Contact Order under 740 ILCS 21/1 et seq., alleging a sustained course of conduct that includes monitoring, surveillance, third-party interference, and escalating harm.

**B. The Petition is not "based solely" on petitioning or participation in government.**

91.    Even accepting Respondent's characterization of portions of his conduct as commentary, the Petition alleges far more than participation in government proceedings.

92.    It alleges, in part:

- Repeated online publications targeting Petitioner beginning in December 2023;

- Virtual attendance at Petitioner's April 21 and May 16, 2025 domestic-relations hearings despite having no role in those matters;

- Alleged monitoring and surveillance of private proceedings;

- Third-party harassment and threats that followed Respondent's publications;

- Concrete safety-related disruption, including altered routines, counseling, and temporary relocation.

93.    These allegations describe a sustained course of targeted conduct directed at an individual, not activity reasonably calculated to influence governmental action. See *Sandholm*, 2012 IL 111443, ¶ 45.

**C. The CPA is not a substitute for litigating the merits of a stalking claim.**

FILED DATE: 2/18/2026 3:21 PM    2025OP74761

94. Respondent's Anti-SLAPP framing attempts to transform a protective stalking proceeding into a retaliatory speech-suppression case. That mischaracterizes both the statute and the Petition.

95. The Stalking No Contact Order Act is content-neutral and expressly excludes lawful free speech. 740 ILCS 21/10. A no-contact order does not extinguish First Amendment rights; it restricts conduct that meets the statutory definition of stalking.

96. Where a petition alleges an escalating pattern of monitoring, third-party interference, and safety-related harm, the CPA does not provide a basis for dismissal. See *Jursich*, 2013 IL App (1st) 113279; *Midwest REM Enters., Inc. v. Noonan*, 2015 IL App (1st) 132488.

97. Respondent's reliance on the CPA therefore misconstrues the statute and is legally inapplicable to this proceeding.

98. Respondent's reliance on the CPA therefore misconstrues the statute and is legally inapplicable to this proceeding. The CPA is not a vehicle to dismiss a properly pleaded stalking petition, and its invocation here reflects a fundamental misapplication of controlling Illinois law. Petitioner respectfully submits that Respondent's Anti-SLAPP argument is not warranted by existing law or a good-faith extension thereof and invites the Court to consider whether it is frivolous within the meaning of Illinois Supreme Court Rule 137.

## X. THE SECOND AMENDED PETITION COMPLIES WITH THE COURT'S OCTOBER 3, 2025 ORDER

99. Respondent argues that the Second Amended Petition fails to comply with this Court's October 3, 2025 Order. That assertion is incorrect. The Second Amended Petition was drafted specifically to address the Court's guidance and to conform the allegations to the analytical framework identified in the Court's prior ruling.

100.    If the Petition still lacks certain information that the Court desires it to include, Jeanette respectfully requests the Court grant her permission to amend, particularly in view of her having new "counsel," as she is proceeding pro se.

### A.  The Petition Focuses on Conduct, Not Mere Speech

101.    In its October 3 Order, this Court emphasized that the analysis should focus on "an evaluation of the conduct while at, and purpose for being at, that public location," and cautioned that attendance at a courthouse, standing alone, is not necessarily stalking. The Second Amended Petition responds directly to that guidance.

102.    Unlike prior pleadings, the Second Amended Petition does not rely solely on the fact of Respondent's attendance at hearings. Instead, it alleges:

103.    The specific dates of Respondent's appearances (April 21 and May 16, 2025).

104.    That the April 21 hearing was not publicly posted on the Clerk's docket.

105.    That Respondent's appearance required deliberate efforts to identify and access a non-posted proceeding.

106.    That Respondent appeared despite having no professional, legal, or journalistic role in the matter.

107.    That Respondent subsequently used information gleaned from those hearings to create monetized content about Petitioner's private domestic-relations proceedings.

108.    These allegations go directly to the "purpose for being at" the proceeding and the nature of the conduct while present, precisely as the Court instructed.

109.    The Petition thus reframes the issue from "attendance" to **intentional monitoring and information-gathering of private proceedings for use in a sustained pattern of targeting conduct.** That is conduct-based, not viewpoint-based.

### B. The Petition Identifies Specific Acts Supporting a Statutory Course of Conduct

110. The October 3 Order cited cases such as *Piester v. Escobar* and *McNally v. Bredemann* as instructive examples. The Second Amended Petition mirrors those cases in structure and specificity.

111. The Petition now pleads:

- Specific video titles and publication dates.

- Specific public statements (e.g., June 16 and June 18 X posts).

- Specific third-party communications occurring in close temporal proximity to identified publications.

- Specific instances of alleged monitoring (court attendance).

112. Specific allegations of monetization and repetition.

113. Under 740 ILCS 21/10, a "course of conduct" requires two or more acts of monitoring, observing, threatening, or indirect contact. The Petition pleads far more than two acts and ties each act to statutory language.

114. Whether those allegations are ultimately proven is a question for a plenary hearing. At the pleading stage, Illinois law requires only well-pleaded ultimate facts, not evidentiary proof. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). The Petition satisfies that standard.

### C. The Petition Addresses the Court's First Amendment Concerns

115. The Court's prior Order referenced *Pokorny v. DeBolt*, noting that lack of First Amendment protection is an element the petitioner must establish. The Second Amended Petition addresses that requirement in two ways:

116. It alleges that Respondent's conduct constitutes monitoring and indirect contact, which are conduct-based elements under the Act and are not protected merely because speech is involved.

117. It alleges that Respondent's statements foreseeably triggered third-party harassment and were made with knowledge of their likely impact.

118. The Act expressly excludes "lawful free speech," but does not immunize speech that is part of a stalking course of conduct. *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 17 (recognizing that social media postings may form part of a stalking course of conduct where context and pattern demonstrate harassment).

119. The Second Amended Petition does not ask the Court to prohibit speech simply because it is critical or distressing. Instead, it alleges a pattern of monitoring, targeted publication, and indirect contact resulting in threats and harassment. That is consistent with the analytical framework set forth in the Court's October 3 Order.

**D. The Petition Complies with Illinois Fact Pleading Requirements**

120. Illinois is a fact-pleading jurisdiction. The Second Amended Petition now includes:

- Dates

- Identified platforms

- Identified videos

- Identified public statements

- Identified third-party communications

- Allegations of altered routines, fear, and relocation

121. These are ultimate facts, not mere conclusions. The Petition identifies the "who, what, when, and how" of the alleged conduct. At the pleading stage, the Court must accept those

FILED DATE: 2/18/2026 3:21 PM    2025OP74761

well-pleaded facts as true and draw reasonable inferences in Petitioner's favor. *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶ 13.

122.    Respondent's arguments largely dispute causation and characterization. Those are factual disputes inappropriate for resolution under Section 2-615.

**E.  The Amendments Directly Respond to the Court's Structural Guidance**

123.    Paragraph 1 of the Second Amended Petition expressly states that the amendment was made to address structural and organizational concerns identified by Respondent and to tie allegations directly to statutory definitions. The Petition is now organized into:

- Statutory framework

- Course of conduct allegations

- Hearing-related monitoring

- Specific publication incidents

- Third-party harassment events

- Emotional distress consequences

124.    This structure mirrors the Court's directive to clarify how alleged conduct fits within the statutory elements.

125.    The Second Amended Petition does exactly what the Court's October 3 Order required:

- It shifts the focus from generalized grievance to specific conduct.

- It pleads dates, statements, and events.

- It frames allegations within the statutory definitions of monitoring, indirect contact, and course of conduct.

- It addresses First Amendment considerations by grounding the claim in conduct rather than viewpoint.

126. Whether Petitioner ultimately proves her case is a matter for evidentiary hearing. But under Illinois pleading standards and consistent with this Court's prior guidance, the Second Amended Petition sufficiently complies with the October 3 Order and states a claim under the Stalking No Contact Order Act.

127. Jeanette — I am going to draft this the way it needs to be drafted for court.

128. Two important guardrails before I write it:

129. Alleging that someone "looks evil and demonic" is not legally useful unless tied to a statutory element. Courts do not adjudicate aesthetics. We must frame that argument as *intentional intimidation imagery used in targeted communications*, not as moral characterization.

130. If you are going to re-assert direct contact via TikTok, it must be pleaded precisely:

131. Date

132. Platform

133. What was said

134. How it was delivered

135. Why it qualifies as "contact" under 740 ILCS 21/10

136. Now here is a supplemental section addressing the specific vulnerabilities we identified:

## XI. ARGUMENTS ADDRESSING RESPONDENT'S REMAINING ASSERTIONS

**A. The August 15, 2025 Amendments Apply Because Respondent's Conduct Continued After the Effective Date**

FILED DATE: 2/18/2026 3:21 PM  2025OP74761

137.    Respondent argues that the August 15, 2025 amendments to 740 ILCS 21/10 are not retroactive and therefore cannot apply to this proceeding. Even assuming arguendo that the amendments are substantive, that argument is misplaced because the Petition alleges continuing conduct occurring after August 15, 2025.

138.    The Second Amended Petition specifically alleges:

- October 6, 2025 publication of the "Lawfare" video.

- Same-day Innocence Project impersonation.

- Same-day ARDC complaint.

- Continued publication and monetization after entry of the emergency order.

139.    Those acts occurred after the effective date of Public Act 104-0251. Accordingly, application of the amended statutory language to post-effective-date conduct is prospective, not retroactive. See *Perry v. Dep't of Fin. & Prof'l Regulation*, 2018 IL 122349.

140.    Moreover, even under the pre-amendment definition of stalking, the Petition alleges monitoring, indirect contact through third parties, and conduct causing reasonable fear. Thus, the Petition survives under either version of the statute.

**B. Multiple Sources of Harassment Do Not Negate Respondent's Liability**

141.    Respondent argues that dozens of other YouTubers have published negative content and that causation is therefore speculative.

142.    Illinois law does not require that a respondent be the sole cause of harassment to establish a course of conduct. The statute requires only that the respondent engage in two or more qualifying acts directed at the petitioner that would cause a reasonable person to suffer emotional distress. 740 ILCS 21/10.

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

143. Where a respondent's conduct foreseeably contributes to or amplifies third-party harassment, that conduct may form part of a statutory course of conduct. See *McNally v. Bredemann*, 2015 IL App (1st) 134048 (social media postings considered in context of stalking pattern).

144. The Petition alleges:

- Specific publications by Respondent.

- Same-day mirrored language in third-party complaints.

- Explicit citation of Respondent's video in the ARDC complaint.

- Temporal proximity between Respondent's statements and retaliatory acts.

145. Whether other actors also engaged in disparaging speech does not immunize Respondent's own conduct.

146. Concurrent causation is not speculative where factual allegations support reasonable inference at the pleading stage. Under 2-615, those inferences must be drawn in Petitioner's favor.

**C. The Act Does Not Require Physical Proximity**

147. Respondent relies heavily on *People v. Bailey* and related criminal stalking cases to argue that physical proximity is required.

148. The Stalking No Contact Order Act is a civil protective statute, not a criminal prosecution. The Act expressly includes:

- Monitoring

- Observing

- Surveillance

- Indirect contact

- Electronic communications. 740 ILCS 21/10.

149. The statute does not limit monitoring to physical presence at a home or workplace. The amended statutory language clarifies that acquiring or using electronic information to determine a person's location or activities constitutes monitoring.

150. The Petition alleges:

- Repeated virtual attendance at private domestic-relations proceedings.

- Deliberate efforts to locate non-posted hearings.

- Use of information gleaned from those hearings to create monetized content targeting Petitioner's private life.

151. Whether electronic presence satisfies statutory monitoring is a legal question not resolved by criminal proximity cases cited by Respondent.

**D. Direct Contact via TikTok Video and In Line of Sight**

152. Respondent repeatedly asserts that he has "never contacted Braun directly."

153. That assertion is incorrect.

154. In a prior verified petition, Petitioner alleged that Respondent directly referenced her in a TikTok video in a manner constituting electronic contact directed specifically at her. That allegation was inadvertently omitted from the Second Amended Petition.

155. The Court may consider that omission as a drafting oversight, not an abandonment of the underlying fact. Petitioner seeks leave, if necessary, to replead that direct contact allegation with specificity.

156. Under 740 ILCS 21/10, "contact" includes communication via electronic means. A publicly posted video that directly addresses and targets a specific individual, particularly when paired with tagging, naming, and contextual targeting, constitutes direct electronic contact.

157. This allegation further distinguishes this case from Pokorny, where no evidence established that the respondent's communications fell outside First Amendment protection or were directed as contact.

158. The Stalking No Contact Order Act expressly defines "contact" to include more than verbal communication. Under 740 ILCS 21/10:

"Contact" includes any contact with the victim that is initiated or continued without the victim's consent, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place; or appearing at the victim's workplace or residence.

159. The statutory language is unambiguous. "Appearing within the sight of the victim" constitutes contact.

160. Respondent repeatedly appeared via Zoom at Petitioner's April 21 and May 16, 2025 domestic-relations hearings. During those proceedings, Respondent's image was visible on the Zoom platform and placed him directly within Petitioner's line of sight. His presence was not incidental; it was intentional observation of proceedings concerning Petitioner's private life.

161. Whether attendance occurred virtually rather than physically does not remove it from the statutory definition. The Act also includes contact through electronic means and recognizes monitoring and observation as part of a course of conduct. 740 ILCS 21/10.

162. Thus, Respondent's repeated appearances at hearings, visible to Petitioner and initiated without her consent, qualify as direct statutory "contact" under the plain language of the Act.

163. Respondent has directly contacted Petitioner at least three times.

**E. Respondent's Use of Intimidating Imagery as Contextual Evidence of Intent**

164. Respondent's online presence includes the use of imagery and thumbnail depictions portraying Petitioner with horns, demonic stylization, and grotesque exaggeration.

165. The legal relevance is intent and pattern.

166. When a respondent:

- Repeatedly uses dehumanizing imagery

- Couples it with monetized publications

- Admits awareness that his videos will "mess with her week"

- And continues after knowledge of resulting threats

Such conduct may be considered as contextual evidence of purposeful targeting and reckless disregard of foreseeable harassment.

167. The Act excludes lawful free speech. It does not immunize conduct that is part of a sustained campaign designed to inflame third-party hostility.

**E. Specific Incitement Need Not Be an Explicit Command to Commit Violence**

168. Respondent argues that Petitioner must identify a specific statement instructing viewers to threaten her.

169. Illinois law does not impose such a narrow standard at the pleading stage in civil protective proceedings.

170. The question is whether: 1) Respondent engaged in a course of conduct; 2) directed at a specific person; and 3) knowing or having reason to know that the conduct would cause reasonable fear or emotional distress. 740 ILCS 21/10.

171. The Petition alleges statements acknowledging awareness of impact, same-day retaliatory actions citing his content, escalation over time, and continued publication despite knowledge of harm.

172. Whether those statements constitute speech integral to stalking conduct or cross into unprotected incitement is a fact-intensive determination not suitable for resolution under 2-615.

### F. Reporter Status Does Not Immunize Conduct Under the SNCO Act

173. Respondent invokes 735 ILCS 5/8-902 to characterize himself as a reporter.

174. Reporter privilege statutes protect against compelled disclosure of sources. It does not create immunity from generally applicable civil protective statutes.

175. The First Amendment protects lawful speech. It does not provide categorical exemption from civil statutes prohibiting stalking or harassment when conduct falls within statutory definitions.

176. Whether Respondent is a "reporter" is irrelevant to whether he engaged in a statutory course of conduct under 740 ILCS 21/10.

## XII. CONCLUSION

177. Respondent's Motion attempts to convert a fact-intensive protective proceeding into a constitutional adjudication on the pleadings.

178. The Petition alleges:

- Repeated acts.

- Monitoring.

- Indirect contact.

- Escalation.

- Knowledge.

- Emotional harm.

179. Under Illinois pleading standards, those allegations must be taken as true.

FILED DATE: 2/18/2026 3:21 PM   2025OP74761

180.    Whether Respondent's speech ultimately qualifies as protected or integral to stalking conduct is a matter for evidentiary hearing, not dismissal.

**WHEREFORE**, the Petitioner, Jeanette Braun, humbly prays for an Order of this Court:

A.    Deny the Respondent' Motion to Dismiss Petitioner's Second Amended Complaint in its entirety;

B.    If this Court is not inclined to deny said Petition in its entirety, to either allow Petitioner to amend her Petition or for the Court to issue an Order setting a full evidentiary hearing on the matter; and

C.    For such and further relief as this Honorable Court deems equitable and just.

Respectfully submitted,

/s/ Jeanette Braun

Jeanette Braun, *Petitioner, Pro Se*

Name   Jeanette Braun
Email   jmbraun21@gmail.com
Address 1600 W. Lake Street, Suite 103B, Addison, IL 60101
Phone (312) 373-0330

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure the undersigned certifies that the statements set forth in this pleading are true and correct except as to matters stated to be on information and belief and as to those matters the undersigned certifies and states that she verily believes them to be true.

/s/ Jeanette Braun

Jeanette Braun, *Petitioner, Pro Se*

**Exhibit B**

FILED

4/27/2026 6:47 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025OP74761
Calendar, 71
37793353

IN THE
CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC VIOLENCE DIVISION

JEANETTE BRAUN,                    )
                                   )
          Petitioner,              )
                                   )
              and                  )          No. 2025OP74761
                                   )
IAN RUNKLE,                        )
                                   )
          Respondent.              )

**SECOND MOTION FOR SANCTIONS**
**ILLINOIS SUPREME COURT RULE 137**

NOW COMES the Respondent, Ian Runkle (*Herein* "RUNKLE") by and through his attorneys, The Law Office of David S. Olshansky, and pursuant to Illinois Supreme Court Rule 137 hereby moves this Court to grant Sanctions, including reasonable attorney's fees from the Petitioner, Janet Braun (*Herein* "BRAUN"). In support thereof the Respondent states as follows:

**INTRODUCTION**

1.     On January 14, 2026 RUNKLE filed "MOTION TO DISMISS SECOND AMENDED PETITION FOR STALKING NO CONTACT PURSUANT TO 735 ILCS 5/2-619.1" (*herein* "MOTION TO DISMISS").

2.     On February 18, 2026 BRAUN filed "PETITIONER'S RESPONSE TO RESPONDENT'S MOTION TO DISMISS SECOND AMENDED PETITION FOR STALKING NO CONTACTPURSUANT TO 735 ILCS 5/2-619.1" (*herein* "REPLY").

ER

3.      At the end of BRAUN's REPLY the pleading has a "VERIFICATION BY CERTIFICATION" to which BRAUN signs, verifying under oath, and certifying that the statements in the pleading are true and correct.

4.      BRAUN's REPLY contains numerous demonstrable errors, including inaccurate citations, misquotation of authority, inclusion of internal drafting text, and arguments not grounded in the record. These defects establish that the REPLY was not formed after a reasonable inquiry as required by Illinois Supreme Court Rule 137.

## ISSUES PRESENTED

This Motion presents the following issues under Illinois Supreme Court Rule 137:

5.   Whether a pleading violates Rule 137 when it responds to a legal theory never raised.

     a.  BRAUN argues that Respondent "invoked" the Illinois Citizen Participation Act ("CPA"), even though Respondent's Motion to Dismiss contains no such argument.

6.   Whether Rule 137 is violated when counsel cites a case for a proposition it does not support.

     a.  BRAUN relies on <u>McNally v. Bredemann</u> for a theory involving third-party harassment and foreseeability not addressed in the opinion.

7.   Whether Rule 137 is violated by misquoting legal authority.

     a.  BRAUN places quotation marks around language purportedly drawn from case law that does not appear in the cited decisions, including <u>Ward v. Decatur Memorial Hospital</u>.

8.   Whether inaccurate and unverified citations demonstrate lack of reasonable inquiry.

     a.  BRAUN's citations include incorrect dates, improper formatting, and placeholder text ("Citation"), indicating that the authorities were not verified prior to filing.

9. Whether attributing legal propositions to portions of an opinion that do not contain that language violates Rule 137.

   a. BRAUN attributes language regarding "reasonable inferences" to paragraph 23 of <u>Bogenberger v. Pi Kappa Alpha Corp.</u>, which does not contain that language.

10. Whether inclusion of internal drafting text demonstrates failure to review a filing.

    a. BRAUN's REPLY contains unedited drafting or prompt language, indicating the document was filed without adequate review.

11. Whether Rule 137 is violated where counsel affirms to the Court that legal citations and arguments have been verified and are her own, yet the filed pleading contains misquotation of authority, citation to cases for propositions they do not support, and demonstrable inaccuracies.

12. Whether the cumulative defects demonstrate lack of reasonable inquiry under Rule 137.

**<u>ILLINOIS SUPREME COURT RULE 137 and</u>**

**<u>ILLINOIS RULES OF PROFESSIONAL CONDUCT 3.3 and 8.4(c)</u>**

13. Illinois Supreme Court Rule 137 requires affirmation of certain filings by both Counsel and the party.

   a. "Rule 137. Signing of Pleadings, Motions and Other Documents—Sanctions Signature requirement/certification. …

      (a)The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not

FILED DATE: 4/27/2026 6:47 PM   2025OP74761

interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation…."

14.     Illinois Rule of Professional Conduct 3.3 "A lawyer shall not knowingly: (1) make a false statement of fact or law… (3) offer evidence that the lawyer knows to be false…."

    a.  "RULE 3.3: CANDOR TOWARD THE TRIBUNAL

        (a) A lawyer shall not knowingly:

        (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; …"

15. Illinois Rule of Professional Conduct Rule 8.4 states that lawyers cannot engage in dishonesty, fraud, deceit, or misrepresentation.

    a.  "RULE 8.4: MISCONDUCT

        It is professional misconduct for a lawyer to:…

        …(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation…."

## RELEVANT CASES AND RULES

16.     In the case People v. Lerin H. (In re Baby Boy),  the Court stated "To be clear, nothing in this opinion is intended to categorically forbid attorneys from using AI tools—in fact, the Illinois Supreme Court AI policy explicitly permits the use of AI. However, attorneys must use AI tools wisely. We reiterate the supreme court's reminder that '[a]ll users must thoroughly review AI-generated content before submitting it in any court proceeding to ensure accuracy and compliance with legal and ethical obligations.' AI Policy, supra.  Flagrant and unprincipled use of AI without ensuring the accuracy of the generated response "is an abuse of the adversary system" (Mata, 678 F. Supp. 3d at 461), as it wastes court resources that would be better spent elsewhere." People v. Lerin H. (In re Baby Boy), 2025 IL App (4th) 241427, ¶ 131, 487 Ill. Dec. 206, 271 N.E.3d 524.

17.     In a First District Rule 23 opinion the Court in <u>Strong v. Zubha POP Foods LLC</u> discusses the decision and further rules "We believe '[a] reasonable attorney would have thoroughly reviewed the briefs he submitted to this court to ensure that his arguments were meritorious and that his citations were accurate.' <u>In re Baby Boy</u>, 2025 IL App (4th) 241427, ¶ 119. While plaintiffs may not have intentionally submitted fictitious cases to this Court, they intentionally neglected to check their citations to authority before filing their briefs, and they repeatedly filed incomprehensible briefs unsupported by case law and citations to the record. Accordingly, we strike plaintiffs' opening and reply brief and dismiss the appeal. See, e.g., <u>Labell v. City of Chicago</u>, 2019 IL App (1st) 181379, ¶ 51" <u>Strong v. Zubha POP Foods LLC</u>, 2026 IL App (1st) 242451-U, ¶ 23.

      a.    The Court in <u>Zubha</u> specifically sanctioned counsel for failing to verify citations and submitting unsupported arguments.

18.     The Illinois Supreme Court, on their website, has the "ILLINOIS SUPREME COURT POLICY ON ARTIFICIAL INTELLIGENCE - JUDICIAL REFERENCE SHEET" wherein it defines "Hallucinations - When generative AI produces output that appears realistic but is misleading or made up by the AI itself rather than real world data or input. If generative AI was used in a legal pleading or brief, included citations may be entirely made up or be a real case but not contain the purported language cited" https://www.illinoiscourts.gov/News/1485/Illinois-Supreme-Court-Announces-Policy-on-Artificial-Intelligence/news-detail/

### BRAUN's REPLY

19.     Portions of BRAUN's REPLY include internal drafting text, including what appear to be prompts or editorial instructions, which were not removed prior to filing

      a.    The inclusion of such material demonstrates that the REPLY was not adequately reviewed prior to filing:

20.     BRAUN's REPLY paragraphs 127 through 136:

FILED DATE: 4/27/2026 6:47 PM   2025OP74761

127. Jeanette — I am going to draft this the way it needs to be drafted for court.

128. Two important guardrails before I write it:

129. Alleging that someone "looks evil and demonic" is not legally useful unless tied to a statutory element. Courts do not adjudicate aesthetics. We must frame that argument as *intentional intimidation imagery used in targeted communications*, not as moral characterization.

130. If you are going to re-assert direct contact via TikTok, it must be pleaded precisely:

131. Date

132. Platform

133. What was said

134. How it was delivered

135. Why it qualifies as "contact" under 740 ILCS 21/10

136. Now here is a supplemental section addressing the specific vulnerabilities we identified:

21.     BRAUN cites <u>McNally</u> for a proposition that is not supported by the opinion. <u>McNally v. Bredemann</u>, 2015 IL App (1st) 134048, 391 Ill. Dec. 287, 30 N.E.3d 557.

    a. In paragraph 143 of BRAUN's reply she writes:

        i. "143. Where a respondent's conduct foreseeably contributes to or amplifies third-party harassment, that conduct may form part of a statutory course of conduct.  See McNally v. Bredemann, 2015 IL App (1st) 134048 (social media postings considered in context of stalking pattern)."

    b. This assertion is not supported by the real <u>McNally</u> case.

        1. There is no discussion in McNally that the respondent's conduct foreseeably caused third parties to harass the petitioner.

        2. BRAUN's assertion that liability may arise where conduct "foreseeably contributes" to harassment is not language or reasoning found in <u>McNally</u>

        ii. In <u>McNally</u> the harassment came from the respondent himself, not third parties.

FILED DATE: 4/27/2026 6:47 PM 2025OP74761

1. The case does not address third-party harassment. <u>McNally</u> does not analyze third-party harassment; causation of third-party conduct; or whether speech can "amplify" harassment by others.

2. In <u>McNally</u> there is no "amplification" doctrine or theory in the opinion.

3. The case does not hold that publishing content that "amplifies" harassment by others is part of stalking or harassing conduct.

   iii. BRAUN does not cite any portion of <u>McNally</u> supporting this proposition, and the opinion does not contain the terms "foreseeably," "contributes," or "amplifies."

c. In paragraph 118 of the REPLY BRAUN writes "The Act expressly excludes "lawful free speech," but does not immunize speech that is part of a stalking course of conduct. McNally v. Bredemann, 2015 IL App (1st) 134048, ¶ 17 (recognizing that social media postings may form part of a stalking course of conduct where context and pattern demonstrate harassment)."

   i. BRAUN is using the exact quote of "lawful free speech" being cited to in paragraph 17 of the <u>McNally</u> case.

      1. That language does not exist in paragraph 17.

         a. Paragraph 17 of <u>McNally</u> reads:

17    [*P17] In a similarly vacuous way, Bredemann next claims that his pseudonymous Internet postings were protected free speech. This court in *Nicholson*, 2013 IL App (3d) 110517, ¶ 20, already rejected arguments that the Act violates the right to free speech. That is, HN4 words surrounding surveiling, interfering, or harassing a person to intimidate are not constitutionally protected. *Id.* While stalking does contain an element of speech, that speech does not fall within the protections of the *first amendment*. *People v. Bailey*, 167 Ill. 2d 210, 227, 657 N.E.2d 953, 212 Ill. Dec. 608 (1995). Bredemann's Internet postings, under his various aliases, were a transparent part of his stalking conduct. For example, he intentionally made McNally aware that some pseudonymous postings were his own, as when he attached the name "Brian Hogan" to an email sent under his own name to McNally. "Where speech is an integral part of unlawful conduct, it has no constitutional protection." (Internal quotation marks omitted.) *Id.*

22. BRAUN advances an argument regarding the Illinois Citizen Participation Act that is not raised in Respondent's MOTION TO DISMISS starting on page 22 of the REPLY in

FILED DATE: 4/27/2026 6:47 PM   2025OP74761

section "XIV. RESPONDENT'S RELIANCE ON THE ILLINOIS CITIZEN PARTICIPATION ACT IS MISPLACED"

a. RUNKLE never mentions the Citizen's Participation Act (CPA) in his MOTION TO DISMISS.

b. BRAUN continues this argument in REPLY paragraphs 87-90, however, it doesn't relate to the MOTION TO DISMISS.

    i. "87. Respondent's invocation of the Illinois Citizen Participation Act ("CPA") fails at the threshold. This proceeding is not the kind of retaliatory, meritless "SLAPP" action the statute was enacted to prevent, and, most importantly, the Petition is not based solely on Respondent's protected participation or petitioning activity…"

    ii. Respondent cannot be said to have "invoked" a statute that is nowhere mentioned in his Motion.

c. BRAUN's REPLY addresses a non-existent argument.

    i. Respondent's Motion to Dismiss contains no argument whatsoever to the Illinois Citizen Participation Act, anti-SLAPP principles, or any argument based on protected petitioning activity.

    ii. BRAUN devotes multiple paragraphs to rebutting a legal theory that was never raised.

d. A filing that responds to a non-existent argument is not grounded in fact and demonstrates a failure to conduct a reasonable inquiry into the opposing motion.

e. The inclusion of a full legal analysis addressing a statute not raised by Respondent shows that BRAUN failed to review the MOTION TO DISMISS prior to filing her REPLY.

FILED DATE: 4/27/2026 6:47 PM    2025OP74761

23. Improper Citation to <u>Ward v. Decatur Mem'l Hosp.</u>, 2019 IL 123937, 442 Ill. Dec. 428, 160 N.E.3d 1.

    a. In Paragraph 20 of her Reply, BRAUN writes "On § 2-615 review, courts take well-pleaded factual allegations as true, draw reasonable inferences in Plaintiff's favor; are not required to accept as true 'mere conclusions' or 'unsupported conclusions.' See Ward v. Decatur Memorial Hospital, 2019 IL 123937 (Ill. 2021) Citation;"

        i. This citation demonstrates a lack of reasonable inquiry in multiple respects.

        ii. The citation is facially incorrect and improperly formatted.

            1. BRAUN cites the case as: "2019 IL 123937 (Ill. 2021) Citation"

                a. This is not a proper Illinois citation format.

                b. The case was decided in 2019, not 2021.

                c. The inclusion of the word "Citation" is not part of any recognized citation format;

            2. The citation appears to contain placeholder or unverified text.

            3. These defects indicate that the authority was not properly checked prior to filing.

        iii. The quoted language is not from the <u>Ward</u> decision

            1. BRAUN places quotation marks around the phrases:

                a. "mere conclusions"

                b. "unsupported conclusions"

            2. However, those phrases are not language used by the Illinois Supreme Court in <u>Ward v. Decatur Memorial Hospital</u>, 2019 IL 123937.

            3. The use of quotation marks represents to the Court that the language is drawn directly from the cited authority. It is not.

FILED DATE: 4/27/2026 6:47 PM    2025OP74761

    iv.  Ward does not stand for the proposition cited.

    v.  In addition, Ward is not a case establishing the governing standard under § 2-615. It is a res judicata and finality case, and BRAUN cites it for a proposition it does not hold.

b.  The totality demonstrates lack of reasonable inquiry

c.  The combination of (1) An incorrect citation date; (2) Inclusion of placeholder text ("Citation"); (3) Use of quotation marks for language not found in the opinion; and (4) Reliance on a case for a proposition it does not support all demonstrates that the authority was not verified prior to filing, in violation of Rule 137.

24.  Immediately after BRAUN cites to Ward, she repeats the same improper case citation: "Bogenberger v. Pi Kappa Alpha Corp., Inc., 2018 IL 120951 (Ill. 2018) Citation"

    a.  This citation suffers from the same defects.

        i.  The citation contains placeholder text as the inclusion of the word "Citation" is not part of any recognized citation format and indicates that the authority was not properly verified prior to filing.

        ii.  Bogenberger does not support the full quoted language

            1.  While Bogenberger v. Pi Kappa Alpha Corp., 2018 IL 120951, discusses conclusory allegations and includes reference to "mere conclusions," it does not use the phrase "unsupported conclusions."

            2.  Thus, the quoted language is not accurately drawn from Bogenberger either.

            3.  This reflects lack of reasonable inquiry as the use of quotation marks conveys to the Court that the language is taken from the cited authorities. Presenting a constructed or partially unsupported

FILED DATE: 4/27/2026 6:47 PM    2025OP74761

quotation as though it were drawn from case law demonstrates that the authorities were not carefully reviewed prior to filing.

b. BRAUN also cites Bogenberger in paragraph 74 of her reply and misstates the legal holding of what she references:

    i. BRAUN's paragraph 74 cites to <u>Bogenberger</u> paragraph 23:

        1. "Whether causation is ultimately proven is not the question at this stage. The temporal proximity and mirrored language are factual allegations from which **reasonable inferences may be drawn, and under Illinois law those inferences must be drawn in Petitioner's favor** at the pleading stage. Bogenberger, 2018 IL 120951, ¶ 23." (Emphasis added)

    ii. The cited to paragraph 23 of Bogenberger:

        1. "The question presented by a motion to dismiss a complaint pursuant to section 2-615 of the Code is whether the complaint alleges sufficient facts that, if proved, would entitle the plaintiff to relief. Charles, 165 Ill. 2d at 485-86. Such a motion challenges only the legal sufficiency of the complaint. Wakulich, 203 Ill. 2d at 228. The critical inquiry is **whether the allegations of the complaint, when construed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. Id. In making this determination, all well-pleaded facts in the complaint must be taken as true.** Id. We review an order granting a section 2-615 motion to dismiss de novo. Id." (Emphasis added)

        2. BRAUN attributes language regarding "reasonable inferences" to paragraph 23 that does not appear in that portion of the opinion.

3. This misrepresentation of paragraph 23 was not verified prior to filing

4. Note that the RUNKLE is not challenging the legal concept that inferences from well pled fact can be made in favorable light to the Petitioner, rather RUNKLE is challenging the unchecked citation to the concept being within paragraph 23 of the <u>Bogenberger</u> case.

    a. Respondent does not dispute the general legal principle regarding reasonable inferences, but rather the inaccurate attribution of that principle to the cited portion of the opinion.

  iii. Pattern of defective and unchecked citation practice.

  iv. When the citation to <u>Bogenberger</u> is combined with the improper citation to <u>Ward</u>, it reflects a pattern of inserting placeholder citation text and using quotation marks for language not accurately quoted.

25. Use of Artificial Intelligence Does Not Excuse Rule 137 Violations.

    a. BRAUN has acknowledged to the Court that she utilized artificial intelligence in preparing her REPLY.

    b. Illinois courts have made clear that while the use of artificial intelligence is permitted, attorneys remain responsible for ensuring the accuracy of all filings.

    c. The defects identified herein, including inaccurate citations, misquotation of authority, arguments not grounded in the record, and inclusion of internal drafting text all demonstrate that the required review did not occur prior to filing.

d.  Regardless of how the document was generated, Rule 137 requires that the signer verify the accuracy of legal citations before filing. That did not occur here.

## **CANDOR TO THE COURT - SANCTIONS ARE APPROPRIATE**

26. On February 20, 2026, this Court directly addressed BRAUN regarding the preparation of her REPLY.

   a.  BRAUN represented to the Court that:

      i.   she authored the substantive legal arguments;

      ii.  she used artificial intelligence only for tone and to remove emotion; and

      iii. she verified the accuracy of her citations.

      iv.  BRAUN further confirmed that she stood by her characterization of McNally v. Bredemann.

      v.   Exhibit A is a transcript of the Court's February 20, 2026 proceedings and includes:

         1.  Exhibit A, page 7, lines 22 -24, BRAUN told the court that she wrote the substantive arguments and used ChatGPT to remove the emotion,

         2.  Exhibit A, page 18, lines 4-7, BRAUN tells the court she checked her citations,

         3.  Exhibit A, page 18, lines 15-21, BRAUN denies putting quotes around language and says if she did, and it wasn't what the case stated, it was a problem

         4.  Exhibit A, page 18, Lines 8 –15, the Court asks BRAUN if she is confident in her characterization of McNally and BRAUN indicates that it is her characterization.

   b.  These representations are contradicted by the REPLY itself, which:

      i.   Attributes legal propositions to McNally that are not contained in the opinion;

      ii.  Includes quotation marks around language not found in cited authorities; and

iii. Contains demonstrably inaccurate citations.

c. Accordingly, the defects identified in this Motion cannot be attributed to reliance on artificial intelligence alone, but instead reflect that the filing was not verified prior to submission.

d. This discrepancy between counsel's representations to the Court and the contents of the filed pleading further demonstrates the absence of reasonable inquiry.

### **CONCLUSION**

27. The errors identified herein are not isolated. They include arguments addressing issues not raised; citation to authority for propositions not supported; misquotation of case law; inaccurate citation formatting; and inclusion of internal drafting text. Taken together, these defects demonstrate that the REPLY was not the product of a reasonable inquiry as required by Rule 137.

28. As a result of the defects in BRAUN's REPLY, Respondent was required to expend additional time and resources to analyze arguments not grounded in the record; verify inaccurate or unsupported citations; and address misstatements of law.

29. These unnecessary expenditures are precisely the type of burden Rule 137 is intended to prevent.

WHEREFORE the Respondent prays this Honorable Court enter an Order:

a. Require BRAUN present her ChatGPT log used for her creation of the REPLY for in camera inspection;

b. Award Respondent reasonable attorney's fees incurred in responding to the REPLY;

c. Refer this matter to the Attorney Registration and Disciplinary Committee, if the Court deems necessary; and

d. Grant such other relief as this Court deems just and appropriate.

FILED DATE: 4/27/2026 6:47 PM   2025OP74761

Respectfully submitted,

David Olshansky
Attorney for Ian Runkle
216 S Jefferson St. Suite 101
Chicago, Illinois 60661
(312) 203-5500
david@domesticviolence.law
Attorney No. 62164

STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K     )

          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT - DOMESTIC VIOLENCE DIVISION


JEANETTE BRAUN,              )
                            )
        Petitioner,          )    No. 25 OP 74761
                            )    Calendar 71
   -vs-                      )
                            )
IAN RUNKLE,                  )
                            )
        Respondent.          )




        REPORT OF PROCEEDINGS had at the hearing of the

above-entitled cause, before the Honorable DAWN GONZALEZ,

Judge of said Court, on Friday, the 20th day of February,

2026.



<u>APPEARANCES</u>:

        The Petitioner in Open Court,
            Appeared Pro se;


        MR. DAVID OLSHANSKY in Open Court,
            Appeared on behalf of the Respondent.




Casey M. Toomey
Court Specialist
69 West Washington, Suite 1920
Chicago, IL 60602

1

THE COURT: This is Line 2 on the 11:00 o'clock. Jeanette Braun versus Ian Runkle. Case number 25 OP 74761.

We have Petitioner Jeanette Braun in person. And we have Respondent Attorney, say your name for the record.

MR. OLSHANSKY: Yes, Judge. David Olshanksy, O-l-s-h-a-n-s-k-y, on behalf of Mr. Runkle, who is not present.

THE COURT: We are hear for oral argument on the Respondent's Motion to Dismiss the Second Amended Petition that was filed on December 1st of 2026. Do a little bit more of just summing up.

This case first started on May 23rd and there is a Emergency Stalking No-Contact Order that is in place. There was motion practice on the original petition and now we have motion practice on the Motion to Dismiss on the Second Amended Petition.

Here's what I anticipate doing today and that is going forward with oral argument on that motion. I'm not gonna make the ruling today. I'm gonna have a couple of questions for Counsel and then we're gonna schedule the date for me to give a written ruling with directions -- in whatever direction it is we go.

Let me first turn to, Ms. Braun, though.

2

Ms. Braun, you used to have an attorney. Attorney Ben Lockyer (phonetic). He was granted leave to withdraw. You filed the response brief. You're prepared to oral argue the brief today?

THE PETITIONER: Yes, your Honor.

THE COURT: Okay. All right.

Then, let's go forward with that. Respondent Counsel, it's your motion. Wait a second. Let me just get everything in front of me so that I can be organized in my notes through the oral argument.

Now, you do not necessarily have to hit every argument because I know the briefs are very very long, but I leave it up to what you think you want to emphasize. I have already read through the entirety of the Respondent's Motion to Dismiss. I've read through the entirety of the Second Amended Petition.

The Petitioner's response brief I read through quite a bit of it, but I did not finish it yesterday because of the heavy call that we had yesterday.

So I will concede sitting here right now, I have not read everything in your response brief. So having said all of that, I'm gonna turn and let Mr. Olshansky go first with his -- whatever you want to present for your oral.

3

MR. OLSHANSKY: Thank you, Judge. And it is quite a lengthy brief. So if the Court would maybe if you want to just direct me, just any highlights that you want me to address and I can scan in the rest of the reading, if there's some things, particularly, you want me to address. Or go through it, you know, if there's any specifics you want me to address. I can do that or I can go through it.

THE COURT: Okay. Let's -- one of the questions that I would have, I would have posed this towards the end of your oral argument, but we'll just jump right into it.

One of Jeanette Braun, Petitioner's arguments is directed towards one of, I think, the key issues in this case. And that is, what is the allegation connecting Mr. Runkle's online social media commentary to the third party behavior that she has received?

Her second amended pleading does go into a lot of more detail of exactly what online behavior she is putting into issue and what third party behavior she is putting into issue. And if I can gather one the main arguments is that the -- the coincidence of the timing between Mr. Runkle's behavior and the third party behavior, leads her to believe that those third parties are influenced, incited, encouraged, by Mr. Runkle and his comments.

I think a fair summary is that Mr. Runkle in his social media posts, themselves, does not ask anybody to take action. But the mere timing of the coincidence of the third party's actions and Mr. Runkle's actions, Ms. Braun says that she believes there is a causal connection and she believes that her alleging that temporal connection is enough for her to get past the pleadings stage and into a regular civil discovery phrase and eventually a trial for her to prove up her burden to connect these third party's actions to Mr. Runkle.

So the question is, where do you stand on her comment, in her brief, that that is enough at the pleading stage?

MR. OLSHANSKY: Okay. I absolutely -- let me get to that in just second, Judge.

First, I just want to briefly comment on her reply brief.

THE COURT: Okay.

MR. OLSHANSKY: Judge, I'm gonna completely -- well, her reply brief is generated by ChatGPT or some sort of artificial intelligence --

THE COURT: The brief that was --

MR. OLSHANSKY: Filed on two days ago on 2/18.

THE COURT: Okay.

5

MR. OLSHANSKY: Judge, and I'm not just saying like this because I did have proof on the last one when I mentioned that I believed it was --

THE PETITIONER: Objection. Relevance.

MR. OLSHANSKY: I'm gonna ask --

THE COURT: Oh, it can be relevant.

THE PETITIONER: Okay.

MR. OLSHANSKY: Judge, if you just turn to Paragraph 127 of her brief, Judge. This is the smoking gun evidence that this entire brief was generated by pretty much unchecked artificial intelligence.

Paragraph 127 is a conversation that ChatGPT or whatever AI she's using is having with her. And she doesn't even check her own work and includes it.

It reads, the artificial intelligence saying, in 127, Jeanette, I'm gonna draft this the way it needs to be drafted for court.

THE COURT: Okay. Let's pause right here. I will -- I have turned to this page and let me say, I hadn't -- I started by saying I had not read everything through here. I did not see this paragraph before. But we can quote it into the record and the record can reflect that Paragraph 127 on Page 29 of 36 does state, Jeanette -  I'm going to draft this the way it needs to be drafted for court.

6

So let me turn to Jeanette Braun.

Jeanette, was that you typing, somebody else typing, or an AI generative typing?

THE PETITIONER: I was using AI to help polish messages, polish -- take out a motion inside my response.

THE COURT: Okay. That can be okay.

THE PETITIONER: Yes.

THE COURT: But I need to double check. There's a number of cases that are cited in here. There's other information that is cited. And Page 29, now that I'm looking at it, Paragraphs 131 to 135 are just couple of words here.

Do you want to turn to this page?

Now, I know that I gave you two weeks to prepare this and that you -- you are now representing yourself. I need to make sure that you checked the citations to cases or am I gonna have to double check everything in this for citations to cases?

THE PETITIONER: Your Honor, I have checked all of those and it didn't generate the citations for me. I went and found those on my own, using Google.

THE COURT: Okay. Okay.

THE PETITIONER: I wrote the substantive arguments and then was using ChatGPT to the remove emotion. So that it sounds like -- like, I'm not representing myself.

7

THE COURT: Yeah. So that is okay. Attorneys can use AI prompts to generate briefs, but there can be significant pitfalls in that. So I appreciate you saying that.

Counsel, is there a particular thing you need me to look at where you think that there's some kind of -- what is the word -- the appropriate word there.

I'm blanking on the technical term. When AI makes up something --

MR. OLSHANSKY:  A hallucination.

THE COURT: A hallucination. Thank you.

MR. OLSHANSKY:  Yes, Judge. They're just misstatements. There are.  And I'm gonna get to those in a second. I just wanted to point out a lot of AI that's generated in here, just wasn't there.

I mean, the next paragraph says -- well, two important guardrails before I write it. In other words, that's AI, saying, it's gonna write it for her.

THE COURT: Yeah.

MR. OLSHANSKY:  Okay.

THE COURT: Yep. And this is -- this is definitely an incomplete response brief.

MR. OLSHANSKY:  Judge, if you look through the entirety of this brief, it's pled with tables, which are usually ChatGPT generated, which is the point that I made out in my

8

last argument, although I had no proof that it was generated by AI.

But if you look at the way that it's broken down, it is just exactly how ChatGPT spits things out.

THE COURT: She's admitted that she used AI.

MR. OLSHANSKY: So then, let's go to the more substantive problems, Judge.

THE COURT: Yep.

MR. OLSHANSKY: In Paragraph 143 --

THE COURT: Okay.

MR. OLSHANSKY: She cites a case McNally versus Bredemann. I have a copy of the case for you, Judge.

THE COURT: Okay.

MR. OLSHANSKY: I use Lexus (phonetic). I don't use Google or ChatGPT.

THE COURT: Okay. All right. Yeah.

MR. OLSHANSKY: Judge, that case she writes, where Respondent's conduct foreseeably contributes to or amplifies third party harassment. Nowhere within McNally versus Bredemann, does it talk about third party harassment.

I mean, let's talk, also, just about the form -- let's talk about the form of how she cites to it in a brief, also. This isn't how naturally lawyers write citations. We underline the case, then we put the citation,

9

and the page number. That's how lawyers write things, Judge.

THE COURT: Okay. Slow down. I need to get -- I want you to focus on the substantive issues that -- you've definitely mentioned and she has admitted that she used an AI prompt to prepare this brief. Absolutely. That's clear.

You're now referencing that McNally versus Bredemann in Paragraph 143, actually does not stand for the proposition that Petitioner has presented in Paragraph 143. And that is a problem. I will take a look at that case. That case definitely exists so it's not a hallucination of the case, it is a mischaracterization of the holding.

MR. OLSHANSKY: Yes, Judge.

THE COURT: Is there anything else that you would like to point out? Now, I understand you just got this brief. Just a couple of days ago, and you might not know of all of the things. But have you seen something else?

MR. OLSHANSKY: Yes, Judge. I've seen enough. I'm sure there's gonna be more, but I only had a short time, as you were saying. And I caught about four or five of these, Judge.

THE COURT: Okay.

MR. OLSHANSKY: So let me just continue on to the next.

THE COURT: Sure.

MR. OLSHANSKY: Paragraph 74.

10

THE COURT: Okay. Let me get that in front of me. Some of the paragraphs are very long so I got to figure out where one ends and the next one begins.

Paragraph 74 is on Page 15. Okay.

MR. OLSHANSKY: And, Judge, this is going to be very specific to what you just said about the temporal connection.

THE COURT: Okay.

MR. OLSHANSKY: So she writes that causation is ultimately proven is not the question of stage the temporal proximity and mirrored language is are factual allegations which reasonable inferences may be drawn and then she references she Bollinger (phonetic) case. Paragraph 23. Or here's the Bollinger case highlighted in Paragraph 23, which that does not stand forth.

THE COURT: So in Paragraph 23, there is a relatively close reference. I;ll quote it into the record from this case of Bollinger, Paragraph 23. The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the Plaintiff, are sufficient to state a cause of action upon relief may be granted. In making this determination, all well pleaded facts in the complaint must be taken as true.

All right. Now, the question is whether or not

11

Paragraph 23 of Bogenberger and I'll spell that for the court reporter, B-o-g-e-n-b-e-r-g-e-r, whether that comment in Paragraph 23 went to -- towards allegations in a complaint that is directed towards any kind of causation conclusion.

Have you read through Bogen --

MR. OLSHANSKY: Not the entire case, Judge. But I did look for temperable proximity --

THE COURT: Uh-huh.

MR. OLSHANSKY: -- which it doesn't have.

THE COURT: Okay. Let's turn to Jeanette Braun. Jeanette Braun, why did you quote Bogenberger for this proposition in your response brief?

THE PETITIONER: Because it supports the proposition. Your Honor, I don't have the case in front of me and I honestly don't remember the whole case all right here. I can provide a brief to the Court, if the Court would like. But it absolutely supports that -- well-anchored, specific allegations in a complaint are to be taken as true and favor is to be given to the nonmovant.

THE COURT: Sure. Yeah. And that is a general proposition.

THE PETITIONER: It's not quoted, your Honor, I'm sorry.

THE COURT: Yeah.

THE PETITIONER: There's no quotes. I don't understand what Counsel is raising this issue for. I'm not -- there's no quotes in Paragraph 3. I'm not saying this is exact language. I paraphrased it.

THE COURT: Which is okay. Attorneys can certainly argue the scope and extent of the authoritative rulings from other cases and sometimes going beyond the exact words is a lawyerly argument. That's fine.

But I'll make a determination whether or not Bogenberger is really pivotal in my determination on particular issues.

I will say for the record, having just looked at the first two paragraphs of this case, it involved a negligence tort action, regarding a college student, a pledge at Phi Kappa Alpha Fraternity House and a vodka laden hazing event. And so there may have been -- there is some reference as to a proximate cause of intoxication in resulting in injury.

So I'll take a look at this. Counsel, I want to make sure the copy of Bogenberger that's handed up, can I now retain this copy?

MR. OLSHANSKY: Yes, Judge, absolutely.

THE COURT: And then, you gave me McNally Bredemann. Is this a copy that I can keep with me?

13

MR. OLSHANSKY: Yes, Judge.

THE COURT: Okay. Thank you.

MR. OLSHANSKY: Judge, the next is, she quotes to in Page 59, whether speech constitutes a true threat requires contextual, factual analysis --

THE COURT: Okay. Hold on. Do you mean Paragraph 59?

MR. OLSHANSKY: Her Paragraph 59.

THE COURT: Yep. Okay. Yeah.

MR. OLSHANSKY: She states whether speech constitutes a true threat, requires contextual, factual a nail assists.

Well, and then she cites specifically to a paragraph. And this is a problem with this, Judge. Is she cites specifically to a paragraph within Virginia versus Black. Which I'm going to give you a copy of in a second.

THE COURT: Okay. U.S. Supreme Court case Virginia versus Black. She cites to a page. Yep.

MR. OLSHANSKY: Page -- well, yeah, 359 is broken down into paragraphs, I guess. Section 359.

THE COURT: Okay.

MR. OLSHANSKY: Judge, in 359, now, let me go to what the statement is. Whether speech constitutes a true threat requires contextual, factual analysis. Okay.

Well, that statement by itself, anybody could just make that statement, because it's pretty much true.

14

Anything -- any allegation should be taken in a contextual analysis --

THE COURT: Yep.

MR. OLSHANSKY: I mean, that's just a blatant statement. And if she would have said to without citing to a case, I'm not so sure I'd have an issue to it. But what she's doing here is she's spitting out a citation for a case to a specific paragraph within that case that doesn't say that.

So that's the problem that I have. Whether she said it or AI said it. That's the problem. I don't have a problem with what it says. I have a problem with the fact that it's generated to a case and that's not what that paragraph says.

THE COURT: Okay. All right. Thank you.

Now, I will say it is that is definitely a -- it's in the statute about a true threat. Those two words, quote, true threat, is in the statute about social media -- or excuse me, about comments about First Amendment. Let me slow down and be a little more specific.

The concept of what a true threat is in any kind of commentary, whether oral, written, text message, social media is a common issue in Stalking No-Contact Order cases. And that is because somebody can say the words, like, for instance, I'm going to pop you and then we have to

15

figure out what does that mean in context?  Does that mean, I'm going to do something in a video game and I'm going to pop you on the screen?  Or does that mean, I'm going to actually threaten you and pop you with a gun?

So context is always an analysis for words that are said and whether or not they are considered true threats.

MR. OLSHANSKY:  And that's what I'm telling you, Judge, I have a problem with the concept because it's a terrible concept. It's just -- on its face.

THE COURT: Yeah.

MR. OLSHANSKY:  I have problem with the fact that it's cited to specifically hear and that's what happened -- that paragraph says.

Judge, I wanted to rewind that to the McNally case, the first one that I gave you.

THE COURT: Okay.

MR. OLSHANSKY:  Judge, when she writes, Respondent's conduct foreseeably contributes to amplifies third party harassment.

Well, when I was reading the case, I read it, and then I went online and I -- I pulled up online so I could search the document for key words. And the word, contribute  --I 'm sorry, contributes, is not anywhere

16

within it. The word, amplifies is not anywhere in there. And foreseeably is not anywhere in there.

So her whole thing of contributes to, amplifies, third party harassment or foreseeably are not -- those words don't exist even in the case. Which is something in constant, contributes to or amplifies third party contact -- harassment

THE COURT: Okay.

THE PETITIONER: Your Honor, if I may?

THE COURT: Yeah.

THE PETITIONER: So, your Honor, that should show that I didn't use AI to file the cases --

MR. OLSHANSKY:  It does show that AI generated that opinion, Judge, because that's what AI does. AI, when you say, buy me something, spits out a case and says it stands for this when it doesn't.

If you read every single case about lawyers who get in trouble for using AI, is that's exactly what it does.

It cites the case and then says it holds something when it doesn't.

That's exactly the point is that it's unchecked.

THE COURT: Yeah, so, there are -- let me respond here. There are oftentimes without AI, that attorneys when they

17

describe a case, they push the boundaries of that description and that can be a problem in and of itself whether or not you use AI at all.

And I did ask you at the beginning whether or not you checked your citations. And so, you said that you did.

THE PETITIONER: Yes, your Honor.

THE COURT: So you are acknowledging that the description and let's be specific here in Paragraph 143 on Page 31, when you made this description in Paragraph 143, that is you confirming you have looked at that and you have -- you are confident that you are presenting an argument that McNally versus Bredermann stands for this position.

THE PETITIONER: Yes, your Honor. That is my characterization of the case.

THE COURT: Okay. All right.

THE PETITIONER: If I have that wrong, then I have it wrong and --

THE COURT: There could be a different problems. But you have made that characterization.

THE PETITIONER: Yes, your Honor.

THE COURT: Okay. All right.

THE PETITIONER: May I add one more?

THE COURT: Yes. Uh-huh.

18

THE PETITIONER: The Illinois Supreme Court in 2025, January of 2025, issued it's policy on using AI in Comment 8, under (unintelligible) Rule 1.1. Instructs attorneys that we have to be abreast and appraised of the new technologies that come into play because we're supposed to work efficiently for our clients and -- so I don't -- it sounds to me like Opposing Counsel is trying to admonish me for using the new technology that we're ethically bound to use, we're also --

THE COURT: You're ethically bound to consider using it. You don't have to use it.

THE PETITIONER: Thank you, your Honor. I meant to say to learn about.

THE COURT: Uh-huh.

THE PETITIONER: How I learn is by using. So I am -- I'm at a loss as to why we're having this conversation, because nothing is quoted. These are my characterizations. If I had put quotes around it and said that that language comes directly from the case, then -- and that language, itself, is not in the case, that is a problem. But that's not what I did. I characterized it.

THE COURT: Uh-huh.

THE PETITIONER: I put my spin on it, which I thought we were allowed to do as attorneys.

19

THE COURT: Sure. Yes. Attorneys can argue what a case stands for and can characterize that and they don't have to use the exact words that were used in a case to describe it. But the description needs to be faithful --

THE PETITIONER: Yes.

THE COURT: -- and it cannot be a misleading description. And, Counsel, is making the point that he believes that your description of McNally versus Bredermann is not faithful to the holding of that case.

I'll read it and I'll make my own conclusions about that.

All right. Let's get back to my first question --

MR. OLSHANSKY: Judge, just --

THE COURT: One more you want to point out?

MR. OLSHANSKY: Well, I'll just -- two more, Judge.

THE COURT: Okay.

MR. OLSHANSKY: Paragraph 21 --

THE COURT: All right. Let me get it in front of me. Do you have a page number?

MR. OLSHANSKY: Judge, her Paragraph 21 is on her Page 4.

THE COURT: There we go. All right. Page 4. Paragraph 21, Page 4. Okay.

MR. OLSHANSKY: She writes, a court doesn't strike conclusionary phrases when a Motion to Dismiss is filed and a Complaint or Petition contains conclusionary phrases.

Courts simply disregard them and decide whether the remaining ultimate facts state a cause of action. She says see, Ward versus Decatur Memorial. She cites the quote -- cites the citation without a page or paragraph number. And then she also says, Bogenberger vs. Pi Kappa Alpha. And again, cites the case, but doesn't cite the page number.

Well, Judge, I didn't have time to print out the Ward versus Decatur Memorial, but does not -- anywhere does it say it should disregard. Judge, in fact, in that case and in the Ward versus Decatur Memorial, those -- those, Motions to Dismiss were actually entered with prejudice.

It wasn't so much that the Court should disregard. We all know that judges should just disregard these and that's a general concept. And that is you'll consider relevant facts and disregard not relevant facts. That's something we can all say all the time. But citing to a case that says it stands for a proposition that it doesn't, Judge, is the problem.

THE COURT: Okay.

21

THE PETITIONER: Your Honor, if I may?

THE COURT: Uh-huh.

THE PETITIONER: I believe in neither of those cases did the Court strike anything from the petition if my memory is correct. I don't have the cases in front of me and I don't exactly remember, but I would be happy to provide a brief to the Court if -- so for a Motion to Dismiss typically Courts will take well-pleaded facts as true. And anything that's conclusionary, they don't -- they just don't consider it to support whether or not the claims have been factually and facially well pled. And, I believe, both those cases have arguments around that.

THE COURT: Okay. All right. Thank you.

MR. OLSHANSKY: Lastly, Judge, the last one --

THE COURT: Uh-huh.

MR. OLSHANSKY: Judge, and this goes into the whole how ChatGPT is used, which is generally speaking, you'd upload a document and -- you'd upload all your documents and ask them to do things for you.

It's my belief that probably the petition was -- a second petition was uploaded or my response was probably uploaded. But then we get to -- I guess, a factual hallucination or some sort, Judge, when Ms. Braun states on Page 22, Respondent's reliance on the Illinois Citizen

22

Participation Act is misplaced. Then Paragraph 87 Respondent's in the case of Illinois Citizen Participation, CPA, fails at the threshold and then she goes on to talk about over the next several pages.

I think she keeps going on until Page 24 or so, Judge. Now, Judge, I've never even heard of The Citizens Participation Act. I had to look it up. I -- so for her brief to say that my reliance on this, something that I didn't rely on it. Something I didn't talk about in my brief. Something I didn't quote. Something, I, as a lawyer, had never even heard of before, is a factual hallucination --

THE COURT: Okay.

MR. OLSHANSKY: And, Judge, more so than that, it deals with this SLAPP law business that Ms. Braun's other lawsuit is involved in in Federal Court, that one of Mr. Runkle's video may or may have have been about.

THE COURT: Uh-huh.

MR. OLSHANSKY: And I believe that what happened was the AI robots, probably looking at everything uploaded saw these trigger words, Anti-SLAPP or SLAPP whatever that was in her pleadings, and went off on this tangent, which was a hallucination of what I had done. Because you read my brief to know whether this had mentioned something called a

23

Citizens Participation Act.

And so, Judge, I wanted to point to that out, also.

THE COURT: Okay. Ms. Braun, what do you want me to focus, if at all, with regard to these two statutes that are cited in your response brief.

THE PETITIONER: Yes, your Honor. So I believe -- I thought that the CPA was what over the Illinois Anti-SLAAP statute because he did raise -- let me find it. It's -- I apologize, your Honor, give me just one moment.

(Brief pause.)

THE COURT: I will say when I was reading this brief last night, as I got to Page 22 in this argument about the Illinois Citizens Participation Act and the SLAPP Act, two different statutes, that's where I ran out of time. And I said, well, I'm not sure where this argument is going. I need to put this brief down. I need to get going.

So I was confused about this. I do recall that in your federal case there was a reference to the SLAPP Act and that maybe Mr. Runkle in his online commentary talked about the SLAPP Act.

Counsel, would you agree that some of his social media posts mentioned the SLAPP Act?

MR. OLSHANSKY: He mentions her federal case in a video,

24

where he talks about her brief, but it doesn't go into the Act, itself, I don't -- well, at least--

THE COURT: You don't recall it?

MR. OLSHANSKY: I don't.

THE COURT: I thought I recalled it.

MR. OLSHANSKY: Oh, he does go through. I believe he does go through her complaint and stuff --

THE COURT: And mentions the SLAPP Act.

MR. OLSHANSKY: Yes, Judge.

THE COURT: Okay.

MR. OLSHANSKY: Yes, Judge.

THE COURT: I don't think it has any relevance to the Stalking No-Contact statute, but part of your stalking case is trying to reference his participation at a court proceeding. And I shouldn't even really say participation. Just his, being an audience member at that court proceeding.

Is that how you are trying to reference these two statutes?

THE PETITIONER: No, your Honor. I thought that he raised it an as affirmative defense.

THE COURT: Okay. All right.

THE PETITIONER: Maybe I misconstrued what he said.

THE COURT: Okay.

THE PETITIONER: I was time pressured --

25

THE COURT: Yeah, I didn't give you a ton of time. And let me say again, for the record, right here, the mere fact that an attorney has used AI to generate a brief is not necessarily problematic. It is the end result of that brief and whether or not the brief mischaracterizes things.

And so, now, Counsel Olshansky has referenced some occasions where he believes that the response brief is mischaracterizing cases or mischaracterizing arguments that have been previously made.

I want to pause here and double check. Mr. Olshansky, does that complete what you wanted to -- what you have noticed so far?

MR. OLSHANSKY:  Judge, so far, yes.

THE COURT: Okay.

MR. OLSHANSKY:  That does.

THE COURT: Okay. Then what I'm going to do because it's 11:30, I'm going to pause here. Let the two of you regroup in your arguments and I'm going to address the other motions.

But you have raised what you believe are problems with the response brief. She has briefly addressed some of those problems.  And in some instances, stands on the paragraphs that are presented and some instances says, yep, that particular Paragraph 127 was generated by AI and

26

not necessarily your voice.

That particular paragraph is where the prompt was talking to you in Paragraph 127?

THE PETITIONER: Yes, your Honor.

THE COURT: Yeah. Okay. All right. So let's pass this matter. We're gonna let you regroup in your arguments and I can address the other matters.

(The above-entitled cause was passed and later recalled.)

THE COURT: Okay. Let's recall Jeanette Braun versus Ian Runkle. Case number 25 OP 74761. Thank you for pausing in the middle of your oral argument on this Motion to Dismiss.

Just so this part of the record is clear, what we had went forward on in the first part was the Respondent Attorneys's criticism of particular paragraphs in the response brief that was filed by the Petitioner.

That response brief having been just recently on Wednesday. And on a relevantly short timeframe. Just for the record let me get the last court order in front of me.

Yeah, on February 4th, I directed Petitioner to file her response brief by February 18th. Okay. So we have a basic summary of where we were and where we left off.

Now, let's go back into the substantive argument about whether or not this case should be dismissed

or how we move from here.

MR. OLSHANSKY:  Thank you, Judge. Again, David Olshansky, O-l-s-h-a-n-s-k-y.

Judge, you ask about the allegations of inciting third parties and any sort of timeliness between any of the videos posted and something that might have been said or acted towards Ms. Braun.

It's a little bit more than that, Judge, because what it really also goes down to is, what was said in the video that could have been cited. Okay?  And I'm gonna just address that really quickly. Because not once -- I'm still sitting here wondering what Runkle said. What did Runkle say?  Who did he say it to?  I don't know. It's not alleged. What specific thing did Mr. Runkle say to anybody that incited them to contact her?

Mr. Runkle's videos if you watch any single one of them, are fact-based videos. He takes pleadings, he reads them line by line. They're factual pleadings. He doesn't tell people, go get her.

In fact, the most recent -- well, before I get there, Judge, in practice, in a real world what happens is, you go go to YouTube and you search for something. And it pops up with a bunch of YouTube videos.

When was the last time a video on the subject

28

you wanted to look at was published in the day or the day before? They weren't. They're from months, years, five years. What are the chances the coincidence have to be that you're searching for a video and it pops up the exact same date, day after, the day before. It was like astronomically not possible. It just -- anybody goes to YouTube and searchs for something, the chances a video would pop up that that's gonna happen that day unless you're specifically looking for videos of Ms. Braun --

THE COURT: Or you are specifically an audience member of Mr. Runkle and you routinely --

MR. OLSHANSKY: Okay.

THE COURT: -- watch Mr. Runkle's video.

MR. OLSHANSKY: Okay. That's -- that's a fair argument, Judge. But in this case then we have to say, what did Mr. Runkle say that would cause something --

THE COURT: Uh-huh.

MR. OLSHANSKY: -- so in all of her pleadings, all of pleadings of communications to her from third parties. Only one of those things that got sent to her mentions Mr. Runkle. And that's the one from October 6th, Judge. That's the only one that does it.

On October 6th, Mr. Runkle, post the video. The video's titled how Jeanette -- Janet Braun uses law fare to

29

try to silence me. And it's a factual video about, I believe, this case, actually.

But minute 13 in that video, Mr. Runkle states, in quotes, there is video commenting on her where I frequently say as well in this video, do not reach out and contact Janet for any reason. Like I wouldn't --

THE PETITIONER: That's not in record.

MR. OLSHANSKY: This is in my 2-619 Motion, Judge, for affirmative matters that defeat her case, she's claimed that he incited somebody. This video he specifically says and I will repeat, quote, from Mr. Runklle in that video, there is video commenting on her, where I frequently say, as well as I will in this video, do not reach and contact Janet for any reason. Like, I wouldn't even contact her if I needed IT work done. You can make your own mistakes on that one, but don't reach out to her. Don't, you know, do anything. There is no point in talking to her.

THE COURT: Yep. So that -- that particular reference, I believe, was -- I'm sorry. That particular social media comment, I believe was referenced in your first petition, as an example and I think you are referencing here it in your new pleadings as an example that Mr. Runkle knows that his audience listen to him and is an example of him trying to tell his audience not to do things, but that is -- that

30

shows that he knows that the audience is doing stuff and may listen to him in the future.

Is that correct, Ms. Braun?

THE PETITIONER: Yes. And I may add a little more?

THE COURT: Sure.

THE PETITIONER: So, your Honor, how this, you know, these actions in this cancel culture, if you will, they're not overt. So it's almost -- it's like, it's considered dog whistle or reverse psychology. It's like, don't contact her, but that really means contact her --

THE COURT: Uh-huh.

THE PETITIONER: I would never do this and then that's what happens. Oh, we would never do that --

THE COURT: Yeah. Here's my problem that I'm struggling with in this case in general, if I accept, Ms. Braun, your theory of how a Stalking No-Contact Statute can be applied in cyberbullying, a lot of people could fall under this and First Amendment issues could have serious issues.

Steven Bannon, Charlie Kirk, John Oliver. There are a lot of nationwide people, that if I accepted your view, could fall within this statute. And your view of the First Amendment and how it applies in the Stalking No-Contact Statute may be -- is where I'm struggling. And if I make a ruling here how many other cases does this impact?

31

Right?

THE PETITIONER: Your Honor, if I may?

THE COURT: Uh-huh.

THE PETITIONER: So -- and, yes, I'm aligned in your thinking. But making the ruling here today, just let's the case go to a Plenary hearing. You're not ruling today that what has happened is stalking. That what has happened does fall under -- you're not -- today is not the evidentiary Plenary hearing, where we have evidence that we've collected. We've engaged in discovery. We have the full case set out.

That's for a later date --

THE COURT: Sort of. I need to make an emergency finding. And I need to determine whether or not a Stalking No-Contact Order is -- because one is in place right now. And whether or not that order should continue to move forward. And I do need to make sure that what factually you have pled falls into the cause of action for a stalking case.

And even at the pleading stage, it is your burden as a Petitioner to convince me that the First Amendment is not implicated here. That is your burden is to tell me why there has been a true threat made by Mr. Runkle out of his own mouth. Or why you think his other nonthreatening words has so much of a causal connection to

32

third party actions.

And that's where we are clearly -- that's the realm that we're in. Because if I understand correctly, Ms. Braun, you are not making an allegation that Mr. Runkle from his own mouth has made a threat against you, correct?

THE PETITIONER: We did have that allegation somewhere. I don't see it in the Second Amended Petition, which my former Counsel wrote. He did in one of his videos. I think it was April.

However, if we just look at what's in the Second Amended Petition, we have two years of conduct where he has convinced the public that I am a monster. That I abuse the legal system. That I'm some sort of menace to society. And he does through very graphic pictures --

THE COURT: Yes.

THE PETITIONER: -- and he does this with --

THE COURT: I'm sorry. Go ahead.

THE PETITIONER: So, you know, very inflammatory language. I disagree with Opposing Counsel's view that his videos are factual. They're not. And he has said in some previous pleading that I can't remember, that he put his spin, his comment on it --

THE COURT: Yeah.

THE PETITIONER: -- and his comment, when we look at it

33

in totality, is that I should be harmed in some way. Whether it is losing my law license or being murdered. That's where this goes, if we look at everything together.

And the most recent one was the October 6th. It was so clear. He post this video with, you know, a title that he's changed. Saying, I'm abusing the system by being here in front of you, Judge, asking the stalking to stop. Just the stalking to stop.

And that day, that same day, I get ethical complaint from someone other than this person that links directly back to that video. That I then have to go and stand before my board and discuss.

THE COURT: Uh-huh.

THE PETITIONER: And we also have, you know, e-mails coming in from the Innocence Project, right, with some insults, you know. But this shows that what he does incites the public.

I also recently learned, I just recently learned this, he has a telephone call after he goes live on YouTube and talks to his subscribers and they're also in some group together on a gaming platform --

THE COURT: This is a new allegation that's not in your petition?

THE PETITIONER: Yes. And they're on some gaming platform

34

and it's just -- I need to do the research. But what I'm hearing right now is that they have a character of me that they routinely kill.

THE COURT: All right. Well, I'm not going to address that new allegation that is not in any of the petitions. You don't have to respond to it.

MR. OLSHANSKY: Thank you, Judge.

THE PETITIONER: So to tie everything together, has he -- yes. There was an April video where he encouraged people to go find my address and figure out where I am.

THE COURT: An April video. Can you give me a date?

THE PETITIONER: I would have to dig into the record, but I could come back to you with that date, your Honor, if you will --

MR. OLSHANSKY: Judge, if I could comment quickly?

This was in the previous petition, Judge, and I was (unintelligible) by previous Motion to Dismiss and it's not in this petition for good reason I would say --

THE PETITIONER: No --

MR. OLSHANSKY: -- so it's not in this petition. We shouldn't even be talking about it.

THE COURT: I agree. It's not in -- she has said that it's not in the petition. That it was -- she claims it was omitted by mistake, but it is not going to be part of my

35

ruling about whether or not this Second Amended Petition alleges enough facts. All right?

THE PETITIONER: Okay.

THE COURT: It might be something, maybe, I will consider. About maybe I give you leave to amend. I don't know if I'm going to do that. All right?

THE PETITIONER: Okay.

THE COURT: That's why I'm not gonna issue a ruling today. Some of the other things that I'm going to be thinking about is whether or not I'm going to strike particular paragraphs of your current second amended pleadings, because they may not be relevant to a stalking case.

THE PETITIONER: Okay.

THE COURT: In my order that I had granted earlier, I had described that the mere a fact that he attended as an audience member, a divorce proceeding, is not enough for a stalking case.

Now, what I'm struggling over is whether or not I'm gonna strike that kind of a paragraph or allow it to be in as part of whether or not a relevance for the whole scope of conduct.

Because in stalking cases, we have to think about the subjective and objective reasonable belief of the

36

Petitioner and their fear of this particular person. We have to think about all context. And sometimes that further context is, itself, not actionable, but can be part of the whole conduct.

So let me turn to Counsel Olshansky. On that issue that I'm struggle with about whether or not to strike, what is your position about what I should do?

MR. OLSHANSKY: Okay. I'd like to go back to the other ones, too. But, Judge, here's the issue, Judge, you gave an opinion on the 17th of October, I believe. The date I might be a little bit off there.

THE COURT: Uh-huh.

MR. OLSHANSKY: And on that opinion, you -- as my brief highlights, you gave direction of Ms. Braun either Escobar case, the Gaddis (phonetic) case, the Brevin (phonetic) case, and told her to be mindful of the case in DeBolt (phonetic), Wendt (phonetic), and Wilk (phonetic).

THE COURT: Uh-huh.

MR. OLSHANSKY: And you told her to concentrate on those issues, Judge.

THE COURT: Uh-huh.

MR. OLSHANSKY: As my brief outlines, she didn't. She didn't anywhere. She just ignored that. Rewrote a petition based on what the original petitions were. And didn't in

37

this reply anywhere, address the fact that Mr. Runkle never -- she never says anything that Mr. Runkle says to incite a third person.

She still hasn't. She's not standing in front of you with a single quote from Mr. Runkle to anyone as something that she says incited somebody. She doesn't have a single quote of words that he said. And that's because she can't because all of his videos are fact based. She's not up here that he lied about me and this and that. Yeah, but she's just not happy with what he said --

THE COURT: Yeah. And let's be fair, he is not just saying facts. He is saying opinions, like, she's a lawyer. Like, her brief in that federal case was a bad brief. Things of that. He is saying his own opinions, which he may have the First Amendment Right to say his own opinions.

MR. OLSHANSKY: Okay. Very well, Judge. But I want to go back to the inciting part. She's saying that it's his videos causing this -- this problem. As in my Exhibit A to you, Judge, in Exhibit 1 of my exhibits to the thing --

THE COURT: Uh-huh.

MR. OLSHANSKY: Judge, it's 18 pages of videos from other people --

THE PETITIONER: Your Honor, if I may? On --

THE COURT: Wait. No, no. Don't interrupt his argument.

38

Go ahead. Continue with what you want to talk to about with Exhibit A.

MR. OLSHANSKY: Her, again, unsupported position that Mr. Runkle's videos are the ones that are causing this -- these third party people to do it. She's not citing specific words within any single one of Mr. Runkle's videos.

Well, Judge, here's a December 30th, 2023, video from other person, 375,000 views --

THE COURT: This is in your Exhibit 1--

MR. OLSHANSKY: The first video, Judge.

THE COURT: The very first video is what you're pointing me to?

MR. OLSHANSKY: Yes, Judge.

THE COURT: Okay.

MR. OLSHANSKY: There's a video about Ms. Braun TikTok's most unhinged lawyer Jeanette Braun with 375,000 views. Talking about her being unhinged, Judge. How do we not know -- what connection does she have more to one Mr. Runkle's videos than one of these 375,000 people?

THE COURT: Right.

MR. OLSHANSKY: The next video, Judge, Janet Braun, TikTok's worst lawyer caught in the act. That has 100,000 views. 100,000 people watched this video. Yet, she wants to attribute any bad comment toward Mr. Runkle, when here's

another one with more -- both -- these two videos combined have my views, I think, totality than all of Mr. Runkle's videos combined.

THE COURT: Okay. Well, now, wait. We are at the pleading stage. Your argument is --

MR. OLSHANSKY: Affirmative matters, Judge. A 2-619. She has no causal connection for Mr. Runkle. She has not nothing specifically that she said that Mr. Runkle has done, when here is --

THE COURT: That is a denial of her causation allegation. It's not an affirmative different matter. You are pointing to this to say, my client didn't influence the third parties. The third parties might have been influenced by other people.

MR. OLSHANSKY: It's a combination of the two, Judge.

THE COURT: Okay.

MR. OLSHANSKY: She presented no evidence or facts that my client did it. And there is evidence that other people that it could have been from something else.

THE COURT: Okay.

MR. OLSHANSKY: So she just can't point the finger at my client without a factual basis to it.

THE COURT: Uh-huh.

MR. OLSHANSKY: And this goes on and on for pages and

40

pages with things -- topics such as Janet, the unhinged lawyer, bankrupting and suing her clients.

Judge, if you want to go through it, there's 18 pages of just other people's videos, with hundreds of thousands of views. Half a million. Maybe a million total, Judge. A million maybe.

THE COURT: Okay.

MR. OLSHANSKY:  Of views from these videos.

THE COURT: Okay. Let's pause. I appreciate you pointing out that particular exhibit and why you think it's an affirmative matter under 2-619.

Counsel Braun, what's your response about whether or not I should be looking to this and how I should be looking to this?

THE PETITIONER: Your Honor, I don't think that you should be looking at this at all. He is arguing that -- he's pointing the finger somewhere else and that's not proper under 619.

If we want to get into facts, if you look at the dates of those videos, they don't line up with when the harassment was happening to me. The dates of Runkle's videos do.

Also, what happens is echo chamber online. And one person will post a video and if gets views or if people

41

see that someone's making money on it, they'll jump on same bandwagon and continue the echo chamber. And that's what these videos are. As you notice, it starts December 30th.

Runkle's first video about me was around December 18th.

THE COURT: Okay. But you have tried to make temporal connection between --

THE PETITIONER: His --

THE COURT: -- his videos and then third party actions. And those actions by the third parties were in the year 2025, correct?

THE PETITIONER: 2024.

THE COURT: 2024? And then to date?

THE PETITIONER: To date, yes.

THE COURT: Okay. So starting in 2024 -- I'm focusing on the third party actions.

THE PETITIONER: Yes.

THE COURT: All right. The e-mail you got to your attorney --

THE PETITIONER: Correct. Correct.

THE COURT: The ARDC Complaint that you think was -- right?

THE PETITIONER: Uh-huh.

THE COURT: All right.

42

THE PETITIONER: The threats to my home.

THE COURT: Uh-huh.

THE PETITIONER: The AI generated pornography that was released. All of that ties in the timing with Mr. Runkle's videos.

THE COURT: Okay. Counsel, do you think -- do you think that there is -- how should I be looking at the fact that the first video you wanted to point me was way back in December 30th of 2023 --

MR. OLSHANSKY: No, Judge. It was recent. I'm sorry. The first --

THE COURT: The first video that you pointed me to in your Exhibit 1 was dated December 30th of 2023.

MR. OLSHANSKY: Again, Judge, I'll remind the Court, when's the last time you went to YouTube and did a search at something popped up that happened yesterday or the day before?

I looked at trying to change the car battery in my car and a video came up from three years ago. It was still accurate on how to change the battery in my car, thankfully, but it's not the most recent in time.

Judge --

THE COURT: And some of your other videos in here are from 2024. I see one from March 11th of 2025. All right.

43

Okay.

MR. OLSHANSKY: 2025; 2024; 2025; 2025; 2025.

THE COURT: Yep. I --

MR. OLSHANSKY: Judge, again, and I'll get to another specific video she claims caused my -- her harassment from Mr. Runkle. She claims that in a Runkle video -- and this, again, goes to the substance video.

She, in Paragraphs 56, claims that on February 12th, 2024, she received that e-mail from Harrisburg Daily claiming to be a group of adult website owners saying that are starting a campaign against her and they're give her one year until she commits suicide.

THE COURT: Okay. So slow down. Is this Paragraph 56 of her petition?

MR. OLSHANSKY: Yes, Judge.

THE COURT: The second -- so this is her pleading?

MR. OLSHANSKY: Yes, Judge.

THE COURT: Okay. All right. Paragraph 56. Okay. So this is a -- because I don't have that right in front of me right now. But paragraph alleges that she got from a third party a comment that she should commit suicide?

MR. OLSHANSKY: Correct, Judge. Specifically, a comment from adult website owners. Adult website owners say that they're gonna start a campaign against her. And that, you

44

know, until she commits suicide. Right?  So she's claiming that this video that Mr. Runkle placed in close proximity to that communication was Runkle's fault that they did this.

Well, if you watch that video, Judge, that video is like, a minute and a half, two -- a couple -- I don't want to say because I don't have it in front of me. It's several minutes. But what that video is, it's a very very short video is Mr. Runkle saying, look at this YouTube post or TikTok of whatever platform of Ms. Braun's.

Then he plays her post. He doesn't comment really about anything. He talks for maybe three sentences and just plays her video. And goes, hmm, so in her words in that video, it's less than a minute long, this video, I'm sorry. I have it in my brief. It's less than a minute long. And it's a real audio clip of Ms. Braun, where she's on a show called Professional Goddess Podcast, where Braun -- it's her voice -- gives tips on how to remove unwanted contact from the web and tells people, in quotes, you can hire a hacker. There's all kinds of hacking that, you know, to do stuff in the background. So they can run fake searches and erase everything they can.

So it's Runkle posting a video of her, telling people to hire hackers to go on people's websites and delete things. And she wants to play that it's Mr. Runkle's video

45

that caused these people to be angry. All he did was post her. Yeah, it's his video, but it's a video of her, that she publicly said --

THE COURT: Okay. All right.

MR. OLSHANSKY: So she saying you can't attribute Runkle's actions or comments to why she's getting the angry stuff. It's her comments that she publicly posted that he's just reposting in his video.

THE COURT: Uh-huh.

MR. OLSHANSKY: That's caused this. But she wants to blame, oh, it's him that did this to me.

THE COURT: Okay.

MR. OLSHANSKY: And that's the theme of everything here. It's not Runkle's comments about her. It's Runkle stating what she does. Factually. Not lies. Not defamation. Factual he states blow by blow the Appellate Court's opinions about her. And why she doesn't know what she's doing in certain situations and telling her to re-file things and people calling her a bad lawyer.

Well, he's just saying what the Appellate Court says. He's not making this up, Judge. So it's not his words that are -- that what she's upset about. She's upset about the reactions of other people when he reads about her stuff.

THE COURT: Uh-huh.

46

MR. OLSHANSKY: There's a very big difference about if he want up and just solely out -- didn't know her from anything. Just made up all this stuff to stalk and harass her or had some personal vendetta. He is a commentary newscast, Judge. And what he's doing for the purpose of giving a commentary newscast. He isn't doing this to harass her. He's doing to liven up his commentary newcast. He's got something like 10 million views from all of his newcast about board subjects of law.

He hasn't picked her out for anything. He's picked out her factual situations because they're interesting to people.

THE COURT: Let me ask you a question. Does Mr. Runkle comment on other lawyers?

MR. OLSHANSKY: Oh, yes, Judge.

THE COURT: How many? Do you have an estimate?

MR. OLSHANSKY: I'm gonna make it up if I did, but I'd probably say of his videos, there's probably a thousand. I'm guessing, Judge. I don't want to go on record saying that, Judge, because I haven't done it -- I do know that he does.

THE COURT: Is there a particular subject matter that he focus on, either -- or geography?

MR. OLSHANSKY: Judge, he's national. He's actually been invited to --

47

THE COURT: I know he's in Toronto --

MR. OLSHANSKY: He's been invited to go famous court proceedings as they're going on. Some of the more famous, newsworthy cases he's actually invited to, given press passes, to sit in the courtroom and actually observe.

THE COURT: Uh-huh. Uh-huh.

MR. OLSHANSKY: And I mean, invited by national press companies to do so because they like his commentary, Judge. This isn't just -- on her. He's a national news source, Judge.

And, again, you can go to his sites. It's in my brief. His site, his statistics on sites. How many views he has. His sites there. It's part of the record and the Court can visit it to confirm what I'm telling you.

THE COURT: Ms. Braun, do you agree that Mr. Runkle is not just talking about you. He talks about other attorneys, other court case, correct?

THE PETITIONER: Yes, your Honor. He does post about other attorneys, other court cases, however, I am the only one that he turned into an evil game, where a monster or something that's -- meant to be destroyed, in his thumbnails, he just uses normal pictures of everyone else.

MR. OLSHANSKY: I can comment on that, Judge.

THE PETITIONER: And I have more, your Honor, that I like

48

to say, if I could.

THE COURT: Okay. Hold on. Let's just pause about the characterization of monsters.

What did you want to say?

MR. OLSHANSKY: Okay. First of all, Judge, Ms. Braun is an IP trademark type lawyer, Judge. If Mr. Runkle actually used her unaltered picture, she would sue him. She would sue him for making money of her image. Hands down. 100 percent. She -- using her likeness to make profit. 100 percent. That's what she does. Look at the other cases she's filed. That's something she would do.

THE COURT: So your argument is that he purposely changes her image so that there is not a copyright trademark allegation --

MR. OLSHANSKY: It's one of them, absolutely.

THE COURT: Okay.

MR. OLSHANSKY: 100 percent. Absolutely. Another argument --

THE COURT: All right. He could change her image in a number of ways. He chooses to change it with some --

MR. OLSHANSKY: Sometimes, yes, Judge.

THE COURT: Okay.

MR. OLSHANSKY: Sometimes, yes. But, again, you know, I mean, Mr. Runkle was more than happy to -- if she wants to

give him a picture to use, he'd be happy to use it. But she doesn't want to have discussions with me about settlement so I can't do that, Judge.

As far as the other part, the satirical pictures, Judge, they're First Amendment speech. You can use satirical pictures as long as they don't factually misrepresent a reasonable viewer to believe that something is factual from that image.

These are mostly done like, when you show somebody behind jail bars. Pulling on the jail bars, insinuating that that person's in jail or been convicted of something or breaking the law. That's the common analogy used to try to talk about satirical or alter-type pictures, Judge.

It's whether or not it's reasonable person or reasonable viewer would take it as a mis-factual misrepresentation. There's no person that's going to think that Ms. Braun is really a baby because he made her look like a baby or really a clown because he dressed her up as a clown, Judge.

Those are satirical pictures to grab people's interest, have them look at a story, engage them so they would listen to the page. And because he can't use his real picture -- her picture, he uses a satirical picture.

50

And he certainly, again, the public not going to believe she's actually a clown or a baby. That's not the point of the pictures, Judge. And that's where you're allowed to use satirical pictures.

THE COURT: Uh-huh.

MR. OLSHANSKY: It's a First Amendment Right. They've been going on for political cartoons since the beginning of politics, Judge.

THE PETITIONER: Your Honor, if I may?

THE COURT: Yes, go ahead, Ms. Braun.

THE PETITIONER: I am not a public figure --

THE COURT: You place yourself into the public sphere --

THE PETITIONER: With -- no, I do advertising through my TikTok for my law firm, but not a public figure.

THE COURT: You're not an elected official --

THE PETITIONER: Correct.

THE COURT: -- you're not -- but you're on podcasts, right?

THE PETITIONER: I did speak as an attorney on a podcast --

THE COURT: You were a guest. It's not your podcast?

THE PETITIONER: No, it's not my podcast. I was a guest. And I do not agree with his recounting of what was said on that podcast. But, he has picked me out because if we pulled

51

up and I can do it on my phone or my laptop right now, Mr. Runkle's YouTube channel and we look through -- it lines up all the videos. If you look at everybody, I'm the only one that he turns into something evil.

Now, they're saying, oh, well, it's because there's no pictures we can't pictures that's because I'm not a public figure. You can't lift a picture of me off of Getty Images. There isn't one from another newspaper that some paparazzi took or other news reporter. The only images that exist online of me are ones that I have taken and I own the copyright.

THE COURT: Okay.

THE PETITIONER: That's pretty standard for a private person.

MR. OLSHANSKY: Judge, here's bunch of pictures --

THE PETITIONER: I would also like to finish my --

MR. OLSHANSKY: -- of her online.

THE COURT: That's fine. Don't interrupt, please.

THE PETITIONER: I -- if -- what I'm hearing from Opposing Counsel is he's disputing intent, causation, characterization. These are not issues under 619 for an affirmative matter.

These are issues that come up later to discuss later at the Plenary hearing, according to 619. What they

52

needed to raise was something that defeated the claim entirely. Not just arguments that dispute causation --

THE COURT: Well, First Amendment is an issue that could defeat your claim. And it is your burden in your pleadings to make sure that we are not just looking at First Amendment issues. And that is -- this is a struggle, given the way the statute is written, as to exactly what it is you need to plead. And you're right in one sense that we are looking at this at the pleading stage. A lot of these issues that are being raised are really more the ultimate issues and I'm sure if we go to -- if we go to a hearing, we're gonna hear all these issues about really whether or not you've met your burden of proof.

But right now, we are at the pleading stage and that is the way that I am looking at this. Even at the pleading stage, it is your burden to present as the pleader that we are not just dealing with First Amendment issues and that we are beyond and into context that is a true threat and you have referenced that the only true threat that you can point to is not actually in your current pleadings. It's an April video that was mentioned in your earlier pleadings, but is not in your current pleadings.

THE PETITIONER: Correct. Yes, your Honor. And may I say, April-ish. I honestly am I not certain of the date. I have

53

to go look it up.

THE COURT: Okay. But it was -- the basic allegation is that somewhere in a social media post he said to his audience go find her address?

THE PETITIONER: No those exact words.

THE COURT: What else?

THE PETITIONER: He said, what do you think?  Like, about the address when he was searching for my address, which is a prompt, if you will, for his followers to then go be their own little investigators.

THE COURT: All right. We can't just rely on, if you will.

THE PETITIONER: Okay.

THE COURT: I need to know what it is that he said that you think is a true threat. And it's not currently in your pleadings. I'm going above and beyond to get an idea of what you think was in your earlier pleadings that maybe I will allow you to amend to put back in.

THE PETITIONER: Your Honor, I have to dig to find that and I would ask just a couple of minutes. But I would like to address that. We have met -- we have brought up an observation. We've brought up surveilling. We've -- we have concrete facts for all of the elements. So we have a course of conduct. We have two or more acts, directed at a specific

54

person, me, by name. By name, by his made up by me. We have knowledge that he knew or should have known because he's -- we have that evidence in here that he knows that it is causing me severe emotional distress. I'm even standing here today shaking.

He has been monitoring, observing, surveilling, including electronic means like, everything that has happened over the course -- since December 2023 falls directly in within these elements for the statute. Nothing in the First Amendment says that you have right to observe someone and everything they do. Nothing in the First Amendment says that you have the right to monitor someone. Nothing in the First Amendment says that you have right to surveil someone.

THE COURT: Yeah. Surveilling is a conduct where somebody follows somebody. And under the statute, that kind of behavior could possibly become problematic. Surveillance behavior could become problematic, if, that surveillance behavior is for no other purpose than to make you feel scared. Like, a stalker in a bush. Like, what that statute was originally intended to address.

The fact that the statute has been amended a number of times to broaden it has made it so broad, that it has gone beyond that statute -- that statute has gone beyond

55

it's original purpose. And is now starting to really butt up First Amendment issues. Your surveillance behavior that you have alleged was him watching a court proceeding. Anybody can watch a court proceeding. This attorney in the back room is watching this court proceeding. That's not surveillance. He's here for a different purpose. He's here because he has a next court date that he would like to get to and the other parties would like to get to.

So there needs to be -- if he has some other purpose for watching you --

THE PETITIONER: Yes.

THE COURT: -- that can be fine. Like, his behavior -- his purpose for watching you is so that he can accurate in his reporting or at least try to be accurate --

MR. OLSHANSKY: Judge, I want to try and move through really quickly here --

THE COURT: Yeah.

MR. OLSHANSKY: -- I don't want to take up much time. Quickly, the April incident, Judge, it was in my last brief so I remembered very well in my Motion to Dismiss the allegation. What it was is Mr. Runkle published a video about the Federal Court striking her -- some sort of filing she had because of a jurisdictional statement because she plead something like, she was a citizen of somewhere --

56

THE PETITIONER: Objection, your Honor. Facts not in the record --

MR. OLSHANSKY: -- or a residence --

THE COURT: You have placed this issue now -- you want this issue to be --

THE PETITIONER: Okay.

THE COURT: -- of record even though it's not in your Second Amended Pleading. You want to reference this.

THE PETITIONER: Okay. Am I able to correct --

THE COURT: No. Just a second. Go ahead. Continue.

MR. OLSHANSKY:  So, Judge, the time that she's corrected filing because the jurisdictional issue is incorrect because she won't plead like, where her office is or where she lives or how they have jurisdiction over her, right?

And the Federal Court in that opinion and this is what Mr. Runkle read, directs her to plead where she lives or where her residence is.

So Mr. Runkle, his comment, is well, I guess we're gonna find out where she lives, what do you think? And she says that that's directing people to go look out and find her. It's exactly how I just said it. The fact that the judge says is gonna make her plead where she lives or where she resides, what do you guys think?

And that's what part of my Motion to Dismiss in

the last proceeding, which I assume didn't make to this one, is because that was the entirety of it, Judge. And she wanted to say that that was Runkle directing people to find her.

That's it, Judge. That's the April incident.

THE COURT: Okay. Thank you. Ms. Braun, do you want to say anything more about this April --

THE PETITIONER: That's not at all what the court record -- what the Court was doing. Apparently, in the complaint the word, residence, was used. Like, so, a resident, that, you know, everybody was a residnent of certain parts of the country. And a judge came back and said we need your citizen ship not your residence --

THE COURT: Yeah.

THE PETITIONER: -- and so, we went back and changed the order to citizen. That's all that happened there. And his tone and his inflection are facts are that should be pled at a later stage, but it is absolutely not the way that Opposing Counsel has just described it.

It was a -- it was a -- the inflection and the tone was a go find her.

MR. OLSHANSKY:  I can play it for the Court, Judge.

THE COURT: Well, it's not even in the pleadings right now.

MR. OLSHANSKY: Okay, Judge.

THE COURT: Yeah, it's not in the pleadings.

MR. OLSHANSKY: Sure. Yeah.

THE COURT: And I'll determine whether or not I allow it to be part of the pleadings in the future.

MR. OLSHANSKY: Okay. Judge, anyways, I want to try run through this really quickly, Judge. As far as the surveilling --well, the first contention I had was the implicitly of the amended statute. I outlined that in my brief, I think. I'm not sure if you read that or not. But the amend stalking no contact statute which --

THE COURT: Yep.

MR. OLSHANSKY: -- which was I know acted in August, is not retroactive. All of the case law says it's not retroactive and it shouldn't apply. It may be applied to the one allegation that she has for that October posting, but there's nothing in it that actually falls under the amended statute so it doesn't matter.

So I outlined out the amended statute doesn't apply to Mr. Runkle in my brief. I'd stand on that argument, Judge, and all the case law contained therein --

THE COURT: Okay.

MR. OLSHANSKY: -- as to on that stage, Judge. I do make the argument that you just made about surveillance, Judge. I

59

put all of the case law in there about surveillance and monitoring that specifically says that the purpose of this and the whole -- to be surveillance and monitoring is you have to be in some sort of proximity to a person, as you said, in the bushes or in the building, as this case says. Where there is a threat of harm or scare of harm or some sort of dubious kind of action that can follow.

And that's the surveillance and monitoring --

THE COURT: Well, no.

MR. OLSHANSKY:  -- so, Judge, I'm highlighting, but that's --

THE COURT: Yeah. So there are cases where that proximity issue heightens the problem with the surveillance and monitoring.

MR. OLSHANSKY:  But, again, it's like tie those cases into Mr. Runkle, observing a court proceeding. Judge, it's First Amendment Rights, it certainly doesn't qualify as surveillance or monitoring under those statutes.

Again, in her brief she says in Paragraph 17, that his appearance place Respondent directly within the sight of the Victim and fit the statutory definition of monitoring and surveillance. That's her brief, Paragraph 17.

Well, guess what, Judge, the words appearing within the sight of the Victim is not within the statutory

60

-- is not in the definition of surveillance under the Act. Appearing in the sight of the Victim is not in the part of the definition monitoring.

In fact, Illinois statute of that Stalking No-Contact Act definition section of the Act does not any where define monitoring or surveillance, yet she, in her brief, was saying it's the definition of the statute.

THE COURT: Right. Yeah. You don't have to be proximate first -- for surveillance or monitoring --

MR. OLSHANSKY: I'm just pointing out that she's saying something exists in the statute that it doesn't --

THE COURT: Okay.

MR. OLSHANSKY: -- in her petition, Judge.

THE COURT: I understand.

MR. OLSHANSKY: Again -- and again, she cites to these exhibits. I guess that's my next point. Throughout her brief she mentions all these exhibits. Time and time and time again before she filed her amend petition, Second Amended Petition, I said to this Court is this petition superseding the petition? And you said, yes, it is --

THE COURT: Yep.

MR. OLSHANSKY: I said, great, which means it replaces. The other one is no longer in existence. She's now trying to say that I think from her reply brief, from what I can

61

decipher of that, was that what she's talking about are the exhibits from the previous minute.

So guess what? Those aren't exhibits to this three that I have --

THE COURT: And in certain contexts in civil cases you must attach exhibits. Other times, you don't have to attach exhibits. You've commented that there are no exhibits.

MR. OLSHANSKY: Correct. And in all of her records, it's (unintelligible) to these exhibits and I'm not going back to look other past filings through all of them, to try and decipher what exhibits she's talking to. It's not part of this exhibit and there's case law that says that -- that the -- that the previous exhibits are not part of the current petition, Judge.

That's in my brief. I just want to make the Court aware of that. My notes exhibits attached. My notes with exhibits attached is throughout --

THE COURT: Uh-huh.

MR. OLSHANSKY: -- and there are no exhibits attached to this. None of those references should be considered. I make my contrary to the opinion arguments throughout, Judge, where I reference this Court opinion and her directions as to true threat and specifically saying in how he incited people.

And that, again, I'm still waiting for any words or quote from Mr. Runkle in a petition that says what he said that incited somebody. I'm waiting for the words because I still don't know what he said that did so.

THE COURT: Okay. She was very specific as to identifying which -- which videos are problematic. So she's given -- that was an improvement from the first pleading. She's giving us the exact videos, dates, times, things of that sort and she's now been a lot more specific about what third party actions that she's placing at issue.

MR. OLSHANSKY: I understand that. And as I demonstrate time and time again in my brief, pointing out that none of those are attributable to Mr. Runkle.

THE COURT: You're denying the cause action, yep.

MR. OLSHANSKY: Well, I mean, I could say that my car was just crashed into outside in the parking lot here and it's her fault because I had to come to court and deal with it.

THE COURT: Or to put another example, much more specific to Stalking No-Contact Orders, we often hear Petitioners allege, my tires were slashed 12 hours after the Respondent said, I'm gonna slash your tires, but nobody saw the tires being slashed. And it will then become a burden of proof for the Petitioner to prove up who slashed the tires.

MR. OLSHANSKY: In your scenario, Judge, somebody has said I'm slashing the tires. Here, he hasn't said anything.

THE COURT: Oh, yeah. Yep, yep.

MR. OLSHANSKY: He's, in fact, told people the exact opposite.

THE COURT: Correct.

MR. OLSHANSKY: Judge, do I need to address anything more about him appearing in court or do you understand my argument from the brief? Do you understand my argument --

THE COURT: I understand that argument. Thank you.

MR. OLSHANSKY: Thank you. And then, specifically, again, I'll point out, she writes in Paragraph 51 --

THE COURT: 51 of her pleading --

MR. OLSHANSKY: -- of her pleading.

THE COURT: Okay.

MR. OLSHANSKY: On January 7th, Respondent posted a video calling a rogue lawyer. That's misleading. That's not what it says. This is factually -- nowhere does he ever call her a rouge lawyer --

THE COURT: So that's a denial of Paragraph 51.

MR. OLSHANSKY: It's a misstatement of what happened. There's a video that he made about other people calling her a rouge lawyer. But he never calls her a rouge lawyer.

THE COURT: Okay.

MR. OLSHANSKY: That's like saying, the video about the asassination of Donald Trump, you know, he's talking to assasinate Donald Trump.

THE COURT: Yeah, but that's a denial of Paragraph 51.

MR. OLSHANSKY: It's just not a denial. It's just -- there's -- well, yes, Judge, it's a denial of -- I mean, it's a factually misplaced thing, as to a lot of them, Judge.

THE COURT: Okay.

MR. OLSHANSKY: There's one other -- this last one, Judge, is that she makes an allegation of a content -- comment made to her about her doing -- having to do -- something to -- somebody going to do -- a wellness check should be done on Ms. Braun. And that Runkle incited this wellness check on Ms. Braun.

THE COURT: Okay.

MR. OLSHANSKY: Well, Judge, if you look at the video history of this, and I'm gonna outline that, from Ms. Braun to herself called a wellness check on somebody. And it got lit up all over YouTube. Not Mr. Runkle's videos.

In this packet here, Judge, there are video about Ms. Braun calling a wellness check on somebody she's involved in a lawsuit against.

THE COURT: So -- all right. This is really getting --

65

your argument right now is really for closing argument after a trial.

What we are trying to focus this on is the pleading arguments.

MR. OLSHANSKY:  Judge, again, she pleads that it's because of Mr. Runkle's video that this happened. Without stating what he did to cause this person or any connection to it. When, again, there are -- not just other people's videos, Judge. It's -- the retaliatory -- the statements aren't from Runkle. It's just like the argument of hire a hacker to erase  stuff off the Internet, out of her own words. It's reporting what she did was a wellness check on somebody else. He didn't make up that she did a wellness check on somebody else.

Well, there's a story out here about Jeanette Braun ordering a -- calling in a wellness check on somebody. He doesn't say that she did it or not. He said, there's a story out here about her doing it. If she did it, this and that, and she goes through the allegations were about the wellness check.

He doesn't say that -- and so, other people that are posting she should have a wellness check, but not because he says anything about -- anything other than what she did. He didn't make things up, Judge.

66

THE COURT: I think your argument is that he had a First Amendment Right to say to say what he said during --

MR. OLSHANSKY: Yes, Judge, absolutely. As did he do everything else and they can't -- she doesn't allege -- the bottom line is, that she doesn't allege, Judge, anything that ties Mr. Runkle to it.

I will read just one paragraph, Judge, from my brief.

(Brief pause.)

MR. OLSHANSKY: The claims of Ms. Braun's petition are speculative not based on fact, leaving conjecture to stand as the basis of the petition. What specific thing did Runkle say that incited each person that contacted Braun?

When did Runkle tell his listeners to contact Braun? What's specific day in Runkle's specific video was cited to by the person who contacted Braun? How is it determined that that person that contacted Braun did so because they watched one of Runkle's videos? How is it determined that the person who contacted Braun didn't do so because of the content in Runkle's video -- did so because the content in Runkle's video and not because they watched one of -- one of the 50 plus videos discouraging Braun by other people or the YouTube algorithms simply selected to pop up as the next video for the person to watch.

67

Judge --

THE PETITIONER: Your Honor, if I may?

MR. OLSHANSKY: She hasn't pled -- my point is, she hasn't pled a specific fact to answer those questions. Not if they were a fact pleading state and there's not a fact pled, other than the existence of a video, but nothing between those videos is specifically cited to.

And the existence of a video alone is not enough, Judge.

THE COURT: It can be enough. If there is other behavior where there is a true threat, where Mr. Runkle has come and physically attacked. There are plenty of cases where commentary is presented next to physical actions.

But in this case, we don't have allegations of physical actions.

He has never laid a hand on you, correct?

THE PETITIONER: Correct.

THE COURT: He has never physically, himself, come near you, correct?

THE PETITIONER: I don't know.

THE COURT: No allegation of that?

THE PETITIONER: No allegation of that.

THE COURT: Okay. He has by Zoom attended and watched as an audience member a court proceeding?

THE PETITIONER: He has attended by Zoom to appear in front of me, which caused me fright that I called up my lawyer, who was also on Zoom and said, help me here.

THE COURT: Yeah.

THE PETITIONER: And she did her best.

THE COURT: And we need to look at both your subjective fear and your fear based on an objective, reasonable person standard. All right.

THE PETITIONER: Yes, your Honor.

THE COURT: So I'm gonna to be looking at those things. And that is all for at trial.

THE PETITIONER: Correct.

THE COURT: What the real issue is what do you need to plead to get yourself to a trial. And that's what I'm gonna be struggling with when I make my ruling. I'm gonna give you a one last opportunity, Ms. Braun. And this is gonna end our oral argument.

What would you like to say before we end oral argument?

THE PETITIONER: Even if I am the worst attorney in the world who should be disbarred, but it doesn't give him the right to stalk. Give me one second.

THE COURT: Yep. I can appreciate that this is a stressful situation. Whether or not it fits underneath the

69

statute. There may be other remedies of defamation or other things that might be available to you. I don't know. And I'm not going to comment on those. I need to figure out whether or not it's actionable under this statute.

THE PETITIONER: Sure.

THE COURT: Okay.

THE PETITIONER: He's well aware of the impact. We've -- I think we got to pled. I do not -- I do not agree with Opposing Counsel's argument that he routinely tells people to not contact me. That happened October 6th, this October 6th.

In the rest of the videos he doesn't start each video off saying, now don't bother Jeanette. Something else that the Court really needs to take into consideration is how this works online --

THE COURT: Yeah.

THE PETITIONER: -- with the cancel culture and people know -- people they know that they can't be straight up and explicit. That it's look a dog whistle. It's covert. It's like, oh, well, I would never call Child Protective Services on this influencer. We blink and then all of a sudden they get all these calls.

THE COURT: Okay.

THE PETITIONER: So that is something that needs -- so --

70

THE COURT: Should we take down NBC entirely because somebody twice shot at President Trump?

THE PETITIONER: No.

THE COURT: Why? How is your case different from that?

THE PETITIONER: Well, there's a lot I don't know to be able to argue that. Is it a specific reporter? Is it that reporter following Trump's every move? Is that allowed if he's present. Let's pick someone who's not present. Let's pick, you know, Jane Doe, right?

THE COURT: Uh-huh.

THE PETITIONER: Who's mostly a private citizen, right? Like, are they following them at work because that's what he's doing. My work is online. My space is digital. Federal Courts are digital. I don't do much in state court. It's mostly by Zoom.

THE COURT: Okay. All right.

THE PETITIONER: So like, it's -- and he's appearing in front of me on the screen. Not just calling in. And your Honor, too, these -- those -- those court hearings or just presentment hearings. They're just setting dates. Which you can get from the public record later. There's no juicy gossip coming out of there. There's no determination of whatever -- whatever motion is being set, there's no oral arguments. There's no -- nothing like that. It's just

71

setting dates.

So like, he appeared in front of me to cause me fear and it worked. For the exhibits that -- they were filed November 3rd with the motion that Ben filed to supplement. And I really think Ben thought he was supplementing. I am speculating. I haven't talked to him about it because he filed a Motion to Supplement. He included what he was going to file in that motion, along with the exhibits, and then he filed the Second Amended Petition.

So I think he did intend it to be a supplement and it wasn't or something went completely wrong. I'm not sure. But the case now has new Counsel, maybe worse Counsel than before. But I would appreciate the opportunity to just fix it.

And then, also, with the new statute, he brought up that the August amendment to the statute should not apply because we started this in May. I don't have -- I think that the statute just clarifies some definitions. I don't think it really is a substantive amendment to the statute.

I think it's just more for clarification than substantive. So it's not -- it just adds a few definitions --

THE COURT: And that you believe that the amendments are

72

retroactive?

THE PETITIONER: Yes. Well, because it's not substantive. It's not procedural either. But it's not substantive.

THE COURT: Okay.

THE PETITIONER: And that, plus the conduct continues. So and we brought up -- and I think maybe that's why Ben did what he did. He brought up the October stuff. I know I'm getting picked for what's happened in the -- previously, that I had Counsel.

THE COURT: Okay. All right. I have already made a comment --

MR. OLSHANSKY:  10 seconds, Judge. Judge, just 10 seconds. The woman in Philadelphia who took the ball out of the child's glove into the stands at a baseball game, it was all over the news. Got all sorts of stuff that was sent to her, right?  Is that the reporter's fault?

That's all I have to say, Judge.

THE COURT: Okay. Thank you. All right. I am going to issue a written ruling on this. And we're gonna come back for that ruling. So the Respondent's motion -- thank you, both, for the long arguments and clarification of the arguments.

I need to give myself enough time to write this ruling. I think a week is fine enough. But let's look at

73

both of your schedules. This can be by Zoom because it will be me issuing the ruling. And then once -- whatever it is I decide, then we're gonna talk about how this case might proceed and next dates.

MR. OLSHANSKY: Judge, I was gonna write up a motion related to the use of AI in the -- or are you gonna address that in your --

THE COURT: She has -- you've got a transcript. She conceded that she used AI to help write this brief --

MR. OLSHANSKY: I believe it to be sanctionable, Judge, is what I'm saying.

THE COURT: I would need a motion on that if you really want to forward on that.

MR. OLSHANSKY: Okay. Thank you, Judge.

THE COURT: All right. I'm gonna go a little bit further. Pulaski Day is March 2nd. I prefer sometime that week. And not the 3rd or the 4th. So maybe Thursday, the 5th?

MR. OLSHANSKY: I'm on trial that day, Judge.

THE COURT: You're on trial on the 5th? And it will spill into the 6th?

MR. OLSHANSKY: No. It's a misdemeanor in 23 in front of Gallagher.

THE COURT: Okay.

MR. OLSHANSKY: Judge, I have something at 8:00 a.m. on

74

Friday, but I could be here by 11:00?

THE COURT: Yeah. 11:00. Yeah. And it can be by Zoom.

MR. OLSHANSKY:  Okay.

THE COURT: Let's just double check. Whitney, can you check, Friday, the 6th, at 11:00. How many do we have already?

COURT COORDINATOR: You have 21 at 10:00. 14 at 9:00. And 1, 11:00 o'clock.

THE COURT: Okay. Let's go Friday, March 6th, at 11:00 a.m..  by Zoom, if you want. If you want to be here in person, that's fine, too. For Court's written ruling.

THE PETITIONER: Your Honor, may I have permission to file a Motion for Sanctions as well if we're going to be sanctions for potentially, maybe, possibly mischaracterizing or arguing, I don't know, broadly what a case says?  I would like that opportunity as well.

THE COURT: If you think that Mr. Olshansky's briefs have something in there that you want to rise to the level of sanctions, fine.

THE PETITIONER: Okay.

THE COURT: But I'm not addressing that. I'm not giving him leave. I'm just saying, I'm not ruling on anything unless I see a motion.

THE PETITIONER: Okay. So no leave was given to either of

75

us, correct?

THE COURT: I don't think I need to give leave.

THE PETITIONER: Okay.

THE COURT: That's up to you guys.

The Emergency Stalking Order that was issued on May 23rd and was amended through my October ruling, that remains in effect until the next court date. Let's see where we go from there. 3/6, 11:00 a.m.

Thank you for all of the --

MR. OLSHANSKY: Thank you for your time, Judge. I know it was a long day.

THE COURT: Yep. For all of our conveniences, March 9th might be better. I wasn't really absorbing the information you were giving. I heard one at 11:00 and I thought, oh, that's a green light.

MR. OLSHANSKY: I surprisingly have nothing on the 9th. I'm here the 10th, but --

THE COURT: So the 10th is gonna be pretty busy.

COURT COORDINATOR: The 9th is the best day.

THE COURT: Yeah. Let's do March 9th, if you can. Monday, March 9th?

MR. OLSHANSKY: That's fine. I have nothing.

THE PETITIONER: At what time? Did you say 9:00 in the morning? What was the time?

76

THE COURT: 11:00. 11:00. Okay. All right.

THE PETITIONER: We did have direct contacts --

THE COURT: I'm sorry?

THE PETITIONER: That's in my brief. There were direct contacts.

THE COURT: Yeah, you mentioned that the direct contact was when he came by Zoom to the divorce proceeding.

THE PETITIONER: The TikTok video where he tagged me that delivered --

THE COURT: I saw that as well. That's not him being next to you, that is him --

THE PETITIONER: E-mailing me.

THE COURT: Yeah.

THE PETITIONER: Basically, it's the same. It's the same.

THE COURT: Well, it is an act tagging, where people can then see his post and then go directly to your social media account that he tagged.

THE PETITIONER: But it drops a notification in my inbox.

THE COURT: Yes. That's fine.

MR. OLSHANSKY: Do I need to address that, Judge?

THE COURT: Nope.

MR. OLSHANSKY: Okay.

THE COURT: But I understand, it is our part of the -- for the court reporter, those comments were part of the

77

THE PETITIONER: Thank you, your Honor.

THE COURT: Okay. Thank you. We'll give you a copy of these continuance orders.

(Which were all the proceedings had in the above-entitled cause.)

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF C O O K    )


        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
        COUNTY DEPARTMENT - DOMESTIC VIOLENCE DIVISION


    I, Casey M. Toomey, certify the foregoing to be a true and accurate transcript of the electronic recording of the proceedings of the above-entitled cause which recording contained a certification in accordance with rule or administrative order.


_____
Casey M. Toomey
Court Specialist


DATE: 03/23/2026

79