**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEANETTE BRAUN, BRAUN IP LAW, LLC, & LAUREN PROPSON, | ) ) ) | |
| Plaintiffs, | ) | Case No. 23 C 16856 |
| v. | ) ) | |
| REBEKAH M. DAY NEE BOX, KRISTA CARTER & LILY MARSTON | ) ) ) | |
| | ) ) | |
| Defendants. | ) | |

**DEFENDANT LILY MARSTON'S AMENDED RESPONSES TO PLAINTIFF
JEANETTE BRAUN, BRAUN IP LAW, LLC & LAUREN PROPSON'S FIRST SET OF
INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Lily

Marston ("Defendant"), by and through her attorneys, hereby provides her amended responses to

Plaintiffs Jeanette Braun, Braun IP Law, LLC, and Lauren Propson (together, "Plaintiffs") First

Set of Interrogatories (hereafter, the "Requests").

**GENERAL OBJECTIONS AND RESPONSES**

Defendant makes the following General Objections to each and every individual request in

Plaintiffs' First Set of Interrogatories. Each of Defendant's General Objections is hereby

incorporated in and made a part of each of the specific objections to particular requests set forth

below, as stated therein.

1.      **Privilege Objection**. Defendant objects to Plaintiff's First Set of Interrogatories

to the extent they seek information and documents subject to the attorney-client privilege and/or

work product doctrine.  Production of any privileged or otherwise protected material by Defendant

in the course of this litigation is inadvertent and shall not constitute a waiver of any such

privilege(s) and/or protection(s) or other grounds for objection to discovery with respect to such materials.

2. **Compilation Objection.** Defendant objects to those Requests that seek a summary, compilation, or analysis of information that is already contained in documents being produced or made available for inspection under Federal Rule of Civil Procedure 33(d). Rule 33(d) expressly permits a responding party to produce business records in lieu of preparing a written narrative response where "the burden of deriving or ascertaining the answer will be substantially the same for either party." *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 325 (N.D. Ill. 2005) (applying Rule 33(d) and holding that "where the information requested can be derived from records equally accessible to both sides, Rule 33(d) permits the responding party to direct the interrogating party to those records rather than create a summary").

Preparing the requested summary would impose an undue burden on Defendant, as it would require distilling and compiling information from records that are equally available to Plaintiffs once produced. *See* Fed. R. Civ. P. 33 (c) advisory committee's note to the 1970 amendment. The foregoing objection shall be referred to herein as the "Compilation Objection."

3. **Equally Available Objection**. Defendant objects to those Request that seek documents that are publicly available on Defendant's own social media platforms and are therefore equally accessible to Plaintiffs. The Federal Rules of Civil Procedure do not require a party to produce information that is publicly available and equally obtainable by the requesting party. See Fed. R. Civ. P. 26(b)(2)(C)(i) (requiring the court to limit discovery if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive"); *Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.*, 222 F.R.D. 594, 598 (E.D. Wis. 2004) (noting that a party

"need not produce documents that are publicly available"); *In re Subpoena Duces Tecum to Third Party MetLife, Inc.*, 682 F. Supp. 2d 339, 345 (E.D.N.Y. 2010) (same principle widely applied).

The materials Plaintiffs seek in the Request can be directly accessed, downloaded, or captured from Defendant's public-facing platforms without burdening Defendant with redundant collection or production efforts. The request therefore appears calculated to harass or impose unnecessary expense rather than obtain information unavailable to Plaintiffs by other means. See Fed. R. Civ. P. 26(b)(1)–(2) (proportionality and anti-harassment safeguards). The foregoing objection shall be referred to herein as the "Equally Available Objection."

4.     To the extent that specific General Objections are cited in a specific response, those specific objections are provided because they are believed to be particularly applicable to the specific request and are not to be construed as a waiver of any General Objection applicable to information falling within the scope of the requests.

6.     Defendant is in the process of completing its review and analysis of information thus far gathered in the course of discovery. This response is made by Defendant without waiving Defendant's right to introduce, use, or refer to information and/or documents that she presently has but which it has not yet had sufficient time to weigh, analyze and evaluate. In addition, Defendant reserves her right to amend or supplement its response in the event that any information and/or document previously available is unintentionally omitted from Defendant's response.

**RESPONSES TO INTERROGATORIES**

**Interrogatory No. 1:** Identify every social media or messaging account You used at any time from October 1, 2023 to the present. For each account, state: the platform; handle and user ID; profile URL; associated email address and phone number; whether the account is primary, alternate, burner, or backup; whether You control any page, group, or server through that account; and the

3

date range You used it.

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the grounds that it seeks highly confidential and proprietary information regarding her private email address and telephone number. Based on previous and existing threats to Defendant's safety, such information will not be disclosed. Subject to and without waiving the foregoing objections, Defendant responds as follows: (Also See LM00001)

Primary personal accounts:
- https://twitter.com/lily_marston
- https://instagram.com/lily_marston
- https://tiktok.com/lilymarston
- https://youtube.com/thelilzchannel

Primary shared accounts all shared with Jessica Vazquez for the "Do We Know Them?" Podcast
- https://youtube.com/doweknowthem
- https://instagram.com/doweknowthempodcast
- https://tiktok.com/doweknowthempodcast
- https://patreon.com/doweknowthem

Alternate accounts
- https://instagram.com/thelilzlens

**Interrogatory No. 2:** For each account identified in Interrogatory No. 1, identify every person who had access to the account from October 1, 2023 to the present, and for each person state their name, role (e.g., editor, moderator, manager, agent), the nature of their access, and the dates access began and ended.

**Response to Interrogatory.** Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows: (Also See LM00001)

- https://youtube.com/doweknowthem
  - Lily Marston (Co-Owner)
  - Jessica Vazquez (Co-Owner)
- https://patreon.com/doweknowthem
  - Lily Marston (Co-Owner)
  - Jessica Vazquez (Co-Owner)
  - Joe Fucigna (Patreon Manager)

4

- o https://instagram.com/doweknowthempodcast
  - Lily Marston (Co-Owner)
  - Jessica Vazquez (Co-Owner)
  - Katherine Canas (Social Media Editor) – access started August 12, 2025
- o https://tiktok.com/doweknowthempodcast
  - Lily Marston (Co-Owner)
  - Jessica Vazquez (Co-Owner)
  - Katherine Canas (Social Media Editor) – access started August 12, 2025

**Interrogatory No. 3:** Identify each statement You made, published, republished, or caused to be published about Jeanette Braun, Braun IP Law, LLC, or Lauren Propson from October 1, 2023 to the present. For each statement, provide: the exact words (verbatim if available); the date and time (with time zone); the platform and account used; the URL/permalink or other location; the names/handles of all participants; whether it was edited or removed (and when and why); and every person who drafted, reviewed, approved, or discussed the statement.

Response to Interrogatory. Defendant incorporates the Equally Available Objection, the Compilation Objection and the Privilege Objection. Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant will not identify each and every comment or reply that she made in relation to original post or video as such a request is unduly burdensome and harassing. Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as See LM01083 and LM00338 from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

**Interrogatory No. 4:** With respect to any *Do We Know Them* episode(s) in December 2023 that discussed any Plaintiff, identify all participants (including hosts, producers, editors, and contractors), each person's role and contribution (e.g., scripting, research, outline, editing, thumbnail, title, description), and the time-coded segments that discuss any Plaintiff.

**Response to Interrogatory.** Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows:

**Episode 97: https://www.youtube.com/watch?v=FWDqzt59xI4**

- o **EPISODE INFORMATION:** Episode titled, *"Lauren the Mortician's Lawyer is WAY WORSE Than We Thought + VLOG SQUAD: Where Are They NOW? (Ep 97)"* was published on December 1, 2023 and is hosted by Defendant and Jessica Vazquez. Plaintiffs are discussed throughout the entirety of the first topic which begins at roughly 5:09 and ends at 1:10:52.

- o **PRODUCING/RESEARCH:** Jessica Vazquez and Defendant.

- o **JESSICA EDITING:** Cutdown of episode with assistance from Joel Vazquez who edited a portion of the episode that Jessica Vazquez reviewed afterwards.

- o **MY EDITING:** Defendant colored and added graphics and assets to this episode.

- o **UPLOAD/PUBLISH:** Defendant uploaded the content, wrote the description, and created the thumbnail. Titles are a collaborative effort. Any versions prior to upload were only to address technical edits but the content itself does not vary.

**Episode 100: https://www.youtube.com/watch?v=7yJxFlc8AMw**

- o **EPISODE INFORMATION:** Episode titled, This UNHINGED Lawyer Is Trying to TAKE DOWN Our Channel (Ep. 100)" was published on December 11, 2023 and is hosted by Defendant and Jessica Vazquez. Plaintiffs are discussed throughout the entirety of the first topic which begins at roughly 3:48 and ends at 1:03:00.

- o **PRODUCING/RESEARCH:** Jessica Vazquez and Defendant.

- o **JESSICA EDITING:** Cutdown of episode with assistance from Joel Vazquez who edited a portion of the episode that Jessica Vazquez reviewed afterwards.

- o **MY EDITING:** Defendant colored and added graphics and assets to this episode.

- o **UPLOAD/PUBLISH:** Defendant uploaded the content, wrote the description, and created the thumbnail. Titles are a collaborative effort. Any versions prior to upload were only to address technical edits but the content itself does not vary.

**Episode 101: https://www.youtube.com/watch?v=pofjXcBVfk0**

- o **EPISODE INFORMATION:** Episode titled, "Matt Rife KEEPS Tanking His Career + We're Being SUED?! (Ep 101)" was published on December 15, 2023 and is hosted by Defendant and Jessica Vazquez. Plaintiffs are discussed throughout the entirety of the first topic which begins at roughly 00:20 and ends at 40:24.

- o **PRODUCING/RESEARCH:** Jessica Vazquez and Defendant both contributed.

- o **JESSICA EDITING:** Cutdown of episode with assistance from Joel Vazquez who edited a portion of the episode that Jessica Vazquez reviewed afterwards.

- o **MY EDITING:** Defendant colored and added graphics and assets to this episode.

- o **UPLOAD/PUBLISH:** Defendant uploaded the content, wrote the description, and created the thumbnail. Titles are a collaborative effort. Any versions prior to upload were only to address technical edits but the content itself does not vary.

**Episode 104: https://www.youtube.com/watch?v=ZYATW5vabXo**

- o **EPISODE INFORMATION:** Episode titled, *"We're Actually Being Sued...(For Real This Time) + BIG SURPRISE for 100K Subscribers! (Ep 104)"* was published on December 26, 2023 and is hosted by Defendant and Jessica Vazquez. Plaintiffs

7

are discussed throughout the entirety of the first topic which begins at roughly 04:01 and ends at 09:45.

- o **PRODUCING/RESEARCH:** Jessica Vazquez and Defendant both contributed.

- o **JESSICA EDITING:** Cutdown of episode with assistance from Joel Vazquez who edited a portion of the episode that Jessica Vazquez reviewed afterwards.

- o **MY EDITING:** Defendant colored and added graphics and assets to this episode.

- o **UPLOAD/PUBLISH:** Defendant uploaded the content, wrote the description, and created the thumbnail. Titles are a collaborative effort. Any versions prior to upload were only to address technical edits but the content itself does not vary.

**Interrogatory No. 5:** Regarding Your December 10, 2023 X/Twitter post stating that Ms. Braun was "actively committing perjury," state the exact text of the post; the date, time, and time zone it was posted and any edits or deletion; every person who reviewed or discussed the post before or after publication; and the reasons it was posted, edited, or removed.

**Response to Interrogatory.** Defendant incorporates the Equally Available Objection. Subject to and without waiving the foregoing objections, Defendant responds as follows: The post reads, "I gotta say… one of our biggest questions in all of this, is do we think demps knows that her embarassing excuse for a lawyer is using her name while actively committing perjury? Someone might wanna tell her" and was posted at 2:46 PM on December 10, 2023. It has never been edited or deleted and can still be found at its original link: https://x.com/lily_marston/status/1733981442819182802

Prior to posting, at 2:44 PM, Defendant sent Jessica Vazquez a screenshot of a draft of a nearly identical tweet that read, "One of our biggest questions in all of this, is do we think demps knows her embarassing excuse for a lawyer is using her name while actively committing perjury? Someone might wanna tell her" but she did not acknowledge or respond to the screenshot and no discussion took place. (See LM00502). Defendant then made a minor adjustment and posted the tweet 2 minutes later. No other person reviewed or discussed the post before publication.

**Interrogatory No. 6:** For each statement identified in Interrogatory No. 3 (including the accusation that Ms. Braun committed perjury), state all facts You contend make the statement true or otherwise not actionable, identify every person with knowledge of those facts (name, role, and contact information if known), and describe each document or ESI that supports those facts (date, author, title/description, and where it is kept).

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the ground that it is compound as presently framed as it seeks to require Defendant to provide a response to multiple "statements" that were identified in response to Interrogatory number 6 and therefore is not the proper subject of a discrete interrogatory. Subject to and without waiving the foregoing objections, Defendant responds as follows: *See* Response to Interrogatory No. 20 and LM01083.

**Interrogatory No. 7:** Describe all fact-checking, verification, legal review, or editorial review You performed from October 1, 2023 to the present before publishing statements about any Plaintiff, identifying who performed it, what was reviewed, and the outcome.

9

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the ground that it is compound as presently framed as it seeks to require Defendant to provide a response to multiple "statements" that were identified in response to Interrogatory number 6 and therefore is not the proper subject of a discrete interrogatory. Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant provides the following general activities she conducted to verify the claims about false copyright strikes and perjury:

1. Closely reviewed all e-mail correspondence related to the Plaintiff's multiple takedown requests submitted to YouTube as well as any of the accessible information provided by YouTube during the time period that our videos had been taken down. (See LM000671-LM000701).

2. Researched several articles detailing fair use, how it is determined, commercial examples of fair use, and the copyright claiming process specific to YouTube. (See LM00247 - LM00323).

3. Reviewed 17 U.S.C. 107 as well as significant Fair Use cases such as *Online Policy Group v. Diebold, Inc.* and *Campbell v. Acuff-Rose Music*. (See LM00309).

4. Reviewed the screenshots and screen recordings of e-mails and notifications for copyright claims filed against Kodye Elyse. (See LM00002 - LM00019 and LM01050 - LM01066).

**Interrogatory No. 8:** Identify all posts, comments, direct messages, private messages, emails, texts, server or channel messages, voice/video messages, Story replies, modmail, or similar communications between You and Rebekah (Bekah) Day from October 1, 2023 to the present that discuss, mention, or refer to any Plaintiff or content about any Plaintiff. For each, state the

10

platform, date range, participants, and general subject.

**Response to Interrogatory**. Defendant incorporates the Equally Available Objection, the Compilation Objection and the Privilege Objection. Subject to and without waiving the foregoing objections, Defendant responds as follows: Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as LM00002–LM00166, LM00187 – LM00209, LM00593 – LM00596, from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

**Interrogatory No. 9:** Identify all communications of the types listed in Interrogatory No. 8 between You and Krista/Kristina Carter (a/k/a @CaffinatedKitti) from October 1, 2023 to the present that discuss, mention, or refer to any Plaintiff or content about any Plaintiff. For each, state the platform, date range, participants, and general subject.

**Response to Interrogatory**. Defendant incorporates the Equally Available Objection, the Compilation Objection and the Privilege Objection. Subject to and without waiving the foregoing objections, Defendant responds as follows: Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as LM00169 – LM00171, LM00210 – LM00224, LM00339–LM00418, from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

**Interrogatory No. 10:** Identify all communications of the types listed in Interrogatory No. 8 between You and Jessica Vazquez from October 1, 2023 to the present that discuss, mention, or refer to any Plaintiff or content about any Plaintiff, including planning, scripting, editing, promotion, or post-publication discussions. For each, state the platform, date range, participants,

11

and general subject.

**Response to Interrogatory**. Defendant incorporates the Equally Available Objection, the Compilation Objection and the Privilege Objection. Subject to and without waiving the foregoing objections, Defendant responds as follows: Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as LM00419–LM00604, from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

**Interrogatory No. 11:** Identify all posts, comments, direct messages, private messages, emails, texts, server or channel messages, voice/video messages, Story replies, modmail, or similar communications between You and (a) Ian Runkle; (b) any account identified as "Runkle of the Bailey"; or (c) the Reddit account "Varsil" from October 1, 2023 to the present that discuss, mention, or refer to any Plaintiff or this lawsuit. For each, state the platform, date range, participants, and general subject, and state all information You have about the real-world identity of "Varsil," if any.

**Response to Interrogatory**. Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows: Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as LM000763– LM00867, from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

**Interrogatory No. 12:** Describe the nature and history of Your relationship with Ian Runkle (a/k/a "Runkle of the Bailey") from October 1, 2023 to the present, including: when and how You first connected; the frequency and modes of communication; any collaborations, guest appearances,

cross-promotion, or coordinated content; any payments or other benefits exchanged; any agreements (written or oral); and any discussions about content concerning any Plaintiff.

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the grounds that it is not relevant to the claims and/or issues in the operative Complaint, and therefore is unlikely to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant first learned who Ian Runkle was after seeing that he had followed Defendant on Twitter. Defendant reviewed his profile and saw that he had just posted a tweet in which he linked to his first YouTube video regarding the instant dispute. Defendant watched the video and sent it to the other Defendants because it was interesting to us to from the perspective of an unbiased lawyer who was not familiar with anyone involved. In his video, Mr. Runkle reads through the initial complaint and essentially offers an informative breakdown of the filing while also offering some blunt commentary and reactions in which he seemed to express shock and disbelief over specific aspects of the complaint as well as the lawsuit overall. After watching about 35 minutes of the video, Defendant returned to his twitter, followed him back and sent him a DM that read, "Sir... 👏🏻👏🏻👏🏻👏🏻👏🏻 When I tell you I'm only 35 min in and have had a grin plastered on my face the whole time hahahaha." He responded saying "Hello! I will admit I hadn't seen your content until this whole thing, but you do quality work. And I'm just stunned at Jeanette and the Mortician. But thank you, I always worry about what the subjects of these videos will think." Defendant then stated "Hahaha honestly same but it's safe to say you now have 4 new fans (and thank you)". (See LM00763). Following this communication, Defendant quote tweeted the video on her Twitter account as Mr. Runkle's coverage of the lawsuit felt like a helpful source for

13

Defendant's followers who were eager to know more about the situation than she was providing. (See LM01084 - LM01085).

Following the initial communications, Defendant and Mr. Runkle communicated intermittently as to the absurdity of the entire situation/lawsuit. (See LM000763– LM00867). Defendant and Mr. Runkle have never collaborated on any content, nor have either made any guest appearances in each other's content. Defendant has used small clips from his commentary in her podcasts but never anything that was created for her to use or that was agreed upon or planned ahead of time. No discussions of payments or any payments have occurred or existed between Defendant and Mr. Runkle.

**Interrogatory No. 13:** Identify every non-defendant person who supplied You with information, tips, screenshots, documents, talking points, or "evidence" regarding any Plaintiff from October 1, 2023 to the present**,** stating the platform, dates, subject(s), and whether You used the information.

**Response to Interrogatory.** Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows:

> **Bekah Day:**
>
> > o Shared evidence via Instagram DM. These were provided primarily in the form of screenshots and screen recordings that revealed several instances in which Jeanette Braun had engaged in behavior that she felt was unprofessional and at times unethical. These included:
> >
> > > ▪ A screen recording she had received from a creator named Kodye Elyse, that showed her scrolling through what appeared to be hundreds of e-mails

14

notifying her of copyright claims that had been filed against her. The recording showed her opening several of them to reveal that they had been filed by the Plaintiff on behalf of two of the Plaintiff's clients.

- Screenshots that show some of the individual examples of those copyright claims, a handful of which do not feature any outside content whatsoever but that were still claimed by Jeanette Braun on behalf of her clients.

- An additional screen recording that scrolls through Kodye Elyse's TikTok account and reveals that the majority of her content had been reported as violating community guidelines.

- A cease and desist letter that had been authored and sent by Jeanette Braun on behalf of Lauren the Mortician. The recipient was an individual who had only sent a single e-mail to Lauren's publicly available e-mail address, and yet the letter accused this individual of harassment, extortion, blackmail, etc. and included outrageous threats of potential jail time and up to $250,000 in fines.

- A similarly structured cease and desist sent to a creator back in 2021

- Other evidence related to claims of Copyright and Takedown notices.

- A screen recording that reveals a TikTok posted by Jeanette Braun on the @BraunLaw TikTok account in which Braun is on camera and pointing to on screen text that reads, "When TikTok changes their DMCA Requirements because my legal team overwhelmed their system taking down imposter accounts." Then to another on screen. Caption that reads, "Apologies to all who have to resubmit their reports." And finally, one that

15

reads, "We still can slay all imposter accounts. No sweat." This all takes place as a trending audio plays in the background saying, "Listen, I can't give any more information, but I fear I may have girl bossed a bit too close to the sun."

- ■ A screenshot of a text message from Jeanette Braun sent to her client Kelsey Pumel in which Braun notifies Pumel that Instagam had suspended Kodye Elyse's account following the copyright claims filed by Braun IP Law on Pumel's behalf.

  (See LM00002 – LM00054).

**Christin Williams:**

- o Ms. Williams sent an e-mail on November 28, 2023 and attached 2 screenshots that appeared to show copyright claims that she had received on her TikTok that featured screenshots of a text message conversation that she had one of Jeanette Braun's clients. She would also tweet me these screenshots and more on December 10, 2023. (See LM00726 - LM00731).

- o She provided her phone number, name, and TikTok name, but we have never responded or engaged in a conversation with her. Defendant referenced this e-mail in our December 1st episode titled, *"Lauren the Mortician's Lawyer is WAY WORSE Than We Thought + VLOG SQUAD: Where Are They NOW? (Ep 97)"*.

**Kodye Elyse:**

- o Ms. Elyse forwarded me an e-mail she received from **Christin Williams** (mentioned above) that contained the same screenshots we had already received as well as 4 additional ones that showed DM conversations between Christin and

16

Kaitlyn Dempsey and screenshots showing additional copyright claims that had been filed against her content. (See LM00732- LM00739).

o   Ms. Elyse also provided via text and e-mail, various videos that included some of the content that had been taken down as a result of hundreds of copyright claims filed by the Plaintiff on behalf of two of her clients, as well as content from other creators that supported the narrative which she had been attempting to share before her Instagram was indefinitely suspended due to excessive copyright claims filed by the Plaintiff.  (See LM01051 – LM01063).

**Kaitlyn Shoemaker:**

o   Ms. Shoemaker sent three e-mails on December 14, 2023 containing screenshots showing that her content, which was actually reuploaded clips from our DWKT Episode 97, had been getting taken down after being reported for various violations including "nudity and body exposure" or "alcohol, tobacco, and drugs". She also publicly shared proof of over a dozen instances in which her content had been removed for violating community guidelines despite the content not including the alleged violations. I did not interact with Ms. Shoemaker directly but I did share some of the screenshots she had provided on Twitter but no videos discussing it were ever published. (See LM00745 - LM00753).

**Chelsea Suarez**

o   Mrs. Suarez is a content creator and friend who forwarded an e-mail on January 3, 2024 that revealed multiple attempts by Jeanette Braun to have her content removed on behalf of her client, Bunnie XO. She would also forward a January 6, 2024 thread showing a second attempt that Jeanette Braun had made to have her content

17

removed, this time on her own behalf. Both e-mail threads that she sent show that YouTube had denied these takedown requests, explaining that they believed Mrs. Suarez's content to be protected by fair use. The correspondence in one of these threads also shows that Jeanette Braun responded to the denial by sending notice of her client's (Bunnie XO) intent to litigate and to name YouTube/Google as a defendant. (See LM00709 - LM00714)

o   On January 4, 2024, Mrs. Suarez sent texted me a series of screenshots she'd taken during various conversations she was having with Bunnie XO across TikTok, Instagram, and in the comment section of one of her YouTube Shorts. These screenshots showed Bunnie repeatedly stating that she had *not* tried to have any of Mrs. Suarez's content removed, and in fact, had specifically instructed her lawyer, Jeanette Braun, to NOT take any action against the content, and explained that if anything had been filed on her behalf against Mrs. Suarez's video, it was after she had told Braun to leave it alone. Mrs. Suarez informs her more than once that Braun had indeed been acting on her behalf and had even threatened litigation against her and YouTube/Google, even though her content is protected under fair use/freedom of speech, suggesting that she "tighten that leash". (See LM00702 - LM00707)

o   On or around the same day, following Mrs. Suarez's content discussing Jeanette Braun acting on Bunnie XO's behalf, Bunnie XO would respond to two different comments on her YouTube Community post that mentioned her. One reply stated that Braun "was fired over this," and the other explained that "she is no longer [her] lawyer." (See LM00715).

18

o On February 6, 2025, in a group text with myself and Jessica Vazquez, Mrs. Suarez sent what she identified as screenshots that she had received from Bunnie XO that revealed a conversation between Bunnie XO and Jeanette Braun following the copyright claims that Braun had filed on her behalf. In this exchange between Bunnie XO and Braun, Bunnie reiterates more than once that she had explicitly told Braun to NOT file any copyright claims against Mrs. Suarez's video, expressing her frustration and confusion as to why Braun had gone against her wishes anyway. Braun explains that she misunderstood, which Bunnie XO appears to challenge and further express her anger over her unwanted involvement. Braun apologizes and explains that she is looking for a solution but that she would first like the chance to watch Mrs. Suarez's video and then discuss further after she can "see what she is saying." Notably, this is in regards to a video in which Braun had already filed two separate copyright takedown requests, and even threatened litigation over once the requests were denied. And yet, these texts reveal Braun confessing to having not yet watched the video, despite having made multiple attempts to remove it. She also attempts to appease Bunnie XO by offering her proceeds from a lawsuit that she plans to file against Mrs. Suarez, but Bunnie XO denies the offer and asks Braun, "What are my options as far as us parting ways?" to which Braun tells her that she will prepare her files for transfer. (See LM00608 - LM00610).

o We did not post or reveal any of this information received from Mrs. Suarez.

o 5 months later, around May 5th, 2024, Mrs. Suarez would text me informing me that there was a creator named "@Goob_2u" that had made an Instagram Reels calling out Bunnie XO for editing her photos, showing a comparison of a photo

19

she'd posted on her Instagram, revealing that she had clearly edited it so that she was skinnier than she appeared in the original photo, which he found on Getty Images. The creator followed up with another post, this time showing a screenshot of a DM he had received from Bunnie XO in which she tells him that her "lawyer will be taking it down" and even claiming that her "image is trademarked" – which is obviously not true because images cannot be trademarked. Mrs. Suarez then shared screenshots that she'd obtained from the creator that show he had received a copyright violation removing his content regarding Bunnie XO and also that his Threads account was disabled as a result. Both notifications provide an e-mail for more information, listing docket@brauniplaw.com as the law firm that acted on behalf of the rights owner. But while the photo may have been of Bunnie XO, she is not rights owner of the photo, as it was sourced from Getty Images, which gives them the ability to license the photo, but the copyright still belongs to the photographer – and he actually did comment on "Goob_2u's" content and explain that he had filed an IP strike, but did not reveal whether he and Bunnie XO share Jeanette Braun as a lawyer and that Braun had done it on his behalf. If that isn't the case, not only does this show Braun filing a copyright claim against content that she or Bunnie XO do not own the rights to, but this serves as proof that Bunnie XO did not actually stop working with Jeanette Braun as her lawyer like she had claimed, showing they were still very much associated with each other as of May 5, 2024. None of this was every discussed or posted publicly. (See LM00722 – LM00725).

**Erica Fisk:**

o Ms. Fisk sent an e-mail in which she discusses Jeanette Braun being investigated on her behalf by the ARDC and mentions that Braun's client, "Demps" has a temporary PPO on her. She attaches a letter from the ARDC notifying her of their investigation into Braun. I saw the e-mail but did not investigate further or reply, and have never interacted or had any contact with Ms. Fisk outside of receiving this e-mail. She states that she sent an Instagram message but I never saw or opened it. (See LM00740 - LM00741).

**Interrogatory No. 14:** Identify each edit, removal, retraction, limitation, or correction of content about any Plaintiff from October 1, 2023 to the present, stating what was changed, when and why, and who decided to make the change.

**Response to Interrogatory.** Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant temporarily decided to private our episode titled, "TikTok Mortician's Fans TURNED On Her + Cheesecake Factory Date Lady (Ep. 86)" that originally was published October 23, 2023. Defendant and Jessica Vazquez made the mutual decision to do this after they had received 2 strikes on Episode 96 and Episode 97 that were temporarily removed by YouTube as a result of the takedown requests filed by Jeanette Braun. YouTube's strike policy states that "*3 strikes in the same 90-day period may result in your channel being permanently removed from YouTube. Each strike will not expire until 90 days from the time it was issued.*" Because Defendant and Ms. Vazquez already had 2 strikes on their account, they were concerned that Jeanette Braun would file a third strike in order to have our channel terminated, and the only other episode at the time that featured content from

Ms. Braun or one of Ms. Braun's clients was the episode covering Lauren the Mortician. As soon as the 2 strikes had been removed from the channel, the video was made public again.

**Interrogatory No. 15:** For any content about any Plaintiff from October 1, 2023 to the present, identify the performance metrics available to You (including views, watch-time, click-through rate, comments, shares, and engagement), the platform source of those metrics (e.g., YouTube Studio, TikTok Analytics), and the date ranges covered.

**Response to Interrogatory**. Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows: Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as LM00038, from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

**Interrogatory No. 16:** Identify all monetization, sponsorships, affiliate links, revenue shares, ad deals, or other financial arrangements tied to content about any Plaintiff from October 1, 2023 to the present, including counterparties, deliverables, and amounts paid or owed.

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the grounds that it seeks highly confidential and proprietary information regarding her private financial transactions that are not relevant to any claims or issues in the operative complaint, and therefore unlikely to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendant responds as follows: The episode titled, "Matt Rife KEEPS Tanking His Career + We're Being SUED?! (Ep 101)" was sponsored by Scentbird. Deliverable was a 60 second hosted ad read placed within the episode.

22

We receive Adsense from Google, ad revenue from Audioboom, the platform that hosts the audio version of the episodes. Audioboom also facilitates our hosted ad reads that are included in both audio and video formats. Additionally, Defendant is paid by Patreon which is a monthly subscription service that provides viewers with exclusive content.

**Interrogatory No. 17:** Describe all steps You have taken from October 1, 2023 to the present to preserve potentially relevant electronically stored information relating to any Plaintiff, including any litigation holds, changes to auto-delete settings, and steps to secure devices or accounts, identifying the dates implemented and persons responsible.

**Response to Interrogatory.** Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant's ESI from October 1, 2023 to the present exists in accessible form in or on the respective devices and/or platforms, and Defendant has not deleted any such data. Defendant first exported this data recently in order to review and produce data responsive to the Requests for Production of Documents served by Plaintiffs, concurrently herewith.

**Interrogatory No. 18:** Identify any potentially relevant electronically stored information relating to any Plaintiff that was deleted, lost, overwritten, or is otherwise unavailable from October 1, 2023 to the present, and state when, how, and why it was lost and what steps, if any, You took to attempt recovery.

**Response to Interrogatory.** Defendant incorporates the General Objections. Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant's ESI from October 1, 2023 to the present exists in accessible form in or on the respective devices and/or

23

platforms, and Defendant has not deleted any such data. With respect to "stories" are no longer visible to the public that is only because such stories expire after 24 hours, per the subject platform policy.

**Interrogatory No. 19:** Identify all facts You contend support each of Your affirmative defenses in this action (including but not limited to truth, opinion, privilege, lack of actual malice, and statute of limitations), and identify all persons with knowledge of those facts and all documents or ESI that support them.

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the grounds that it seeks information that is subject to the attorney work-product doctrine. Subject to and without waiving the foregoing objections, Defendant responds as follows: *See* Response to Interrogatory No. 20 and LM01084 which identify all facts supporting the affirmative defenses.

**Interrogatory No. 20:** State each and every fact You contend supports the accusation that Ms. Braun "committed perjury," identifying the proceeding(s) at issue, the specific statement(s) under oath You challenge, how each element of perjury is satisfied, and all persons and documents or ESI on which You rely.

**Response to Interrogatory.** Defendant incorporates the General Objections. Defendant further objects to this request on the grounds that it seeks information that is subject to the attorney work-product doctrine. Defendant further objects to this request on the grounds that it calls for a legal conclusion as to "how each element of perjury is satisfied." Defendant further objects to this request on the grounds it is compound, as it improperly seeks to ascertain a response on multiple

24

subjects within a single interrogatory. Subject to and without waiving the foregoing objections, Defendant responds as follows: In November and December of 2023, Ms. Braun began relentlessly submitting DMCA takedown requests in an effort to have two of our (Defendant and Jessica Vazquez) podcast episodes removed from YouTube. These episodes covered how multiple creators had received what we believed to be false copyright strikes submitted by Ms. Braun on behalf of her clients. We also discussed her use of legal intimidation through aggressive and unprofessional cease-and-desist letters. She and her client even went so far as to call a wellness check on my fellow defendant, Krista Carter. In other words, when we highlighted what we viewed as Ms. Braun's unethical behavior to silence creators, we were quickly met with those very same tactics ourselves. (See LM00338).

We spoke at length in our episodes about fair use because, based on the language used by Ms. Braun's clients, it appeared she had convinced them that any use of their content was automatically copyright infringement. That is simply not true. Fair use absolutely allows for the use of copyrighted content without authorization in certain circumstances. Yet her clients repeatedly boasted about their ability to have someone's content removed if it was used to "talk shit," "spread lies," or "bully them." (See LM01049). One even wrote: *"Like submitted copyright infringements against creators taking my content and dragging me? Absolutely."* (See LM01067). Another client flat out admitted, "I have a team that takes down anything defamatory or deemed that." (See LM00711). The manner in which her clients described these takedowns made clear that their concerns were not about intellectual property rights, but about silencing critics and controlling the narrative. After our coverage, which featured portions of Ms. Braun's TikToks to give context within each episode, Ms. Braun began what became a 14-month campaign to have our content removed and to force us to compensate her for using her TikTok videos. Determined

25

to scrub our criticism from the internet, Ms. Braun submitted (and re-submitted) numerous takedown requests. She first targeted Episode 96. YouTube initially rejected her request, informing her that the video fell under fair use and directing her to a resource link on their site. Displeased, Ms. Braun responded with a lengthy and hostile email reprimanding YouTube for "acting as a judiciary" and insisting it had no authority to determine fair use, claiming only a court could do that.

Yet, in the same breath, Ms. Braun conducted her own supposed "fair use analysis." Rather than applying the four statutory factors, she sent YouTube the following numbered list of nine reasons she believed our work was not fair use:

1. *"My entire work was copied and put into the video, not just a small portion."*

2. *"The video is monetized which makes the use for a commercial purpose."*

3. *"No link to my original work or credit was provided."*

4. *"No transformation of my work was made: my original work was copied and displayed as I exactly published it."*

5. *"No parody is included in the reported video that makes fun of my original work."*

6. *"My market for my work is being harmed… The infringer is profiting… those profits should have been paid to me."*

7. *"Any criticisms made are not protected speech (infringer makes false statements of fact) and fair use does not allow infringements to take place for unprotected speech."*

8. *"I never gave the infringer authorization or permission to use my work for any purpose."*

9. *"I did not post my original work on YouTube and none of YouTube's license agreements allow the infringer to use my work for any purpose."*

26

She concluded: *"The fair use analysis fails at every factor. Please remove my stolen art from the reported video."* (See LM01017).

On December 3, 2023, Ms. Braun submitted yet another a takedown request. This time, it was for Episode 97, claiming our video used her TikTok for more than an hour (0:22:40 to 1:24:08). Her entire TikTok was 8:38 minutes long, and the portion we had used was limited and no more than was reasonable to critique the short clip, approximately 1 minute long .And while it does initially appear at 22:40 – the clip only plays for 20 seconds. It is however, revisited and played in its entirety from 47:01- 48:03. The timecode that was provided by Ms. Braun is not only patently inaccurate, but it also grossly misrepresents the amount of her content that was used, suggesting that we began playing her content at 22:40 and continued playing it until the very end of the episode. Nonetheless, Ms. Braun would still sign this notice under penalty of perjury, certifying that the information was accurate and that she had a "good faith belief" our use was unauthorized. (See LM01001).

YouTube did not immediately accept her claim. On December 4, 2023, YouTube asked Ms. Braun for clarification, noting her notice might be invalid and citing potential fair use. Rather than reconsider, Ms. Braun doubled down. She responded with the two correct timestamps (22:41– 23:01 and 47:03–48:03) and again demanded removal. (See LM00999).

On December 6, 2023, we were notified that we had received a strike on our channel for Episode 96. But while Ms. Braun had succeeded with that request, the same day YouTube would again flag her claim for Episode 97 as potentially invalid and again cited fair use. Refusing to accept their denial, Ms. Braun continued to relentlessly challenge their decision in a series of increasingly hostile replies. In one email Ms. Braun scolded YouTube for "acting as a judiciary," referred to her TikTok as "stolen art," and demanded a litigation hold. Ms. Braun also rushed to

register the TikTok with the Copyright Office days after publication — something she had never done before. In another email that same day, Ms. Braun cited *Campbell v. Acuff-Rose Music* and asserted that "no fair use would be found." (See LM00692 and LM00697).

Determined to get Episode 97 removed as well, in addition to her e-mails replying to her initial takedown requests, Ms. Braun would simultaneously file additional requests. On December 7, 2023, Ms. Braun filed a new version of the same request, this time identifying only the second instance where her clip played from 47:03–48:04 as the infringing content. Ms. Braun explicitly stated she had performed a fair use analysis and that it failed on all four factors. Again, Ms. Braun swore this under penalty of perjury, though the wording differed slightly from previous instances as it appeared to be something she included herself as this notice was not filled out online but done via e-mail. In this submission, Ms. Braun had signed underneath the following:

"I have a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law."

"The information in this notification is accurate, and under penalty of perjury, I am the owner, or an agent authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.

Despite her persistence, on December 8, 2023, we received an e-mail from YouTube notifying us that while it *had* received a takedown request regarding Episode 97, the content would *not* be removed because they believed it was protected by fair use. This would be the first time we became aware of any attempts Ms. Braun had made to have our content removed.

That same day, Ms. Braun sent even more aggressive follow-ups, repeatedly asserting that no fair use applied, citing *Campbell* again, and even went as far as to send an e-mail declaring her intent to litigate and name YouTube as a defendant, noting that YouTube had waived its

28

protections under DMCA. Ms. Braun also oddly claimed that their request for more information in regards to the copyright takedown request would require her to provide them "with information that is attorney work product and attorney client privileged" which she refused to do without a subpoena or without it being under seal. In the same e-mail, Ms. Braun refers to a "client" for a second time, saying "My client currently has the intent to institute litigation and reserves all rights and remedies available to it." This statement was wholly false and there was no client involved in this matter, as the content that Ms. Braun cited as the original work for these takedown requests was her own. (See LM00690).

On December 9, 2023, YouTube notified us that Ms. Braun's takedown request had finally succeeded. Notably, this was a result of the takedown request where she had cited the incorrect timecode of 0:22:40 to 1:24:08. Even though they had declined identical requests leading up to this, after all of her e-mails and threats of litigation, it appeared that YouTube had finally relented and Episode 97 was removed, which caused us to have a second strike applied to our channel. This was especially concerning because YouTube's policy notes that if you receive 3 strikes, your channel will be permanently removed, leaving us only one strike away from losing what we both depend on as our sole income. (See LM00680).

Eager to get the situation resolved, we began investigating the claims as much as we could, which led us to click on the removed video (Episode 97) in the YouTube Studio app, only to discover that the copyright information that popped up had bizarrely listed **"Kaitlynn Demps"** as the content owner. This prompted us to check Episode 96 as well – which revealed the same thing: **"Kaitlynn Demps"** was listed as the 'content owner.' Any name other than Ms. Braun would have been confusing, but this was especially strange considering 'Kaitlyn Dempsey' is the name of one of Ms. Braun's clients, who is known on the internet as "Demps". And while we had used small

29

clips of content from a few of Ms. Braun's other clients in our episodes, we had used zero content from Kaitlyn Demps in either episode. Ms. Dempsey being listed as the content owner made no sense, especially because Ms. Braun's own notices had cited her TikTok as the source, not Ms. Demps. (See LM006821-LM00683).

Just days later, after repeatedly tweeting YouTube's various Twitter accounts, we received 2 e-mails from YouTube. One came on December 12, 2023 and another on December 13, 2023, both notifying us that YouTube had determined that the takedown requests submitted by Ms. Braun were determined to be invalid and that the videos had been reinstated and associated strikes removed. (See LM00671-LM00701).

Again, in each of these notices, Ms. Braun swore under penalty of perjury that she had "a good faith belief" our use was unauthorized by law. Yet both YouTube and the Copyright Claims Board later determined our use was not only lawful but a clear textbook example of fair use. This is especially troubling given that Ms. Braun markets herself as an intellectual property attorney, boasts about filing hundreds of takedown requests in short spans of time, and even offers classes purporting to teach creators specifically about copyright and fair use. There is simply no reasonable excuse for why someone with her credentials and claimed expertise could not recognize what YouTube had almost immediately — and what the CCB would also eventually confirm in its final determination.

And yet, Ms. Braun spent over a year maintaining, without qualification, that our use failed all four factors of fair use and that "no fair use would be found." In doing so, she never presented any legitimate argument to support this finding and even presented blatantly false statements to try and argue her claim. (See LM00671-LM00701 and LM00899 – LM00987).

.

30

The CCB's final determination made clear that this was not a close case. When she sought reconsideration, the Board denied it in a detailed seven-page order, reiterating that our case was an obvious example of fair use and describing Ms. Braun's arguments as "preposterous," "strange," and in some instances "meaningless." (See: LM00981 – LM00987). Ms. Braun's insistence that we had infringed on her copyright and that no fair use was found was constant and unwavering for over a year. She has yet to take any accountability and is still trying to silence us and other creators in any way she can think of, as evidenced by this lawsuit.

In fact, this refusal to accept the Board's ruling is reflective of the broader pattern that has also led her clients to believe copyright law is a tool to police defamation and criticism. (See LM00711, LM 01049, LM 01069) Rather than going through the proper steps of filing a Defamation Complaint, which would be a lengthy process, (Se: LM01082-LM01083), Braun utilizes the much quicker process of a DMCA takedown, relying on it as a tool for censorship, not protection of intellectual property. And while Braun *does* acknowledge that one must consider fair use before submitting a DMCA Takedown (See LM01078 - LM01080), she bypasses any genuine attempt at conducting a fair use analysis by personally determining that the content is defamatory and therefore ineligible for fair use protection. (See LM00697, LM00703, LM00713, LM01035, LM01080 – LM01081).

Given this record, my December 10, 2023 tweet stating that Ms. Braun was "actively committing perjury" was grounded in verifiable evidence and substantially true. She submitted DMCA notices with false timecodes, inconsistent claims, and sworn certifications under penalty of perjury, all while denying and/or ignoring the clear and unquestionable applicability of fair use.

31

My statement is therefore protected by the substantial truth defense to defamation. Moreover, as Ms. Braun is a public figure, she must prove actual malice, which she cannot, as my statement was based on documented evidence and a reasonable belief in its accuracy.

Pursuant to Rule 33(d), Defendant refers Plaintiffs to the business records being produced concurrently herewith as LM00671-00701, LM00899 – LM00987, LM0129 – 01032, LM01037 - LM01049, LM01072, LM01078 - LM01083, and additional answers on LM01084, from which the information responsive to this Interrogatory may be derived or ascertained with equal burden.

Dated:  November 7, 2025                                    Respectfully Submitted,

*s/        Brandon J. Witkow*
Attorney for Defendants

Brandon J. Witkow [pro hac vice]
WITKOW │ BASKIN
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
(818) 296-9508
bw@witkowlaw.com

*s/        Amy Doig*
Attorney for Defendants

Amy M. Doig
COZEN O'CONNOR
123 N. Wacker Dr., Suite 1800
Chicago, Illinois 60606
(312) 474-7900
adoig@cozen.com

*Attorneys for Defendants*

**VERIFICATION**

I, Lily Marston, Defendant in the above-entitled action, have read the foregoing AMENDED RESPONSES TO INTERROGATORIES ("Responses"). I declare under the penalty of perjury that the factual information contained in the Responses is true and correct to the best of my current knowledge, information, and belief.

Executed this 7th day of November 2025.

*Lily Marston*

Lily Marston

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was served on all counsel of record noted below via electronic mail.

Benjamin C.R. Lockyer
Lockyer Law LLC
100 N. Riverside Plaza, Suite 2400
Chicago, Illinois 60606
ben@lockyerlaw.com

***Attorney for Plaintiffs***

Dated: November 7, 2025                    /s/ *Brandon J. Witkow*
                                           Brandon J. Witkow