**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JEANETTE BRAUN, ~~&~~ | ) | |
| BRAUN IP LAW, LLC ~~&~~ | ) | |
| ~~LAUREN PROPSON,~~ | ) | |
| | ) | Case No. 23 C 16856 |
| Plaintiffs, | ) | |
| | ) | Hon. J. Mary Rowland |
| v. | ) | |
| | ) | Mag. J. M. David Weisman |
| REBEKAH M. DAY NEE BOXX, ~~&~~ | ) | ~~**DEMAND FOR JURY TRIAL**~~ |
| ~~KRISTA CARTER, &~~ | ) | **DEMAND FOR JURY TRIAL** |
| LILY MARSTON, | ) | |
| | ) | |
| Defendants. | ) | |

**~~THIRD~~ FOURTH AMENDED COMPLAINT**

Plaintiffs, Jeanette Braun ("Braun"), and Braun IP Law, LLC ("Braun Law"), ~~and Lauren Propson ("Propson"),~~ ("collectively Plaintiffs"), present their Complaint against Rebekah M. Day nee Boxx ("Day")~~, Krista Carter ("Carter")~~, and Lily Marston ("Marston") and alleges as follows:

**NATURE OF THE CASE**

1.     This is a diversity action asserting Illinois state law claims for defamation *per se*, trade libel, and false light, ~~and tortious interference with contract and tortious interference with economic advantage, and Wisconsin state law claims for tortious interference with contract and tortious interference with economic advantage~~ because of the Defendant Day and Marston's publication of defamatory statements regarding Plaintiff Braun, and the Defendants' public criticisms that were harmful, offensive, and made for monetary and commercial gain.

**PARTIES**

2.     Plaintiff Jeanette Braun is a citizen of Illinois.

1

**EXHIBIT B**

3.      Plaintiff Braun Law is a limited liability company organized and existing under the laws of the State of Illinois, with a contact address of 1600 W. Lake Street, Suite 103B, Addison, Illinois 60101.

4.      Plaintiff Lauren Propson is a citizen of the State of Wisconsin.

5.4.    Defendant Rebekah Day nee Box is a citizen of the State of Missouri.

6.      Defendant Krista Carter is a citizen of the State of Georgia.

7.5.    Defendant Lily Marston is a citizen of the State of California.

**JURISDICTION AND VENUE**

8.6.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 as this is an action by Plaintiff Braun, who is a citizen of the State of Illinois and Braun Law, an Illinois limited liability company, against Defendants Day, Carter, and Marston who upon information and belief are citizens of various states including Missouri, Georgia, and California, and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

9.7.    Venue in the Northern District of Illinois is proper pursuant to 28 U.S.C. §1391 because Plaintiff Jeanette Braun and Plaintiff Braun Law are in this District and the reputational harm to Plaintiff Braun and her legal practice occurred in this District.

10.8.   In accordance with Rule 20(a)(1) of the Federal Rules of Civil Procedure, Ms. Braun, and Braun Law, and Propson are permissively joined in bringing this action as their claims arise out of the same transaction, occurrence, or series of transactions or occurrences, and the same questions of law or fact common to all Plaintiffs will arise in this action. The allegations central to the Plaintiffs' claims arise from the same videos and series of videos posted by the Defendants.

2

EXHIBIT B

11.9.    Defendants Day, Carter, and Marston are properly joined in this action pursuant to Rule 20(a)(2) as their involvement in the same series of transactions or occurrences, and the same questions of law or fact are common to all Defendants.

**BACKGROUND**

*Defendant Krista Carter's Campaign to Damage the Reputation of Plaintiff Lauren Propson p/k/a "Lauren the Mortician" and label her as transphobic*

12.10.    Ms. Propson, a client of Plaintiffs, is a licensed mortician and operates a social media account known publicly as "Lauren the Mortician."

13.11.    Ms. Propson posts social media videos and commentary that bring awareness about common safety issues causing death. Her content provides lighthearted and educational videos that discuss death, the loss of loved ones, and demystify occupations and professions that work with deceased persons.

14.12.    Defendant CarterMiss Carter is a social media personality and influencer, publicly known as @CaffinatedKitti.

15.13.    Defendant CarterMiss Carter describes herself as a "villain life coach" and uses her platform to create content that she monetizes from views and user engagement.

16.14.    Upon information and belief, Defendant CarterMiss Carter followed Ms. Propson on social media and viewed her content.

17.15.    Upon information and belief, Defendant CarterMiss Carter receives compensation from TikTok based on the number of views a video receives.

18.16.    On or around October 24, 2023, Defendant CarterMiss Carter published a video of herself to TikTok where she made statements about Ms. Propson and identified her by her public persona "Lauren the Mortician."

3

EXHIBIT B

19.17.  In the October 24, 2023 video, ~~Defendant Carter~~Miss Carter goes on to accuse Ms. Propson of being "transphobic" and a "TERF" because she liked posts by a conservative social media personality, who is in a gay relationship.

20.18.  The video starts off with the following monologue by ~~Defendant Carter~~Miss Carter:

> "Lauren the Mortician is a TERF, I have **receipts**, I have **deets**, and you should just go ahead and take a seat."

21.19.  "TERF" is a derogatory slur in feminist groups and a highly offensive term.

22.20.  "TERF" is an acronym standing for "Trans-Exclusionary Radical Feminist" which is a term used to refer to or describe "an advocate of radical feminism who does not believe that transgender people's gender identities are legitimate, and who is hostile to the inclusion of trans women in the feminist movement." Dictionary.com, TERF Definition (accessed on Dec. 12, 2023), https://www.dictionary.com/browse/terf.

23.21.  "DEETS" is slang for "details." Merriam-Webster.com, DEETS Definition (accessed on March 21, 2024), https://www.merriam-webster.com/dictionary/deets.

24.22.  Upon information and belief, the above statement's reference to "receipts" and "deets" was intended to tell audiences that ~~Defendant Carter~~Miss Carter had verifiable proof that Ms. Propson was transphobic.

25.23.  Urban Dictionary, an online resource that defines modern slang and internet slang, defines "receipts" as, "Evidence or proof. Often in the form of screenshots or saved snaps." [3]

26.24.  Lauren the Mortician is the only person discussed and accused in the video (aside from references to the other social media personality).

27.25.  ~~Defendant Carter~~Miss Carter goes on to explain the meaning of her opening statement in the video by stating:

4

EXHIBIT B

> "[A]nd not only was she following him but she was actively liking incredibly **transphobic** and hateful rhetoric and content. So, as you can see here, I decided to make a fun and helpful little list of all the different videos I caught her liking."

28.26. Along with the video, ~~Defendant Carter~~Miss Carter announced that she compiled a list of links to posts that Ms. Propson "liked" contained "transphobic and hateful rhetoric."

> **Formatted:** Font: (Default) Times New Roman

29.27. In using the word "TERF" to describe Ms. Propson, ~~Defendant Carter~~Miss Carter provided the following clarification in her video after discussing the posts and beliefs allegedly endorsed by Ms. Propson by noting:

> **Formatted:** Font: (Default) Times New Roman

> "[she is] trying to divert the attention by saying she is just pro LGBTQ and bisexual as if that is some kind of hall pass that prevents her from being prejudiced to other sub-genres of the rainbow. Just like any other person can be biphobic, **bi people can be transphobic**. (Text Caption: "Unfriendly Reminder: we see transphobic so we're saying transphobic. That ain't bullying it's an observation").

30.28. In showing the list in her video, ~~Defendant Carter~~Miss Carter expressed, "this is obsessive. Maybe – but I just like being *thorough* when dealing with accusations. Seems responsible to me."

> **Formatted:** Font: (Default) Times New Roman

31.29. Upon information and belief, none of the videos ~~Defendant Carter~~Miss Carter linked contain transphobic content.

> **Formatted:** Font: (Default) Times New Roman

32.30. Upon information and belief, ~~Defendant Carter~~Miss Carter's motive and intent behind these posts were to tarnish and damage Ms. Propson's reputation while boosting her own social media career.

> **Formatted:** Font: (Default) Times New Roman

33.31. In explaining her reasoning for her accusations, ~~Defendant Carter~~Miss Carter stated that she was making her claims because people were confusing Ms. Propson's "Lauren the Mortician" persona with ~~Defendant Carter~~Miss Carter's "@CaffinatedKitti" persona;

> **Formatted:** Font: (Default) Times New Roman

5

EXHIBIT B



*Id.*

34.32.  Upon information and belief, ~~Defendant Carter~~Miss Carter is aware that, at the time of her post, Defendant Propson followed and liked pro-LGBTQ and pro-trans rights content on social media.

35.33.  Upon information and belief, ~~Defendant Carter~~Miss Carter acted with malice in stating that Ms. Propson was a TERF and transphobic because she either knew her statements would enrage her fanbase and incite an internet mob against Ms. Propson.

36.34.  Upon information and belief, ~~Defendant Carter~~Miss Carter chose to highlight only Ms. Propson's interactions with the conservative social media personality, while ignoring or recklessly disregarding evidence contradicting her transphobia claims.

37.35.  ~~Defendant Carter~~Miss Carter actively engaged with and further incited her fans and the general public through public social comments, and upon information and belief, through direct messages on social media platforms.

38.36.  Upon information and belief, ~~Defendant Carter~~Miss Carter made her false statements to tarnish Ms. Propson's reputation and career as a social media influencer.

6

EXHIBIT B

39.37.  Upon information and belief, ~~Defendant Carter~~Miss Carter accused Ms. Propson of being transphobic in an attempt to incite pro-LGBTQ community members to engage in a cancel culture campaign against Ms. Propson.

40.38.  Upon information and belief, ~~Defendant Carter~~Miss Carter's actions were made with malice and in an attempt to remove a business competitor.

### *Damage to Ms. Propson's Reputation*

39.      On November 2, 2023, Ms. Propson received an email from Andi Cunningham that stated:

Good morning Lauren,

I'm reaching out to see if you have any further comments on being caught interacting with extremist, right content & hateful anti-trans posts as well. I have several people reaching out to me, stating they have been blocked, just for simply asking for an explanation. With a big platform, it is your duty to lead with an honest approach and many people feel like that isn't what's happening. If you have those beliefs, that is shameful- but you do you. However, backing something you don't believe in is very harmful for so many. Conservative Anthony is known to hate the gay community. He condemns the community for many reasons. If that is truly what you want to back and believe in, you need to be honest and upfront. People make mistakes, but only guilty people will try to hide and dodge the real questions. Silencing people is a horrific thing to do. I'm giving you the opportunity to clear the slate before more deep dives are released with even more proof of these issues. Again, as someone who's been hated for their sexual and orientation, I'm speaking for the group as a whole. We can keep blocking people and dodging comments, or we can be a grown-up and talk about these things head-on. The ball is in your court.. just please be honest. You have hurt so many, and silencing, the majority will not fly. Again, if you have those beliefs, don't hide behind them, own them. Your own actions got you here.

One last thing, since you're mortician, I highly recommend you look up the autopsy for Kyle Rittenhouses' victims. He shot those men in the back as they ran away. They were protesters, running away from a child with an assault rifle. He illegally carried that assault rifle across state lines, which makes it obvious that he had intent to harm people. Again, Kyle had the intention to hurt a certain group of people. He was so full of hate that he showed up with an assault rifle and slaughtered people. Not sure if that's a person you would want to back… I only am putting that part in this email, just in case you have not been educated on that certain situation.

7

EXHIBIT B

We will not let you continue to exploit the gay community for views and likes. If we are not welcomed in your world, then make that known. Again, none of us are being mean we just want an open door discussion. Removing our genuine questions, and leaving up your followers, hateful anti-gay comments is an atrocity.

Have a good day.

Thank you

40.     The email was sent from andibrooks2014@gmail.com and said "I'm speaking for the group as a whole" and "I'm giving you the opportunity to clear the slate before more deep dives are released with even more proof of these issues."

41.     Ms. Cunningham indicated that she was working with others and was going to release more deep dive videos about Ms. Propson if Ms. Propson did not do what Ms. Cunningham wanted.

42.     Around this time, Defendant Day had released more than 5 videos about Ms. Propson which she calls "deep dive" videos.

43.     On November 3, 2023, Plaintiffs sent Ms. Cunningham a Cease and Desist letter.

44.     This is the only Cease and Desist letter Plaintiffs had sent on behalf of Ms. Propson.

45.     On November 4, 2023, Plaintiffs received an email from Ms. Carter that stated:

Good afternoon Jeanette,

I've reached out to the owner of the video you had taken down for copyright, and she confirmed that she did not have any issue with my reposting of her content- as I explicitly asked for her permission beforehand and still maintain it.

My team and I would *love* further details on your client and how the video had grounds for a copyright strike, as it clearly falls under fair use. ("Under the *fair use* doctrine of the U.S. copyright statute, it is permissible to use limited portions of a work including quotes, for purposes such as commentary, criticism, news reporting, and scholarly reports. There are no legal rules permitting the use of a specific number of words, a certain number of musical notes, or percentage of a work. Whether a particular use qualifies as fair use depends on all the circumstances. See, Fair Use Index, and Circular 21, *Reproductions of Copyrighted Works by Educators and Librarians.*" if you needed a refresher.)

8



EXHIBIT B

I do understand how you have reached out with cease and desists to smaller content creators speaking negatively about Lauren the Mortician's scandals, and while I understand your desire to protect a creator you enjoy- if you were not legally obtained as counsel for her and I speak on this via my platform, your actions are going to cause her *significantly* more strife. I would imagine it would reflect very negatively on you and your practice as well for you to attempt to use your personal law firm to intimidate people because you don't like what they have to say. You should patch me in with your business development and PR team, I'm sure they'd have some interesting advice for you.

I look forward to your response,
Kitti

46.     Miss Carter's statement that "I do understand how you have reached out with cease and desists to smaller content creators speaking negatively about Lauren the Mortician's scandals" was referencing the Cease and Desist letter Plaintiffs sent to Ms. Cunningham.

47.     This shows that Miss Carter was working with Ms. Cunningham and the group of people Ms. Cunningham was representing in her November 3, 2023, email to Ms. Propson.

48.     Due to Ms. Propson's following, the allegation that she is transphobic spread quickly throughout the internet and became the source of multiple posts, comments, and blog articles.

49.     The impact of this allegation caused Ms. Propson immediate and irreparable harm to her reputation, lowered her in the eyes of her community, and deterred people in the content creation community from associating with her.

50.     Specifically, Ms. Propson lost numerous followers, her contract with The Travel Channel, and a podcast deal that was in negotiations, as well as brand endorsement contracts, such as Pair Eyewear.

51.     In her social media career, Ms. Propson amassed millions of followers on the social media platform TikTok, as well as sponsorships and monetization of her videos.

9

EXHIBIT B

45.52.  Of these sponsorship deals, Ms. Propson secured a brand partnership in 2023 with The Travel Channel.

46.53.  As a part of the sponsorship, Ms. Propson was paid to make monthly videos for The Travel Channel.

47.54.  Upon information and belief, Defendant CarterMiss Carter was aware of Ms. Propson's sponsorships and her contract with The Travel Channel from studying Ms. Propson's "Lauren the Mortician" social media account.

48.55.  Fans of Defendant CarterMiss Carter's commented on The Travel Channel's posts accusing Ms. Propson of being transphobic.

49.56.  Upon information and belief, this led to The Travel Channel deleting comments accusing Ms. Propson of being transphobic.

50.57.  On or about October 31, 2023, representatives of The Travel Channel told Ms. Propson that due to the online controversy surrounding her, they needed to protect themselves from the negativity and would no longer post her videos.

51.58.  On or around this time, Ms. Propson's negotiations to start a podcast were also ended.

52.59.  In addition, Ms. Propson received an email from her sponsor Pair Eyewear stating that "We can't work with someone who has this kind of content out there."

**_Defendant CarterMiss Carter p/k/a @CaffinatedKitti's Campaign Against Plaintiff Braun and Braun Law_**

53.60.  In attacking the reputation of Ms. Propson, Defendant Krista Carter published social media videos using copyrighted material belonging to Lauren Propson without permission. In response, Propson retained Attorney Jeanette Braun to assist in filing a DMCA complaint with Meta, which resulted in the removal of Carter's Facebook post. Following that removal, Carter

10

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

EXHIBIT B

posted a series of inflammatory videos, including one accusing Braun of filing "false copyright claims" and acting in bad faith as an attorney.

54.61. Carter's accusations were made during ongoing settlement discussions with Braun and were designed to discredit her professional conduct. In a TikTok video and on a GoFundMe campaign page, Carter identified Braun by name, published private communications, and repeated the accusation that Braun filed copyright claims improperly. These posts received hundreds of thousands of views and were tied to Carter's fundraising efforts.

55.62. Carter's statements were designed to incite her fanbase against Defendant Braun. By attacking Braun's legal conduct and encouraging public backlash during the course of her client representation, Carter interfered with Braun's law practice and damaged her professional reputation and business relationships.

### *Defamatory Statements Made by Defendant Rebekah Day nee Boxx*

56.63. Defendant Day is a social media content creator known professionally as "Bekah Day" and holds herself out to be an unbiased content creator and an independent investigative reporter.

57.64. Upon information and belief, Defendant Day has no professional training or degree in journalism.

58.65. Bekah Day, "Bekah Day Profile" linkedin.com (accessed on Dec. 15, 2023), https://www.linkedin.com/in/bekah-day-98457a177/.

59.66. Defendant Day creates content that disparages social media creators and celebrities, which she monetizes for income from TikTok.

60.67. Upon information and belief, Defendant Day receives compensation from TikTok based on the number of views a video receives.

11



EXHIBIT B

61.68. During her social media career, Ms. Day has been accused of posting false and untrue statements about public figures, such as Grammy award winning musician Diplo and other prominent social media personalities.



62.69. In November 2023, Defendant Day made content regarding ~~Defendant Carter~~Miss Carter's claims about Ms. Propson and Ms. Braun.

63.70. Upon information and belief, Defendant Day did not conduct any investigation that involved fact-checking or reaching out to knowledgeable parties to verify the information in her posts about Ms. Braun and Ms. Propson.

64.71. Defendant Day never contacted the Plaintiffs to verify the information in her posts.

***Defendant Day's Campaign Against Jeanette Braun and Braun IP Law LLC***

---

[1] Bekah Day, Post September 5, 2023, tiktok.com (accessed on Dec. 13, 2023), https://www.tiktok.com/@bekahdayyy/video/7275351757197200683?lang=en.; Bekah Day, Post Oct. 5, 2023 (accessed on Dec. 13, 2023), https://www.tiktok.com/@bekahdayyy/video/7286578172643003678?lang=en.

EXHIBIT B

65.72. In November 2023, Defendant Day posted a "deep dive" video about ~~Defendant Carter~~Miss Carter's dispute with the Plaintiffs.

66.73. In her "deep dive" video about ~~Defendant Carter~~Miss Carter's dispute with the Plaintiffs, Defendant Day identified Ms. Braun by her first and last name.

67.74. Upon information and belief, Ms. Braun is the only attorney that Defendant Day has ever discussed on her tabloid TikTok channel.

68.75. Upon information and belief, due to the success of her content about Ms. Propson and Ms. Braun, and the amount of money TikTok paid her for those posts, Defendant Day made plans to make more videos about Ms. Braun's other clients that are social media creators.

69.76. In a TikTok story post made in December 2023, Defendant Day said she was in possession of: "proof of another VERY large & well-liked content creator that is utilizing the same attorney that Lauren the Mortician has used (Jeanette) to harass a small creator on this app & misuse the copyright strike system to have her account taken down." (Original Below)

13

EXHIBIT B



70.77.  In another video posted in December 2023, Defendant Day discussed Ms. Braun's representation of another one of her clients, Kaitlynn Dempsy p/k/a "Demps."

71.78.  Upon information and belief, Defendant Day learned of Ms. Braun's representations by communicating with a stalker that Ms. Dempsey has obtained numerous protective orders against.

72.79.  In the December 2023 video about Demps, Defendant Day published the following caption with her video and accused Ms. Braun of filing "false copyright strikes" and using an "unethical tactic to scare creators off this app."

73.80.  In discussing Ms. Braun and her representation of her client Demps, Defendant Day asserted the following:

14

EXHIBIT B

"I will not be showing any photos or screenshots of the faces of the creators involved but I will be saying names so let's get into this so yesterday we talked about how a Creator on here named Demps hired an attorney named Jeanette Braun to file a *false copyright strike* against a small Creator named Kristen."

74.81. In the same December 2023 post, Defendant Day claimed,

"I have a list of creators who have utilized Jeanette, and *another list of creators who have been wrongfully impacted by false copyright strikes sent in by Jeanette*."

75.82. Upon information, Defendant Day's reference to a list of content creators using Ms. Braun and her list creators who have been impacted is intended to represent to her audience that she has proof of Ms. Braun "filing false copyright strikes".

(This Space Left Intentionally Blank)

76.83. The original post by Defendant Day is shown below:

15

EXHIBIT B



77.84. In a since deleted video from TikTok, following her December 2023 posts about Ms. Braun's client, Defendant Day stated her intent to ruin Ms. Braun's career as a social media lawyer:

> "But I just wanted to make it very clear that my position is to ensure that there is not a rogue attorney on this app."

78.85. Upon information and belief, Defendant Day's fans knew Defendant Day was discussing Ms. Braun due to the number of videos and posts that Defendant Day made about Ms. Braun and her clients.

79.86. Upon information and belief, and the context of Defendant's other posts, Defendant Day intended to falsely cast Ms. Braun as an unethical attorney that files baseless claims by calling her a "rogue attorney."

(This Space Left Intentionally Blank)

*Defendant Day's Harassment of Ms. Braun's Clients*

16

EXHIBIT B

80.87.  Upon information and belief, Defendant Day used the above statements and rhetoric to incite her fans to become an angry mob and engage in a harassment campaign against Ms. Braun and her past clients that are social media influencers.

81.88.  Defendant Day's harassment campaign has had detrimental effects on Ms. Braun, her former clients, her practice, and has caused emotional distress and harm to Ms. Braun.

82.89.  In addition to her public comments, Defendant Day has made unsolicited communications to Ms. Braun's client in attempts to obtain disparaging information.

83.90.  On March 21, 2024, Defendant Day contacted one of Ms. Braun's clients knowing that the person was one of Ms. Braun's clients.

84.91.  Upon information and belief, Defendant Day is contacting Ms. Braun's clients to possibly intimidate them, interfere with their contract with Ms. Braun for legal representation, and/or to collect a statement to publish to social media for more likes and follows.

*Bekah Day's Defamatory and False Statements About Plaintiff Braun and Braun Law*

85.92.  On December 11, 2023, Defendant Day created and posted a story on TikTok stating that she "Just got confirmation from the Illinois Attorney Registration & Disciplinary Commission [("ARDC")] thay [sic] they have received multiple CREDIBLE complaints about Jeanette Braun and they have assigned multiple attorneys to investigating [sic] this matter." (emphasis in original). @bekahday, "Dec. 11, 2023 Story Post" tiktok.com (captured on Dec. 11, 2023).

(This Space Left Intentionally Blank)

86.93.  The below screenshot is a true and accurate copy of the post made by Defendant Day.

17

EXHIBIT B



**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

**Formatted:** Font: (Default) Times New Roman

87.94. Defendant Day's statement that the ARDC told her that received "multiple credible complaints about Jeanette Braun and they have assigned multiple attorneys to investigate this matter" is false and did not occur.

18

88.95.  Upon information and belief, the ARDC did not comment or provide information to Defendant Day about its investigation or other complaints made against Ms. Braun.

89.96.  Defendant Day intentionally made this statement on December 11, 2023 knowing that her report about the ARDC's commenting that it received "complaints about Jeanette Braun and they have assigned multiple attorneys to investigate this matter" was false.

90.97.  Defendant Day made this false statement to place Ms. Braun and Braun IP Law in a false light and to sensationalize her social media post, add credibility to her claims, and disparage Ms. Braun before the public.

91.98.  Upon information and belief, Defendant Day made this statement with actual malice in that she either knew the statement's falsity and had a reckless disregard for the truth.

92.99.  Upon information and belief, Defendant Day made this statement to incite and encourage the public to make ethics complaints to the ARDC against Ms. Braun.

93.100.       As a proximate cause of Defendant Day's posts and comments, numerous people filed complaints to the ARDC and requested the ARDC to investigate Ms. Braun.

94.101.       All ARDC complaints that were filed against Ms. Braun by the internet mob--as a result of Defendant Day's false statements--were closed without any warning, censure, or admonishment to Ms. Braun.

95.102.       The Attorney Registration and Disciplinary Commission is the governing body overseeing and regulating the conduct of attorneys. The ARDC operates under the authority of the Illinois Supreme Court, which has sole authority to regulate the admission and discipline of lawyers in Illinois. ARDC, "Overview of ARDC" iardc.org (accessed on Dec. 15, 2023), https://www.iardc.org/About.

19

EXHIBIT B

96.103.     All attorney investigations are confidential until the Commission brings a complaint against an attorney. *Id.*

97.104.     Upon information and belief, the ARDC does not comment or provide input on the merits of an investigation to anyone calling to inquire about a registered attorney.

98.105.     As of the filing of this Third Amended Complaint, Ms. Braun is an attorney in good standing and has no pending investigations or misconduct violations on her record with the Illinois Attorney Registration & Disciplinary Commission.

99.106.     Despite Defendant Day's that claim that "multiple attorneys" were assigned to the "multiple credible complaints" against Ms. Braun, the ARDC only assigned one attorney to review the matter.

100.107.     The ARDC closed the complaints against Ms. Braun.

101.108.     The ARDC did not censure, disbar, or privately admonish Ms. Braun.

102.109.     Although Defendant Day published numerous videos updating the public about the actions she had taken against Plaintiff Braun and refers to herself as a journalist, she did not post any video informing viewers that the ARDC chose not to pursue her Complaint against Braun.

### *Defamatory Statements Made by Defendant Lily Marston and Tortious Interference by Defendant Marston*

103.110.     Upon information and belief, Defendant Marston and her co-host Jessica Vazquez are owners and co-hosts of the "Do We Know Them" podcast.

104.111.     The "Do We Know Them" podcast is an online video podcast that is also disseminated through various audio platforms where Defendant Marston and Ms. Vazquez promote online controversies, rumors, and celebrity gossip, all of which are monetized.

20

EXHIBIT B

105.112.     Upon information and belief, Defendant Marston is paid by YouTube and at least 18 other platforms based on the number of views/plays their videos/podcast receives and thus is profiting from her posts that spread the false statements about Ms. Braun that are described in this Complaint.

106.113.     Defendants Day and Marston communicated with each other about Ms. Propson and Ms. Braun to make videos and a podcast.

107.114.     In their December 2, 2023 episode, Defendant Marston acknowledged that she spoke to Defendant Day by referring to her username @bekahdayy and tagging her TikTok post:

> "HUGE SHOUTOUT TO THE LOVELY BEKAH DAY FOR PROVIDING US WITH THE STUFF WE NEEDED TO NAVIGATE THRU JANET'S BS!
>
> For more information and detailed up to date coverage on all of the claims that Janet's been doling out to people like she's passing out candy on Halloween, go check out Bekah's Tiktok! @bekahdayyy"

108.115.     In discussing Ms. Braun's past representations, Defendant Marston and her co-host played Defendant Day's video discussing Ms. Braun's representation of Ms. Dempsey.

109.116.     Upon information and belief, Defendant Marston did not conduct any investigation that involved fact-checking or reaching out to knowledgeable parties to verify the information in Defendant Day's video.

110.117.     Upon information and belief, Defendants Marston relied on the false information provided by Defendant Day.

111.118.     Defendant Marston acted with malice in that she knew Defendant Day's information was false or held a reckless disregard as to the truth about their statements prior to publishing them.

21

EXHIBIT B

112.119.     In a video posted on December 3, 2023, Defendant Marston and her co-host mocked Ms. Braun by mis-pronouncing her name as "Janet" instead of "Jeanette."

113.120.     In the December 3, 2023 video, Defendant Marston and her co-host identified Ms. Braun by her full name and expressly noted that they intentionally mispronounced her name because it was "fun" but that they were still referring to Ms. Braun.

114.121.     In the videos, Defendant Marston discussed in detail about Ms. Braun's past representations and clients.

115.122.     In the video, Defendant Marston played a clip of a video from Ms. Braun's former client.

116.123.     Defendant Marston and her co-host noted that reputable and known content-creators, such as Alyssa DeFord p/k/a "Bunnie XO" and Kaitlynn Dempsey p/k/a "Demps" hire Ms. Braun to represent them and take down videos that use their likeness or photographs without their permission.

117.124.     In their December 3, 2023 video, Defendant Marston and her co-host criticized Ms. Braun and her legal practice, calling her unethical and unhinged.

118.125.     In a since removed post, Defendant Marston publicly accused Ms. Braun of "actively committing perjury."

119.126.     The below image is an accurate copy of Defendant Marston's



22

127. The name "Demps" in Defendant Marston's post refers to Ms. Braun's client Kaitlynn Dempsey.

128. Upon information and belief, Defendant Marston's followers were aware that Ms. Dempsey was represented by Ms. Braun from Defendant Marston's December 2, 2023 video on the topic.

***Damage to Reputation and Harm to Braun Law and Attorney Jeanette Braun***

129. As a direct result of the false and defamatory statements made by Defendants Day and Marston, and their collective efforts to publicly malign and discredit Plaintiffs Braun and Braun IP Law, an angry internet mob comprising the Defendants' followers was incited.

130. Through public comments, videos, and messages to members of the internet mob, the Defendants personally fueled and incited the mob with the intention of making Ms. Propson and Ms. Braun endure public humiliation, harassment, and threats of harm and violence against them and their property.

131. The inciting of the mob was a foreseeable and direct result of the statements made by the Defendants; specifically, the internet threats via online comments, direct messages, emails, phone calls, and 911 calls.

132. The Defendants comments were intended to incite members of the internet mob into sending numerous intimidating communications and threats of harm to the Plaintiffs.

133. As a direct result of the statements made by the Defendants, Plaintiff Braun received threats of violence against her and threats to burn her home down.

134. In April 2024, Defendants through their counsel, were made aware of the death threat to Jeanette Braun and the threat to burn her home. Despite these requests and pleas to

23

EXHIBIT B

make a public comment to stop the harassment, Defendants refused to mitigate the harassment to the Defendants.

Formatted: Font: (Default) Times New Roman

128.135. As a direct result of the statements made by the Defendants, this Court has received ex parte communications from the internet mob to prejudice and bias the Plaintiff's case before the Court.

129.136. The posts and comments published by the Defendants caused their various fans and followers to post negative and 1-Star Google Reviews against Ms. Braun and Braun Law to harm its reputation.

130.137. The online harassment has spread across various platforms and into real life. The Defendants have encouraged their followers to view and support disparaging content that spreads the Defendant's false claims and videos attacking the Plaintiffs' case. The Defendants actions, false statements, and encouragement of their fans to harass the Plaintiffs, have caused the Defendants' fans to invade Plaintiffs' privacy, file real-life ethics complaints against Ms. Braun, and leave false 1-Star business reviews against Braun Law.

Formatted: Font: (Default) Times New Roman

131.138. As a result of the false and defamatory statements by Defendants Marston and Day, Ms. Braun lost her client Alyssa DeFord p/k/a BunnieXo and her client Monsters and Martians.

Formatted: Font: (Default) Times New Roman

132.139. Ms. DeFord and Monsters and Martians chose to terminate Ms. Braun's representation because of the online scrutiny caused by Defendant Day and Defendant Marston's false statements and promotion of the online controversy.

Formatted: Font: (Default) Times New Roman

133.140. Upon information and belief, Defendants Day and Marston conspired with each other and third parties to spread their false statements that Ms. Braun was committing perjury

24

EXHIBIT B

and that the ARDC was investigating Braun because they had received confirmation that multiple credible complaints about her.

141. Upon information and belief, Defendants Day and Marston conspired with third-parties to create and post social media content, videos, and forums that are disparaging to the reputation and public image of Ms. Propson, Ms. Braun, and Braun IP Law. Defendants Day and Marston acted with the intent to damage the Plaintiffs' ability to conduct business as a social media influencer and attorney.

<u>**COUNT I**</u>

**Defamation *Per Se***
**Against Rebekah Day**
**by Plaintiffs Jeanette Braun and Braun IP, Law LLC**

142. Plaintiffs Braun and Braun Law repeat and reallege by reference the allegations in paragraphs 1 through 134 as if fully set forth herein.

143. Defendant Day defamed Plaintiffs Braun and Braun Law and made a verifiably false statement by publicly stating that she received "confirmation from the Illinois Attorney Registration & Disciplinary Commission thay [sic] they have received multiple CREDIBLE complaints about Jeanette Braun and they have assigned multiple attorneys to investigating [sic] this matter."

144. These statements are false and were made by Defendant Day to promote her platform's credibility and attack Plaintiff Braun and Braun Law's character and reputation, all for a commercial gain.

145. The context of Defendant's comments were designed to explicitly and implicitly damage the reputation of Plaintiffs Braun and Braun Law by lowering them in the eyes of the community and deterring the community from associating with them.

25

EXHIBIT B

139.146.     Defendant Day made these defamatory statements publicly across multiple social media platforms.

140.147.     The defamatory statements concerned Plaintiff Braun and Plaintiff Braun Law, as they referenced her by her full legal name, "Jeanette Braun." The average viewer understood the statements to be about Jeanette Braun the owner of Braun IP Law, LLC.

141.148.     The statements were defamatory because they harmed Plaintiff Braun's and Plaintiff Braun Law's reputation, and caused others to engage in harassing behavior, such as filing ARDC complaints against Plaintiff Braun.

142.149.     The false statements were defamation *per se* because the harm to Plaintiffs Braun's and Braun Law's reputation is obvious and apparent on its face. The statement that the ARDC told Day they had received confirmation of the ARDC receiving "multiple ***credible*** complaints about Jeanette Braun and they have assigned multiple attorneys to investigate this matter." Being accused of being an "unethical lawyer" that is being investigated due to "multiple credible complaints" painted Plaintiff Braun in a false light and incited others to act against her. This resulted in Plaintiffs Braun and Braun Law losing current clients and potential clients. These statements prejudice Plaintiffs Braun and Braun Law in their profession and harmed their ability to retain new clients.

143.150.     Defendant Day's statements are verifiably false because the ARDC does not comment on the existence or credibility of complaints or investigations, and no such information was communicated to Day by the ARDC.

144.151.     Defendant Day's statements are verifiably false because there were not multiple attorneys assigned to investigate Plaintiff Braun.

EXHIBIT B

145.152.    Defendant Day's posting to TikTok was an unprivileged publication of the false statements to third parties.

Formatted: Font: (Default) Times New Roman

146.153.    As a proximate result of Defendant Day's publication of false statements of fact about Plaintiffs Braun and Braun Law, they sustained injuries to their good name, character, and reputation; all for a commercial gain, so as to establish presumed damages.

Formatted: Font: (Default) Times New Roman

147.154.    As a proximate result of Defendant Day's publication of false statements of fact about Ms. Braun and Braun Law, they were harmed and continue to be harmed in that they have experienced economic and non-economic damages, including emotional distress, mental anguish, harm to reputation, and harm to her career.

Formatted: Font: (Default) Times New Roman

148.155.    Defendant Day's defamatory statements were made with knowledge of their falsity and with a reckless disregard for the truth, all for a commercial purpose, so as to justify an award of punitive damages.

Formatted: Font: (Default) Times New Roman

149.156.    Defendant Day held a reckless disregard for whether Plaintiffs Braun and Braun Law, and their clients, had a good faith basis for their copyright infringement filings, and instead published statements without any proper investigation into the truth of the matter being asserted to make money.

Formatted: Font: (Default) Times New Roman

### COUNT II

**Defamation *Per Se***
**Against Lily Marston**
**by Plaintiffs Jeanette Braun and Braun IP, Law LLC**

150.157.    Plaintiffs Braun and Braun Law repeat and reallege by reference the allegations in paragraphs 1 through 134 as if fully set forth herein.

Formatted: Font: (Default) Times New Roman

27

EXHIBIT B

151.158.     Defendant Lily Marston is a social media personality with a substantial online following. On or about December 10, 2023, Marston published a post on the social media platform X (formerly Twitter) stating:

> "I gotta say... one of our biggest questions in all of this, is do we think demps knows that her embarrassing excuse for a lawyer is using her name while actively committing perjury? Someone might wanna tell her."

152.159.     This statement was widely understood by the public to refer to Plaintiff Jeanette Braun, who was then publicly known to be representing the country music influencer Kaitlynn Dempsey p/k/a "Demps."

153.160.     Marston's post accused Braun of actively committing a crime—perjury—in the course of her legal representation of Demps.

154.161.     Marston's statement is verifiably false. Plaintiff Braun has never committed perjury, nor has she been found by any court or agency to have engaged in any unethical or criminal conduct.

155.162.     The accusation that Braun is "actively committing perjury" while acting as a lawyer imputes both criminal behavior and a lack of integrity in her profession. As such, the statement is defamatory *per se* under Illinois law.

156.163.     The statement was made publicly and was accessible to third parties. Upon information and belief, it was shared, liked, and viewed by others, further amplifying its impact and harm.

157.164.     The statement was not privileged and was not made in a context of opinion, satire, or rhetorical hyperbole. It was presented as a factual assertion regarding Plaintiff Braun's conduct as a lawyer.

28

EXHIBIT B

158.165.      Defendant Marston made the statement with actual malice—knowingly, or with reckless disregard as to its falsity—and for the purpose of damaging Plaintiff Braun and Braun Law's professional reputation and inciting public backlash.

159.166.      As a direct and proximate result of Defendant Marston's false and defamatory statement, Plaintiffs Braun and Braun IP Law, LLC have suffered damage to their reputation, goodwill, emotional well-being, and business relationships, including the loss of clients and prospective clients.

160.167.      Plaintiffs are entitled to presumed damages due to the defamatory *per se* nature of the accusation, as well as punitive damages based on Defendant's malice, intent, and reckless disregard for the truth.

**COUNT III**

**False Light**
**Against Rebekah Day nee Box**
**by Plaintiffs Jeanette Braun and Braun IP, Law LLC**

161.168.      Plaintiffs Braun and Braun Law reallege and incorporate as though fully set forth herein, paragraphs 1 through 135.

162.169.      On or about December 11, 2023, Defendant Rebekah Day posted a TikTok video in which she stated that she "got confirmation from the Illinois Attorney Registration & Disciplinary Commission thay [sic] they have received multiple CREDIBLE complaints about Jeanette Braun and they have assigned multiple attorneys to investigating [sic] this matter."

163.170.      This statement was false. The ARDC does not disclose whether complaints have been filed, whether they are considered "credible," or whether specific attorneys have been assigned to investigate a lawyer. The ARDC made no such statement to Defendant Day or to any member of the public.

29

EXHIBIT B

164.171. Defendant Day's false statement placed Plaintiff Braun in a false light by suggesting she was the subject of an active and serious investigation for professional misconduct by the state agency charged with attorney discipline.

165.172. Defendant Day's conduct placed Plaintiff Braun and her law firm in a false light. The false implication that Braun was under professional investigation and the subject of "multiple credible complaints" was highly offensive to a reasonable person, particularly given Braun's public-facing role as an attorney and her reliance on professional integrity and trust in her practice.

166.173. Defendant Day made this statement publicly on a social media platform with a substantial audience, and the video was viewed and engaged with by a wide number of individuals.

167.174. Defendant Day acted with actual malice; that is, she acted with knowledge that her statements were false or with reckless disregard for whether the statements were true or false.

168.175. Defendant Day knew that the implication of misconduct and ongoing disciplinary action was false, or acted with reckless disregard for the truth or falsity of that impression.

169.176. Defendant Day intentionally posted several TikTok videos and comments for the sole purpose of creating and monetizing content on her social media profile. Defendant Day had reason to know that her actions had the potential to incite a large number of people to attack and retaliate against Plaintiff Braun and her law firm, and that her allegations needed to be carefully sourced. Nonetheless, Defendant Day made false accusations to attack Plaintiff Braun's and Braun Law's reputation.

30

EXHIBIT B

170.177.      As a direct and proximate result of being cast in this false light, Plaintiff Braun suffered reputational harm, emotional distress, and damage to her business relationships and legal practice.

Formatted: Font: (Default) Times New Roman

171.178.      Defendant Day made her statement with actual malice—that is, with knowledge that the implication was false or with reckless disregard for whether it was true. The statement was part of a broader campaign by Defendant Day to discredit Braun online, drive engagement to her own platform, and inflame public outrage.

## COUNT IV

**False Light**
**Against Lily Marston**
**by Plaintiffs Jeanette Braun and Braun IP, Law LLC**

172.179.      Plaintiffs Braun and Braun Law reallege and incorporate as though fully set forth herein, paragraphs 1 through 134.

173.180.      On or about December 10, 2023, Defendant Lily Marston published a public tweet on X (formerly Twitter) falsely stating that Braun, while acting as an attorney, was "actively committing perjury." The tweet referred to Braun's representation of her client Kaitlynn Dempsey, publicly known as "Demps," and implied that Braun was misusing her client's name in an unethical and criminal manner.

174.181.      Defendant Marston's false statement placed Plaintiffs Braun and Braun Law in a false light by implying they engage in criminal and dishonest conduct while representing clients. Marston's statement was not couched in hyperbole or opinion but was a factual assertion intended to portray Braun as acting unlawfully in her professional capacity.

31

EXHIBIT B

175.182.     Defendant Marston's portrayal would be highly offensive to a reasonable person, especially one in Braun's position as a licensed attorney whose reputation and career depend on trust, ethical conduct, and adherence to the law.

176.183.     Defendant Marston made the statement with actual malice—that is, with knowledge that the implication was false or with reckless disregard for whether it was true. The statement was part of a broader campaign by Defendant Marston to discredit Braun online, drive engagement to her own platform, and inflame public outrage.

177.184.     As a result of Defendant Day's conduct, Plaintiffs were harmed and continue to be harmed through economic and non-economic damages, including emotional distress, mental anguish, harm to her reputation and harm to her career or ethics.

### COUNT V

**Trade Libel**
**Against Defendant Rebekah Day nee Box**
**by Plaintiff Jeanette Braun and Plaintiff Braun Law**

178.185.     Plaintiffs Braun and Braun Law reallege and incorporate as though fully set forth herein, paragraphs 1 through 134.

179.186.     Beginning in or about November 2023, and continuing through the present, Defendant Rebekah Day made false and disparaging statements about the quality and lawfulness of Plaintiffs Braun and Braun Law's professional services. These statements were made orally and in writing to Day's large public audience, including followers on TikTok and other social media platforms.

180.187.     Specifically, Day made the false statement that she "got confirmation from the Illinois Attorney Registration & Disciplinary Commission thay [sic] they have received

32

EXHIBIT B

multiple CREDIBLE complaints about Jeanette Braun and they have assigned multiple attorneys to investigating [sic] this matter."

181.188. These statements did not merely attack Braun's personal reputation but specifically disparaged the quality and legality of the legal services offered by Braun and Braun Law, thereby constituting commercial disparagement and trade libel.

182.189. Defendant Day knew these statements were false or acted with reckless disregard for their truth or falsity. Upon information and belief, she published these statements to increase her social media engagement and to promote her personal brand.

183.190. As a direct and proximate result of these false and disparaging statements, Plaintiffs Braun and Braun Law suffered loss of current and prospective client relationships, diminished goodwill, and damage to their professional reputation in the legal and creator communities.

184.191. Plaintiffs Braun and Braun Law continue to suffer economic harm, emotional distress, and reputational injury. Damages are ongoing and subject to proof at trial but are believed to exceed the jurisdictional minimum of this Court.

**<u>COUNT VI</u>**

**Trade Libel**
**Against Defendant Lily Marston**
**by Plaintiffs Jeanette Braun and Braun IP, Law LLC**

185.192. Plaintiffs Braun and Braun Law reallege and incorporate as though fully set forth herein, paragraphs 1 through 134.

186.193. Beginning in or about November 2023, and continuing through the present, Defendant Marston willfully, without justification or privilege, published orally and in writing false, misleading, and disparaging statements about Plaintiff Braun and her reputation as an

33

> **Formatted:** Font: (Default) Times New Roman



# EXHIBIT B

attorney, including but not limited to Defendant Marston's followers on numerous platforms. Defendant Marston's statements described in this Complaint improperly disparaged Plaintiff Braun and her law firm's services and credibility by making the false and misleading accusations that Plaintiff Braun is unethical and commits perjury in her lawsuits.

187.194. Defendant Marston acted with actual malice in that she either knew the statements she made were false or that she intentionally failed to conduct an appropriate investigation to determine the truth of her claims and not rely entirely on mere speculation and conjecture.

188.195. As a proximate result of Defendant Marston's publication the claim that Plaintiff Braun committed perjury, Plaintiffs Braun and Braun Law's existing and prospective clients have been deterred from hiring and otherwise dealing with her and her law firm. As a further proximate result of Defendant Marston's publication of the above-referenced statements, on information and belief, Plaintiffs Braun and Braun Law have endured, and continues to endure, numerous digital attacks by an angry mob that were incited by Defendant Marston's false statements that Plaintiff Braun lacks ethics as a lawyer and commits perjury in representing her clients.

189.196. From these statements, Plaintiff Braun and Plaintiff Braun Law suffered injury to their business and reputation as an attorney and law firm in an amount currently unknown but believed to be more than the jurisdictional minimum for this Court. Once damages have been determined, Plaintiff will seek leave to amend this Complaint or will otherwise inform Defendant of the damages that are sought.

**COUNT VII**

**Tortious Interference with Contract
Against Defendant Carter**

34

EXHIBIT B

by Plaintiff Lauren Propson

190. Plaintiff Propson realleges and incorporates as though fully set forth herein, paragraphs 1 through 134.

191. At all relevant times, Plaintiff Propson had a valid and enforceable agreement with the Travel Channel and Pair Eyewear under which she was to appear in a series of digital videos published on a monthly basis, highlighting her professional expertise and public education work as a mortician. The agreement provided for recurring features and compensated content creation.

192. Defendant Krista Carter was aware of this agreement. Around October 24, 2023, Carter published multiple social media videos in which she falsely accused Propson of being a "TERF," "transphobic," and of liking and promoting "incredibly transphobic and hateful rhetoric and content." These accusations were not based in fact and misrepresented the content and context of Propson's social media activity.

193. Carter framed her accusations as objective fact by stating that she had "receipts," "deets," and "proof" to support her claims. In reality, Carter's so-called evidence consisted of a misleading and decontextualized list of Propson's social media "likes," which she used to portray Propson as promoting hate-based rhetoric. Carter knew or recklessly disregarded the fact that her accusations could materially harm and damage Propson's reputation.

194. In addition to her defamatory posts, Carter took steps to interfere with Propson's contract relationships, such as the Travel Channel, by encouraging others to report or shame the company for working with Propson.

195. Following Carter's actions, several sponsors including the Travel Channel and Pair Eyewear terminated their contracts with Propson, citing concerns over reputational backlash.

35

EXHIBIT B

Multiple sponsorship discussions and potential collaborations were also abandoned as a result of the reputational fallout.

196. Carter's interference was intentional and unjustified. Her actions were motivated by animus and retaliation, not public discourse. Carter used her platform to target and harass Propson and to elevate her own public profile as a self-styled provocateur. Her conduct was not protected speech, but a campaign of reputational sabotage directed at a known business relationship and to interfere with Propson's economic advantage.

197. As a direct and proximate result of Carter's conduct, Propson has suffered substantial damages, including lost income, loss of professional opportunities, reputational harm, and emotional distress.

### COUNT VIII

**Tortious Interference with Economic Advantage**
**Against Defendant Krista Carter**
**by Plaintiff Lauren Propson**

198. Plaintiff Lauren Propson realleges and incorporates by reference Paragraphs 1 through 134 as though fully set forth herein.

300. At all relevant times, Plaintiff Propson maintained an established and growing presence on social media platforms where she engaged in professional mortuary education, advocacy, and entertainment. Based on her reputation and public profile, she maintained active discussions with multiple brands and content sponsors regarding endorsement deals, collaborations, and content production opportunities.

36


EXHIBIT B

301. Plaintiff Propson had a reasonable expectation of entering into additional business relationships and contracts with various media outlets, sponsors, and commercial partners, based on her existing audience engagement, recent inquiries, and past commercial success.

302. Defendant Krista Carter knew or reasonably should have known that Plaintiff Propson maintained such ongoing and developing commercial relationships. Defendant Carter publicly acknowledged Propson's visibility, influence, and marketability, and was aware that Propson's livelihood depended on public perception and brand collaborations.

303. Despite that knowledge, Defendant Carter intentionally published multiple defamatory and misleading statements accusing Plaintiff Propson of transphobia and hateful conduct, framing her conduct as bigoted and unethical. These statements were designed to discourage others from working with or supporting Plaintiff.

304. Upon information and belief, Carter further encouraged her followers to publicly report and call out Plaintiff Propson for being transphobic through public comments and direct messages.

305. These actions were done in an attempt to prejudice the public against Plaintiff Propson and to pressure brands to cancel their relationships with her.

306. Defendant Carter herself responded to follower comments and escalated claims against Plaintiff Propson in ways that directly targeted Plaintiff Propson's professional opportunities.

307. As a direct and proximate result of Defendant Carter's actions, Plaintiff Propson was wrongfully cast as transphobic and lost multiple sponsorship opportunities and commercial relationships, including but not limited to those with content platforms, product partnerships, and brand sponsorships. These lost opportunities caused financial harm and reputational injury.

EXHIBIT B

308. Carter's conduct was not justified by any legitimate interest. Her actions were motivated by animus and executed with the intent to cause economic harm to a rival social media influencer. Her statements were malicious and inflammatory characterizations made and reasonably calculated to damage Plaintiff's professional viability and foreseeably incite an angry mob against her.

### COUNT IX

**Tortious Interference with Existing and Potential Business Relationships**
**Against Defendants Rebekah Day & Lily Marston**
**By Plaintiff Jeanette Braun and Plaintiff Braun IP Law, LLC**

199. Plaintiff Braun and Braun Law reallege and incorporates as though fully set forth herein, paragraphs 1 through 134.

200. At all relevant times, Plaintiffs Braun and Braun IP Law, LLC maintained ongoing attorney-client relationships and had a reasonable expectation of entering into additional client engagements based on their reputation and continued presence in the legal and creator advocacy space.

201. Defendants Rebekah Day and Lily Marston were aware, or reasonably should have been aware, that Braun operated an active legal practice and maintained professional relationships with clients, including content creators, influencers, and online entrepreneurs.

202. Despite this knowledge, Defendants engaged in a coordinated campaign to damage Braun's professional reputation and interfere with her client relationships. Through social media posts, videos, podcasts, and commentary, Defendants accused Braun of filing "false copyright claims," acting as a "rogue attorney," abusing legal processes, being investigated by the Illinois ARDC and committing perjury.

38

EXHIBIT B

203. Defendant Marston intentionally posted several Youtube videos and podcast episodes, and multiple tweets, regarding the controversy involving Braun for the sole purpose of monetizing and driving traffic to their social media profiles. Defendants Marston both had reason to know that their actions had the potential to incite a large number of people to attack and retaliate against Plaintiffs Braun and Braun Law, and that their allegations needed to be carefully sourced. Nonetheless, Defendant Marston accused Plaintiff Braun of being unethical and "committing perjury" to harm Plaintiffs Braun and Braun Law's reputation.

204. Defendants Day and Marston discussed Plaintiff Braun and Braun Law's clients and past representations.

205. Defendants' statements were not limited to generalized critique but included specific references to Braun's actual and prospective clients, such as country music influencers Alyssa DeFord p/k/a Bunnie XO and Kaitlynn Dempsey p/k/a "Demps."

206. Defendants suggested that Braun was engaged in unlawful or unethical representation on behalf of such clients.

207. As a proximate cause of the Defendants smear campaign and Defendant Day and Defendant Marston's false and defamatory statements, Plaintiff Braun and Braun Law lost work from numerous clients including, Ms. DeFord and Ms. Dempsey.

208. As a result of Defendants' smear campaign and the resulting harassment directed at Plaintiff Braun and her clients by Defendants' followers, multiple clients, including Ms. DeFord and Monsters and Martians, began to distance themselves from Braun Law and Plaintiff Jeanette Braun.

39

EXHIBIT B

209. Defendants' false and defamatory statements about Plaintiff Braun's legal practice were made to cause interference with her current clients, and to other content creators from hiring Braun Law for legal representation.

210. The false statements published by the Defendants interfered with Ms. Braun's existing and prospective client relationships as an attorney. Following Defendant Marston's and Defendant Day's statements, Plaintiff Braun and Braun Law received several 1 star google reviews for Braun Law, and had clients end their use of Braun Law for legal services out of fear of harassment.

211. Plaintiff Braun also received numerous ARDC complaints that were filed after Defendant Day and Defendant Marston's posts.

212. Defendants' past and present false statements on their aforesaid social media platforms caused great damage to Plaintiff Braun and Braun IP Law's business and harm to their reputation. The individual and joint actions of the Defendants were intended to cause and have caused deception of the public, misleading clients and prospective clients of Plaintiff Braun and Braun Law's as to the true characteristics and qualities of their services.

213. Defendant Day further claimed, in a publicly posted video, that the ARDC told her that Braun was the subject of "multiple credible complaints" and that "multiple attorneys" had been assigned to investigate her. This statement was knowingly false or made with reckless disregard for the truth, as the ARDC does not disclose such investigatory information to the public.

214. On information and belief, Defendant Day contacted others both privately and publicly to contact the Illinois ARDC, and to leave 1-star Google reviews and public comments, as a means to instigate reputational harm and dissuade Braun's clients, or potential clients, from working with her.

40

EXHIBIT B

215. ~~The individual and joint actions of the Defendants have disparaged Plaintiff Braun and Braun Law's name in the legal profession, social media services industry, and besmirched their reputation through false and defaming statements as detailed in this Complaint.~~

197. ~~Defendants' conduct as aforesaid in disseminating false and disparaging accusations and dissuading the public from dealing with Plaintiff Braun and Braun Law constitutes unlawful interference with Plaintiff Braun and Braun Law's existing and prospective contracts with its current and prospective clients to their severe damage and detriment, as a result of which Plaintiff Braun and Braun Law have suffered damage to their business, harm to their reputations, lost income, attorney's fees, and other economic loss.~~

**COUNT VII**

**Illinois Civil Conspiracy**
**Against Defendants Lily Marston and Rebekah Day**
**by Plaintiffs Jeanette Braun and Braun IP, Law LLC**

198. Plaintiffs Jeanette Braun and Braun IP Law, LLC reallege and incorporate by reference paragraphs 1 through 197 as though fully set forth herein.

199. This Count is pleaded under Illinois common law. Plaintiffs do not plead civil conspiracy as an independent tort divorced from the underlying wrongdoing. Plaintiffs plead civil conspiracy as a basis to impose liability on Defendants Rebekah M. Day nee Boxx and Lily Marston for tortious acts committed by them and by their co-conspirators in furtherance of the common scheme alleged below.

200. Plaintiffs seek judgment on this Count against Defendants Day and Marston only. Plaintiffs do not seek judgment in this Count against every person who participated in or furthered the conspiracy. Krista Carter, Jamie Grayson, Ian Runkle, Jessica Vazquez, Kodye Elyse Byrne, Paige Christie, Chelsea Dean aka CC Suarez, Nick Snider, Dustin Daily, Michael Marsille aka

41

| Formatted: Font: Font color: Auto |
| Formatted: Font: (Default) Times New Roman, Bold, Underline, Font color: Black |
| Formatted: Font: (Default) Times New Roman, Font color: Black |
| Formatted: Normal, Indent: Left: 0.5", No bullets or numbering |
| Formatted: Font: (Default) Times New Roman, Bold, Font color: Black |
| Formatted: Font: (Default) Times New Roman, Font color: Black |
| Formatted: Font: (Default) Times New Roman, Bold, Font color: Black |
| Formatted: Font: (Default) Times New Roman, Font color: Black |
| Formatted: Font: (Default) Times New Roman, Bold, Font color: Black |
| Formatted: Font: Font color: Auto |
| Formatted: No bullets or numbering |
| Formatted: Indent: Left: 0", First line: 0.5" |



EXHIBIT B

Madcatster, and others known and unknown are pleaded as co-conspirators whose conduct demonstrates the existence, purpose, scope, overt acts, malice, foreseeability, and damages caused by the conspiracy.

201. Beginning no later than November 2023 and continuing through today, Defendants Day and Marston knowingly and voluntarily entered into, joined, and participated in a common plan with each other and with co-conspirators Carter, Grayson, Runkle, Vazquez, Byrne, and others known and unknown to publicly discredit, disparage, and damage Plaintiffs through coordinated social-media publications, podcast episodes, TikTok videos, YouTube videos, Reddit posts, reposts, private messages, source-sharing, GoFundMe promotion, cross-promotion of content, and amplification of false narratives about Plaintiffs.

202. The unlawful objectives and unlawful means of the conspiracy included, without limitation, publishing and amplifying false statements that Plaintiff Braun and Braun Law filed "false copyright strikes," acted as a "rogue attorney," misused legal process, were the subject of "multiple CREDIBLE complaints" before the Illinois ARDC, were being investigated by "multiple attorneys," and that Plaintiff Braun was "actively committing perjury"; and intentionally interfering with Plaintiffs' client relationships, prospective economic relationships, and professional reputations.

203. The underlying torts committed in furtherance of the conspiracy include the defamation per se, false light, and trade libel, as alleged in Counts I-VI.

204. Defendant Day's role in the conspiracy included soliciting and receiving information from Carter, Byrne, Grayson, Erika Fisk (a cyberstalker of Plaintiffs' client Kaitlynn Dempsey who had an active Order of Protection against Ms. Fisk at that time which also protected her then 6 year old daughter from Ms. Fisk), and other co-conspirators, communicating with

42

EXHIBIT B

Marston, providing information and materials to Marston and the Do We Know Them podcast, publishing "deep dive" TikTok videos and TikTok stories about Plaintiffs, claiming to have lists of creators who used Plaintiff Braun and creators allegedly impacted by "false copyright strikes," encouraging and publicizing reports to disciplinary and platform authorities, and portraying Plaintiff Braun as a "rogue attorney."

205. Defendant Marston's role in the conspiracy comprises, among other things, communicating with Day, using Day's materials in Do We Know Them podcast episodes, publicly crediting Day as a source, republishing and amplifying Day's allegations regarding Plaintiffs, publicly mocking and disparaging Plaintiff Braun and Braun Law, and publishing the false statement that Plaintiff Braun was "actively committing perjury."

206. Carter's role in the conspiracy included initiating and amplifying false accusations made by Defendants Day and Marston against Plaintiffs, coordinating publication timing and amplification of videos meant to destroy Plaintiffs, sending materials to third parties, and soliciting additional amplification by other creators.

207. Grayson's role in the conspiracy included creating or participating in private group communications with Day and Carter, amplifying content about Plaintiffs on Reddit and other social media platforms, public posts and legal materials, discussing reports against Plaintiff Braun, and coordinating responses to Plaintiffs' legal actions.

208. Runkle's role in the conspiracy included publishing and promoting about 160 YouTube videos and hundreds of X/Twitter content denigrating Plaintiffs (much of which is now deleted) starting in December 2023, and continuing through today, including content using AI-generated images that portrayed Plaintiff Braun as a zombie, demon, demonic-looking clown, or

43

EXHIBIT B

other grotesque figure, engaging with Defendants' content by commenting on it and sharing it, and promoting the "Girlies vs. Janet" GoFundMe associated with Day and the defense of this litigation.

209. On or about November 29, 2023, Marston contacted Day after viewing Day's posts concerning Plaintiff Braun and stated that she had "SO MANY QUESTIONS." Day responded positively, thereby beginning direct communications between Day and Marston about Plaintiffs before Marston's podcast episodes concerning Plaintiffs.

210. On or about December 2, 2023, Marston and her co-host publicly credited Day as a source for their podcast content about Plaintiffs, stating: "HUGE SHOUTOUT TO THE LOVELY BEKAH DAY FOR PROVIDING US WITH THE STUFF WE NEEDED TO NAVIGATE THRU JANET'S BS!" Marston and her co-host further directed their audience to Day's TikTok account for "more information and detailed up to date coverage."

211. Marston's public credit to Day was not incidental. It shows that Day supplied Marston with information, materials, and direction for the podcast content concerning Plaintiffs, and that Marston knowingly used Day's materials to publish and amplify the same defamatory and disparaging narrative.

212. On or about November 30, 2023, Grayson created a private Instagram group chat with Day and Carter. The group chat began with Grayson stating: "I've taken the liberty of creating a group chat so I can check in on how we're all spiraling lololol."

213. The private group chat became a coordination channel for the common scheme. Day, Carter, and Grayson used it to exchange information about Plaintiffs, discuss their contacts and communications with Plaintiff Braun's clients, plan coordinated content releases that will reach the most people, particularly around the holidays, plain their ARDC complaints, and plain their amplification of third party content concerning Plaintiffs.

44

EXHIBIT B

214.    On December 1, 2023, Carter told the group: "And you can also throw in the fact I'm being very clear in my message, and your reporting and how you deliver that information is your own." This statement reflects Carter's role as a source and strategist while Day prepared and delivered public content concerning Plaintiffs.

215.    On December 2, 2023, after Grayson asked Carter whether he could tell people he had heard certain calls, Carter responded: "I don't think there is anything wrong with it since Bekah has confirmed she heard them (which it's been clear that I'm one of Bekah's sources and she has spoken to me, nothing illegal about that lol) but it might be wise to hold off? Idk they're gonna be spinning that this was all a conspiracy and you were the ringleader after all. You've seen the email stating we had some secret relationship."

216.    Carter's December 2, 2023, message shows that Carter understood she was serving as a source for Day's publications, that the participants were coordinating what to say publicly, and that the participants understood their conduct could be characterized as conspiratorial.

217.    On December 2, 2023, Day asked Carter about timing for public release of materials, stating: "Do you think you'll release sometime next week? I had someone ask when they were coming out! If you just have a rough idea?"

218.    On December 3, 2023, Day wrote in the group chat: "I think you're exactly right, and I absolutely cannot wait to see alllll those blue check marks truly show their asses when they hear what their little friend Lauren said to the police. Not to mention, their ringleader Jeanette. The conspiracy thing is so funny to me. We are all from different corners of the internet. It doesn't even make logical sense that we would have just randomly found each other and decided to go after a blonde girl from Florida who thinks she's Wednesday Adams? Lmao?!! Like PLEASE."

45

EXHIBIT B

219.    In the same exchange, Day offered to provide supporting materials for Carter's public content, stating: "Kitti if you need any receipts of dates of my first communications with anyone for your receipt video, let me know!"

220.    Day then described the timing of her communications with Carter and Grayson, stating: "When I posted my video that's when Jamie and I became mutuals, and yours was just a day after or so! And Jamie and I didn't even message until after you video came out. People were tagging me in your video and that's how I found you and then you messaged me shortly after to give me the heads up about Jeanette."

221.    On December 3, 2023, Day further stated: "Like we can start conspiring asap," followed by, "I mean they're manifesting it for us at this point."

222.    On December 4, 2023, in a separate direct-message exchange with Kodye Elyse Byrne, Byrne told Day: "Literally couldn't do it without you! Thank you for bringing this all to light!!" and then stated: "When I file everything, it will be public. So get ready to report on that lol."

223.    Day responded approvingly to Byrne's plan, writing: "OH MY GOSH!!! Yes!!!! I knew that would come in handy!!!!!" and "I'm so proud of you!! You're literally Mrs Incredible keeping the internet safe Kodye."

224.    On December 5, 2023, Day sent or referenced "iardc.org" in the group chat.

225.    On December 5, 2023, Carter asked Day: "Have you sent this message to the other two girls? Cristin and Erika?"

226.    Carter then stated: "Yep I'll send to them! Erika might be the one who already sent a complaint she was on it," and later, "Sent to Christin!"

46

EXHIBIT B

227. Day then stated: "So glad I acted on that adhd impulse to just sit down until I figured out the exact direct resource we needed to contact about Jeanette! I was determined lmao!"

228. Carter then wrote: "And Erika's messages she sent me that same link actually so I'm pretty sure she did complain then," and later: "I also told Anna and Tori about the link and to submit their complaints."

229. These December 5, 2023 communications show that Day and Carter were not merely commenting independently about Plaintiffs. They were identifying the disciplinary authority for Plaintiff Braun, distributing that contact information to others, including cyberstalkers and harassers of Plaintiffs' client Kaitlynn Dempsey, confirming who had complained, and encouraging additional complaints.

230. Ms. Dempsey had an active Order of Protection from the Davidson County Court in Nashville, Tennessee against Erika Fisk at that time that also protected her 6 year old daughter.

231. Upon information and belief, Christin Williams was acting as Ms. Fisk's mouthpiece at that time.

232. Also on December 5, 2023, Day told Byrne: "I hope they feel the pressure because we have 6-7 reports going in TODAY!"

233. On December 5, 2023, Carter asked Day to "text out that email." Day then provided the TikTok reporting link and the email address "communitymanager@tiktok.com"

234. Carter responded: "Okay! I'll send them in."

235. On December 7, 2023, Carter coordinated the timing of her next publication, writing: "Well I'm getting my hair done now- so let's officially call it as posting tomorrow," and "Once my hair is done I'll post some mini teaser on my story."

47

EXHIBIT B

236. On December 8, 2023, Day amplified that teaser by writing: "YAAAASSS!!! Perfect teaser!!! I shared to my story!!"

237. On December 8, 2023, after Grayson reported that "[p]eople are talking about your calls over on Reddit and linking to your YouTube," Day replied: "Noticing this too!!" and Carter stated: "spreading it like a plague."

238. Carter then proposed further public amplification: "Kinda wanna leave a comment like 'make sure to come back for all the tea and Jeanette's call' #supportsmallbusiness #thatbusinessbeingmyantagonism."

239. On December 9, 2023, Grayson wrote in the group chat: "I just started a poll in ewlauren on Reddit bc I give two shits lol." Carter replied: "LMAO my main got blocked but not my backup."

240. On December 11, 2023, Carter expressly solicited amplification by additional creators, writing: "I'd repost as well 100% and I'll look into making one. Jessi and Lily, Kodye, any of them would be great if they also made something directly."

241. In the same exchange, Carter asked Day for TikTok contact information, and Day supplied "legal@tiktok.com and "communitymanager@tiktok.com."

242. On December 11, 2023, Carter then confirmed: "Alright- sent in the same things I sent to the IL bar."

243. On December 11, 2023, after coordinating complaints and platform contacts with Carter and others, Day publicly posted that she "Just got confirmation from the Illinois Attorney Registration & Disciplinary Commission thay [sic] they have received multiple CREDIBLE complaints about Jeanette Braun and they have assigned multiple attorneys to investigating [sic] this matter."

EXHIBIT B

244. Day's December 11, 2023 ARDC statement was false. The ARDC did not tell Day that it received "multiple CREDIBLE complaints" against Plaintiff Braun, and the ARDC did not tell Day that "multiple attorneys" had been assigned to investigate Plaintiff Braun.

245. Day's December 11, 2023 statement was not an isolated misstatement. It was the foreseeable product of the coordinated campaign reflected in the December 5 through December 11 communications, in which Day and Carter identified the ARDC as the "exact direct resource," distributed the ARDC link to others, confirmed multiple complaints, discussed "6-7 reports going in TODAY," and then publicized the existence of supposed "credible" complaints as if they were independent proof of misconduct by Plaintiff Braun.

246. On or about December 10, 2023, Marston published a public post accusing Plaintiff Braun of "actively committing perjury." Marston's statement was false and was made in the course of the same coordinated campaign to portray Plaintiff Braun and Braun Law as unethical, criminal, and professionally unfit.

247. Marston's "actively committing perjury" statement was made after Marston had communicated with Day, relied on Day's materials, publicly credited Day as a source, and published podcast content concerning Plaintiffs using Day's information.

248. Marston's statement was an overt act in furtherance of the conspiracy because it  amplified the same false narrative that Plaintiffs were abusing legal process, acting unethically, and committing misconduct in the course of Plaintiff Braun's legal representation of clients.

**Formatted:** Indent: Left: 0", First line: 0.5"

249. On December 12 through December 15, 2023, Marston and her co-host Jessica Vazquez exchanged messages planning to denigrate Plaintiffs copyright takedown requests, the Copyright Claims Board proceeding, counter-notice strategy, opt-out strategy, platform reuploads, as future podcast content.

EXHIBIT B

250. During those exchanges, Marston and Vazquez disparaged the legal documents and Plaintiffs, including statements such as "the idea she thinks she was about to get them to hold all of our money is actually insane," "garnishing our wages lmao," and "Janet rn."

251. Marston and Vazquez also planned podcast and TikTok content using the "Janet" label, including content calling Plaintiff Braun "the craziest bitch on this app" and stating, "Let's call her… Janet."

252. In the same set of communications, Marston and Vazquez referenced Day directly, including the question, "What did bekah say?" That reference further shows Marston's continued reliance on Day's information and participation in the shared narrative concerning Plaintiffs.

253. On information and belief, Day also posted multiple TikToks promoting videos by co-conspirator Ian Runkle concerning Plaintiffs and directed her audience to Runkle's videos denigrating Plaintiffs.

254. On information and belief Marston also posted multiple X/Twitter comments promoting videos by co-conspirator Ian Runkle concerning Plaintiffs and directed her audience to Runkle's videos denigrating Plaintiffs.

255. Runkle's content denigrated Plaintiff Braun and used AI-generated imagery that portrayed Plaintiff Braun as a zombie, demon, demonic-looking clown, and other grotesque or dehumanizing figures.

256. Runkle promoted the "Girlies vs. Janet" GoFundMe on his YouTube and X/Twitter accounts. The GoFundMe was organized to fund the Defendants' defense against Plaintiffs and the updates they post continue the cancel culture campaign against Plaintiffs.

257. Mr. Runkle has communicated with individuals associated with Plaintiffs through his Facebook profile. Plaintiffs note that Mr. Runkle maintains a publicly accessible Facebook

50

EXHIBIT B

profile, located at https://www.facebook.com/ian.runkle, which includes a banner image depicting Mr. Runkle aiming a long rifle while leaning on a hay bale and a profile image in which his face is painted in a skull-like manner, with white coloring of his skin and black areas around the eyes and mouth.



258.    These images are not ones a reasonable person would expect to see when contacted by a "member of the press," as Runkle purports to be.

259.    Day's promotion of Runkle's content and Runkle's promotion of the GoFundMe were overt acts in furtherance of the conspiracy because they expanded the audience for the false and disparaging narrative, drove public hostility toward Plaintiffs, and helped fund the continued campaign.

51

EXHIBIT B

260. Day also publicly admitted on Reddit to having "fully debrief[ed]" Plaintiff Braun's former client Alyssa DeFord p/k/a Bunnie XO with "receipts" concerning Plaintiffs and Carter and to giving a "heads up" regarding 911 calls before those calls were publicly released.

261. Plaintiffs did not call 911 to place the wellness check request against Miss Carter.

**Formatted:** Indent: Left: 0", First line: 0.5"

262. Day's communications with Bunnie XO were overt acts in furtherance of the conspiracy because they targeted one of Plaintiff Braun's then-current client, supplied that client with disparaging information about Plaintiff Braun, and foreseeably interfered with Plaintiff Braun's existing and prospective attorney-client relationships.

263. The conspiracy was not limited to online opinion or lawful criticism. The conspiracy included the publication and amplification of verifiably false statements of fact, including the ARDC statement, the "actively committing perjury" statement, statements that Plaintiff Braun filed "false copyright strikes," and statements portraying Plaintiff Braun and Braun Law as unethical, abusive, criminal, and professionally unfit.

**Formatted:** Indent: Left: 0", First line: 0.5"

264. Each Defendant understood the general objectives of the conspiracy: to damage Plaintiffs' reputations; to portray Plaintiff Braun and Braun Law as unethical, criminal, and abusive; to induce public backlash against Plaintiffs; to cause third parties to file ARDC complaints and platform reports; to pressure clients to stop associating with Plaintiffs; and to monetize the controversy through TikTok, YouTube, podcasts, GoFundMe, and other platforms.

265. Each Defendant knowingly and voluntarily accepted those objectives and performed acts in furtherance of them.

266. The overt acts committed in furtherance of the conspiracy include, without limitation: Day's November and December 2023 videos and stories accusing Plaintiff Braun and Braun Law of false copyright strikes and unethical conduct; Day's December 11, 2023 ARDC

52

EXHIBIT B

statement; the Do We Know Them podcast episodes using and crediting Day's materials; Marston's public accusation that Plaintiff Braun was "actively committing perjury"; the coordinated sharing of source materials; the coordinated timing of posts; the coordinated encouragement of ARDC complaints; the coordinated provision of TikTok reporting information; the amplification of Runkle's videos; the promotion of the "Girlies vs. Janet" GoFundMe; and the public encouragement of additional creator coverage.

267. Paige Christie, Chelsea Dean aka CC Suarez, Nick Snider, Dustin Dailey, and Michael Marsille, Esq. a/k/a "Madcatster" are YouTube and social-media creators who amplified Defendants Day's and Marston's false and disparaging narrative concerning Plaintiffs. They are not named as defendants in this Count, but are identified as non-party co-conspirators and/or amplifiers whose conduct shows the scope, foreseeability, and reputational harm caused by the conspiracy.

268. During the same time period, these creators published or promoted content concerning Plaintiffs that repeated or amplified the same narrative that Plaintiff Braun was a abused legal process and/or engaged in unethical conduct.

269. Their amplification increased the audience for Defendants' false statements, reinforced the appearance that the allegations had been independently verified, and foreseeably caused Plaintiffs additional reputational harm, emotional distress, and reputation-repair costs.

270. The acts of Carter, Grayson, Runkle, Vazquez, Byrne, Paige Christie, Chelsea Dean aka CC Suarez, Nick Snider, Dustin Daily, Michael Marsille aka Madcatster and other co-conspirators are alleged as acts in furtherance of the conspiracy joined by Day and Marston. Plaintiffs do not allege that every co-conspirator must be joined as a defendant for complete relief to be awarded against Day and Marston.

53

**EXHIBIT B**

271. Because Day and Marston knowingly joined and participated in the conspiracy, each is jointly and severally liable for the foreseeable damages proximately caused by the tortious acts committed in furtherance of the conspiracy.

272. As a direct and proximate result of the conspiracy and the overt acts committed in furtherance of it, Plaintiffs suffered substantial injury, including reputational harm, costs incurred and to be incurred to repair and rehabilitate Plaintiffs' reputations, reputational mitigation expenses, emotional distress, anxiety, mental anguish, and other non-economic harm.

273. Defendants acted willfully, wantonly, maliciously, and with reckless disregard for Plaintiffs' rights, reputations, and business relationships. Defendants' conduct was undertaken for personal, commercial, reputational, and financial gain, including increased podcast views, TikTok engagement, YouTube engagement, social-media growth, and GoFundMe contributions.

216.274. Plaintiffs are entitled to compensatory damages, consequential damages, presumed damages where available, punitive damages, costs, and such other relief as the Court deems just and proper.

**WHEREFORE,** Plaintiff respectfully requests the Court to enter judgment in their favor and against the Defendants, each of them jointly and severally, as follows:

(a) (a) Awarding Plaintiff damages in amounts pertaining to each to be determined at trial, but not less than $75,000, compensatory damages for reputational repair and mitigation costs, emotional-distress damages where recoverable, presumed damages where available, punitive damages, costs, and such other relief as the Court deems just and proper;including general, special, consequential, actual, and punitive damages;

(b) Awarding an accounting to Plaintiff for the gains and profits of Defendants arising from the unlawful conduct;

(c) Issuing an order requiring Defendant Krista Carter to retract, remove, and repudiate in full all videos and disparaging statements made regarding Plaintiff Lauren Propson;

54

**EXHIBIT B**

(db) Issuing an order requiring Defendants Rebekah Day and Lily Marston to retract, remove, and repudiate in full all defamatory and disparaging statements made regarding Plaintiff Jeanette Braun and Plaintiff Braun IP Law, LLC;

(ce) Awarding Plaintiff's attorneys' fees and costs; and

(df) Granting Plaintiff such other and further relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Benjamin C.R. Lockyer*

Benjamin C.R. Lockyer
Lockyer Law LLC
6515 W. Archer Ave.
Chicago, Illinois 60638
ben@lockyerlaw.com
(773) 340-0011

*Attorney for Plaintiffs*

May 11, 2026                    s/Jeanette M. Braun
                               Attorney for Plaintiffs

                               Jeanette M. Braun [pro hac vice]
                               Braun IP Law, LLC
                               1600 W. Lake Street, Suite 103B
                               Addison, IL 60101
                               (312) 373-0330
                               docket@brauniplaw.com

                               *Attorneys for Plaintiffs*

55

EXHIBIT B

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the foregoing document was filed and served on all counsel of record noted below via the CM/ECF system of the United States District Court of the Northern District of Illinois.

Amy M. Doig
Cozen O'Connor
123 N. Wacker Dr., Suite 1800
Chicago, Illinois 60606
(312) 474-7900
adoig@cozen.com

Brandon J. Witkow
Cory A. Baskin
witkow | baskin
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
(818) 296-9508
bw@witkowlaw.com
cb@witkowlaw.com


Dated: May 11, 2026                          /s/ Jeanette M. Braun

56

**EXHIBIT B**